IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IGT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-282 (KAJ) |
| | ) | |
| BALLY GAMING INTERNATIONAL, | ) | |
| INC., BALLY TECHNOLOGIES, INC., | ) | |
| and BALLY GAMING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**BALLY'S REQUEST FOR JUDICIAL NOTICE IN
OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS
BALLY'S COUNTERCLAIM COUNTS X, XI AND XII**

Pursuant to Federal Rule of Evidence 201, Defendants Bally Gaming International, Inc., Bally Technologies, Inc. and Bally Gaming, Inc. (collectively, "Bally") hereby request that the Court take judicial notice of the following:

1.    IGT's Motion To Strike Portions Of Answer Pursuant To Fed. R. Civ. P. 12(f), And Motion To Dismiss Counterclaim Counts IX Through XIV Pursuant To Fed. R. Civ. P. 12(b)(6); Memorandum Of Points And Authorities In Support Thereof, dated February 25, 2005, Case No. 2:04-1676-RCJ-RJJ (D. Nev.).  A true and correct copy is attached hereto as Exhibit 1.

2.    Order, dated January 10, 2006, Case No. 2:04-1676-RCJ-RJJ (D. Nev.).  A true and correct copy is attached hereto as Exhibit 2.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs Louden*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
klouden@mnat.com
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
 Attorneys for defendants

OF COUNSEL:

Charles K. Verhoeven
Amy H. Candido
Quinn Emanuel Urquhart Oliver & Hedges, LLP
50 California Street
San Francisco, CA  94111
(415) 875-6600

Edward J. DeFranco
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue
New York, NY  10010
(212) 849-7000

August 18, 2006

533394

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on August 18, 2006 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> William J. Wade
> Richards, Layton & Finger

and that I also caused copies to be served upon the following in the manner indicated:

### BY HAND

William J. Wade
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19801

### BY FEDERAL EXPRESS

David P. Enzminger
O'Melveny & Myers LLP
610 Newport Center Drive
Newport Beach, CA  92660


*/s/ Karen Jacobs Louden*

_____
Karen Jacobs Louden
klouden@mnat.com

# Exhibit 1

# ORIGINAL

1 | STEVE L. MORRIS (Nevada Bar No. 1543)
JAMES B. FAIRBANKS (Nevada Bar No. 7330)
2 | MORRIS PICKERING & PETERSON
900 Bank of America Plaza
3 | 300 S. Fourth Street
Las Vegas, Nevada 89101
4 | Telephone: (702) 474-9400
Facsimile: (702) 474-9422
5
MARK A. SAMUELS
6 | DAVID B. MURPHY
BRETT J. WILLIAMSON
7 | NATHANIEL L. DILGER
O'MELVENY & MYERS LLP
8 | 610 Newport Center Drive, 17th Floor
Newport Beach, California 92660-6429
9 | Telephone: (949) 760-9600
Facsimile: (949) 823-6994
10
Attorneys for Plaintiff and Counterclaim Defendant
11 | IGT

12

13

14 | **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
15

16 | IGT, a Nevada corporation,          Case No. CV-S-04-1676-RCJ-(RJJ)

17 |        Plaintiff,

18 |    v.                               **IGT'S MOTION TO STRIKE**
**PORTIONS OF ANSWER PURSUANT**
19 | ALLIANCE GAMING CORPORATION, a    **TO FED. R. CIV. P. 12(f), AND**
Nevada corporation; BALLY GAMING    **MOTION TO DISMISS**
20 | INTERNATIONAL, INC., a Delaware    **COUNTERCLAIM COUNTS IX**
corporation; and BALLY GAMING, INC., a **THROUGH XIV PURSUANT TO FED.**
21 | Nevada corporation d/b/a BALLY GAMING & **R. CIV. P. 12(b)(6); MEMORANDUM**
SYSTEMS,                            **OF POINTS AND AUTHORITIES IN**
22 |        Defendants.                 **SUPPORT THEREOF**

23

24 | AND RELATED CROSS-ACTION.

25

26

27

28

28/29

ORIGINAL

# TABLE OF CONTENTS

Page

MOTION ............................................................................................................. 4

MEMORANDUM OF POINTS AND AUTHORITIES .................................... 5

I.   INTRODUCTION ...................................................................................... 5

II.  IGT'S MOTION TO STRIKE .................................................................. 5

    A.   The Court Should Strike Defendants' Inadequately Alleged Affirmative Defenses ................................................................................................. 6

        1.   Defendants have alleged no facts supporting their "laches" and "estoppel" affirmative defenses and counterclaims ........................ 6

        2.   The Court should strike defendants' sixth affirmative defense ......... 7

        3.   Defendants' seventh through fifteenth affirmative defenses should also be stricken ......................................................................... 7

    B.   The Court Should Strike Counterclaim Allegations That Have No Factual Basis ........................................................................................... 9

    C.   The Court Should Strike All Counterclaim Allegations Regarding Constitutionally Protected Petitioning Activity ..................................... 9

        1.   The submission of prior art to the PTO is neither inequitable conduct nor can it support an antitrust claim ............................. 11

        2.   As a matter of law, IGT's defense of the 2002 declaratory judgment action does not and cannot support an antitrust claim ............... 13

        3.   The Court should strike defendants' nonspecific allegations that IGT wrongfully acquired and/or enforced its patents ................ 15

        4.   The statements made in IGT's Complaint and press release are protected under Noerr-Pennington and therefore do not violate the antitrust laws. .................................................................... 17

III. IGT'S MOTION TO DISMISS ............................................................. 18

    A.   Defendants Fail to State a Claim Under Nevada's Unfair Trade Practices Act ...................................................................................................... 19

    B.   The Court Should Dismiss Defendants' Lanham Act Counterclaim ... 21

        1.   The few statements of fact in IGT's press release are literally true and thus, as a matter of law, were not made with the requisite "bad faith." ....................................................................................... 22

        2.   Noerr-Pennington precludes defendants' Lanham Act claim ....... 25

        3.   Defendants likewise cannot rely on the woefully inadequate allegation that "[u]pon information and belief, IGT has also made other false statements." ................................................................ 25

    C.   The Court Should Also Dismiss Defendants' Intentional Interference Counterclaim ........................................................................................ 26

1            1.     Because IGT's press release was not made in bad faith, defendants'
intentional interference counterclaim is preempted and should be
2                 dismissed ................................................................................................ 27

3            2.     Defendants' intentional interference counterclaim is barred by
Noerr-Pennington and should be dismissed for this additional
4                 reason ...................................................................................................... 27

5            3.     Additionally, defendants do not allege with sufficient particularity
the "prospective relationships" with which IGT supposedly
6                 interfered ................................................................................................ 28

         D.      Defendants' Walker Process "Claim" Is Duplicative of Its Sherman Act
7            Section 2 Claims and Should Be Dismissed ........................................... 29

8   IV.     CONCLUSION.................................................................................................. 29

1

## MOTION

2

3        For the reasons set forth in the attached Memorandum of Points and Authorities,

4   incorporated herein by reference, plaintiff IGT hereby moves (a) to strike the third, fourth, sixth,

5   seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and fifteenth affirmative

6   defenses in defendants' Answer, paragraphs 15-18, 20-30, 55-61, 81, 88, 95, 102 and 106 of

7   defendants' Counterclaims, and designated portions of paragraphs 67 and 74 of defendants'

8   Counterclaims; and (b) to dismiss with prejudice Counts IX, X, XI, XII, XIII and XIV of

9   defendants' Counterclaims.

10

11        Dated: February 25, 2005                    MORRIS PICKERING & PETERSON

12

13                                                    By: _____

14                                                       Steve L. Morris
                                                         MORRIS PICKERING & PETERSON
15                                                       900 Bank of America Plaza
                                                         300 S. Fourth Street
16                                                       Las Vegas, Nevada 89101
                                                         Telephone: (702) 474-9400
17                                                       Facsimile: (702) 474-9422

18                                                    Attorneys for IGT

19   OF COUNSEL:

20   MARK A. SAMUELS
     DAVID B. MURPHY
21   BRETT J. WILLIAMSON
     NATHANIEL L. DILGER
22   O'MELVENY & MYERS LLP
     610 Newport Center Drive, 17th Floor
23   Newport Beach, California 92660-6429
     Telephone:    (949) 760-9600
24   Facsimile:    (949) 823-6994

25

26

27

28

                                                4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Introduction.

This is a patent infringement action by IGT against defendants Alliance Gaming Corporation, Bally Gaming International, Inc. and Bally Gaming, Inc., affiliated companies that – like IGT – make and sell gaming machines and systems. IGT's Complaint is a straightforward, eight page pleading with six claims for relief, each alleging infringement by defendants of a different patent owned by IGT. Defendants did not challenge the adequacy of the Complaint in their responsive pleading.

Defendants did, however, file an elaborate, 35 page Answer, Affirmative Defenses, and Counterclaims pleading (the "Answer"), containing 15 separate affirmative defenses and 137 paragraphs of counterclaim allegations in support of 14 counterclaim Counts. Some portions of the Answer – including the first, second, and fifth affirmative defenses, the counterclaims for declaratory judgments involving the IGT patents-in-suit (Counts I through VI), and the counterclaims for alleged violation of Section 2 of the Sherman Act (Counts VII and VIII) – are pled adequately enough that IGT does not challenge them at this stage. Much of the Answer, however, contains either impermissibly vague conclusions or irrelevant matter that, even if assumed true, does not support any legally recognized claim or defense. IGT therefore makes this consolidated motion pursuant to Fed. R. Civ. P. 12(g) to streamline the case by ensuring that the pleadings reflect only those claims and defenses properly at issue.

## II.   IGT's Motion to Strike.

Rule 12(f) provides that a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." As this Circuit has noted, a motion to strike is entirely appropriate "for the purpose of streamlining the ultimate resolution of the action and focusing the jury's attention on the real issues in the case." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993) *rev'd on other grounds*, 510 U.S. 517 (1994). Although viewed with disfavor when interposed merely for the purpose of delay, motions to strike are entirely appropriate to simplify unnecessarily complex pleadings. *Id.*

Here, defendants' Answer cries out for the streamlining Rule 12(f) was designed to accomplish, since it contains numerous inadequately pled affirmative defenses as well as many allegations that have no bearing on any valid claim or defense in this case. Because the only apparent purpose of these affirmative defenses and allegations is to "unnecessarily clutter" this litigation, see *Heller Financial, Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989), the Court should grant IGT's motion to strike for the reasons set forth below.

