IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IGT, a Nevada corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>BALLY GAMING INTERNATIONAL,<br>INC., BALLY TECHNOLOGIES, INC.,<br>and BALLY GAMING, INC.,<br><br>        Defendants. | CA No. 06-282 (KAJ) |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF IGT'S REPLY IN
SUPPORT OF ITS MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM
<u>COUNTS X, XI AND XII</u>**

OF COUNSEL

David P. Enzminger
Brett J. Williamson
Charles A. Thomasian
O'MELVENY & MYERS L.L.P.
400 S. Hope Street
Los Angeles, CA 90071
(213) 430-6000

September 1, 2006

William J. Wade (#704)
Wade @rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
Matthew W. King (#4566)
King@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiff IGT*

Pursuant to Federal Rules of Evidence 201, plaintiff IGT, by and through its attorneys, hereby requests the Court to take judicial notice of the following:

1.    Defendants' Answer; Affirmative Defenses and Counterclaims, dated January 21, 2005, Case No. CV-S-04-1676 RCJ-(RJJ) (D. Nev.).  A true and correct copy of this document is attached as Exhibit 1.

2.    Special Verdict Form, dated March 27, 2001, Case Nos. CV-S-98-1462-EJW (LRL) and CV-S-97-1383-EJW (LRL) (D. Nev.)  A true and correct copy of this document is attached as Exhibit 2.

3.    Judgment In A Civil Case, dated March 29, 2001, Case No. CV-S-97-1383-EJW (LRL) (D. Nev.).  A true and correct copy of this document is attached as Exhibit 3.

4.    Judgment, dated July 11, 2006, Case No. 01-CV-1109 (Fed. Cir.).  A true and correct copy of this document is attached as Exhibit 4.

The above documents are matters of public record and are properly the subject of a request for judicial notice.  *LUM v. Bank of Am.,* 361 F.3d 217, 222 (3d Cir. 2004), *cert. denied,* 543 U.S. 918 (2004) ("[A] prior judicial opinion constitutes a public record of which a court may take judicial notice . . . on a motion to dismiss."); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint."); *Southmark Prime Plus LP v. Falzone,* 776 F. Supp. 888, 892 (D. Del. 1991) ("[F]ederal courts may also take notice of proceedings in other courts . . . if the proceedings have a direct relation to matters at issue.  The contents of the court records that may be judicially noticed include the briefs and petitions of the parties.").

OF COUNSEL

David P. Enzminger
Brett J. Williamson
Charles A. Thomasian
O'MELVENY & MYERS L.L.P.
400 S. Hope Street
Los Angeles, CA  90071
(213) 430-6000

September 1, 2006

William J. Wade (#704)
Wade@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
Matthew W. King (#4566)
King@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

Attorneys for Plaintiff IGT

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 1, 2006, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

>Jack B. Blumenfeld, Esquire
>Karen Jacobs Louden, Esquire
>Morris, Nichols, Arsht & Tunnell
>1201 N. Market Street
>Wilmington, DE  19899

I hereby certify that on September 1, 2006, I caused to be sent by electronic mail the foregoing document to the following non-registered participants:

>Charles K. Verhoeven
>Quinn Emanuel Urquhart
>    Oliver & Hedges, LLP
>50 California Street, 22nd Floor
>San Francisco, CA 94111

>Edward J. DeFranco
>Quinn Emanuel Urquhart
>    Oliver & Hedges, LLP
>51 Madison Avenue
>New York, NY 10010-1601

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

# EXHIBIT 1

1  | J. Stephen Peek, Esq.
Hale Lane Peek Dennison and Howard
2  | 2300 West Sahara Ave
Eighth Floor, Box 8
3  | Las Vegas, Nevada 89102
Telephone: (702) 222-2500
4  | Facsimile: (702) 365-6940

5  | Charles K. Verhoeven, Esq.
Kevin P.B. Johnson, Esq.
6  | R. Tulloss Delk, Esq.
QUINN EMANUEL URQUHART
7  |     OLIVER & HEDGES, LLP
50 California Street, 22d Floor
8  | San Francisco, California  94111
Telephone: (415) 875-6600
9  | Facsimile: (415) 875-6700

10 | Attorneys for Defendants Alliance
Gaming Corp., Bally Gaming
11 | International, Inc., and Bally Gaming, Inc.

12 |

13 |                 **UNITED STATES DISTRICT COURT**

14 |                      **DISTRICT OF NEVADA**

15 | IGT, a Nevada corporation,                    ) CASE NO. CV-S-04-1676-RCJ-(RJJ)
                                                  )
16 |              Plaintiff,                       )
                                                  ) **DEFENDANTS' ANSWER,**
17 | v.                                            ) **AFFIRMATIVE DEFENSES; AND**
                                                  )
18 | ALLIANCE GAMING CORP., a Nevada              ) **COUNTERCLAIMS FOR:**
corporation; BALLY GAMING                        ) **DECLARATORY JUDGMENT OF**
19 | INTERNATIONAL, INC., a Delaware              ) **PATENT NONINFRINGEMENT AND**
corporation; and BALLY GAMING, INC.,             ) **PATENT INVALIDITY;**
20 | a Nevada corporation d/b/a/ BALLY            ) **MONOPOLIZATION OF THE**
GAMING & SYSTEMS,                                ) **GAMING MACHINES MARKET;**
21 |                                               ) **ATTEMPTED MONOPOLIZATION**
                                                  ) **OF THE GAMING MACHINES**
22 |              Defendants                       ) **MARKET; VIOLATION OF THE**
                                                  ) **LANHAM ACT; UNFAIR TRADE**
                                                  ) **PRACTICES; AND INTENTIONAL**
23 |                                               ) **INTERFERENCE WITH**
                                                  ) **PROSPECTIVE BUSINESS**
24 |                                               ) **ADVANTAGE; AND**
                                                  )
25 |                                               ) **DEMAND FOR JURY TRIAL**
                                                  )
26 | _____               )
                                                  )
27 | AND RELATED COUNTER-CLAIMS                    )
                                                  )
28 | _____               )

50878/BallysAnswerandCounterclaims_v1.wpd

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500616

1   Defendants Alliance Gaming Corp. ("Alliance"), Bally Gaming International, Inc. and

2   Bally Gaming, Inc. ("Bally") (collectively "Defendants"), by their undersigned attorneys, state

3   for their Answer to Plaintiff's Complaint for Patent Infringement, Application for Injunctive

4   Relief and Demand for Jury Trial, and Counterclaims for Declaratory Relief and Money

5   Damages, as follows:

6                                    **ANSWER**

7       1.    Defendants admit that the Complaint purports to allege claims for patent

8   infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

9       2.    Defendants admit that the Complaint purports to state a cause of action over

10  which this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11      3.    Defendants admit that this Court has personal jurisdiction over defendants.

12      4.    Defendants admit, for the purposes of this action only, that venue is proper in this

13  district pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

14                                    **PARTIES**

15      5.    Defendants admit the allegations of paragraph 5 of the Complaint.

16      6.    Defendants admit that defendant Alliance Gaming Corporation is a corporation

17  organized and existing under the laws of the State of Nevada having a principal place of business

18  at 6601 S. Bermuda Road, Las Vegas, Nevada 89119.

19      7.    Defendants admit that defendant Bally International, Inc. is a corporation

20  organized and existing under the laws of the State of Delaware having a principal place of

21  business at 6601 S. Bermuda Road, Las Vegas, Nevada 89119.

22      8.    Defendants admit that defendant Bally Gaming, Inc. is a corporation organized

23  and existing under the laws of the State of Nevada having a principal place of business at 6601 S.

24  Bermuda Road, Las Vegas, Nevada 89119.  Bally admits that it does business as Bally Gaming &

25  Systems.

26      9.    Defendants admit that Bally Gaming & Systems is an operating division of

27  Alliance.  Defendants deny the remaining allegations of paragraph 9 of the Complaint.

28

IGT-IN500617

## Count I

**(Infringement of U.S. Patent No. 6,827,646)**

10.    Defendants repeat and reallege their answers to the allegations in paragraphs 1 through 9 of the Complaint, inclusive, as if fully set forth herein.

11.    Defendants admit that U.S. Patent No. 6,827,646 ("the '646 patent") was issued on December 7, 2004 and is titled "Slot Machine With an Additional Payout Indicator." Defendants further admit that IGT is listed as an assignee on the on the face of the '646 patent.  Defendants also admit that a true and correct copy of the '646 patent is attached to the Complaint as Exhibit 1. Defendants deny the remaining allegations of paragraph 11.

12.    Defendants deny the allegations of paragraph 12 of the Complaint.

13.    Defendants deny the allegations of paragraph 13 of the Complaint.

## Count II

**(Infringement of U.S. Patent No. 5,848,932)**

14.    Defendants repeat and reallege their answers to the allegations in paragraphs 1 through 13 of the Complaint, inclusive, as if fully set forth herein.

15.    Defendants admit that U.S. Patent No. 5,848,932 ("the '932 patent") was issued on December 15, 1998 and is titled "Method of Playing Game and Gaming Games With an Additional Payout Indicator."  Defendants also admit that a true and correct copy of the '932 patent is attached to the Complaint as Exhibit 2.  Defendants deny the remaining allegations of paragraph 15.

16.    Defendants deny the allegations of paragraph 16 of the Complaint.

17.    Defendants deny the allegations of paragraph 17 of the Complaint.

18.    Defendants deny the allegations of paragraph 18 of the Complaint.

## Count III

**(Infringement of U.S. Patent No. 5,788,573)**

19.    Defendants repeat and reallege their answers to the allegations in paragraphs 1 through 18 of the Complaint, inclusive, as if fully set forth herein.

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500618

1      20.    Defendants admit that U.S. Patent No. 5,788,573 ("the '573 patent") was issued on

2    August 4, 1998 and is titled "Electronic Game Method and Apparatus With Hierarchy of

3    Simulated Wheels." Defendants further admit that International Game Technology is listed as an

4    assignee on the face of the '573 patent. Defendants also admit that a true and correct copy of the

5    '573 patent is attached to the Complaint as Exhibit 3. Defendants deny the remaining allegations

6    of paragraph 20.

7      21.    Defendants deny the allegations of paragraph 21 of the Complaint.

8      22.    Defendants deny the allegations of paragraph 22 of the Complaint.

9      23.    Defendants deny the allegations of paragraph 23 of the Complaint.

10                                   **Count IV**

11                    **(Infringement of U.S. Patent No. 5,722,891)**

12     24.    Defendants repeat and reallege their answers to the allegations in paragraphs 1

13    through 23 of the Complaint, inclusive, as if fully set forth herein.

14     25.    Defendants admit that U.S. Patent No. 5,722,891 ("the '891 patent") was issued on

15    March 3, 1998 and is titled "Slot Machine Having Two Distinct Sets of Reels." Defendants also

16    admit that a true and correct copy of the '891 patent is attached to the Complaint as Exhibit 4.

17    Defendants deny the remaining allegations of paragraph 25.

18     26.    Defendants deny the allegations of paragraph 26 of the Complaint.

19     27.    Defendants deny the allegations of paragraph 27 of the Complaint.

20     28.    Defendants deny the allegations of paragraph 28 of the Complaint.

21                                    **Count V**

22                    **(Infringement of U.S. Patent No. 6,712,698)**

23     29.    Defendants repeat and reallege their answers to the allegations in paragraphs 1

24    through 28 of the Complaint, inclusive, as if fully set forth herein.

25     30.    Defendants admit that U.S. Patent No. 6,712,698 ("the '698 patent") was issued on

26    March 30, 2004 and is titled "Game Service Interfaces for Player Tracking Touch Screen

27    Display." Defendants further admit that IGT is listed as an assignee on the face of the '698

28

IGT-IN500619

1    patent.  Defendants also admit that a true and correct copy of the '698 patent is attached to the

2    Complaint as Exhibit 5.  Defendants deny the remaining allegations of paragraph 30.

3          31.    Defendants deny the allegations of paragraph 31 of the Complaint.