### A. The Court Should Strike Defendants' Inadequately Alleged Affirmative Defenses.

Defendants allege no facts that, if true, would support defendants' third, fourth, and seventh through fifteenth affirmative defenses, mandating that these defenses be stricken. *Heller Financial*, 883 F.2d at 1295 (court may properly strike affirmative defenses that are "nothing but bare bones conclusory allegations"). And because IGT plainly has stated a claim for patent infringement, the sixth affirmative defense, failure to state a claim, is likewise properly stricken.

#### 1. Defendants have alleged no facts supporting their "laches" and "estoppel" affirmative defenses and counterclaims.

The third affirmative defense asserts that every patent at issue (with the exception of the '646 patent) "is unenforceable, in whole or in part, against [defendants] under the doctrine of laches." Answer at 5. Completely lacking from the Answer, however, are any alleged facts that, if true, would support a finding of laches. Indeed, the sentence quoted above is the only allegation made by defendants regarding this defense. Such a conclusory statement does not satisfy even the liberal notice pleading requirements set forth in Fed. R. Civ. P. 8, and therefore should be stricken. *Raychem Corp. v. PSI Telecom., Inc.*, No. C-93-20920 RPA, 1995 U.S. Dist. LEXIS 22325, at *12 (N.D. Cal. Mar. 6, 1995) (striking laches affirmative defense: "Although PSI's opposition to [Raychem's motion to strike] provides specific dates demonstrating Raychem's purported delay in bringing suit, there are no facts stated in PSI's Answer which support a laches defense").

Defendants' fourth affirmative defense asserts that IGT's '646, '932, '573 and '891 patents "are unenforceable, in whole or in part, against [defendants] under the doctrine of

1　estoppel." Answer at 5. This is the ***only*** allegation in defendants' Answer regarding this defense,

2　and thus Rule 8 again mandates that it be stricken. *Qarbon.com Inc. v. eHelp Corp.*, 315 F. Supp.

3　2d 1046, 1049 (N.D. Cal. 2004) ("eHelp alleges, based on information and belief, that Qarbon

4　must be 'barred from recovery in whole or in part' by the doctrines of waiver, estoppel, and

5　unclean hands. eHelp does not specify what the defense is – whether it is asserting a single type

6　of estoppel or several types of estoppel such as prosecution history estoppel, equitable estoppel,

7　or some other type of estoppel. As such, eHelp does not provide fair notice of its affirmative

8　defenses.").

9　**2.** The Court should strike defendants' sixth affirmative defense.

10　　　For their sixth affirmative defense, defendants assert that IGT's "complaint fails to state a

11　claim upon which relief can be granted." Answer at 5. To state a claim for patent infringement,

12　however, IGT need only allege that defendants make, use, offer to sell, or sell the patented

13　invention within the United States, during the term of the patent, and without authority of the

14　patent holder. *See* 35 U.S.C. § 271(a). Here, IGT has pled that it has standing to bring suit on the

15　asserted patents (*see* Complaint ¶¶ 11, 15, 20, 25, 30, 35), and that defendants have infringed and

16　continue to infringe the asserted patents "by making, using, selling, offering to sell, advertising,

17　leasing, offering to lease, and/or marketing certain gaming machines . . .." Complaint ¶¶ 12, 16,

18　21, 26, 31, 36. Of course, at the pleading stage these averments must be taken as true and

19　construed in the light most favorable IGT. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th

20　Cir. 1986). Because IGT has clearly stated every required element for a patent infringement

21　claim, the Court should strike defendants' sixth affirmative defense for failure to state a claim.

22　*See Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 989 F. Supp. 1237, 1249 (N.D.

23　Cal. 1997) ("[g]iven that ACS has alleged the essential elements of patent infringement . . . the

24　Court strikes SciMed's Fourth [Affirmative] Defense of failure to state a claim").

25　**3.** Defendants' seventh through fifteenth affirmative defenses should also be

26　　　stricken.

27　　　Defendants likewise do not provide "fair notice" of the factual bases for their seventh

28　through fifteenth affirmative defenses. As to the seventh (unclean hands), ninth (waiver), and

1   eleventh (IGT's actions) affirmative defenses, defendants fail to plead any factual allegations

2   whatsoever supporting these defenses. For example, although defendants allege that IGT's suit

3   "is barred under the doctrine of unclean hands," the Answer contains nothing beyond this bare

4   invocation of the unclean hands doctrine. Answer at 5. But merely referring to "unclean hands"

5   does not provide IGT sufficient notice of the grounds for this defense. *Qarbon.com*, 315 F. Supp.

6   2d at 1049 (striking affirmative defenses of waiver, estoppel and unclean hands: "Because eHelp

7   simply refers to the doctrines without setting forth the elements of its affirmative defenses, eHelp

8   does not provide 'fair notice' of its defenses"). Defendants' "waiver" defense is similarly

9   deficient, as is its bare assertion that "as a result of [IGT's] actions, [IGT] is not entitled to

10  equitable relief." Answer at 6. Defendants do not allege what conduct by IGT constitutes a

11  waiver of their claims or what actions IGT took that preclude equitable relief here. Defendants'

12  seventh, ninth and eleventh affirmative defenses are thus properly stricken.

13          The eighth, tenth and twelfth affirmative defenses assert that the "acts, omissions,

14  negligence, and/or intentional misconduct" of IGT and/or unnamed third parties supposedly

15  "contributed" to IGT's damages, and further, that IGT failed to "mitigate its damages." Answer

16  at 5-6. Again, however, the answer lacks any allegations describing the alleged "acts, omissions,

17  negligence, and/or intentional misconduct" or how IGT supposedly failed to mitigate its damages.

18  In addition, patent infringement is a "strict liability" offense. *See, e.g., Jurgens v. CBK, Ltd.,* 80

19  F.3d 1566, 1570 n.2 (Fed. Cir. 1996). Accordingly, "a court must award 'damages adequate to

20  compensate for infringement' . . ." because "comparative fault" and "mitigation" are simply not

21  cognizable defenses to a claim for patent infringement. *Id.* For at least these reasons, defendants'

22  eighth, tenth and twelfth affirmative defenses should be stricken.

23          Defendants' thirteenth (ratification/release), fourteenth (license), and fifteenth (res

24  judicata/collateral estoppel) affirmative defenses also fail to give IGT "fair notice" of the grounds

25  for the alleged defense and should therefore be stricken. For example, nowhere do defendants

26  allege facts that, if true, would show that defendants have a license to practice IGT's patented

27  technology. *See* Answer at 6. The "license" defense therefore fails as a matter of law. *Sun*

28  *Microsystems, Inc. v. Dataram Corp.*, No. CIV. 96-20708 SW, 1997 U.S. Dist. LEXIS 4557, at

1  *11 (N.D. Cal. Feb. 4, 1997) (striking "license" defense: "To properly plead a defense of implied

2  or express license, Dataram must assert some factual allegations that demonstrate the existence of

3  a license"). Similarly lacking from the Answer are any alleged facts supporting defendants'

4  assertion that "the claims in the complaint are barred by the doctrines of ratification and release"

5  or that IGT's "claims are barred . . . by the doctrines of res judicata and/or collateral estoppel

6  and/or issue preclusion and/or claim preclusion." Answer at 6. As noted above, "[a] reference to

7  a doctrine, like a reference to statutory provisions, is insufficient notice." *Qarbon.com*, 315 F.

8  Supp. 2d at 1049. Thus, defendants' thirteenth and fifteenth affirmative defenses should also be

9  stricken.

10  **B.      The Court Should Strike Counterclaim Allegations That Have No Factual**

11  **Basis.**

12  Similar to their laches and estoppel affirmative defenses, Counts I through VI of

13  defendants' counterclaims include an allegation that each of the patents at issue is unenforceable

14  due to "laches" and "estoppel."[1]  Answer ¶¶ 67, 74, 81, 88, 95, 102. As with their affirmative

15  defenses, defendants' laches and estoppel counterclaim allegations are unaccompanied by *any*

16  alleged facts that, if true, would entitle defendants to the declaratory relief they seek, *id.*, and thus

17  similarly fail to satisfy the pleading requirements of Rule 8. *Qarbon.com*, 315 F. Supp. 2d at

18  1049; *Raychem*, 1995 U.S. Dist. LEXIS 22325, at *12. Accordingly, IGT moves to strike the

19  entirety of ¶¶ 81, 88, 95, and 102; the words "estoppel and" from ¶ 67, and the words "estoppel,

20  laches, and" from ¶ 74 of defendants' counterclaims.

21  **C.      The Court Should Strike All Counterclaim Allegations Regarding**

22  **Constitutionally Protected Petitioning Activity.**

23  As purported support for their antitrust claims, defendants assert a number of supposedly

24  anti-competitive acts by IGT, alleging that: (i) "the ['646 patent was fraudulently procured to

25  obtain a patent that cited the prior art that IGT knew rendered the '932 patent invalid . . .'"

26  _____

27  [1] The single exception is that counterclaim Count I does not include an allegation for laches against the '646 patent (which issued on the same day IGT brought suit). Answer ¶ 67. In

28  addition, IGT does not move to strike any of the other allegations in Counts I through VI of the counterclaims.

1    (Answer ¶¶ 27, 28, 106(c)); (ii) during a declaratory judgment action brought by Bally, IGT

2    misrepresented its intention to sue defendants for patent infringement (*Id.* ¶¶ 20-27, 29-30); (iii)

3    IGT wrongfully acquired and/or attempted to enforce certain unnamed patents (*Id.* ¶¶ 15-18,

4    106(a); (iv) IGT made supposedly "ill defined" claims of infringement in the Complaint filed in

5    this case (*Id.* ¶¶ 55-59, 106(d)); and (v) IGT issued a supposedly deceptive press release relating

6    to the filing of the instant lawsuit (*Id.* ¶¶ 60-61, 106(e)).  But even assuming (for purposes of this

7    motion only) that defendants' allegations are true, the conduct alleged comprises activity that falls

8    squarely within the constitutional protection of the *Noerr-Pennington* doctrine: "[P]rivate efforts

9    to influence governmental bodies or courts, even for anticompetitive purposes, enjoy an

10   exemption from the antitrust laws grounded in the First Amendment right to petition." *Boulware

11   v. Nevada*, 960 F.2d 793, 797 (9th Cir. 1992).  The *Noerr-Pennington* doctrine "sweeps broadly

12   and is implicated by both state and federal antitrust claims that allege anticompetitive activity in

13   the form of lobbying or advocacy before any branch of either federal or state government."