4          32.    Defendants deny the allegations of paragraph 32 of the Complaint.

5          33.    Defendants deny the allegations of paragraph 33 of the Complaint.

6                              **Count VI**

7                  **(Infringement of U.S. Patent No. 6,722,985)**

8          34.    Defendants repeat and reallege their answers to the allegations in paragraphs 1

9    through 33 of the Complaint, inclusive, as if fully set forth herein.

10         35.    Defendants admit that U.S. Patent No. 6,722,985 ("the '985 patent") was issued on

11   April 20, 2004 and is titled "Universal Player Tracking System."  Defendants further admit that

12   IGT is listed as an assignee on the face of the '985 patent.  Defendants also admit that a true and

13   correct copy of the '985 patent is attached to the Complaint as Exhibit 6.  Defendants deny the

14   remaining allegations of paragraph 35.

15         36.    Defendants deny the allegations of paragraph 36 of the Complaint.

16         37.    Defendants deny the allegations of paragraph 37 of the Complaint.

17         38.    Defendants deny the allegations of paragraph 38 of the Complaint.

18                            **Prayer for Relief**

19         Defendants further deny that IGT is entitled to the relief sought by its prayer for relief, set

20   forth on pages 7 and 8 of its Complaint.

21                   **AFFIRMATIVE AND OTHER DEFENSES**

22                       **FIRST AFFIRMATIVE DEFENSE:**

23     **Noninfringement of the '646, '932, '573, '891, '698, and '985 Patents**

24         Defendants do not make, use, sell, offer for sale, or import into the United States, and

25   have not made, used, sold, offered for sale or imported into the United States any products or

26   methods that infringe any valid claim of the '646, '932, '573, '891, '698, or '985 patents, either

27

28

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500620

1    directly, indirectly, contributorily, through the doctrine of equivalents, or otherwise, and have not

2    induced others to infringe the '646, '932, '573, '891, '698, or '985 patents.

3                **SECOND AFFIRMATIVE DEFENSE:**

4         **Invalidity of the '646, '932, '573, '891, '698, and '985 Patents**

5       The '646, '932, '573, '891, '698, and/or '985 patents claims are invalid for failure to meet

6    the Conditions for Patentability set forth in Title 35 of the United States Code, including, but not

7    limited to, 35 U.S.C. §§ 101, 102, 103, and 112, and the requirements of the Code of Federal

8    Regulations.

9             **THIRD AFFIRMATIVE DEFENSE: Laches**

10       The '646, '932, '573 and '891 patents are unenforceable, in whole or in part, against

11    Defendants under the doctrine of laches.

12            **FOURTH AFFIRMATIVE DEFENSE: Estoppel**

13       The '646, '932, '573 and '891 patents are unenforceable, in whole or in part, against

14    Defendants under the doctrine of estoppel.

15         **FIFTH AFFIRMATIVE DEFENSE: Inequitable Conduct**

16       Defendants hereby incorporate by reference the allegations in Counterclaim paragraphs

17    31 through 54, inclusive, as if fully set forth herein. For the reasons set forth therein, the '646 and

18    '932 patents are unenforceable, in whole or in part, against Defendants as a result of Plaintiff's

19    inequitable conduct -- including its failure to name a known inventor and its misrepresentations

20    regarding known prior art -- in obtaining those patents.

21       **SIXTH AFFIRMATIVE DEFENSE: Failure to State a Claim**

22       The complaint fails to state a claim upon which relief can be granted.

23        **SEVENTH AFFIRMATIVE DEFENSE: Unclean Hands**

24       Plaintiff's claims are barred under the doctrine of unclean hands.

25             **EIGHTH AFFIRMATIVE DEFENSE**

26       The damages, if any, that were allegedly sustained by the Plaintiff as a result of the acts

27    contained in the Complaint were caused in whole or in part or were contributed to by reason of

28    the acts, omissions, negligence, and/or intentional misconduct of the Plaintiff and its agents.

IGT-IN500621

1 **NINETH AFFIRMATIVE DEFENSE: Waiver**

2 Plaintiff has waived any rights it may have had for relief from the Court.

3 **TENTH AFFIRMATIVE DEFENSE: Failure to Mitigate**

4 Plaintiff has failed to use proper and reasonable efforts to mitigate losses and damages

5 incurred, the existence of which are denied, and Defendants have therefore been released and

6 discharged from liability.

7 **ELEVENTH AFFIRMATIVE DEFENSE**

8 As a result of Plaintiff's actions, Plaintiff is not entitled to equitable relief.

9 **TWELTH AFFIRMATIVE DEFENSE**

10 The damages, if any, that were allegedly sustained by the Plaintiff as a result of the acts

11 contained in the Complaint were caused in whole or in part or were contributed to by reason of

12 the acts, omissions, negligence, and/or intentional misconduct of third parties over which

13 Defendants had no control.

14 **THIRTEENTH AFFIRMATIVE DEFENSE**

15 The claims in the complaint are barred by the doctrines of ratification and/or release.

16 **FOURTEENTH AFFIRMATIVE DEFENSE**

17 Defendants have a license to make, use, sell, and/or offer to sell the alleged invention of

18 the patents in suit.

19 **FIFTEENTH AFFIRMATIVE DEFENSE**

20 Plaintiffs' claims are barred in whole or in part by the doctrines of *res judicata* and/or

21 collateral estoppel and/or issue preclusion and/or claim preclusion.

22 **COUNTERCLAIMS**

23 **Nature of the Action**

24    1.    This is an action for anticompetitive behavior in violation of 15 U.S.C. §§ 1 and

25 2, as well as Nevada's state antitrust statutes; violations of the Lanham Act; unfair competition;

26 intentional interference with prospective business advantage; declaratory judgments of

27 noninfringement and invalidity; and state law claims arising out of IGT's anticompetitive

28 conduct.  Alliance and Bally seek actual and enhanced damages.

50878/BallysAnswerandCounterclaims_v1.wpd                    -6-
DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500622

**Parties**

2.    Counter-Plaintiff Alliance Gaming Corporation ("Alliance") is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 6601 S. Bermuda Road, Las Vegas, Nevada 89119.  Alliance is a diversified, worldwide gaming company that designs, manufactures, and distributes gaming machines and computerized monitoring systems for gaming machines; owns and operates a significant installed base of gaming machines; and owns and operates a casino.  Operating under the name Bally Gaming and Systems, and through its wholly-owned subsidiary Bally Gaming International, Inc., Alliance's slot machine unit is a worldwide leader in designing, manufacturing and distributing gaming machines.

3.    Counter-Plaintiff Bally Gaming International, Inc. ("Bally") (Counter-Plaintiffs are also collectively referred to as "Bally" herein) is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6601 S. Bermuda Road, Las Vegas, Nevada 89119.  Counter-Plaintiff Bally Gaming, Inc. is the operating arm of Bally Gaming International, Inc. and is a corporation organized and existing under the laws of Nevada. Bally Gaming, Inc.'s principal place of business is also at 6601 S. Bermuda Road, Las Vegas, Nevada 89119.  Both Bally Gaming International, Inc. and Bally Gaming, Inc. are wholly owned subsidiaries of Counter-Plaintiff Alliance and comprise the unit of Alliance that designs, manufactures and distributes gaming machines.

4.    Counter-Defendant IGT ("IGT") is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 9295 Prototype Drive, Reno, Nevada 89511.

**Jurisdiction And Venue**

5.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 1 and 2 (federal antitrust), 28 U.S.C. §§ 2201 and 2202 (declaratory judgments), 35 U.S.C. § 1 et seq. (patents), and 28 U.S.C. §§ 1331 (federal question) and 1338(a) (patents).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

6.    IGT has submitted to personal jurisdiction in this Court.

IGT-IN500623

1      7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b)

2  because this suit was filed in this district by IGT, all parties conduct business in this judicial

3  district, IGT maintains headquarters in this judicial district, and Bally has its principal place of

4  business in this district.

5                           **General Allegations**

6  **Market Allegations**

7      8.      The New York Times Magazine has referred to IGT as the "Microsoft of the

8  gaming industry." That statement is based on IGT's control of over 75-80% of the gaming

9  machines market. The gaming machine market is the market for gaming machines sold or leased

10 by manufacturers of such machines to casinos, to distributors who in turn sell the machines to

11 casinos, and to government entities who run casinos. A gaming machine means gaming

12 machines, gaming devices, slot machines, video lottery terminals, and the like as set forth in NRS

13 463.0155.0191, and all other relevant provisions of the Nevada Gaming Control Act (NRS

14 Chapter 463), and comparable provisions of other jurisdictions where such devices are legal.

15 The relevant geographic market in this action is the United States.

16     9.      Within the gaming machine market there are also distinct sub-markets such as

17 those for "cashless gaming" and "video gaming machines," to name but two. One such sub-

18 market is relevant to this litigation: the market for gaming machines with wheel-based bonus

19 features (the "wheel game market").

20     10.     The wheel game market is the market for gaming machines that offer a bonus

21 feature whereby, in the event that the bonus feature is activated, the amount of the bonus is

22 determined according to a set of indicia arranged within or around a representation of a wheel.

23 The customers who purchase gaming machines with wheel-based bonus features are a sub-set of

24 the customers who purchase gaming machines, as described above. The majority of gaming

25 machines with wheel-based bonus features are within the class of gaming machines referred to as

26 participation games. Participation games differ from traditional gaming machines in that the

27 manufacturer receives some percentage of the revenue generated by each participation machine.

28 As a result, participation games can be a significant and consistent revenue source for the

IGT-IN500624

1   manufacturers of those games.  Even in jurisdictions where participation games are not

2   permitted, however, wheel games constitute a popular and highly lucrative market.

3       11.    IGT is the dominant provider of gaming machines with wheel-based bonus

4   features in the wheel game market.  Its share in that market is approximately 75-80%, which

5   share is protected by substantial barriers to entry.  These barriers include substantial regulatory

6   and licensing requirements, which have to be independently met in every jurisdiction in the

7   United States and Canada where gaming machines with wheel-based bonus features are legal.  Its

8   market share is also protected by IGT's purported patent portfolio and especially by IGT's

9   excessively aggressive litigation, and threats of litigation, to enforce its patent portfolio, which

10  has the practical effect of expanding the reach of IGT's patent portfolio far beyond its appropriate

11  bounds.  Its market share is also protected by technological constraints to developing new gaming

12  machines with wheel-based bonus features that (a) are attractive to the gaming public, (b) are

13  compatible with the existing infrastructure that supports the wheel game market, and (c) do not

14  infringe on any relevant patents in the field.

15      12.    IGT has taken affirmative steps to further strengthen its share of the wheel game

16  market.  For example, Anchor Gaming, another former competitor in the wheel game market,

17  helped develop the "Wheel of Gold" game, an early wheel game.  Recognizing the potential

18  value of the wheel game market, IGT entered into a joint venture with Anchor Gaming in 1996 to

19  develop a new wheel game, "Wheel of Fortune."  "Wheel of Fortune" quickly became a dominant

20  product in the wheel game market, accounting for approximately 70% of Anchor Gaming's

21  revenues.  In 2001, to solidify its control of the wheel game market, IGT acquired Anchor

22  Gaming for $1.36 billion.  Subsequent to that acquisition, Anchor assigned intellectual property

23  associated with the Wheel of Gold and Wheel of Fortune machines -- including the '932 patent

24  and the application for the '646 patent -- to IGT.  In a press release following the acquisition,

25  IGT's President and CEO, G. Thomas Baker, stated, "Upon closing, IGT will be able to recognize

26  100% of the joint revenue and profits previously shared by the companies.  This is a significant

27  strategic benefit."  A copy of the press release is attached hereto as Exhibit 1.