14   *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1059 (9th Cir. 1998); *MedImmune, Inc. v.

15   Genentech, Inc.*, No. CV 03-2567 MRP, 2003 U.S. Dist. LEXIS 23443, at *25 (C.D. Cal. Dec.

16   22, 2003) ("[A]ttempts to obtain the issuance of a patent from the PTO are ordinarily covered by

17   *Noerr-Pennington*"); *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y.

18   1997) (acts incidental to protected litigation are likewise entitled to *Noerr-Pennington* immunity);

19   *Aircapital Cablevision, Inc. v. Starlink Commun. Group, Inc.*, 634 F. Supp. 316, 326 (D. Kan.

20   1986) (*Noerr-Pennington* immunity extends to press releases and other publicity regarding

21   protected lawsuit).

22        To strip IGT of the presumptive application of *Noerr-Pennington* immunity, defendants

23   must allege facts that, if true, would demonstrate IGT was "using the petitioning process – as

24   opposed to the outcome of that process – as an anticompetitive weapon," *i.e.*, that IGT's

25   petitioning activity was a "sham." *Kottle,* 146 F.3d at 1060 ("sham" exception to *Noerr-

26   Pennington* requires showing that alleged conduct was both "objectively baseless" and concealed

27   an attempt to interfere with competitor's business).  Importantly, the Ninth Circuit applies a

28   heightened pleading requirement to allegations that the "sham" exception applies to strip an

1  antitrust defendant of its *Noerr-Pennington* immunity. *Id.* at 1063 ("when a plaintiff seeks

2  damages for conduct which is *prima facie* protected by the First Amendment, the danger that the

3  mere pendency of the action will chill the exercise of First Amendment rights requires more

4  specific allegations than would otherwise be required. In such cases, we employ a heightened

5  pleading standard") (citations and internal quotes omitted).

6       As explained below, the supposedly "anti-competitive" conduct alleged by defendants

7  merely describes petitioning activity presumptively immunized from antitrust liability under

8  *Noerr-Pennington*. Because defendants have alleged no facts demonstrating that these alleged

9  activities were both "objectively baseless" and concealed an attempt to interfere with defendants'

10 business, this alleged conduct is immaterial to any valid claim or defense and should be stricken

11 "for the purpose of streamlining the ultimate resolution of the action and focusing the jury's

12 attention on the real issues in the case." *Fantasy*, 984 F.2d at 1528; *see also Heller Financial*,

13 883 F.2d at 1294 ("[w]here . . . motions to strike remove unnecessary clutter from the case, they

14 serve to expedite, not delay"). But even if the conduct alleged was not presumptively protected

15 petitioning activity, defendants' remarkably vague and generalized allegations of supposedly anti-

16 competitive conduct by IGT do not satisfy the applicable pleading standards and are properly

17 stricken for this additional and independent reason.

18         **1.**    The submission of prior art to the PTO is neither inequitable conduct nor

19                   can it support an antitrust claim.

20      In perhaps the most curious allegation in the entire Answer, defendants contend that "the

21 ['646] patent was fraudulently procured to obtain a patent that cited the prior art that IGT knew

22 rendered the '932 patent invalid and so that IGT could sue [defendants] without fear of a defense

23 or counter-claims concerning such art." Answer ¶ 28. Specifically, defendants allege that during

24 discussions with IGT regarding the '932 patent, defendants "disclosed a significant amount of

25 prior art to the '932 patent." Answer ¶ 21. Defendants then allege that after receiving this prior

26 art, IGT submitted it to the U.S. Patent & Trademark Office ("PTO") as part of IGT's '646 patent

27

28

application,[2] and that by submitting this prior art to the PTO during prosecution of the '646 patent application, IGT committed inequitable conduct and violated both state and federal antitrust law. Answer ¶¶ 28, 106(c).

As an initial matter, these allegations do not satisfy the Rule 9 heightened pleading standards required to plead inequitable conduct and are properly stricken for at least this reason. *See Ferguson Beauregard/Logic Controls v. Mega Systems, LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003) ("inequitable conduct, while a broader concept than fraud, must be pled with particularity"); *Sun Microsystems*, 1997 U.S. Dist. LEXIS 4557, at *12-13 ( "Thus, in pleading inequitable conduct, a party cannot merely rely on vague allegations of fraud and deception but instead, must specify the time, place, and content of any alleged misrepresentations made to the PTO." ) But even if defendants described the alleged conduct with the requisite particularity, merely citing prior art to the PTO is neither inequitable conduct nor an antitrust violation. Instead, this conduct is entirely lawful *Noerr-Pennington* petitioning activity. *See MedImmune*, 2003 U.S. Dist. LEXIS 23443, at *25. Significantly, IGT's alleged conduct does not lose its antitrust immunity even if one motivation for citing this art was so IGT "could sue defendants without fear of a defense or counter-claims concerning such art." Answer ¶ 28. In fact, not only is it entirely lawful for a patent applicant to submit prior art to the PTO during prosecution, patent applicants are *required* pursuant to the "duty of candor" owed the PTO "to disclose to the Office information they are aware of which is material to the examination of the application." 37 C.F.R. § 1.56. Thus, to the extent defendants informed IGT of material, non-cumulative prior art, IGT's

---

[2] Defendants allege the '646 patent application was a "continuation" of the already issued '932 patent. According to the Manual of Patent Examining Procedure ("M.P.E.P."), "[a] continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original becomes abandoned or patented." M.P.E.P. § 201.07. The continuation application must share at least one inventor and the identical disclosure as the original parent application. *Id.*

duty of candor required that IGT submit this prior art to the PTO.[3] Plainly, compliance with

IGT's statutory duty of candor cannot, as a matter of law, comprise inequitable conduct and/or an

antitrust violation. *See MedImmune*, 2003 U.S. Dist. LEXIS 23443, at *25. Because these

allegations are irrelevant to any claim or defense, the Court should strike ¶¶ 27, 28, and 106(c) of

defendants' counterclaims.

> **2.** As a matter of law, IGT's defense of the 2002 declaratory judgment action
> does not and cannot support an antitrust claim.

In 2002, defendants brought an action seeking a declaratory judgment with respect to

IGT's '932 and '573 patents ("2002 DJ Action"). Answer ¶ 24. Defendants contend that in

connection with IGT's successful motion to dismiss the 2002 DJ Action, IGT argued that "it was

not threatening [defendants] with litigation such that a 'reasonable apprehension' . . . of litigation

was present." Answer ¶ 25; *see BP Chemicals Ltd. v. Union Carbide Co.*, 4 F.3d 975, 977 (Fed.

Cir. 1993) (declaratory judgment jurisdiction requires "definite and concrete dispute between

adverse parties, appropriate to immediate and definitive determination of their legal rights"). The

Court agreed with IGT, and dismissed the declaratory judgment complaint for lack of subject

matter jurisdiction. Answer ¶ 26. Defendants assert that IGT's statement that subject matter

jurisdiction was lacking amounts to a "misrepresentation . . . regarding its plan not to enforce the

'932 patent." *Id.* ¶ 106(b). According to Defendants, this conduct was "anti-competitive" and

violated both state and federal antitrust laws. *Id.*

---

[3] Moreover, IGT's entirely lawful conduct during prosecution of the '646 patent does not become
wrongful because IGT maintained the secrecy inherent in all patent proceedings and did not
disclose the pendency of the '646 patent application to its competitors:

> The integrity of the patent system is maintained in part by inventors'
> understanding that their patent applications will remain secret until either the
> patents issue or the applications are otherwise published by the PTO. Breaches of
> this secrecy undermine the integrity of the patent system.

*Eagle Comtronics, Inc., v. Arrow Commun. Labs., Inc.*, 64 U.S.P.Q.2D 1481, 1488 (Fed. Cir.
2002); *see also* 35 U.S.C. § 122 ("[A]pplications for patents shall be kept in confidence by the
Patent and Trademark Office and no information concerning the same given without authority of
the applicant or owner . . . ."); 37 C.F.R. § 1.14 (same).

1  Even assuming the truth of defendants' factual allegations, IGT's alleged conduct of

2  petitioning the Court for dismissal of the 2002 DJ Action is protected under *Noerr-Pennington*

3  and cannot, as a matter of law, form the basis of an antitrust claim.[4] *Kottle* 146 F.3d at 1060.  But

4  in this instance, the Court need ***not*** assume the allegation is true; although defendants assert that

5  IGT "misrepresented" its intentions regarding the '932 patent, defendants themselves admitted, in

6  opposition to IGT's motion to dismiss the 2002 DJ Action, that "no clear and unequivocal

7  statement of non-infringement by [defendants] of any of the patents in suit has ever been made by

8  IGT. Thus, ***the door remains wide open for IGT to file a patent infringement lawsuit against***

9  ***[defendants] if this action is dismissed.***"  IGT's Request for Judicial Notice ("RJN"), **Ex. B**,

10 Defendants' Memo. in Opp. to IGT's Motion to Dismiss, at 16, n.3 (emphasis added).[5]

11  In addition, where the alleged anticompetitive behavior "consists of making intentional

12 misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon,

13 or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Kottle*

14 146 F.3d at 1060.  Here, IGT's statement in the 2002 DJ Action that defendants lacked a

15 reasonable apprehension of imminent suit did not "deprive the litigation of its legitimacy."

16 Indeed, IGT's position in this regard correctly reflected both the facts and the law. *See, e.g., Teva*

17 *Pharma. USA, Inc., v. Pfizer, Inc.*, No. 04-1186, 395 F.3d 1324, 1334  (Fed. Cir. Jan. 21, 2005)

18 (declaratory judgment jurisdiction requires "reasonable apprehension of imminent suit").

19 Defendants have not and cannot allege that IGT promised to never bring suit on the '932 patent,

20 nor was such a promise necessary to obtain dismissal of the deficient 2002 DJ Action. *BP*

21

22 [4] Arguments made in support of IGT's successful motion to dismiss are also protected under
   Nevada's absolute litigation privilege. The litigation privilege is a "long-standing common law
23 rule that communications uttered or published in the courts of judicial proceedings are absolutely
   privileged." *Circus Circus Hotels v. Witherspoon*, 99 Nev. 56, 657 P.2d 101, 104 (1983). This
24 privilege protects communications outside of court as well as those made during actual judicial
   proceedings. *Fink v. Oshins*, 118 Nev. 428, 49 P.3d 640, 644 (2002).  This provides a separate
25 and independent reason defendants' allegations regarding the 2002 DJ Action are properly
   stricken.
26 [5] Defendants are particularly disingenuous when they assert that IGT's "representations" to the
   court in the 2002 DJ Action were made "despite the fact that [IGT] had asserted  in
27 correspondence that Bally's Monte Carlo product was an 'infringing product,'" and that the court
   dismissed the 2002 DJ Action "[b]ased on IGT's statements in its motion," *see* Answer ¶¶ 25-26.
28 The court not only had the very same correspondence before it on the motion to dismiss, but
   specifically cited to it in the order granting the motion. *See* RJN, Ex. D at 3.