28

IGT-IN500625

1    13.    The "Wheel of Fortune" game continues to be IGT's most successful product and

2    commands an enormous share of the wheel game market by itself.  With approximately a 10%

3    share of the wheel game market, Bally is now the only competitor of IGT with any significant

4    market share.

5    **IGT Has Misused the Patent Process to Create a Monopoly**

6    14.    In its efforts to further gain market share and to reach its goal of a monopoly, IGT

7    has repeatedly and with predatory intent attempted to eliminate Bally as a competitor in the sub-

8    market described above as well as in the gaming machine market as a whole.  IGT has misused

9    the Patent and Trademark Office and the legal system to accomplish its anticompetitive goal of

10    eliminating all competitors in these markets.

11    15.    In recent years, IGT has taken affirmative steps to assert control over as much

12    intellectual property within the gaming machine market as possible.  For example, IGT is the

13    named assignee of at least 250 patents for alleged inventions in the field of gaming machines -- at

14    least 232 of which have issued to IGT *since August 2001*.  Further, on information and belief,

15    IGT has purchased or been assigned numerous additional patents and has obtained exclusive

16    licenses for others still.  Even though IGT knows that many of these purported patents are

17    invalid, once these patents issue to IGT, or IGT purchases such patents, IGT strong-arms

18    competitors into licensing its patents at exorbitant rates.

19    16.    Competitors who refuse to pay royalties to IGT -- regardless of the merits of any

20    argument that the competitor might have that the asserted patent is invalid or not infringed -- are

21    promptly sued by IGT.

22    17.    As to Defendants/Counter-Plaintiffs alone, IGT has filed two lawsuits for

23    purported patent infringement since 2001.

24    18.    IGT has filed at least an additional four lawsuits for patent infringement against

25    other competitors in the gaming machine market since 1999.  Armed with far less resources than

26    IGT, most competitors are forced to settle the lawsuits on less than favorable terms in order to

27    avoid bad publicity, loss of customers and the accumulation of hefty legal fees through protracted

28    litigation.

IGT-IN500626

1   19. The instant lawsuit is the most recent example of, and most clearly demonstrates,

2 the pattern of conduct by IGT in misusing the privileges afforded by the patent office to gain

3 competitive advantage over others in the marketplace.

4 **IGT Misrepresented Its Intent to Sue Bally for Infringement**

5   20. In February of 2002, IGT sent a demand letter to Bally in which it alleged that

6 Bally's Monte Carlo game infringed the '932 and '573 patents, as well as three other patents. The

7 letter also stated that Bally had other products that were "relevant" to an additional four patents.

8 A copy of this February 26, 2002 letter is attached as Exhibit 2.

9   21. The parties thereafter met on several occasions to discuss IGT's allegations.

10 During those meetings and subsequent correspondence, Bally disclosed a significant amount of

11 prior art to the '932 patent -- a patent that IGT had acquired from Anchor Gaming.

12   22. Nevertheless, on September 3, 2002, IGT sent another demand letter to Bally in

13 which it again asserted that Bally's Monte Carlo game infringed four of IGT's patents. A copy of

14 this September 3, 2002 letter is attached as Exhibit 3. This letter concluded with a warning to

15 Bally that "IGT simply cannot let an infringing product steal this [IGT's wheel games] profit."

16   23. The parties then met once again to discuss IGT's purported infringement

17 allegations. Following that meeting, on September 13, 2002, Bally sent a letter to IGT enclosing

18 prior art to the '932 patent. That letter informed IGT that the '932 patent plainly was invalid and

19 that, in any event, Bally did not infringe. A copy of this September 13, 2002 letter is attached as

20 Exhibit 4.

21   24. On October 31, 2002, based on IGT's threatening correspondence and the lack of

22 resolution in negotiations related to such correspondence, Bally filed a declaratory judgment

23 action seeking a declaration that the '932 and '573 patents, among others, were invalid and not

24 infringed by Bally. The action also sought declarations of non-infringement and invalidity as to

25 nine other patents that IGT had previously stated Bally infringed.

26   25. In response to Bally's Complaint, IGT brought a motion to dismiss on the grounds

27 that there was no case and controversy pursuant to 28 U.S.C. § 2201 and, therefore, the Court did

28 not have subject matter jurisdiction over Bally's claims for declaratory relief.  IGT argued that it

IGT-IN500627

1 | was not threatening Bally with litigation such that a "reasonable apprehension" of litigation, the

2 | legal standard for a case or controversy, was present. IGT made this representation despite the

3 | fact that it had asserted in correspondence that Bally's Monte Carlo product was an "infringing

4 | product."

5 |      26.     Based on IGT's statements in its motion, on May 16, 2003, the Court dismissed

6 | Bally's claims for declaratory relief on all patents, including two of the patents in suit in this

7 | litigation -- the '932 and '573 patents.

8 |      27.     On September 13, 2002, unbeknownst to Bally, IGT filed an application for a

9 | continuation patent to the '932 patent. In fact, this application was filed prior to the filing of

10 | Bally's complaint for declaratory relief, but IGT did not mention this application in its motion to

11 | dismiss. As part of its application, IGT provided the patent office with the prior art that had been

12 | sent to IGT by Bally's counsel in the course of negotiations concerning Bally's alleged

13 | infringement of the '932 patent.

14 |      28.     As set forth in paragraphs 47 through 54 below, IGT lied to procure the '646

15 | patent over this prior art. The patent also was fraudulently procured to obtain a patent that cited

16 | the prior art that IGT knew rendered the '932 patent invalid and so that IGT could sue Bally

17 | without fear of a defense or counter-claims concerning such art. The '646 patent was sought and

18 | obtained solely for the purpose of suing Bally and eliminating Bally from the wheel game

19 | market.

20 |      29.     As a result of IGT's misrepresentations to the Court about its intentions, Bally's

21 | request for declaratory relief was denied. Bally was therefore led to believe that it could proceed

22 | in the marketplace with the certainty that the products it was offering to its customers would not

23 | be accused of infringing IGT's patents, including but not limited to the '932 and '573 patents.

24 | Accordingly, Bally subsequently developed and introduced into the market additional and

25 | different versions of those products.

26 |      30.     On the very same day the '646 patent issued, December 7, 2004, and with no

27 | further notice to or discussions with Bally regarding any alleged infringement, IGT sued Bally

28 | not only on the newly issued patent, but on the '932 and '573 patents as well.

IGT-IN500628

**IGT Knows the '932 and '646 patents Are Invalid for Failure to Name A Known Inventor**

31.   On September 23, 1994, William R. Adams, the named inventor on the '932 and '646 patents, filed an application for a U.S. Patent titled "Slot Machine with Mechanical Bonus Indicator," which was assigned Serial Number 311,783 (the "'783 Application"). The concept proposed in the '783 Application was to modify a standard slot machine having standard, rotatable reels to include an additional wheel. The additional wheel would spin if the standard reels landed on specific symbols, and a bonus would be awarded to the player depending on the position of the additional wheel when it stopped spinning. The amount of the bonus was determined by the standard slot machine and the indicator was used merely to inform the player of the bonus.

32.   Claim 1, the only independent claim of the '783 Application, provided:

A slot machine comprising:

means for receiving a wager;

a plurality of rotatable reels, each of said reels comprising a plurality of indicia, wherein said rotatable reels are caused to rotate after a wager has been placed and subsequently stop thereby displaying a plurality of said indicia;

means for generating a plurality of signals corresponding to a plurality of displays of said indicia;

means for providing a winning payout, said payout providing means responsive to said signal generating means;

a mechanical, movable bonus payout indicator for visually indicating one of a plurality of bonus payouts to a player, said bonus payout indicator operatively connected to said signal generating means such that said bonus payout mechanism will only operate if said signal generating means has generated a signal corresponding to one of a preselected plurality of bonus reel displays.

33.   Nothing in the '783 Application described a game having a primary and secondary unit, with the bonus payout selected by the secondary unit. The '783 Application also disclosed

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500629

1  only one version of a rotating wheel, a version with an electro-mechanical control unit such as a

2  servo-motor.

3      34.    The concept disclosed in the '783 Application had limited utility.  Accordingly,

4  Anchor was unable to reduce its concept to practice by developing a satisfactory prototype of the

5  purported invention disclosed in the '783 Application.

6      35.    Upon information and belief, during the March 1995 Las Vegas Gaming Show

7  (the "Gaming Show"), Anchor Gaming ("Anchor") displayed a nonfunctioning version of its

8  purported invention, named the "Wheel of Gold."  This Wheel of Gold machine consisted of a

9  bonus wheel apparatus on top of a Bally-manufactured slot machine.  Anchor employees had

10  worked with Bally employees to develop this Wheel of Gold prototype, and the Bally employees

11  had contributed to the concept of having the bottom (primary) unit communicate with the top

12  (secondary) unit.  Nevertheless, the prototype developed by Bally did not function adequately.

13  As a result, representatives of Anchor contacted John Acres, the Chairman of Acres Gaming

14  ("Acres"), about Anchor's difficulties in developing a functioning prototype of the Wheel of Gold

15  machine.  Specifically, Anchor representatives discussed Anchor's and Bally's inability either to

16  successfully redesign a standard Bally-manufactured slot machine or to locate or manufacture a

17  reliable spinning mechanism, both of which were needed in order to achieve the concept

18  disclosed in the '783 Application.

19      36.    Upon information and belief, at the Gaming Show, Anchor representatives asked

20  Mr. Acres if Acres Gaming could solve the aforementioned problems with the Wheel of Gold

21  prototype.  Acres indicated that he believed Acres Gaming could do so.  During this discussion,

22  Anchor represented to Acres Gaming that Anchor held a patent on the Wheel of Gold game.

23  Anchor thereafter disclosed the '783 Application in support of that representation.

24      37.    Upon information and belief, Acres employees John F. Acres and Mark S. Forbes,

25  using their own resources and without financial support from Anchor, assisted in the

26  development of a successful prototype of the Wheel of Gold game in April of 1995.  In

27  particular, Acres made three conceptual changes to the previous concept.  First, Acres used its

28  own "Concept III Communication Protocol" to communicate between a primary unit, comprised

IGT-IN500630

1    of a standard slot machine, and a secondary unit, housing the additional wheel. Acres also

2    designed and developed a reliable spinning mechanism for the wheel, using an electronic

3    position sensing and stopping mechanism instead of the mechanical or electro-mechanical

4    disclosed in the '783 Application. Finally, Acres rejected the concept of having the primary

5    gaming unit -- the standard slot machine -- determine the bonus to be indicated by the additional

6    wheel and, instead, used a random number generator in the secondary unit to determine this

7    bonus. Anchor had no input to the conception and reduction to practice of the concepts

8    developed and implemented by Acres.

9         38.    In April of 1995, Acres successfully demonstrated its two unit prototype -- the

10   first working prototype of the Wheel of Gold machine -- to Anchor. This unit, like the original

11   prototype, was built atop a Bally-manufacture slot machine. Further, this functioning prototype

12   include significant inventive contributions from both Bally employees and John Acres. As a

13   result of the successful functioning of this prototype, Anchor signed a contract with Acres to

14   produce 100 Wheel of Gold subsystems, without which the Wheel of Gold machine could not

15   operate.

16        39.    Acres subsequently added further enhancements to the Wheel of Gold, including a

17   Bonus Multiplier, an audio speaker as a means of indicating the gradual decreasing rate of spin of

18   the wheel, and a dot matrix display for the bonus multiplier.

19        40.    As a result of the concepts and implementation of the Bally employees and John

20   Acres, the Wheel of Gold game became successful. Anchor Gaming therefore sought to

21   purchase additional bottom units from Bally and additional Wheel of Gold systems from Acres.