14

1  *Chemicals*, 4 F.3d at 980 (defendants' refusal to promise that it would not enforce its patent did

2  not confer declaratory judgment jurisdiction).

3        Because IGT's successful effort to dismiss the 2002 DJ Action falls squarely within

4  *Noerr-Pennington*, it cannot serve as the basis for an antitrust violation. Accordingly, ¶¶ 20-26,

5  29 and 106(b) of defendants' counterclaims have no bearing on any valid claim or defense and

6  should be stricken.

7        **3.**    The Court should strike defendants' nonspecific allegations that IGT

8             wrongfully acquired and/or enforced its patents.

9        Defendants' counterclaims rely heavily on a laundry list of purportedly "anti-competitive"

10  acts by IGT, including: (1) "filing for at least 250 patents for alleged inventions in the field of

11  gaming machines . . . , purchasing or being assigned numerous additional patents, and obtaining

12  exclusive licenses for even further additional patents, even when it knows that many of these

13  purported patents are invalid," and (2) filing patent infringement actions against [defendants] and

14  other competitors in the gaming machine market "based upon the alleged infringement of patents

15  that were fraudulently obtained or that IGT knows are invalid." Answer ¶ 106(a)(i-ii). These

16  remarkably vague allegations, however, fail to satisfy either Rule 9 or even the more relaxed

17  pleading standard of Rule 8, and the alleged conduct does not state an antitrust violation in any

18  event.

19        Turning first to defendants' allegation that IGT has filed for and obtained many patents in

20  the field of gaming machines, this conduct, even if true, simply does not violate the antitrust laws.

21  *In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322, 1324 (Fed. Cir.

22  2000) (affirming holding that "if a patent or copyright is lawfully acquired, the patent or

23  copyright holder's unilateral refusal to sell or license its patented invention or copyrighted

24  expression is not unlawful exclusionary conduct under the antitrust laws."); *SCM Corp. v. Xerox

25  Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981) ("where a patent has been lawfully acquired,

26  subsequent conduct permissible under the patent laws cannot trigger any liability under the

27  antitrust laws"); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp.2d 318, 335 (D.N.J. 1999)

28  ("[t]he mere acquisition of intellectual property rights is, in itself, insufficient to give rise to

1   antitrust liability"). And although defendants allege that IGT's patent acquisitions were

2   "wrongful" because IGT allegedly "knows that many of these purported patents are invalid,"

3   defendants *do not* allege (1) which patents are supposedly invalid, or (2) the basis for the

4   supposed conclusion that the patents are invalid. Plainly, these allegations do not satisfy even the

5   liberal pleading standards of Rule 8. *Advanced Cardiovascular Sys. Inc. v. Sci Med Sys., Inc.,* 40

6   U.S.P.Q.2D 1291, 1294 (N.D. Cal. 1996). In addition, defendants do not even allege that IGT has

7   attempted to enforce these unnamed, supposedly invalid patents. *Silva v. Mamula,* Civ. No. 93-

8   5618, 1994 U.S. Dist. LEXIS 2201, at *6-7 (E.D. Penn. Feb. 24, 1994) ("the mere acquisition of a

9   patent by fraud is insufficient in itself to fulfill the requirements of an action under Section 2.

10  Rather, it is the use of that patent in illegal antitrust behavior that gives rise to liability.").

11          Turning next to defendants' allegation that IGT violated the antitrust laws by filing patent

12  infringement actions "based upon the alleged infringement of patents that were fraudulently

13  obtained or that IGT knows are invalid," this conduct falls squarely within *Noerr-Pennington*

14  immunity unless defendants allege facts, ***with particularity***, demonstrating that IGT's alleged

15  enforcement efforts were merely a "sham," *i.e.,* that the alleged lawsuits (1) were objectively

16  baseless, and (2) concealed an attempt to interfere with defendants' business. *Kottle* 146 F.3d at

17  1060. Defendants fall far short of this standard here -- the Answer does not even identify the

18  patents IGT allegedly attempted to enforce, the circumstances of their alleged enforcement, or the

19  factual basis for the assertion that these unnamed patents were "fraudulently obtained" and/or

20  invalid.[6] *Advanced Cardiovascular,* 40 U.S.P.Q.2D at 1294 ("defendant must provide some

21  factual basis for the allegation that plaintiff knew the patent was invalid or unenforceable when

22  plaintiff filed" the action.). Because the counterclaims lack *any* facts demonstrating that the sham

23  exception applies to strip IGT of antitrust immunity, *Noerr-Pennington* bars defendants'

24  allegation that IGT attempted to enforce certain unnamed and supposedly invalid and/or

25  unenforceable patents. *See Glass Equip. Dev., Inc. v. Besten, Inc.,* 174 F.3d 1337, 1344 (Fed. Cir.

---

26  [6] In addition to the particularized allegations necessary to overcome IGT's *Noerr-Pennington*

27  immunity, the allegation that IGT "fraudulently obtained" patents must also satisfy Fed. R. Civ.
    P. 9 and, at a minimum, "must specify the time, place, and content of any alleged

28  misrepresentations made to the PTO." *Sun Microsystems,* 1997 U.S. Dist. LEXIS 4557, at *12-
    13.

1   1999) (affirming dismissal of antitrust claim where antitrust plaintiff failed to allege that

2   defendant's "actual or threatened infringement suits were sham litigations").

3        For the foregoing reasons, the Court should strike ¶¶ 15-18, and 106(a) of defendants'

4   counterclaims.

5        **4.**     The statements made in IGT's Complaint and press release are protected

6                under *Noerr-Pennington* and therefore do not violate the antitrust laws.

7        IGT asserts in its Complaint that the '573 patent claims are infringed by "certain gaming

8   machines, including but not limited to [defendants'] 'Quartermillion$' linked progressive gaming

9   machines." Complaint ¶ 21. Defendants assert that this allegation is "overbroad" and "ill-

10  defined."[7] Answer ¶ 106(d). But rather than requesting a more definite statement pursuant to

11  Fed. R. Civ. P. 12(e), defendants attempt to characterize IGT's Complaint as anti-competitive

12  conduct allegedly designed "to eliminate [defendants] from the wheel game market." *Id.*

13  Defendants likewise point to an IGT press release announcing the filing of the instant lawsuit as

14  supportive of its federal and state antitrust counterclaims. *Id.* at ¶ 106(e) & Ex. 5.

15       As with virtually all of defendants' antitrust allegations, however, *Noerr-Pennington*

16  immunizes IGT from incurring antitrust liability based on the filing of its Complaint.[8] *Kottle,* 146

17  F.3d at 1060. *Noerr-Pennington* immunity also applies to preclude antitrust liability for acts

18  incident to the filing of a lawsuit, including the issuance of IGT's press release regarding the

19  litigation. *See, e.g., Aircapital,* 634 F. Supp. at 326 (*Noerr-Pennington* immunity extends to press

20  releases publicizing the lawsuit); *Matsushita,* 974 F. Supp. at 359 (acts incidental to protected

21  litigation are likewise entitled to *Noerr-Pennington* immunity). And defendants do not allege *any*

22  facts demonstrating that IGT's allegations with respect to the '573 patent – whether made in its

23  Complaint or in the press release relating to the lawsuit – were a "sham" such that *Noerr-*

24  *Pennington* immunity should not apply.

25

26  _____
    [7] Defendants also contend that IGT's allegations with respect to the '932 and '646 patent are

27  similarly "overbroad" and "ill-defined." Answer ¶ 106(d). Nowhere do defendants describe,
    however, the purported basis for this contention.

28  [8] As discussed at footnote 4, above, the allegations of IGT's complaint are likewise protected by
    Nevada's absolute litigation privilege. *Fink,* 49 P.3d at 644.

1  Furthermore, to sustain a Sherman Act claim based on IGT's purportedly misleading

2  infringement allegations, the Ninth Circuit "insists on a preliminary showing of significant and

3  more-than-temporary harmful effects on competition (and not merely upon a competitor or

4  customer) before these practices can rise to the level of exclusionary conduct." *American*

5  *Professional Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Professional*

6  *Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (citations omitted). In *Harcourt Brace,*

7  the Ninth Circuit rejected plaintiff's Sherman Act theory of liability based on the defendant's

8  allegedly misleading advertising, holding that the plaintiff "must overcome a presumption that the

9  effect on competition . . . was *de minimis*" before a Sherman Act claim could survive based on

10  such conduct. *Id.* at 1152. To overcome this presumption here, defendants must allege facts that,

11  if true, demonstrate IGT's alleged statements were "[1] clearly false, [2] clearly material, [3]

12  clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject

13  matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or

14  other offset by rivals." *Id.* at 1152 (citation omitted). Plainly, a single allegation in a privileged

15  complaint for patent infringement and a single press release do not satisfy this lofty showing.

16  As explained above, the statements made in IGT's Complaint and press release are

17  immunized from antitrust liability and, even if not immune, do not rise to the level of

18  exclusionary conduct actionable under the Sherman Act. Accordingly, the Court should strike ¶¶

19  55-61 and 106(d-e) of defendants' counterclaims.

20  **III.    IGT's Motion to Dismiss.**

21  A court should dismiss a claim under Rule 12(b)(6) where there is either a "lack of

22  cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

23  theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). While the court

24  must accept all well-pleaded facts as true, "conclusory allegations without more are insufficient to

25  defeat a motion to dismiss for failure to state a claim." *McGlinchy v. Shell Chem. Co.*, 845 F.2d

26  802, 810 (9th Cir. 1988). Moreover, the court need not "assume the truth of legal conclusions

27  merely because they are cast in the form of factual allegations." *Western Mining Council v. Watt*,

28  643 F.2d 618, 624 (9th Cir. 1981). Under these standards, the Court should dismiss defendants'

1   Nevada Unfair Trade Practices Act (Counts IX, X and XIII), Lanham Act (Count XI), *Walker*

2   *Process* (Count XII) and intentional interference (Count XIV) counterclaims.