22        41.    On August 8, 1997, Anchor, on behalf of the named inventor, William R. Adams,

23   filed another application for a U.S. Patent, identified as Serial Number 907,764 (the "'764

24   Application"). The '764 Application eventually matured into the '932 patent, which issued on

25   December 15, 1998.

26        42.    The '932 patent, titled "Method of Playing Game and Gaming Device With an

27   Additional Payout Indicator," includes claims directed to Acres' concept of using a primary and

28   secondary unit as well as claims directed to the concepts introduced and developed by the Bally

IGT-IN500631

1   employees.  For example, at least the primary and secondary unit concepts were conceived and

2   reduced to practice by Acres and its employees.  Upon information and belief, neither Anchor nor

3   Mr. Adams contributed to those concepts nor assisted in the reduction of those concepts to

4   practice.

5       43.     Upon information and belief, neither Anchor Gaming, Anchor Coin, William R.

6   Adams, nor anyone associated with them, disclosed to Bally or Acres Gaming that the '764

7   Application had been either prepared or filed.  Further, neither Anchor Gaming, Anchor Coin,

8   William R. Adams, nor anyone associated with them, disclosed to Bally or Acres Gaming any

9   intent to file a patent application on Acres' concepts.

10      44.     On September 13, 2002, Anchor, on behalf of the named inventor, William R.

11  Adams, filed yet another application for a U.S. Patent, identified as Serial Number 243,254 (the

12  "'254 Application").  The '254 application was subsequently assigned from Anchor Gaming to

13  IGT via an assignment dated January 17 and 20, 2003.  The '254 Application eventually matured

14  into the '646 patent, which issued on December 7, 2004.

15      45.     The '646 patent, titled "Slot Machine With an Additional Payout Indicator,"

16  includes claims covering concepts that were conceived and reduced to practice by Bally

17  employees and by Acres and its employees.  Upon information and belief, neither Anchor nor

18  Mr. Adams contributed to those concepts nor assisted in the reduction of those concepts to

19  practice.

20      46.     Upon information and belief, neither Anchor Gaming, Anchor Coin, William R.

21  Adams, nor anyone associated with them, disclosed to Bally or Acres Gaming that the '254

22  Application had been either prepared or filed.  Further, neither Anchor Gaming, Anchor Coin,

23  William R. Adams, nor anyone associated with them, disclosed to Bally or Acres Gaming any

24  intent to file a patent application on Acres' concepts.

25  **IGT Misrepresented Prior Art to the Patent Examiner**

26      47.     During the prosecution of the '932 patent, one of the pieces of prior art identified

27  by the Patent Examiner, Benjamin H. Layno, was a British Patent Application, GB 2,201,821A

28  ("'821" or "Pickardt"), titled "Coin-operated gaming machine," of which Hans J. Pickardt and

IGT-IN500632

1  Jurgen Schattauer were named inventors.  Pickardt disclosed a gaming machine with a set of

2  rotatable reels and, upon activation, a bonus payout indicator in the form of a rotatable disc.  The

3  Pickardt application was filed on September 9, 1987 and published on September 7, 1988.

4      48.    Examiner Layno allowed the claims of the '932 patent, which issued on December

5  15, 1998, over Pickardt pursuant to an Examiner's Amendment dated August 12, 1998.  In his

6  Reasons for Allowance (found within the Examiner's Amendment), Examiner Layno described

7  Pickardt as disclosing a game of skill.  Layno stated:

8       The British patent to Pickardt, cited by the applicant, discloses a
        slot machine having a primary game with rotatable reels.  When
9       the reels stop and display a winning combination of symbols, a
        signal generating means generates a signal to operate a secondary
10      gaming unit.  The secondary gaming unit has a rotatable wheel
        with a plurality bonus payouts [sic] and outer wheel with arrows.
11      The wheels rotate, and using a player's *skill* the player stops
        rotation of the wheels by pressing button 24 to select a bonus
12      payout.  [emphasis in original].

13  Examiner Layno further explained:

14      None of the cited references alone or in combination teach the
        claimed "providing a secondary gaming unit having a plurality of
15      bonus payouts, said secondary gaming unit providing a player with
        a *randomly selected* bonus payout and displaying said bonus
16      payout with a *movable* mechanical bonus indicator in the form of a
        disc."  [emphasis in original].

17

18      49.    Pickardt also was addressed during the prosecution of U.S. Patent No. 6,162,121

19  (the "'121 patent").  The '121 patent, which is a continuation of the '573 patent, issued on

20  December 19, 2000.  IGT is identified on the face of the '121 patent as the Assignee.  In the

21  prosecution history of the '121 patent, the Applicant acknowledged that Pickardt discloses a

22  random based game, in addition to a skill based game.  In particular, in its April 18, 2000

23  Amendment to the patent application, which was filed in response to the first Office Action on

24  the application, the Applicant admitted that Pickardt discloses a random based game, while citing

25  language from Pickardt in order to distinguish the '121 patent over it.  The Applicant described

26  Pickardt as follows:

27      Pickardt notes that "[i]n particular, the microcomputer 15 is
        responsible for *randomly* determining the stopping of the rotatable
28      members 2, 3, and 4 and for *determining the result* in the
        additional winning game (15, 19) .... (Pickardt, pg. 9, lns. 22-26).

IGT-IN500633

... Instead Pickardt discloses a *single microprocessor* for controlling both reels 2, 3, and 4 and the wheel 15. [emphasis added].

50.    During prosecution of the '646 patent, Pickardt was again discussed. Application No. 10/243,254 (the "'254 application") -- the application from which the '646 patent ultimately issued -- was filed on September 13, 2002, with Anchor Gaming as the named assignee. The '254 application allegedly was assigned from Anchor Gaming to IGT via an assignment dated January 17 and 20, 2003.

51.    In an October 6, 2003 Office Action, Examiner Layno, the same examiner who eventually approved the '932 patent, rejected all of the claims (claims 1-18) in the original '254 application. In particular, claims 10-18 were rejected under 35 U.S.C. § 102(b) because they were anticipated by Pickardt. In describing Pickardt in connection with these claim rejections, Examiner Layno explained that, in Pickardt, "[w]hen a predetermined indicia set is displayed, e.g., three 7's, a signal is generated causing the bonus payout indicator disc to rotate and stop providing a player with a *randomly selected bonus payout* displayed on the disc, see pages 8-10." (emphasis added). Examiner Layno, therefore, understood Pickardt to teach a random game.

52.    In response to that October 6, 2003 Office Action, the Applicant filed an Amendment to the application, dated April 5, 2004. Despite IGT's description of Pickardt as a random based game during prosecution of the '121 patent four years earlier, in this 2004 Amendment, IGT attempted to distinguish Pickardt by describing it as teaching a skill based game. In describing the bonus feature disclosed in Pickardt, IGT explained:

> The illuminated arrow 19 rotates relatively slowly (page 4, lines 11-13), and the slow rotation of the illuminated arrow 19 allows the player to stop the rotating arrow in any desired stopping position *based on the use of skill* (page 4, lines 13-15). The rotation of the illuminated arrows 19 and the rotation of the disc 15 are *stopped by the player* by pressing the stop button 24 (page 8, lines 12-16). [emphasis added].

IGT then suggested that Pickardt did not disclose the concept of using a random number generator to select a payout before stopping the payout indicator. In particular, IGT asserted that "there is no disclosure in Pickardt that the disc 15 is caused to stop <u>after</u> a payout amount is

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500634

1  selected," and "there is no disclosure in Pickardt that the disc 15 is caused to stop at a stop

2  position based on a previously selected payout amount." (emphasis in original).

3       53.    In describing the Pickardt application to Examiner Layno in connection with the

4  '254 application, IGT affirmatively failed to disclose numerous references in Pickardt which

5  disclose a random based game. For example, the Abstract in the Pickardt application recites, "[a]

6  coin-operated gaming machine which offers the prospect of a win, including a plurality of

7  rotatable members (2, 3, 4), ... display windows (5), and *a microprocessor (25), fitted with a*

8  *random number generator, for controlling the entire course of the game.*" (emphasis added).

9  The Pickardt application reiterates a second time that "[t]he present invention relates to a

10 coin-operated gaming machine which offers the prospect of a win, including a plurality of

11 rotatable members[,] ... display windows, and *a microprocessor, fitted with a random number*

12 *generator, for controlling the entire course of a game.*" (Pickardt, pg.1, lns. 5-11) (emphasis

13 added). Still further, the Pickardt application reiterates yet a third time that "[a]ccording to the

14 invention, there is provided a coin-operated gaming machine which offers the prospect of a win,

15 comprising a plurality of rotatable symbol carrying members[,] ... display windows, and *a*

16 *microprocessor, fitted with a random number generator, for controlling the entire course of a*

17 *game....*" (Pickardt, pg.3, lns. 12-18) (emphasis added). Finally, Pickardt explained for a fourth

18 time that "*the microcomputer 25 is responsible for randomly determining the stopping of the*

19 *rotatable members 2, 3, and 4 and for determining the result [sic] in the additional winning*

20 *game....*" (Pickardt, pg.9, lns. 22-26). (emphasis added). IGT failed to disclose these references

21 to Pickardt as a random based game in connection with the '254 application even though it had

22 previously disclosed such information and described Pickardt as a random based game in

23 connection with the prosecution of the '121 patent, as set forth above.

24      54.    Based upon IGT's misrepresentations about Pickardt and its failure to disclose the

25 references set forth above, Examiner Layno allowed the '646 patent. In his Reasons for

26 Allowance, Examiner Layno specifically stated:

27              None of the cited references nor Pickardt teach the claimed slot
               machine having "a random number generator for randomly
28              selecting one of said payout amounts," "based on an action
               performed by said random generator, after a payout amount has

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500635

1         been selected, said control unit then causing said movable payout
        indicator to stop at a stop position based on said selected payout
2         amount."

3 This explanation stands in stark contrast to the language of Pickardt that IGT failed to disclose.

4 The issuance of the '646 patent, therefore, was the result of IGT's misrepresentations to the Patent

5 Office.

6 **IGT's Broad Infringement Assertions Seek to Eliminate Bally from the Gaming Machine**

7 **Market**

8      55.     IGT's Complaint asserts a claim of infringement as to each and every possible

9 product that Bally might have in the sub-market defined above. IGT has asserted that all of

10 Bally's wheel games infringe on one or more claims of the '932 patent, '646 patent and '573

11 patent. Yet IGT's infringement assertions extend beyond Bally's wheel games.

12      56.     As to the '573 patent, IGT's claims are particularly broad and assert infringement

13 by "certain gaming machines." According to IGT, this includes all machines, regardless of

14 features, that are linked to the "Quartermillion$" progressive game.

15      57.     As set forth above, the subject matter of these patents was discussed in 2002, prior

16 to Bally bringing a declaratory judgment action. The one other possible "bonus game" that Bally

17 offers -- its "Frenzy" line of gaming machines -- is now also subject to an infringement allegation

18 by IGT. In order to completely eliminate Bally as a competitor in the market for all "bonus

19 games," IGT needed a patent to assert against these particular lines of machines.

20      58.     In April of 2003, while lying in wait for the issuance of the '646 patent, which

21 would allow IGT again to attempt to eliminate Bally from the wheel game market, IGT located

22 and purchased the '891 patent from a company in Tokyo. Despite the fact that this patent issued

23 over 8 years ago and Bally has been offering its Frenzy games for several years, IGT now asserts

24 that Bally infringes the '891 patent and that this alleged infringement must be stopped. IGT

25 purchased this final patent specifically for the purpose of eliminating competitors, and

26 particularly Bally, from the bonus game market. Prior to filing this lawsuit, IGT never once

27 contacted Bally and informed Bally that IGT believed its products to be infringing the '891

28 patent.