3        **A.**     **Defendants Fail to State a Claim Under Nevada's Unfair Trade Practices**

4             **Act.**

5        Defendants' counterclaims feature a host of allegedly anticompetitive unilateral acts.  But

6   even assuming the truth of those allegations, they are insufficient to state a claim under the

7   Nevada Unfair Trade Practices Act (the "Nevada Act") because there is no allegation that IGT

8   engaged in a contract, combination or conspiracy in restraint of trade.  N.R.S. § 598A.060 *et seq.*,

9   upon which defendants' state law antitrust claims are based, prohibits only multilateral conduct in

10  restraint of trade and has no application to unilateral conduct.  This is evidenced by (1) the plain

11  language of the statute, (2) the legislative history of the statute, and (3) analogy to the laws of

12  other states with similar antitrust statutes.

13       First, the unambiguous language of the Nevada Act prohibits only those acts conducted by

14  multiple actors in concert.  Nev. Rev. Stat. § 598A.060(1).  One has to look no further than the

15  very first line of the statute, which provides that "*[e]very activity enumerated in this subsection*

16  constitutes a contract, combination or conspiracy in restraint of trade." *Id.* (emphasis added).

17       Second, the legislative history of the original statute passed in 1975 also is clear that the

18  Nevada Act was not intended to reach unilateral activity.  When the statute was originally

19  proposed, it closely tracked the federal Sherman Act and contained language prohibiting

20  unilateral monopolization. *See* S. Bill No. 173, 58th Sess. (Nev. Feb. 10, 1975).[9]  The statute,

21  however, was amended to expressly remove all prohibitions against unilateral monopolization.

22  *See* Journal of the Senate (Nev.) at 509-10 (Feb. 18, 1975).  According to Sen. Dodge, who

23  introduced the legislation, these sections were purposefully removed at the recommendation of

24  the Nevada Attorney General. *Id.* at 1027 (May 12, 1975) (statement of Sen. Dodge).  Thus, from

25  the outset, the legislature which passed the Nevada Act never meant for it to reach unilateral

26  activity.

27  

28  [9] This and all other portions of the legislative history of the Nevada Act are attached to the RJN as
    Exs. E through I.

And although sub-subsection (1)(e) of § 598A.060 identifies monopolization as one type of "contract, combination or conspiracy" that violates the Nevada Act, *id.*, the legislative history of the amendment that added sub-subsection (1)(e) also is clear that it was not intended to reach unilateral activity. The primary goal of the amendment was to give the Nevada Attorney General the authority to investigate mergers and acquisitions that avoid federal jurisdiction because they are purely in-state transactions. *See* Mins. of the Mtg. of the Assembly Comm. on Commerce & Labor, 75th Sess. (May 2, 2001) (statement of Timothy Hay, Chief Deputy Att'y Gen) ("The essential provisions of [the amendment] provide explicit statutory authority for the attorney general's office to look at mergers, which lessen competition."). Further, the amendment was made in response to an increased number of mergers and acquisitions taking place within the state and one, in particular, involving oil companies, that escaped federal review because of its local nature. *Id.* (Apr. 2, 2001). Indeed, the only specific type of monopolization cited in sub-section (1)(e) is "combining or conspiring to monopolize trade or commerce." Amending the statute to prohibit unilateral conduct would have done nothing to advance the goals of the legislation.

Third, courts interpreting analogous statutes in other states have held that the prohibition on monopolization is limited to concerted activity. For example, New York's Donnelly Act, like the Nevada Act, contains opening language that prohibits "[e]very contract agreement, arrangement or combination whereby a monopoly" is maintained or established, or whereby competition is restrained, or "[f]or the purpose of establishing or maintaining any such monopoly." N.Y. Gen. Bus. Law § 340 (McKinney 2004). New York courts have consistently interpreted this language to prohibit only multilateral activity. *See, e.g., New York v. Mobil Oil Corp.*, 344 N.E.2d 357, 359-60 (N.Y. 1975) (holding that a "one-sided practice" is outside the scope of the Donnelly Act); *McGraw Elec. Co. v. Lockyer*, 267 A.D. 897, 898, 47 N.Y.S.2d 137 (N.Y. App. Div. 1944) (per curiam) (dismissing defendant's counterclaim for "fail[ing] to allege facts showing that plaintiff's claimed action was pursuant to a combination, agreement or arrangement with others constituting an illegal restraint of trade"); *Van Dussen-Storto Motor Inn, Inc. v. Rochester Tel. Corp.*, 338 N.Y.S.2d 31, 36 (N.Y. Sup. Ct. 1972) ("[i]n order to constitute a violation of the State antitrust law . . . the action claimed to be unlawful must be a combination or

1 arrangement in concert with others"); *Famous Beers, Inc. v. Piel Bros.*, 60 N.Y.S.2d 884, 885

2 (N.Y. Sup. Ct. 1945) (holding that plaintiff must "allege that any of the alleged acts were done

3 pursuant to a contract, agreement, arrangement or combination" in order to state a claim under the

4 Donnelly Act).

5       Similar to the Donnelly Act, California's Cartwright Act prohibits actions "prevent[ing]

6 competition" and "carry[ing] out restrictions in trade or commerce," but only where such a

7 purpose is the result of "a combination of capital, skill or acts by *two or more* persons . . . ." Cal.

8 Bus. & Prof.l Code § 16720(1)(a) & (b) (emphasis added). According to the Ninth Circuit, while

9 "[c]ombinations to monopolize would appear to fall within the general prohibitions of the

10 Cartwright Act . . . [the] statute does not address *unilateral* conduct." *Dimidowich v. Bell &*

11 *Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (holding that a claim "challeng[ing] only unilateral

12 conduct . . . is not cognizable under the Cartwright Act, for it fails to allege any combination.")

13 (citations omitted); *see also G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 266 (1983) (Cartwright

14 Act does not prohibit individual or single-firm monopolization).

15       Because the Nevada Act prohibits only multilateral conduct, defendants' state law

16 antitrust claims (Counts IX, X and XIII) must be dismissed.[10]

17     **B.**    **The Court Should Dismiss Defendants' Lanham Act Counterclaim.**

18       To prevail on their Lanham Act counterclaim (Count XI), defendants must establish that:

19 (1) IGT has made a false or misleading statement of fact concerning its product or another's; (2)

20 the statement actually or tends to deceive a substantial portion of the intended audience; (3) the

21 statement is material in that it will likely influence the deceived consumer's purchasing decisions;

22 (4) the statement was introduced into interstate commerce; and (5) there is some causal link

23 between the challenged statement and harm to the plaintiff. *See Zenith Elec. Corp. v. Exzec. Inc.*,

24 182 F.3d 1340, 1348 (Fed. Cir. 1999). Statements of opinion, however, are not actionable under

25

26

___

27 [10] Counts IX and X allege monopolization and attempted monopolization, respectively. Count XIII, however, purports to be a separate claim for relief under N.R.S. § 598A.210 – a provision that merely states that a private right of action for damages and an injunction exists for violations
28 of N.R.S. 598A.060. It is therefore wholly duplicative of Counts IX and X in any event.

1   the Lanham Act. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th

2   Cir. 1999).

3        As explained below, because the facts alleged by defendants, even if true, do not

4   constitute false advertising, the Court should dismiss Count XI of defendants' counterclaims.

5        **1.**    The few statements of fact in IGT's press release are literally true and thus,

6              as a matter of law, were not made with the requisite "bad faith."

7        The principal allegation underlying defendants' Lanham Act claim is that IGT has

8   published "a vague and misleading press release designed to confuse [defendants'] customers into

9   believing that all of [defendants'] products containing bonus game features or technology

10   allowing players to communicate with games and systems infringe IGT's patents." Answer ¶

11   122; Ex. 5.

12        Although marketplace representations of patent infringement may form the basis of a

13   claim under § 43(a) of the Lanham Act, the marketplace representations must have been made in

14   "bad faith," *i.e.*, the claims of infringement were objectively baseless. *Zenith,* 182 F.3d at 1353.

15   In this regard, "a threshold showing of incorrectness or falsity, or disregard for either, is required

16   in order to find bad faith in the communication of information about the existence or pendency of

17   patent rights." *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998).

18   Furthermore, the law "recognizes a presumption that the assertion of a duly granted patent is

19   made in good faith." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 999 (Fed.

20   Cir. 2003).

21        As evidenced by the relevant text below, there is simply nothing false or misleading about

22   the IGT press release challenged by defendants:

23            [IGT] confirmed today that it has filed a patent infringement

24            lawsuit against [defendants] in the Federal District Court in Las

25            Vegas. . . . The lawsuit alleges the defendants are infringing [six]

26            IGT patents covering gaming machines and systems that feature

27            additional payout indicators such as bonus wheels and bonus reels,

28            and touch screen display devices allowing for player interactivity.

| | |
|---|---|
| 1 | . . . "IGT has always vigorously defended its intellectual |
| 2 | property," said Dave Johnson, general counsel for IGT. |
| 3 | "Consistent with that philosophy, we have filed this case to stop |
| 4 | defendants from misappropriating IGT's patented innovations in the |
| 5 | areas of bonus gaming machine features and technology allowing |
| 6 | players to communicate with games and systems." |

7  Answer, Ex. 5.

8      Although defendants take exception to the statement that "[t]he lawsuit alleges the

9  defendants are infringing [six] IGT patents," this is *exactly* what the lawsuit alleges. And with

10  respect to the statement that the patents at issue "cover[] gaming machines and systems that

11  feature additional payout indicators such as bonus wheels and bonus reels, and touch screen

12  display devices allowing for player interactivity," this is *exactly* what the six patents cover. *See,*

13  *e.g.,* '646 Patent (titled "Slot Machine With an Additional Payout Indicator"); '932 Patent (titled

14  "Method of Playing Game and Gaming Games With an Additional Payout Indicator"); '698

15  Patent (titled "Game Service Interfaces For Player Tracking Touch Screen Display"); '573 Patent

16  (titled "Electronic Game Method and Apparatus With Hierarchy of Simulated Wheels"); '891

17  Patent (titled "Slot Machine Having Two Distinct Sets of Reels"); and '985 Patent (titled

18  "Universal Player Tracking System").[11] And as the Federal Circuit has made clear, "bad faith is

19  not supported when the information is objectively accurate." *See Mikohn*, 165 F.3d at 897; *see*

20  *also DCI Mktg., Inc. v. Justrite Mfg. Co.*, 213 F. Supp. 2d 971, 972 (E.D. Wis. 2002) ("the

21  communication of accurate information about patent rights, whether by direct notice to potential

22  infringers or by a press release, does not support a finding of bad faith").