IGT-IN500636

59.    At the Las Vegas Gaming Exposition in October of 2004, Bally introduced a new product, "iView." This product was intended to increase Bally's market share in the market for gaming machines which allow players to communicate with the game. Less than two months after Bally entered this market with iView, IGT found the patents in its arsenal it believed would enable it to prohibit Bally from competing with IGT. Without a single letter, call or other notice to Bally or its counsel, IGT brought claims of infringement against Bally on the '985 and '698 patents. IGT's actions while Bally's product is in its infancy have caused grave customer confusion, virtually eliminating Bally's ability to compete in this market against IGT.

**IGT Deceives the Public into Believing It Has Valid Patents for Entire Sub-markets**

60.    Filing this lawsuit against Bally was not enough. IGT also intended to make sure that all of Bally's customers believed that the products sold by Bally were infringing upon IGT's patents. To accomplish this goal, shortly after filing the Complaint, IGT issued a press release that stated that IGT filed this suit to "stop defendants from misappropriating IGT's patent innovations in the areas of bonus gaming machines features and technology allowing players to communicate with games and systems." A copy of this press release is attached hereto as Exhibit 5.

61.    This press release is not specific to the allegations in the Complaint, but rather deceives the public into believing that all of Bally's products containing bonus game features or technology allowing players to communicate with games and systems infringe IGT's patents. This statement was made in bad faith and has harmed Bally based on the confusion it created in the market and the competitive disadvantage at which this places Bally. Upon information and belief, IGT has made other false statements to Bally's customers. These statements have mislead Bally's customers about the legality of Bally's products.

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500637

## COUNT I

### (Declaratory Judgment of Noninfringement, Invalidity

### and Unenforceability of the '646 Patent)

62.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 61 of their Counterclaims, inclusive, as if fully set forth herein.

63.    IGT alleges that Defendants/Counter-Plaintiffs have infringed and continue to infringe the '646 patent.

64.    Defendants/Counter-Plaintiffs deny IGT's allegations of infringement and further, deny that the '646 patent is enforceable.  Accordingly, there exists a substantial and continuing justiciable controversy between Defendants/Counter-Plaintiffs and IGT as to the infringement, validity, and enforceability of the '646 patent.

65.    Defendants/Counter-Plaintiffs assert this counterclaim against IGT for declaratory relief that the '646 patent is not infringed, either directly, indirectly, under the doctrine of equivalents, or by contributory infringement or inducement, by any act of Alliance or Bally, either individually or collectively.

66.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '646 patent is invalid for failure to satisfy one or more of the requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282, and failure to name an inventor of one or more claims of the '646 patent with deceptive intent, in violation of provisions of the Code of Federal Regulations.

67.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '646 patent is unenforceable due to estoppel and inequitable conduct because of IGT's failure to name a known inventor and misrepresentations to the Patent Examiner.

68.    IGT served the Complaint on Defendants/Counter-Plaintiffs with knowledge that the '646 patent was unenforceable and not infringed.

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500638

## COUNT II

### (Declaratory Judgment of Noninfringement, Invalidity

### and Unenforceability of the '932 Patent)

69.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 68 of their Counterclaims, inclusive, as if fully set forth herein.

70.    IGT alleges that Defendants/Counter-Plaintiffs have infringed and continue to infringe the '932 patent.

71.    Defendants/Counter-Plaintiffs deny IGT's allegations of infringement and further, deny that the '932 patent is enforceable or valid.  Accordingly, there exists a substantial and continuing justiciable controversy between Defendants/Counter-Plaintiffs and IGT as to the infringement, validity, and enforceability of the '932 patent.

72.    Defendants/Counter-Plaintiffs assert this counterclaim against IGT for declaratory relief that the '932 patent is not infringed, either directly, indirectly, under the doctrine of equivalents, or by contributory infringement or inducement, by any act of Alliance or Bally, either individually or collectively.

73.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '932 patent is invalid for failure to satisfy one or more of the requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282, and failure to name an inventor of one or more claims of the '932 patent with deceptive intent, in violation of provisions of the Code of Federal Regulations.

74.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '932 patent is unenforceable due to estoppel, laches, and inequitable conduct because of IGT's failure to name a known inventor and misrepresentations to the Patent Examiner.

75.    IGT served the Complaint on Defendants/Counter-Plaintiffs with knowledge that the '932 patent was unenforceable and not infringed.

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500639

## COUNT III

### (Declaratory Judgment of Noninfringement, Invalidity

### and Unenforceability of the '573 Patent)

76.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 75 of their Counterclaims, inclusive, as if fully set forth herein.

77.    IGT alleges that Defendants/Counter-Plaintiffs have infringed and continue to infringe the '573 patent.

78.    Defendants/Counter-Plaintiffs deny IGT's allegations of infringement and further, deny that the '573 patent is enforceable or valid.  Accordingly, there exists a substantial and continuing justiciable controversy between Defendants/Counter-Plaintiffs and IGT as to the infringement, validity, and enforceability of the '573 patent.

79.    Defendants/Counter-Plaintiffs assert this counterclaim against IGT for declaratory relief that the '573 patent is not infringed, either directly, indirectly, under the doctrine of equivalents, or by contributory infringement or inducement, by any act of Alliance or Bally, either individually or collectively.

80.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '573 patent is invalid for failure to satisfy one or more of the requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282.

81.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '573 patent is unenforceable due to estoppel and laches.

82.    IGT served the Complaint on Defendants/Counter-Plaintiffs with knowledge that the '573 patent was invalid, unenforceable and not infringed.

## COUNT IV

### (Declaratory Judgment of Noninfringement, Invalidity

### and Unenforceability of the '891 Patent)

83.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500640

1  Affirmative Defenses and paragraphs 1 through 82 of their Counterclaims, inclusive, as if fully

2  set forth herein.

3      84.    IGT alleges that Defendants/Counter-Plaintiffs have infringed and continue to

4  infringe the '891 patent.

5      85.    Defendants/Counter-Plaintiffs deny IGT's allegations of infringement and further,

6  deny that the '891 patent is enforceable or valid.  Accordingly, there exists a substantial and

7  continuing justiciable controversy between Defendants/Counter-Plaintiffs and IGT as to the

8  infringement, validity, and enforceability  of the '891 patent.

9      86.    Defendants/Counter-Plaintiffs assert this counterclaim against IGT for declaratory

10  relief that the '891 patent is not infringed, either directly, indirectly, under the doctrine of

11  equivalents, or by contributory infringement or inducement, by any act of Alliance or Bally,

12  either individually or collectively.

13      87.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for

14  declaratory relief that the '891 patent is invalid for failure to satisfy one or more of the

15  requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282.

16      88.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for

17  declaratory relief that the '891 patent is unenforceable due to estoppel and laches.

18      89.    IGT served the Complaint on Defendants/Counter-Plaintiffs with knowledge that

19  the '891 patent was invalid, unenforceable and not infringed.

20                    **<u>COUNT V</u>**

21          **(Declaratory Judgment of Noninfringement, Invalidity**

22              **and Unenforceability of the '698 Patent)**

23      90.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

24  Affirmative Defenses and paragraphs 1 through 89 of their Counterclaims, inclusive, as if fully

25  set forth herein.

26      91.    IGT alleges that Defendants/Counter-Plaintiffs have infringed and continue to

27  infringe the '698 patent.

28

IGT-IN500641

92.    Defendants/Counter-Plaintiffs deny IGT's allegations of infringement and further, deny that the '698 patent is enforceable or valid.  Accordingly, there exists a substantial and continuing justiciable controversy between Defendants/Counter-Plaintiffs and IGT as to the infringement, validity, and enforceability  of the '698 patent.

93.    Defendants/Counter-Plaintiffs assert this counterclaim against IGT for declaratory relief that the '698 patent is not infringed, either directly, indirectly, under the doctrine of equivalents, or by contributory infringement or inducement, by any act of Alliance or Bally, either individually or collectively.

94.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '698 patent is invalid for failure to satisfy one or more of the requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282.

95.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for declaratory relief that the '698 patent is unenforceable due to estoppel and laches.

96.    IGT served the Complaint on Defendants/Counter-Plaintiffs with knowledge that the '698 patent was invalid, unenforceable and not infringed.

## COUNT VI

### (Declaratory Judgment of Noninfringement, Invalidity
### and Unenforceability of the '985 Patent)

97.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 96 of their Counterclaims, inclusive, as if fully set forth herein.

98.    IGT alleges that Defendants/Counter-Plaintiffs have infringed and continue to infringe the '985 patent.

99.    Defendants/Counter-Plaintiffs deny IGT's allegations of infringement and further, deny that the '985 patent is enforceable or valid.  Accordingly, there exists a substantial and continuing justiciable controversy between Defendants/Counter-Plaintiffs and IGT as to the infringement, validity, and enforceability  of the '985 patent.

IGT-IN500642

1    100.    Defendants/Counter-Plaintiffs assert this counterclaim against IGT for declaratory

2  relief that the '985 patent is not infringed, either directly, indirectly, under the doctrine of

3  equivalents, or by contributory infringement or inducement, by any act of Alliance or Bally,

4  either individually or collectively.

5    101.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for

6  declaratory relief that the '985 patent is invalid for failure to satisfy one or more of the

7  requirements of Title 35, including without limitation, Sections 101, 102, 103, 112 and/or 282.

8    102.    Defendants/Counter-Plaintiffs also assert this counterclaim against IGT for

9  declaratory relief that the '985 patent is unenforceable due to estoppel and laches.

10    103.    IGT served the Complaint on Defendants/Counter-Plaintiffs with knowledge that

11  the '985 patent was invalid, unenforceable and not infringed.

12                                    **COUNT VII**

13        **(Monopolization of the Gaming Machine and Wheel Game Markets:  15 U.S.C. § 2)**

14    104.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

15  Affirmative Defenses and paragraphs 1 through 103 of their Counterclaims, inclusive, as if fully

16  set forth herein.

17    105.    IGT's conduct amounts to willful maintenance of its monopoly power in the

18  gaming machine and wheel game markets, and constitutes unlawful monopolization in violation

19  of Section 2 of the Sherman Act, 15 U.S.C. § 2. IGT's monopolization of the gaming machines

20  and wheel game markets occurs in and/or affects interstate commerce.

21    106.    In pursuit of its monopolization efforts of the gaming machine and wheel game

22  markets, IGT has engaged in the following anti-competitive acts:

23            a.    IGT has an extensive history of misusing the patent process and

24  enforcement actions, in order to intimidate and drive out competitors, including:

25                i.    filing for at least 250 patents for alleged inventions in the field of

26  gaming machines (at least 232 of which have issued *since August 2001*), purchasing or being

27  assigned numerous additional patents, and obtaining exclusive licenses for even further

28  additional patents, even when it knows that many of these purported patents are invalid; and

IGT-IN500643

1          ii.     filing patent infringement actions -- including two such lawsuits

2 against Defendants/Counter-Plaintiffs since 2001 and at least an additional four lawsuits against

3 other competitors in the gaming machine market since 1999 -- based upon the alleged

4 infringement of patents that were fraudulently obtained or that IGT knows are invalid.

5          b.     IGT misrepresented its intentions to the Court and to Defendants/Counter-

6 Plaintiffs regarding its plans not to enforce the '932 patent in order to persuade the Court to

7 dismiss Defendants/Counter-Plaintiff's previous declaratory judgment action. However, without

8 having informed the Court or Defendants/Counter-Plaintiffs, IGT already was pursuing a

9 continuation of the '932 patent -- the '646 patent. On the day the '646 patent issued, IGT brought

10 this action to enforce the '646 patent in addition to the '932 patent. IGT did so because it knew

11 that the '932 was invalid because of anticipation by prior art brought to its attention by

12 Defendants/Counter-Plaintiffs.

13          c.     IGT fraudulently procured the '646 patent to obtain a patent that cited the

14 prior art that Defendants/Counter-Plaintiffs had informed IGT rendered the parent '932 patent

15 invalid so that IGT could sue and successfully eliminate Defendants/Counter-Plaintiffs from the

16 wheel game submarket.