23      Defendants also point to the quote from IGT's general counsel stating "we have filed this

24  case to stop defendants from misappropriating IGT's patented innovations in the areas of bonus

25  gaming machine features and technology allowing players to communicate with games and

26  systems" as allegedly being deceptive. But this is not a statement of objective fact – instead, it is

27

28  [11] The '646, '932, '573, '891, '698, and '985 patents are attached to IGT's Complaint as Exhibits
1 through 6, respectively.

1     merely IGT's subjective basis for bringing this suit. *See, e.g., Art Line, Inc. v. Universal Design*

2     *Collections, Inc.*, 966 F. Supp. 737, 744 (N.D. Ill. 1997) ("Universal's [infringement] allegation

3     represents Universal's conclusion and belief, rather than a factual statement"). The Ninth Circuit

4     has explained that – to be actionable – the statement at issue must be a "specific and measurable

5     claim, capable of being proved false or of being reasonably interpreted as a statement of objective

6     fact." *Coastal Abstract*, 173 F.3d at 731 (statements from laypersons purporting to interpret the

7     law "are opinion statements, and not statements of fact. Statements of opinion are not generally

8     actionable under the Lanham Act."). This is clearly not such a statement.

9        In *Cook Inc. v. Boston Scientific Corp.*, No. 01 C 9479, 2002 U.S. Dist. LEXIS 17331

10    (ND. Ill. Feb. 28, 2002), the plaintiff alleged that a Boston Scientific press release contained false

11    or misleading representations of fact regarding Cook's products and therefore violated the

12    Lanham Act. *Id.,* at *5-6. The Court disagreed and therefore dismissed Cook's Lanham Act

13    Claim:

14            The language of the press release, even taken in the light most

15            favorable to Cook, is not a statement of fact. Rather, it states the

16            basis of Boston's opinion that it was entitled to pursue contractual

17            and legal remedies available under the Angiotech agreement and

18            the intent of that company to seek relief through those avenues.

19            This does not state any facts pertaining to Cook's activities with

20            Guidant. A claim that alleges facts undermining the plaintiff's right

21            to relief cannot survive a 12(b)(6) motion.

22    *Id.,* at *8-9; *see also SDS USA, Inc. v. Ken Specialties*, No. 99-133, 2002 U.S. Dist. LEXIS

23    16762, *89 (D.N.J. Aug. 28, 2002) ("Statements with respect to Ken's infringement of SDS'

24    patents are qualified as SDS' subjective belief or opinion.").

25        Defendants attempt to improperly recast IGT's press release as indicating that "***all*** of

26    [defendants'] products with bonus game features or technology allowing players to communicate

27    with games and systems infringe IGT's patents." Answer ¶ 122. But the plain language of the

28    press release neither states, implies, nor suggests any such thing; in fact, the press release contains

1  language to the contrary, by stating truthfully that "*[s]everal* of the defendants' recently

2  introduced gaming machines and systems are alleged in the lawsuit to be infringing the IGT

3  patents. *See id.*, Ex. 5 (emphasis added). Defendants cannot avoid dismissal merely by

4  mischaracterizing the language of IGT's press release. *Eastman Outdoors, Inc. v. Blackhawk*

5  *Arrow Co.*, No. 03-73394, 2004 U.S. Dist. LEXIS 15745, at *12 (E.D. Mich. July 31, 2004)

6  ("[t]he allegations contained in defendants' proposed Second Amended Answer, as to Plaintiffs'

7  allegedly misleading 'statements,' are based on Defendants' interpretation of Plaintiffs' letters,

8  and do not quote from Plaintiffs' actual statements).

9          Because IGT's statements in its press release comprise either accurate statements of fact

10  or non-actionable statements of subjective opinion, IGT's publication of the press release cannot,

11  as a matter of law, comprise a Lanham Act violation.

12                    **2.**      *Noerr-Pennington* precludes defendants' Lanham Act claim.

13  As discussed in Section II(C)(4), above, the issuance of the IGT press release is conduct incident

14  to protected First Amendment petitioning activity and is therefore encompassed within the broad

15  sweep of *Noerr Pennington* antitrust immunity. *See Aircapital*, 634 F. Supp. at 326.

16  Significantly, however, courts have extended *Noerr-Pennington* immunity beyond just the

17  Sherman Act to also preclude liability on numerous other claims for relief, including claims

18  brought under the Lanham Act. *See, e.g., Melea Ltd. v. Quality Models Ltd.*, 345 F.Supp.2d 743

19  (E.D. Mich. 2004) (*Noerr-Pennington* barred Lanham Act and state unfair competition claims)..

20  *Noerr-Pennington* plainly encompasses IGT's press release as conduct incident to protected First

21  Amendment petitioning activity. *See id.; see also Cheminor*, 168 F.3d at 128 ("[W]e have been

22  presented with no persuasive reason why these state tort claims, based on the same petitioning

23  activity as the federal claims, would not be barred by the *Noerr-Pennington* doctrine."). And as

24  discussed above, this press release includes only accurate statements of fact or non-actionable

25  statements of opinion and therefore, as a matter of law, does not fall within the narrow "sham"

26  exception to *Noerr-Pennington*. Thus, defendants' Lanham Act claim fails for the additional and

27  independent reason that the conduct on which it is allegedly based is immunized under *Noerr-*

28  *Pennington*.

3.     <u>Defendants likewise cannot rely on the woefully inadequate allegation that "[u]pon information and belief, IGT has also made other false statements."</u>

Attempting vainly to prop up their deficient Lanham Act claim, defendants further allege that "on information and belief, IGT has made other false statements to [defendants'] customers that have misled or are likely to mislead [defendants'] customers . . . ." *Id.* ¶ 123. Defendants do not identify, however, the supposedly "false statements" made by IGT, the circumstances behind the alleged statements, or how these alleged statements "misled or are likely to mislead [defendants'] customers." *Id.* Defendants' sparse allegation does not even satisfy Rule 8's liberal pleading standard, much less the applicable Rule 9 standard. *See Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 948 (N.D. Cal. 2003) (dismissing Section 43(a) claim for failure to satisfy Rule 9: "The court finds that Taylor is entitled to more specific allegations of what conduct plaintiff claims is actionable as to Taylor under section 43(a) of the Lanham Act . . . .. The complaint does not . . . allege any facts regarding the location, timing, or content of Taylor's allegedly false statements"); *see also Implant Innovations, Inc., v. Nobelpharma AB*, No. 93 C 7489, 1995 U.S. Dist. LEXIS 13804, at *15 (N.D. Ill. Sept. 12, 1995) ("The Court does not find any significant distinction between a 'false statement' and a 'fraud.' In order to comply with Rule 9(b), a plaintiff must allege the 'who, what, when, and where' of the alleged fraud").[12] Defendants' conclusory allegation that IGT "has made false statements" satisfies neither Rule 8 nor Rule 9 and therefore fails to support the deficient Lanham Act counterclaim.

Neither IGT's press release nor defendants' allegation regarding "other false statements" supports defendants' Lanham Act claim. Because defendants fail to allege any facts that, if true, would entitle it to relief, Count XI of the counterclaims should be dismissed.

---

[12] *See also Barr Lab., Inc. v. Quantum Parmics. Inc.*, 827 F. Supp. 111, 118 (E.D.N.Y. 1993) ("even if Rule 9(b) is not applicable [to false advertising claim], Barr is required to state generally the content of the alleged misrepresentations"); *In re Century 21- RE/MAX Real Estate Adver. Claims Litig.*, 882 F. Supp. 915, 927 (C.D. Cal. 1994) ("[i]n litigation in which one party is charged with making false statements, it is important that the party charged be provided with sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense").

C.      **The Court Should Also Dismiss Defendants' Intentional Interference Counterclaim.**

To sustain their counterclaim for interference with prospective business advantage (Count XIV), defendants must allege and prove: (1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311 (1998). Furthermore, where the interference is allegedly based on a patentee's marketplace assertion of its patent rights, the Federal Circuit requires an additional showing that the alleged interference was done in bad faith. *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999) ("[B]ad faith is a prerequisite [to state a claim for tortious interference]; . . . without it, the claim is preempted by patent law").

1.      Because IGT's press release was not made in bad faith, defendants' intentional interference counterclaim is preempted and should be dismissed.

As demonstrated in Section II(B)(1), above, the IGT press release does not meet the "threshold showing of incorrectness or falsity" required by controlling Federal Circuit authority to demonstrate the requisite "bad faith." *See Mikohn*, 165 F.3d at 897. The statements made in IGT's press release are either accurate statements of fact or non-actionable statements of opinion. *See SDS USA*, 2002 U.S. Dist. LEXIS 16762, at *89. Therefore, the IGT press release was not, as a matter of law, made in bad faith. *See Mikohn*, 165 F.3d at 897. Absent the required showing of bad faith, defendants' intentional interference counterclaim is preempted by the federal patent laws and must be dismissed. *Zenith*, 182 F.3d at 1355.

2.      Defendants' intentional interference counterclaim is barred by *Noerr-Pennington* and should be dismissed for this additional reason.

For the same reasons discussed in Section III(B), above, *Noerr-Pennington* precludes an intentional interference claim based on IGT's protected First Amendment petitioning activity.

1   *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (*Noerr-Pennington*

2   barred claims of tortious interference with contract and tortious interference with prospective

3   economic advantage). Similarly, Nevada's absolute litigation privilege protects IGT from

4   incurring liability for statements made in connection with pending litigation. *Fink*, 118 Nev. 428,

5   49 P.3d at 644 (2002) (privilege protects communications outside of court as well as those made

6   during actual judicial proceedings). Thus, defendants cannot prove "the absence of privilege or

7   justification by [IGT]" and its claim therefore fails as a matter of law. *See Consolidated*

8   *Generator*, 114 Nev. at 1311. The Court should dismiss Bally' intentional interference

9   counterclaim for this additional and independent reason.

10          **3.**     Additionally, defendants do not allege with sufficient particularity the

11                    "prospective relationships" with which IGT supposedly interfered.

12          Defendants' intentional interference counterclaim should be dismissed for the additional

13   reason that defendants have not identified the alleged prospective relationships with which IGT is

14   alleged to have interfered. Rather than identify these relationships, the counterclaims refer only

15   to alleged prospective relationships with unnamed "customers in the wheel market." Answer ¶

16   134. But the "law precludes recovery for overly speculative expectancies by initially requiring

17   proof the business relationship contained 'the probability of future economic relationship.'"