17          d.     IGT has made overbroad and ill-defined claims of infringements of the

18 '932, '646 and '573 patents knowing that they are meritless in order to eliminate

19 Defendants/Counter-Plaintiffs from the wheel game market.

20          e.     IGT has deceived the public into believing that it has patents for the

21 submarkets of bonus gaming machines features and technology allowing players to communicate

22 with games and systems by issuing a vague and misleading press release as well as other false

23 statements to Defendants'/Counter-Plaintiffs' customers regarding the legality of

24 Defendants'/Counter-Plaintiff's gaming machine products in the relevant submarkets.

25      107.     IGT's pattern of behavior is harmful to competition in the wheel game market. As

26 a result of its anticompetitive behavior, IGT holds a dominant market share -- approximately

27 80% -- in the wheel game market. Bally is the only substantial competitor to IGT in the wheel

28 game market. Nevertheless, Bally's market share in the wheel game market is only

IGT-IN500644

1  approximately 10%. Absent relief from the Court, IGT will be the only provider in the wheel

2  market, thereby creating a complete monopoly and eliminating all competition in that market.

3      108.    IGT's pattern of behavior is also harmful to competition in the gaming machine

4  market. As a result of its anticompetitive behavior, IGT holds a dominant market share in the

5  gaming machine market, holding approximately 75-80% of the market share. In contrast,

6  Defendants/Counter-Plaintiffs are the only competitor of IGT with more than 10% of the gaming

7  machines market, with the remaining competitors holding less then 10% of the market share

8  collectively. Absent relief from the Court, IGT's market share in the gaming machine market

9  will increase further, thereby approaching a monopoly and eliminating competition in that

10  market.

11      109.    As a direct and proximate result of the foregoing, Counter-Plaintiffs Alliance and

12  Bally have been injured in their business and property in an amount to be determined at trial.

13  ## COUNT VIII

14  **(Attempted Monopolization of the Gaming Machine
   and Wheel Game Markets: 15 U.S.C. § 2)**

15

16      110.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

17  Affirmative Defenses and paragraphs 1 through 109 of their Counterclaims, inclusive, as if fully

18  set forth herein.

19      111.    As set forth in Count VII, IGT has the specific intent to monopolize the gaming

20  machine and wheel game markets. IGT's conduct, as alleged herein, has been undertaken to

21  achieve, maintain or extend such monopolies, and to the extent (if any) that IGT has not already

22  obtained monopoly power, there is a dangerous probability that it will succeed in obtaining it.

23      112.    As set forth in Count VII, IGT is attempting to monopolize the gaming machine

24  and wheel game markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 through

25  anticompetitive actions designed to eliminate competition. IGT's anticompetitive conduct occurs

26  in and/or affects interstate commerce and is harmful to competition.

27      113.    As a direct and proximate result of the foregoing, Counter-Plaintiffs Alliance and

28  Bally have been injured in their business and property in an amount to be determined at trial.

IGT-IN500645

1    **COUNT IX**

2    **(Monopolization of the Gaming Machine and Wheel Game Markets:  N.R.S. § 598A.060)**

3    114.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

4    Affirmative Defenses and paragraphs 1 through 113 of their Counterclaims, inclusive, as if fully

5    set forth herein.

6    115.    As set forth in Count VII, IGT's conduct amounts to willful maintenance of its

7    monopoly power in the gaming machine and wheel game markets, and constitutes unlawful

8    monopolization in violation of Nevada Revised Statute § 598A.060.

9    116.    As a direct and proximate result of the foregoing, Counter-Plaintiffs Alliance and

10    Bally have been injured in their business and property in an amount to be determined at trial.

11    **COUNT X**

12    **(Attempted Monopolization of the Gaming Machine
       and Wheel Game Markets:  N.R.S. § 598A.060)**

13

14    117.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

15    Affirmative Defenses and paragraphs 1 through 116 of their Counterclaims, inclusive, as if fully

16    set forth herein.

17    118.    As set forth in Count VII, IGT has the specific intent to monopolize the gaming

18    machine and wheel game markets.  IGT's conduct, as alleged herein, has been undertaken to

19    achieve, maintain or extend such monopolies, and to the extent (if any) that IGT has not already

20    obtained monopoly power, there is a dangerous probability that it will succeed in obtaining it.

21    119.    As set forth in Count VII, IGT is attempting to monopolize the gaming machine

22    and wheel game markets in violation of in violation of Nevada Revised Statute § 598A.060.

23    120.    As a direct and proximate result of the foregoing, Counter-Plaintiffs Alliance and

24    Bally have been injured in their business and property in an amount to be determined at trial.

25    **COUNT XI**

26    **(Lanham Act)**

27    121.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

28    Affirmative Defenses and paragraphs 1 through 120 of their Counterclaims, inclusive, as if fully
      set forth herein.

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500646

1    122.    In violation of section 43(a) of the <u>Lanham Act</u> (false advertising), IGT has

2  made, in bad faith, material and false representations regarding Defendants/Counter-Plaintiffs'

3  products in interstate commerce that are likely to deceive the intended audience, by releasing a

4  vague and misleading press release designed to confuse Defendants/Counter-Plaintiffs' customers

5  into believing that all of Bally's products that have bonus game features or that have technology

6  allowing players to communicate with games and systems infringe IGT's patents.

7    123.    Upon information and belief, IGT has also made other false statements to Bally's

8  customers that have misled or are likely to mislead Bally's customers about the legality of Bally's

9  products.

10    124.    As a direct and proximate result of the foregoing, Defendants/Counter-Plaintiffs

11  Alliance and Bally have been injured in their business and property in an amount to be

12  determined at trial.

13                                **<u>COUNT XII</u>**

14                              **(Walker Process)**

15    125.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their

16  Affirmative Defenses and paragraphs 1 through 124 of their Counterclaims, inclusive, as if fully

17  set forth herein.

18    126.    IGT fraudulently procured the '932 and '646 patents by failing to identify a known

19  inventor and by misrepresenting prior art to the Patent Examiner.

20    127.    IGT has willfully sought and maintained monopolization of the gaming machines

21  market, in violation of Section 2 of the Sherman Act through predatory conduct, with the intent

22  to monopolize, and with the dangerous probability of gaining monopoly power in the relevant

23  market.

24    128.    As a direct and proximate result of the foregoing, Defendants/Counter-Plaintiffs

25  Alliance and Bally have been injured in their business and property in an amount to be

26  determined at trial.

27

28

IGT-IN500647

## COUNT XIII

### (Violation of N.R.S. 598A.210)

129.    Defendants/Counter-Plaintiffs reallege and incorporate by reference their Affirmative Defenses and paragraphs 1 through 128 of their Counterclaims, inclusive, as if fully set forth herein.

130.    As described herein, IGT's actions constitute unfair business acts and unfair business practices, and violate Chapter 598A of the Nevada Trade Regulations and Practices Code ("Chapter 598A") on the grounds that:

        a)    IGT's actions threaten an incipient violation or a violation of the spirit of the antitrust laws, to wit Section 2 of the Sherman Act (15 U.S.C. § 2) and Nevada Revised Statute Chapter 598A; and/or

        b)    IGT's actions significantly threaten or harm competition.

131.    In pursuit of its objective to threaten or harm competition, IGT engaged in the following unfair business acts:

        a)    IGT has misused the patent process by filing and obtaining numerous invalid patents in order to bring multiple meritless infringement actions against Defendants/Counter-Plaintiffs for the purpose of driving Defendants/Counter-Plaintiffs out of the gaming machine and wheel game markets;

        b)    IGT has misrepresented to the Court and to Defendants/Counter-Plaintiffs regarding their previous intentions in enforcing the '932 patent to later bring this action enforcing the '646 patent, a continuation of the '932 patent;

        c)    IGT wrongfully obtained the '646 patent by fraudulently citing prior art that it knew invalidated the '932 parent patent, in an attempt to immunize itself from any of Defendants/Counter-Plaintiff's possible defenses and counter-claims;

        d)    IGT intentionally misrepresented the Pickardt reference to the Patent Examiner during the prosecution of the '932 and '646 patents;

        e)    IGT has made vague, misleading, and false representations to Defendants/Counter-Plaintiff's customers regarding the legality of their products to gain a

IGT-IN500648

1  competitive disadvantage.

2      132.   As a direct and foreseeable result of IGT's violations of Chapter 598A,

3  Defendants/Counter-Plaintiffs Alliance and Bally have been injured in their business and

4  property in an amount to be determined at trial.

5  **COUNT XIV**

6  **(Intentional Interference with Prospective Business Advantage)**

7      133.   Defendants/Counter-Plaintiffs reallege and incorporate by reference their

8  Affirmative Defenses and paragraphs 1 through 132 of their Counterclaims, inclusive, as if fully

9  set forth herein.

10      134.   IGT is aware that Bally has an economic interest in selling its gaming machines to

11  customers in the gaming machine market, including the wheel game submarket.  Further IGT is

12  aware that Bally receives an economic benefit from its ability to offer its potential customers a

13  product that is either protected by Bally's own patent portfolio or, in the very least, does not

14  infringe others' patents.  IGT is aware that Bally has prospective contractual relationships with

15  third parties based on its ability to manufacture and sell gaming machines without facing

16  exposure to patent litigation.

17      135.   IGT intended to harm Bally by issuing a press release that deceives the public into

18  believing that all of Bally's products containing bonus game features or technology allowing

19  players to communicate with games and systems infringe IGT's patents, and accordingly

20  interfering with Bally's prospective contractual relationships with customers -- customers for

21  whose business IGT also competes.

22      136.   IGT has no justification or privilege to interfere with Bally's prospective

23  contractual relationships with third parties.

24      137.   As a direct and proximate result of the IGT's interference with

25  Defendants/Counter-Plaintiff's' prospective business advantage, Counter-Plaintiffs Alliance and

26  Bally have been and continue to be damaged in an amount to be determined at trial.

27  **PRAYER FOR RELIEF**

28      WHEREFORE, Defendants/Counter-Plaintiffs pray for the entry of judgment in favor of

IGT-IN500649

1   Alliance and Bally and against IGT as follows:

2          A.      The Court dismiss with prejudice, any and all claims of IGT's Complaint and

3   order that Plaintiff IGT take nothing as a result of the Complaint and that all of IGT's prayers for

4   relief are denied;

5          B.      The Court enter judgment that Defendants/Counter-Plaintiffs Alliance and Bally

6   have not infringed, contributed to the infringement of, or induced infringement of the '646, '932,

7   '573, '891, '698, and '985 patents;

8          C.      The Court enter judgment declaring that the '646, '932, '573, '891, '698, and '985

9   patents are invalid and/or unenforceable;

10         D.      The Court award prejudgment interest, pursuant to 35 U.S.C. § 284;

11         E.      The Court award an amount of increased damages in the amount of not less than

12  three times the amount of damages found by the jury or assessed by this Court, for IGT's willful

13  infringement, pursuant to 35 U.S.C. § 284;

14         F.      That this case be declared exceptional pursuant to 35 U.S.C. § 285 and that

15  Alliance and Bally be awarded their reasonable attorneys' fees and costs;

16         G.      Damages for Defendants/Counter-Plaintiffs, in an amount to be determined, and

17  trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

18         H.      Defendants/Counter-Plaintiffs' costs of this suit, including reasonable attorneys'

19  fees, as provided in Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

20         I.      For all other damages in an amount to be proven at trial;

21         J.      For pre-judgment interest at the highest legal rate on all such damages;

22         K.      For reasonable attorneys' fees and costs of suit incurred herein; and

23         L.      The Court grant to Alliance and Bally such other and further relief as may be

24  deemed just and appropriate.