18   *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1311 (N.D. Cal. 1997); *see*

19   *also Cascade Investments, Inc. v. Bank of America, N.A., S.A.*, CV-N-99-559-ECR (RAM), 2000

20   U.S. Dist. LEXIS 21474, at *3 (D. Nev. Sept. 28, 2000).

21          In *Cascade Investments,* the Court dismissed an interference claim based on similarly

22   vague alleged relationships:

23                    We agree with the defendant that a more definite statement is

24                    required by the plaintiffs with regards to their claim of intentional

25                    interference with prospective contractual relationships. . . . The

26                    complaint simply states that the defendant discouraged investors

27                    interested in the project and allowed the property in question to

28                    pollute water sources in Lake Tahoe. The complaint then states that

28

1        the defendant "was aware of these prospective contractual

2        relationships at the time they interfered with the same." We find

3        that these allegations are insufficient to give the defendant

4        sufficient notice so that it may respond.

5    *Id.* (internal citation omitted).

6        Like the plaintiff in *Cascade Investments*, defendants "have not identified the

7    relationships at issue, with whom [it] had these prospective relationships, and how [IGT]

8    interfered." *See id.* Accordingly, defendants' overly speculative interference claim is properly

9    dismissed for this additional and independent reason.

10       **D.    Defendants' *Walker Process* "Claim" Is Duplicative of Its Sherman Act**

11              **Section 2 Claims and Should Be Dismissed.**

12       Defendants assert Sherman Act Section 2 counterclaims for both monopolization (Count

13   VII) and attempted monopolization (Count VIII), as well as what they style a *Walker Process*

14   counterclaim (Count XII). But in *Walker Process Equip., Inc. v. Food Machinery & Chemical*

15   *Corp.*, 382 U.S. 172 (1965), the Supreme Court held that the enforcement of a patent procured by

16   fraud may be violative of Section 2 of the Sherman Act only if the other elements necessary to a

17   Section 2 case are present. In other words, there is no such thing as a separate "claim" for *Walker*

18   *Process*. Instead, defendants' *Walker Process* "claim" is merely duplicative of defendants'

19   Section 2 claims and Count XII should therefore be dismissed. *See, e.g.,* 2-12 Moore's Fed.

20   Practice § 12.37[3] ("[c]ourts will strike a claim as 'redundant' when it essentially repeats another

21   claim in the same complaint"); Fed. R. Civ. P. 12(f); *Lamke v. Sunstate Equip. Co.*, No. C-03-

22   4956 EMC, 2004 U.S. Dist. LEXIS 19345, at *3-4 (N.D. Cal. Sept. 22, 2004) (dismissing claim

23   for breach of the covenant of good faith and fair dealing that was "superfluous" and "added

24   nothing" to remaining claim for breach of contract.).

25   **IV.   Conclusion.**

26       For all of the foregoing reasons, the Court should grant IGT's motion to strike defendants'

27   inadequately alleged affirmative defenses and counterclaim allegations pursuant to Fed. R. Civ. P.

28   12(f). And because defendants have failed to state a claim with respect to their Nevada Unfair

1   Trade Practices Act (Counts IX, X and XIII), Lanham Act (Count XI), *Walker Process* (Count

2   XII) or intentional interference (Count XIV) counterclaims, the Court should dismiss these

3   counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).

4

5   Dated: February 25, 2005                    MORRIS PICKERING & PETERSON

6

7   By: _____

8        Steve L. Morris
         MORRIS PICKERING & PETERSON
9        900 Bank of America Plaza
         300 S. Fourth Street
         Las Vegas, Nevada 89101
10       Telephone: (702) 474-9400
         Facsimile: (702) 474-9422
11
         Attorneys for IGT
12

13  OF COUNSEL:

14  MARK A. SAMUELS
    DAVID B. MURPHY
15  BRETT J. WILLIAMSON
    NATHANIEL L. DILGER
16  O'MELVENY & MYERS LLP
    610 Newport Center Drive, 17th Floor
17  Newport Beach, California 92660-6429
    Telephone:     (949) 760-9600
18  Facsimile:     (949) 823-6994

19

20

21

22

23

24

25

26

27

28

30

1    CERTIFICATE OF SERVICE

2         Pursuant to Fed. R. Civ. P. 5(b), I certify that I am an employee of MORRIS

3    PICKERING & PETERSON, and that on this day I deposited for mailing in the U.S. Mail at

4    Las Vegas, Nevada, a true copy of the following enclosed in a sealed envelope upon which First

5    Class postage was prepaid:  IGT'S MOTION TO STRIKE PORTIONS OF ANSWER

6    PURSUANT TO FED. R. CIV. P. 12(f), AND MOTION TO DISMISS COUNTERCLAIM

7    COUNTS IX THROUGH XIV PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM

8    OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

9    TO:

10   J. Stephen Peek
     HALE LANE PEEK DENNISON
11     AND HOWARD, LLP
     2300 West Sahara Ave.
12   Eighth Floor, Box 8
     Las Vegas, Nevada 89102
13   Telephone:    (702) 222-2500
     Facsimile:    (702) 365-6940
14

     Charles K. Verhoeven
15   Kevin P.B. Johnson
     Jennifer A. Kash
16   R. Tullose Delk
     QUINN EMANUEL URQUHART
17     OLIVER & HEDGES, LLP
     50 California Street, 22nd Floor
18   San Francisco, California 94111
     Telephone:    (415) 875-6600
19   Facsimile:    (415) 875-6700

20   Attorneys for Defendants
     Alliance Gaming Corp., Bally Gaming
21   International, Inc. and Bally Gaming, Inc.

22        Dated this 25 day of February, 2005.

23
          By: _Patricia Cannon_
24

25

26

27

28

31

EXHIBIT 2

1

2

3

4

5

6

7

8

9           **UNITED STATES DISTRICT COURT**

10                    **DISTRICT OF NEVADA**

11   IGT,                                    )
                                             )        CV-S-04-1676 RCJ-(RJJ)
12                     Plaintiff,            )
                                             )
13          vs.                              )                  **ORDER**
                                             )
14   ALLIANCE GAMING CORPORATION, *et*       )
     *al.*,                                  )
15                                           )
                      Defendants.            )
16   _____ )

17

18        This matter coming before the Court on Plaintiff's Motion to Strike (#28) and Motion to

19   Dismiss Defendants' Counterclaims Counts IX through XIV (#29).  The Court has considered

     the motions, the pleadings on file, and oral argument on behalf of all parties.  IT IS HEREBY
20
     ORDERED that IGT's Motion to Strike and Motion to Dismiss Counterclaims Counts IX
21
     through XIV (#28 and #29) are *denied*.
22
                                    **BACKGROUND**
23
          IGT filed the present action for patent infringement on December 7, 2004.  On January
24

25                                 Page 1 of  10

1    24, 2005, Defendants filed a counterclaim against IGT.  IGT subsequently filed the instant

2    motion to strike portions of Defendants' answer and to dismiss Defendants' counter-claims IX

3    through XIV.

**DISCUSSION AND ANALYSIS**

4

5        **A.    Motion to Strike Pursuant to 12(f)**

6        A court may grant pursuant to Federal Rule of Civil Procedure 12(f) a motion to strike an

7    "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "Federal

8    courts generally disfavor motions to strike." *Cardinale v. La Petite Acad., Inc.*, 207 F. Supp. 2d

9    1158, 1162 (D. Nev. 2002) (citing *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339

10   (N.D. Cal. 1991) ("Motions to strike should not be granted unless it is clear that the matter to be

11   stricken could have no possible bearing on the subject matter of the litigation.")).  A court must

12   view the pleading under attack in the light most favorable to the pleader. *Id.* (citing *State of*

13   *California v. United States*, 512 F. Supp. 36, 39 (C. D. Cal. 1981)). Further, a court considering a

14   motion to strike should also consider "the function of a 12(f) motion to strike[, which] is to avoid

15   the expenditure of time and money that must arise from litigating spurious issues by dispensing

16   with those issues prior to trial . . . ." *Sidney-Vinstein v. A. H. Robins Co.*, 697 F.2d 880, 885 (9th

17   Cir. 1983).

18       Given the high threshold that must be reached in order to grant a motion to strike, IGT

19   has not established that the objecting affirmative defenses of Defendants are insufficient or

20   "redundant, immaterial, impertinent, or scandalous."  Fed. R. Civ. Pro. 12(f).

21       **B.    Motion to Dismiss Claims IX through XIV**

22       In addition to its motion to strike, IGT has moved to dismiss several counter-claims

23   asserted in Defendants' answer.  Dismissal is appropriate when it is clear that no relief could be

24   granted under any set of facts that could be proven consistent with the allegations set forth in the

25                                   Page 2 of  10

1 complaint. *See Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000); *Big*

2 *Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir. 1999); *Newman v.*

3 *Universal Pictures*, 813 F.2d 1519, 1521-1522 (9th Cir. 1987).

4      A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable

5 legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

6 *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A motion to dismiss for

7 failure to state a claim is generally viewed with disfavor and is rarely granted. *Gilligan v. Jamco*

8 *Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). A complaint should not be dismissed under Rule

9 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

10 his claim which would entitle him to relief." *Id.* The court must view all allegations in the

11 complaint in the light most favorable to the non-movant and must accept all material allegations–

12 as well as any reasonable inferences to be drawn from them– as true. *See Big Bear Lodging*

13 *Ass'n*, 182 F.3d at 1101; *Am. Family Ass'n Inc. v. City and County of San Francisco*, 277 F.3d

14 1114, 1120 (9th Cir. 2002).

15      Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a

16 court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits,

17 or discovery materials). *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991). A

18 court may, however, consider exhibits submitted with the complaint and matters that may be

19 judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Studios, Inc. v. Richard Feiner*

20 *& Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). For all these reasons, "[d]ismissal is warranted

21 only if it appears to a certainty that [plaintiff] would be entitled to no relief under any state of

22 facts that could be proved." *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

23      In the present case, IGT requests that the Court dismiss the following claims: (1) Counts

24 IX, X, and XIII, all claims under the Nevada Unfair Trade Practices Act; (2) Count XI, a claim

25                       Page 3 of 10

under the Lanham Act; (3) Count XII, an antitrust claim under the *Walker Process* doctrine; and (4) Count XIV, a claim for intentional interference with prospective business advantage.  Each of these claims will be addressed in turn.