25

26

27

28

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500650



DATED:  January 21, 2005

J. Stephen Peek, Esq.
Hale Lane Peek Dennison and Howard
2300 West Sahara Ave
Eighth Floor, Box 8
Las Vegas, Nevada 89102
Telephone: (702) 222-2500
Facsimile: (702) 365-6940

Charles K. Verhoeven, Esq.
Kevin P.B. Johnson, Esq.
Jennifer A. Kash, Esq.
R. Tulloss Delk, Esq.
Quinn Emanuel Urquhart
  Oliver & Hedges, LLP
50 California Street, 22d Floor
San Francisco, California  94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for Defendants and Counter-Plaintiffs
Alliance Gaming Corp., Bally Gaming
International, Inc., and Bally Gaming, Inc.

IGT-IN500651

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Defendants and Counter-Plaintiffs demand a trial by jury on all issues so triable.

DATED:  January 21st, 2005

J. Stephen Peek, Esq.
Hale Lane Peek Dennison and Howard
2300 West Sahara Ave
Eighth Floor, Box 8
Las Vegas, Nevada 89102
Telephone: (702) 222-2500
Facsimile: (702) 365-6940

Charles K. Verhoeven, Esq.
Kevin P.B. Johnson, Esq.
Jennifer A. Kash, Esq.
R. Tulloss Delk, Esq.
Quinn Emanuel Urquhart
  Oliver & Hedges, LLP
50 California Street, 22d Floor
San Francisco, California  94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for Defendants and Counter-Plaintiffs
Alliance Gaming Corp., Bally Gaming
International, Inc., and Bally Gaming, Inc.

DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

IGT-IN500652

Exhibit 1

IGT-IN500653

## International Game Technology Announces Agreement to Acquire Anchor Gaming

RENO, Nev. and LAS VEGAS, July 9 /PRNewswire/ -- International Game Technology (NYSE: IGT) and Anchor Gaming (Nasdaq: SLOT) announced today that the Boards of Directors of both companies have unanimously approved a definitive agreement pursuant to which Anchor Gaming will merge with a subsidiary of International Game Technology ("IGT"). This tax free, stock for stock transaction is valued at $1.365 billion, based on IGT's July 6, 2001 closing price of $59.20 and the assumption of indebtedness of $430 million at March 31, 2001. Based on that price, Anchor Gaming shareholders would receive one share of IGT Common Stock for each share of Anchor Gaming. The exchange ratio is subject to a collar as described below. The transaction will be accounted for on a purchase basis and is expected to be accretive to IGT's earnings. The combination creates a company with total combined annual revenues in excess of $2 billion.

As part of the transaction, Thomas J. (T.J.) Matthews will, at closing, join IGT as its Chief Operating Officer and will continue as President and Chief Executive Officer of Anchor Gaming. Upon closing of the transaction, two new directors will be added to the IGT Board of Directors, one of whom will be T.J. Matthews.

"We are very enthusiastic about this business combination," said G. Thomas Baker, President and Chief Executive Officer of IGT. "IGT and Anchor Gaming have been joint venture partners since 1996 on the very successful Wheel of Fortune(R) product. Upon closing, IGT will be able to recognize 100% of the joint revenue and profits previously shared by the companies. This is a significant strategic benefit. We are also very excited about the addition of Anchor Gaming's significant executive talent which will contribute to the further growth of IGT."

"No other company offers the depth of talent that IGT and Anchor Gaming will have together, from the executive level to design and manufacturing," said T.J. Matthews, Chairman, President and Chief Executive Officer of Anchor Gaming. "We are looking forward to the many possibilities that the combination presents."

Under the terms of the collar contained in the definitive agreement, each share of Anchor Gaming will be converted into one share of IGT subject to a collar from $50.00 to $75.00 per share. Under the collar mechanism, if IGT's average stock price exceeds $75.00 per share during the 20-day trading period ending the third business day prior to Anchor Gaming's shareholder vote on the merger, IGT will have the right to terminate the merger agreement, subject to Anchor Gaming's right to elect to accept a lower exchange ratio such that the value of the stock received by Anchor Gaming shareholders equals $75.00 per share. In addition, if IGT's share price during the 20-day trading period ending three business days prior to Anchor Gaming's shareholder vote on the merger is less than $50.00 per share, Anchor Gaming will have the right to terminate the merger agreement subject to IGT's right to provide a higher exchange ratio such that the value of the IGT stock received by Anchor Gaming shareholders equals $50.00 per share.

The merger is subject to the approval of both companies' shareholders and regulatory approvals, including gaming regulatory approvals. The companies anticipate that the transaction will be completed in the first calendar quarter of 2002.

Exhibit 2

IGT-IN500655

# KIRKLAND & ELLIS

PARTNERSHIPS INCLUDING PROFESSIONAL CORPORATIONS

200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Barry F. Irwin
To Call Writer Directly:
(312) 861-2423
barry_irwin@kirkland.com

Facsimile:
312-861-2200

VIA FEDERAL EXPRESS AND FACSIMILE

February 26, 2002

Mr. Robert Miodunski
President and CEO
Alliance Gaming Corp.
6601 Bermuda Rd
Las Vegas, NV 89119

Re:  Alliance Gaming Inc.; IGT's U.S. Patent Nos. 5,823, 874; 5,848,932;
     5,788,573; 6,162,121; 6,168,520 B1; 5,885,158; 5,643,086; 6,135,884 and
     6,315,666 B1 and IGT's Registered Trademark Five Times Pay.

Dear Mr. Miodunski:

We represent International Game Technology, IGT and Anchor Gaming (collectively "IGT"), the owners of U.S. Patent Nos. 5,823, 874 ("the '874 patent"); 5,848,932 ("the '932 patent"); 5,788,573 ("the '573 patent"); 6,162,121 ("the '121 patent"); 6,168,520 B1 ("the '520 patent"); 5,885,158 ("the '158 patent"); 5,643,086 ("the '086 patent"); 6,135,884 ("the '884 patent"); and 6,315,666 B1 ("the '666 patent") and the registered trademark "Five Times Pay." The '874, '932, '573, '121, and '520 patents generally relate to gaming machines including an indicia of a moving mechanical bonus indicator. The '158 patent generally relates to multi-denominational progressive gaming systems. The '086 patent generally relates to authentication for gaming systems. The '884 and '666 patents generally relate to gaming machines that have a primary display and secondary video display. Copies of these patents as well as the Five Times Pay trademark registration are enclosed for your reference.

We know that you have previously talked to Anchor Gaming about the '874 and '932 patents with regard to your Monte Carlo game. We also wish to make you aware of the '573, '121, and '520 patents, as they also relate to the Monte Carlo game. Additionally, we believe that the '158, '086, '884 and '666 patents are relevant to several of your other products, as further discussed below.

| London | Los Angeles | New York | Washington D.C. |

IGT-IN500656

### KIRKLAND & ELLIS

Mr. Miodunski
February 26, 2002
Page 2

Specifically, we believe that '086 patent would relate to all of the various configurations of the EVO platform offered by Alliance. Additionally, we believe the '884 and '666 patents are relevant to the EVO platforms that are configured with an LCD display in the top box.

Alliance also appears to be using the inventions of the '158 patent in its multi-denominational "Thrillions" progressive games.

Finally, Alliance is using the name Five Times Pay as well as a design that is very similar to the IGT registered trademark Five Times Pay.

IGT would like to discuss with you any reasons you have for believing that the above patents or trademark are not applicable to the corresponding gaming machines and systems mentioned. Please call me at your convenience to discuss these issues. IGT would prefer to resolve these issues amicably and expeditiously.

Thank you in advance for your prompt attention to this matter.

Very truly yours,

Barry F. Irwin

cc:    Henry J. Silberberg, Esq.

IGT-IN500657

Exhibit 3

IGT-IN500658

 **International Game Technology**

September 3, 2002

<u>Via Facsimile and Federal Express</u>

Mr. Robert Miodunski
President and CEO
Alliance Gaming Corp.
6601 Bermuda Rd
Las Vegas, NV 89119

      Re:      **Alliance Gaming's Monte Carlo game; IGT's U.S. Patent Nos.
5,788,573; 5,823,874; 5,848,932; and 6,168,520B1.**

Dear Mr. Miodunski:

    Per your request, IGT is providing this overview of its wheel patent position as it relates Alliance's proposed Monte Carlo game. IGT owns U.S. Patent Nos. 5,788,573 ("the '573 patent"); 5,823,874 ("the '874 patent"); 5,848,932 ("the '932 patent"); and 6,168,520B1 ("the '520 patent"). Based on our evaluation of Alliance's proposed Monte Carlo game *vis-à-vis* these patents, we have concluded that at least the following exemplary claims are relevant to the proposed Monte Carlo game:

- The '573 patent: Claims 1, 4, 5, 9, 10, 11, 12, 13, and 16

- The '874 patent: Claims 1, 15, 23, 26, 27, 28, 29, and 32

- The '932 patent: Claims 1, 2, 3, 4, 6, 10, 11, 12, 13, 16, 19, 22, 23, 24, 33, and 69

- The '520 patent: Claims 13, 15

    I understand that Alliance has taken the position that its proposed Monte Carlo cannot infringe any valid claim from these patents because Alliance is "practicing the prior art" of a 1970's vintage Bally machine titled Monte Carlo (hereinafter "Bally Monte Carlo"). Putting aside the fact that there is no "practicing the prior art" defense, *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002), there are several additional flaws with this position. First of all, IGT has investigated the Bally Monte Carlo game and found nothing to indicate that this game would be "prior art" under the U.S. patent laws. To the contrary, our investigation to date leads us to believe that the game was not manufactured in the United States and therefore may not be prior art.

IGT-IN500659

September 3, 2002
Page 2 of 2
Mr. Miodunski

But even if the Bally Monte Carlo game were assumed to be prior art, it would not affect IGT's position in this matter. The Bally Monte Carlo game and the proposed Monte Carlo game have a number of substantial differences, differences that are specifically covered by the patent claims identified above. For example:

- The Bally Monte Carlo game did not provide a "bonus" (*see e.g.,* '874 patent independent claims 1 and 26; '932 patent independent claims 1, 10, and 19).

- The Bally Monte Carlo game did not include a spin initiation button (*see, e.g.,* '874 patent claim 15 and '932 claims 3, 12, and 69).

- The Bally Monte Carlo game did not incorporate a computer with a random number generator and therefore had no virtual mapping/enhanced odds of either the base reels or the bonus indicator (*see, e.g.,* '520 patent independent claims 13 and 15; '573 patent dependent claims 4, 10, and 11).

- The Bally Monte Calro game did not offer a progressive prize (*see, e.g.,* '573 claims 5 and 13).

The foregoing are just a few of the plain differences between the proposed Alliance Monte Carlo game and the Bally Monte Carlo game – differences specifically covered by relevant patent claims. We believe there are more. We also believe that these differences could be expanded upon in the continuations of these patents that are currently pending in the PTO.

On a final note, I want to reiterate the importance of this technology to IGT's product line-up. Some of the IGT machines using this patented technology make more than $100,000 per year. IGT simply cannot let an infringing product steal this profit.

We would like to meet with you again as soon as possible in an attempt to work this issue out. Would you be available this week for a meeting? Please call to discuss.