### 1.     Counts IX, X, and XIII–Nevada Unfair Trade Practices Act Claims

IGT argues that it is not subject to liability under Nevada's Uniform Trade Practices Act, because the conduct alleged was "unilateral" not "multilateral" as required in Nevada Revised Statute 598A.060.  Various sections of this statute contemplate either multilateral or unilateral conduct.  Compare 598A.060.(1)(a)(1) ("Agreements among competitors...") and 598A.060.(1)(d) ("tying arrangements, consisting of contracts in which the seller or lessor conditions the sale...").  Moreover, 598A.060(1)(e) references both unilateral and multilateral activity; prohibiting "[m]onopolization of trade or commerce in this state, including without limitation, attempting to monopolize or otherwise combine or conspiring to monopolize trade and commerce in this state."

Therefore, as 598A.060 contemplates both unilateral and multilateral conduct, IGT's Motion to Dismiss Defendants' Nevada Unfair Trade Practices Act claims is denied.

### 2.     Count XI–Lanham Act Claim

Defendants' eleventh counterclaim asserts that IGT violated the Lanham Act by issuing a press release regarding the present patent litigation. IGT asserts that it is immune from suit under the Lanham Act because of the *Noerr-Pennington* doctrine.

#### i.     The Lanham Act

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), prohibits any use of a false or misleading description or representation in commercial advertising or promotion that "misrepresents the nature, characteristics, qualities, or geographic origin of. . . goods, services, or

Page 4 of  10

commercial activities." A claim under § 43(a) must allege:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers. *Id.* (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993)).

### ii.        *Zenith Electronic Corp and "Bad Faith"*

Patent suits that include a claim under the Lanham Act must also include an additional element of "bad faith." *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999). In *Zenith Electronics*, the alleged infringer's counterclaim against the patentee was based on statements made by the patentee to the alleged infringer's potential customers that the alleged infringer's product was infringing and that the alleged infringer was unable to design around the patents. *Id*.

The *Zenith Electronics* court observed that "the difference, however, is that the initiation of an infringement suit is clearly not covered by the text of § 43(a) [of the Lanham Act], while a communication to the customers of the accused infringer, in certain circumstances, may be." *Id*. at 1350. After a lengthy discussion, the court concluded that

> before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith. This prerequisite is a function of the interaction between

Page 5 of  10

1    the Lanham Act and patent law, and is in addition to the elements required by
     § 43(a) itself, as § 43(a) alone does not require bad faith.
2

3    *Id*. at 1353. The court made clear that its holding applied to two separate types of marketplace

4    statements: (1) those alleging that an alleged infringer's product infringes the patentee's patents;

     and (2) those alleging that the alleged infringer could not manufacture a noninfringing product.
5

6    *Id*. at 1354. The court noted that "both types of statements, if made in bad faith, are damaging to

     competition and are not the type of statements protected by the patent laws." *Id*.
7

8    In the present litigation, Defendants specifically allege that IGT violated the Lanham Act

9    by making

10          in bad faith, material and false representations regarding Defendants/Counter-
            Plaintiffs' products in interstate commerce that are likely to deceive the intended
11          audience, by releasing a vague and misleading press release designed to confuse
            Defendants/Counter-Plaintiffs' customers into believing that all of Bally's
12          products that have bonus game features or that have technology allowing players
            to communicate with games and systems infringe IGT's patents.
13   (Defs.' Countercl. at 31 ¶ 122).

14                    ***iii.       The Noerr-Pennington Doctrine***

15          IGT asserts that it is immune from suit for issuing its press release under the legal

16   doctrine of *Noerr-Pennington* immunity. The *Noerr-Pennington* doctrine immunizes from

17   antitrust liability those who urge the federal or state government to take actions that may impose

18   restraints on trade.

19          The *Noerr-Pennington* doctrine takes its name from two Supreme Court cases, *Eastern

20   R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); and *United Mine

21   Workers v. Pennington*, 381 U.S. 657 (1965).  In *Noerr*, the Supreme Court recognized an

22   exception to antitrust liability for activities directed toward influencing government action. 365

23   U.S. 127.  The Supreme Court held that the Sherman Act did not reach such activities. *Id*. at 136-

24   38.  However, the Court noted that immunity would not exist if the accused activity, although

25                              Page 6 of  10

1   "ostensibly directed toward influencing governmental action, is a mere sham to cover what is

2   actually nothing more than an attempt to interfere directly with the business relationships of a

3   competitor." *Id*. at 144.  In *Pennington* the Court affirmed its holding in *Noerr* and expanded the

4   doctrine to encompass actions designed to influence administrative decisions. 381 U.S. 657.

5          The Supreme Court has extended *Noerr-Pennington* immunity to attempts to petition the

6   government for redress through litigation in the courts. *Calif. Motor Transp. Co. v. Trucking*

7   *Unlimited,* 404 U.S. 508, 510-11 (1972).  More recently the Supreme Court held that "an

8   objectively reasonable effort to litigate cannot be sham regardless of subjective intent."

9   *Professional Real Estate Investors v. Columbia Pictures Indus*, 508 U.S. 49, 57 (1993).

10         In *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1376 (Fed.

11  Cir. 2004), the Federal Circuit addressed the question as to whether the *Professional Real Estate*

12  standard applied outside the context of actual litigation. The *Globetrotter* Court noted that

13  "'given that petitioning immunity protects joint litigation, it would be absurd to hold that it does

14  not protect those acts reasonably and normally attendant upon effective litigation.'" *Id*. (quoting

15  *Coastal States Mktg, Inc. v. Hunt*, 694 elucidative.2d 1358, 1367 (5th Cir. 1983)). The

16  *Globetrotter* court concluded *Noerr-Pennington* immunity, including the objectively-baseless

17  standard of *Professional Real Estate*, extends to pre-litigation communications directed from the

18  patent holder to an alleged infringer.

19         The Ninth Circuit's recent case of *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, (9th

20  Cir. 2005), provided a discussion of the application *Noerr-Pennington* immunity that is

21  instructive in the present case.  The Ninth Circuit held:

22              Because the *Noerr-Pennington* doctrine grows out of the Petition Clause, its reach
                extends only so far as necessary to steer the Sherman Act clear of violating the
23              First Amendment. Immunity thus applies only to what may fairly be described as
                petitions, not to litigation conduct generally. A complaint, an answer, a
24              counterclaim and other assorted documents and pleadings, in which plaintiffs or

25                                            Page 7 of  10

defendants make representations and present arguments to support their request that the court do or not do something, can be described as petitions without doing violence to the concept. But discovery is merely communication between parties as an aid to litigation. It is not in any sense a communication to the court and is therefore not a petition. Nevertheless, "conduct incidental to" a petition is protected by *Noerr-Pennington* if the petition itself is protected.

*Freeman*, 410 F.3d at 1184 (citations omitted). Therefore, unless the activity in question is squarely-rooted in litigation, or "conduct incidental to" a petition, there is no basis for an extension of *Noerr-Pennington* immunity into marketplace conduct.

According to Defendants' counter-claim, IGT allegedly violated the Lanham Act by issuing a press release regarding the present litigation of alleged patent infringement. The press release was sent out into the marketplace, and its relationship to the actual litigation is a question of fact at best. Issuing press releases about patent litigation may not be squarely rooted in litigation activities. Consequently, *Noerr-Pennington* immunity may not apply. Additionally, as Defendants allege that IGT acted in bad faith, the counter-claim alleging IGT violated the Lanham Act meets the *Zenith Electronics* standard, and withstands IGT's motion to dismiss.

### 3.     Count XII--Antitrust Claim Under the Walker Process Doctrine

IGT asserts that Defendants' *Walker Process* claim is redundant, in that Defendants have properly alleged a Sherman Act claim.

Section 2 of the Sherman Act declares that it is unlawful for a person or firm to "monopolize . . . any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. This language operates to limit the means by which a firm may lawfully acquire or perpetuate monopoly power. Specifically, a firm violates § 2 if it attains or preserves monopoly power through anticompetitive acts. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly power under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the

1    willful acquisition or maintenance of that power as distinguished from growth or development as

2    a consequence of a superior product, business acumen, or historic accident.").

3          In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,382 U.S. 172

4    (1965), the Supreme Court held that an injured party may bring a suit for anti-trust damages

5    under Section 2 of the Sherman Act against a company that attempts to monopolize a market by

6    threatening to enforce a patent obtained by fraud.

7          To sustain a *Walker Process* claim, a party must prove that "(1) the relevant patent is

8    shown to have been procured by knowing and willful fraud practiced by the defendant on the

9    Patent Office or, if the defendant was not the original patent applicant, he had been enforcing the

10   patent with knowledge of the fraudulent manner in which it was obtained; and (2) all the

11   elements otherwise necessary to establish a § 2 monopolization charge." *Id.* at 179 (Harlan, J.

12   concurring).

13         It is clear that a *Walker Process* claim is not identical to a Section 2 cause of action, in

14   that Defendants must prove the additional element of "knowing and willful fraud."

15         **4.     Count XIV--Counterclaim for Intentional Interference With
                    Prospective Business Advantage.**

16

17         Lastly, IGT claims that Defendants' counterclaim of intentional interference with

     prospective business advantage is misplaced.

18

19         Liability for the tort of intentional interference with prospective economic advantage

     requires proof of the following elements: (1) a prospective contractual relationship between the

20

     plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3)

21

     intent to  harm the plaintiff by preventing the relationship; (4) the absence of privilege or

22

     justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's

23

     conduct. *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 88 (1987).  An additional element or

24

25                                    Page 9 of  10

1  showing of bad faith is required where the interference is based on a patentee's marketplace

2  assertion of its patent rights. *Zenith Electronics Corp.*, 182 F.3d at 1335.

3          IGT asserts that this claim should be dismissed as it is entitled to *Noerr-Pennington*

4  immunity. As discussed previously, IGT may not be entitled to *Noerr-Pennington* immunity for

5  the issuance of the "Press Release."  Therefore, Defendants have properly plead a counterclaim

6  of tortious interference.

7                                      **CONCLUSION**

8          For the reasons set forth above, IT IS HEREBY ORDERED that IGT's Motion to Strike

9  (# 28) is *denied*.

10          IT FURTHER ORDERED that IGT's Motion to Dismiss Defendants' Counterclaims IX

11  through XIV (# 29) is also *denied*.

12

13          DATED this 10th day of January, 2006.

14

15

16

17          _____

                             ROBERT C. JONES

18                       UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25                              Page 10 of  10