Very truly yours,

Shawn Van Asdale

IGT-IN500660

Exhibit 4

IGT-IN500661

**Alliance Gaming** CORPORATION

ROBERT L. MIODUNSKI
President and
Chief Executive Officer

September 13, 2002

Mr. T.J. Matthews
IGT
1085 Palms Airport Drive
Las Vegas, NV 89119

Dear TJ:

Following-up our meeting the other day, we are
enclosing several pieces of prior art relating to
the use of lights in bonus games. This listing is
based upon a preliminary search performed over the
past several days.  Our search is ongoing and we
will provide you with additional art as we verify
dates and as we locate additional related art.

Photocopies of the art are attached for your
convenience.

1. Golden Wheels (Circa 1973)  We have this game in
our warehouse and it specifically has sequential
lights illuminating around the wheel.

2. Circus (Circa 1972)

3. Bonus Sevy (Circa 1993)

4. Slot Machine - Japanese Publication 04-058966
(February 25, 1992)

5. Roulette Gamine Machine - Japanese Publication
06-254208 (September 13, 1994)

6. Pachinko Game Machine - Japanese Publication 06-
190114 (December 7, 1994)

BALLY GAMING & SYSTEMS
BALLY WULFF
RAIL CITY CASINO
RAINBOW CASINO
UNITED COIN MACHINE COMPANY
VIDEO SERVICES, INC.

6601 SOUTH BERMUDA ROAD
LAS VEGAS, NEVADA 89119-3605
TELEPHONE: 702-270-7601
FAX: 702-270-7699

IGT-IN500662

7. Roulette Game Machine - Japanese Publication 06-327806 (November 29, 1994)

8. GB 2096376 - October 1982 (United Kingdom)

9. GB 2201821 - September 1988 (United Kingdom)

Again, we have additional pieces of art, but wish to verify their dates before submitting them for your review.

Please do not hesitate to contact me if you should have any questions. I haven't had a chance to reflect on the Monte Carlo license, but will plan to address this shortly after the show.

I also appreciate our mutual understanding agreed to in the meeting to not pursue litigation as a means to resolve our dispute as long as we are in discussion on a licensing agreement. I will also keep you informed in advance of the schedule for commercial deployment of the Monte Carlo units following regulatory approval.


Best regards,

Bob Miodunski

IGT-IN500663

Exhibit 5

IGT-IN500664

IGT Files Patent Infringement Lawsuit Against Alliance Gaming

Page 1 of 2

**YAHOO!** FINANCE  Search - Finance Home - Yahoo! - Help


PR Newswire

**Welcome [Sign In]**

To track stocks & more, Regis

**Financial News**

Enter symbol(s) [_____] [Basic ▾] [GO]  Symbol Lookup



HARRISdirect  Get $100 credit   S7 TRADES Scottrade   BAYSIDE SECURITIES LLC

**Press Release**                                                  Source: IGT

# IGT Files Patent Infringement Lawsuit Against Alliance Gaming

Wednesday December 8, 9:57 pm ET

RENO, Nev., Dec. 8 /PRNewswire-FirstCall/ -- International Game Technology (NYSE: IGT - News) confirmed today that it has filed a patent infringement lawsuit against Alliance Gaming Corporation (NYSE: AGI - News) and its Bally Gaming, Inc. and Bally Gaming International, Inc. subsidiaries in the Federal District Court in Las Vegas. The filing followed the issuance on December 7 of a new United States Patent to IGT. This patent is based on continuation of a patent application originally filed in 1994.


ADVERTISEMENT

The lawsuit alleges the defendants are infringing the new patent and five other IGT patents covering gaming machines and systems that feature additional payout indicators such as bonus wheels and bonus reels, and touch screen display devices allowing for player interactivity. Several of the defendants' recently introduced gaming machines and systems are alleged in the lawsuit to be infringing the IGT patents.

"IGT has always vigorously defended its intellectual property," said Dave Johnson, general counsel for IGT. "Consistent with that philosophy, we have filed this case to stop defendants from misappropriating IGT's patented innovations in the areas of bonus gaming machine features and technology allowing players to communicate with games and systems. IGT has no plans at this time to seek a preliminary injunction or other short-term relief that would affect customers. We will wait for the legal process to proceed and address the issue of relief for IGT at the appropriate time."

IGT (www.IGT.com) is a world leader in the design, development and manufacture of microprocessor-based gaming and video lottery products and software systems in all jurisdictions where gaming or video lottery is legal.

Statements in this release which are not historical facts are "forward looking"

**Related Quotes**

AGI  9-Dec 8  12:31pm (C) Yah

| | | |
|---|---|---|
| AGI | 11.42 | +0.01 Ne |
| IGT | 33.89 | +0.09 Ne |

View Detailed Quotes
Delayed 20 mins
Quote data provided by Reuters

**Related News Stories**

- [external] IGT and Alliance in Patent Dispute - TheStreet.com (9:30 am)
- Alliance Gaming Announces Results of Shareholders Meeting - PRNewswire (6:00 am)
- InPlay: Alliance Gaming comments on patent infringement complaint - Briefing.com (Wed Dec 8)
- Alliance Gaming Comments Patent Infringement Complai PR Newswire (Wed Dec 8)

Mon

- By industry: Computer hardware, Computers, Entertainment, Gambling, La Software

**Top Stories**

- Oil Prices Surge on Worries About OPEC - Associated Press (10:40 am)
- Stocks Sag on Jump in Joble Claims - Associated Press (12:17 pm)
- Folgers Coffee Price Is Hiked 14 Percent - Associated Press (11: am)
- Push to Cut OPEC Oil Production Building - Associated Press (12:25 pm)

Mon

IGT-IN500665

IGT Files Patent Infringement Lawsuit Against Alliance Gaming

statements under the Private Securities Litigation Reform Act of 1995. Although IGT believes that the expectations reflected in any of its forward-looking statements are reasonable, actual results could differ materially from those projected or assumed. IGT's future financial condition and results of operations, as well as any forward-looking statements, are subject to change and to inherent known and unknown risks and uncertainties. IGT does not intend, and undertakes no obligation, to update our forward-looking statements to reflect future events or circumstances.

Information on risks and factors that could affect IGT's business and financial results are included in our public filings made with the Securities and Exchange Commission.

- Most-emailed articles
- Most-viewed articles

Source: IGT

✉ Email Story        📢 Set News Alert        🖨 Print Story

[                    ] [ Search News ]

Sponsor Results

Easy and Fast Auto Loan from RoadLoans
Be in control by shopping like a cash buyer. Get great rates for all types of credit. New and used car financing and refinancing, private party purchase available.
www.roadloans.com

Fast Bad Credit Auto Loans
Qualify for a bad credit auto loan in 30 seconds before you apply. 93% approved nationwide. Rapid decisions to your e-mail. Amistoso Español.
www.fundingway.com

Auto Loans - All Credit Accepted
AutoLoans.us has a nationwide network of car dealers that offer programs for high-risk loans and are prepared to get you approved. Regardless of past credit problems, our experts can help.
www.autoloans.us
                    (What's This?)

Copyright © 2004 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2004 PR Newswire. All rights reserved. Republication or redistribution of PRNewswire content is expressly prohibited without the prior written consent of PRNewswire. PRNewswire shall not be liable for any errors or delays in the content, or for any actions taken in reliance thereon.

IGT-IN500666

# EXHIBIT 2



ENTERED AND
SERVED

MAR 29 2001

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| ACRES GAMING INC., | NO. CV-S-98-1462-EJW (LRL) (Base File) |
| Plaintiff, | |
| | NO. CV-S-97-1383-EJW (LRL) (Base File) |
| v. | |
| MIKOHN GAMING CORPORATION; and CASINO DATA SYSTEMS, | SPECIAL VERDICT FORM |
| Defendants. | |

[25570-0023/Document3]

1

We, the jury, find as follows:

*VALIDITY*

1.    U.S. Patent No. 5,655,961

      Has Mikohn proven by clear and convincing evidence that claim 1 of
      U.S. Patent No. 5,655,961 is invalid?

                                    Yes _____        No ___X___

2.    U.S. Patent No. 5,752,882

      Has Mikohn proven by clear and convincing evidence that the following
      claims of U.S. Patent No. 5,752,882 are invalid?

            Claim 10:     Yes _____        No ___X___

            Claim 11:     Yes _____        No ___X___

3.    U.S. Patent No. 5,820,459

      Has Mikohn proven by clear and convincing evidence that claim 1 of
      U.S. Patent No. 5,820,459 is invalid?

                                    Yes _____        No ___X___

4.    U.S. Patent No. 5,836,817

      Has Mikohn proven by clear and convincing evidence that the following
      claims of U.S. Patent No. 5,836,817 are invalid?

            Claim 1:      Yes _____        No ___X___

            Claim 21:     Yes _____        No ___X___

            Claim 24:     Yes _____        No ___X___

            Claim 29:     Yes _____        No ___X___

{25570-0023/Document3}                         2

*INFRINGEMENT*

5.     U.S. Patent No. 5,655,961

Has Acres proven by a preponderance of the evidence that claim 1 of
U.S. Patent No. 5,655,961 has been infringed by Mikohn?

Yes __X__          No _____

6.     U.S. Patent No. 5,836,817

Has Acres proven by a preponderance of the evidence that the following
claims of U.S. Patent No. 5,836,817 have been infringed by Mikohn?

Claim 1:      Yes __X__          No _____

Claim 21:     Yes __X__          No _____

Claim 24:     Yes __X__          No _____

Claim 29:     Yes __X__          No _____

7.     If you have found any claim to be both valid and infringed, state whether
the infringement was willful.

Yes _____          No __X__

8.     If you have found any claim to be both valid and infringed, state the amount of
Acres' damages:

$ 1,500,000.

Date: __3/27/01__          Signature _____
                                              Foreperson

{25570-0023/Document3}                    3

# EXHIBIT 3

GORDON&SILVER

ENTERED AND
SERVED

MAR 29 2001

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

A 450 (Rev. 5/85)  Judgment in a Civil Case ⊕

# UNITED STATES DISTRICT COURT

***** DISTRICT OF NEVADA

MIKOHN GAMING CORPORATION, ETAL,

Plaintiffs

v.

ACRES GAMING, INC., ETAL,

Defendants.

**JUDGMENT IN A CIVIL CASE**

CV-S-97-1383-EJW (LRL)

_X_ **Jury Verdict.** This action came before the jury for a trial by
the Court.  The issues have been tried and the jury has rendered
it's special verdict.

___ **Decision by Court.** This action came before the Court and a
decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment is entered against
Mikohn Gaming Corporation, et al and in favor of Acres Gaming,
Inc., in the amount of $1,500,000.00 for damages.

March 29, 2001
Date

LANCE S. WILSON
Clerk

(By) Deputy Clerk

A 450 (Rev. 5/85)  Judgment in a Civil Case ⊕

501

# EXHIBIT 4

NOTE:  Pursuant to Fed. Cir. R. 47.6, this disposition is not citable as precedent.  It is a public record.

# United States Court of Appeals for the Federal Circuit

## 05-1287, -1315

ACTION GAMING, INC. and IGT,

Plaintiffs-Cross Appellants,

v.

ALLIANCE GAMING CORP.
and UNITED COIN MACHINE CO.,

Defendants-Appellants,

and

BALLY GAMING, INC.,

Defendant.

# Judgment

ON APPEAL from the      U.S. DISTRICT COURT
DISTRICT OF NEVADA

In CASE NO(S).      01-CV-1109

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

Per Curiam:  (MAYER, LOURIE, and PROST, Circuit Judges):

AFFIRMED.  See Fed. Cir. R. 36.

**FILED**
**U.S. COURT OF APPEALS FOR**
**THE FEDERAL CIRCUIT**

JUL 1 1 2006

**JAN HORBALY**
**CLERK**

ENTERED BY ORDER OF THE COURT

DATED_____JUL 1 1 2006_____      _____
                                    Jan Horbaly, Clerk