IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IGT, a Nevada corporation, | |
| Plaintiff, | C.A. No. 06-282 (KAJ) |
| v. | |
| BALLY GAMING INTERNATIONAL, INC., BALLY TECHNOLOGIES, INC., and BALLY GAMING, INC., | **REDACTED - PUBLIC VERSION** |
| Defendants | |

**PLAINTIFF IGT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION**

OF COUNSEL

David P. Enzminger
Brett J. Williamson
David P. Dalke
Charles A. Thomasian
O'MELVENY & MYERS L.L.P.
400 S. Hope Street
Los Angeles, CA 90071
(213) 430-6000

October 31, 2006

William J. Wade (#704)
Anne Shea Gaza (#4093)
Matthew W. King (#4566)
Richards, Layton & Finger
wade@rlf.com
gaza@rlf.com
king@rlf.com
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiff IGT*

## TABLE OF CONTENTS

Page

I     NATURE AND STAGE OF THE PROCEEDINGS .................................................. 1

II    SUMMARY OF THE ARGUMENT .................................................................... 1

III   STATEMENT OF FACTS ................................................................................. 3

      A    The Patented Bonusing Inventions .......................................................... 3

           1    IGT's Bonusing Inventions ............................................................. 3

           2    The Development Of IGT's Inventions .............................................. 4

           3    IGT's Patented System ................................................................... 6

           4    The Patented Bonusing Products Are Critical to IGT's Systems Sales
                Strategy ..................................................................................... 10

           5    IGT's Bonusing Patents Are Adjudicated Valid And Reaffirmed By The
                PTO During Reissue Proceedings .................................................. 11

      B    Bally Infringes IGT's Bonusing Patents .................................................. 12

           1    ██████████████████████████████████████████
                █████████████████████████ ............................................. 12

           2    Bally Touts Its Infringing Power Bonusing Products And Leverages
                These Infringing Sales Into Sales Of Complete Management Systems
                And Gaming Devices ..................................................................... 13

IV    ARGUMENT .............................................................................................. 16

      A    IGT is Likely To Succeed On The Merits Of Its Patent Infringement Claims ... 17

           1    Bally Infringes IGT's Patents ......................................................... 17

           2    IGT's Patents Have Previously Been Found Valid By A Jury And By
                The PTO During Reissue Proceedings .............................................. 30

      B    An Injunction Is Necessary To Prevent Irreparable Harm To IGT ............... 33

           1    IGT Is Entitled To A Presumption Of Irreparable Harm Based On Its
                Clear Showing Of Likelihood Of Success On The Merits ..................... 33

           2    Even Without The Presumption, Ample Evidence Supports A Finding
                That Continued Infringement Will Cause Irreparable Harm To IGT ....... 33

      C    The Balance Of Hardships Weighs In Favor Of Granting A Preliminary
           Injunction .......................................................................................... 39

      D    No Countervailing Interest Outweighs The Public's Interest In Protecting Valid
           Patent Rights ...................................................................................... 40

i

**TABLE OF CONTENTS**
(continued)

Page

V       CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ii

## TABLE OF AUTHORITIES

Page

CASES

*3M Unitek Corp v Ormco Co,*
  96 F Supp 2d 1042 (C D Cal 2000) . . . . . . . . . . . . 34, 35

*Amazon com, Inc v Barnesandnoble com, Inc,*
  239 F 3d 1343 (Fed Cir 2001) . . . . . . . . . . . . . . 31, 32

*Augat, Inc v John Mezzalingua Assocs, Inc,*
  642 F Supp 506 (N D N Y 1986) . . . . . . . . . . . . . . 37

*Christiana Indus Inc v Empire, Elecs, Inc*
  No 06-12568, 2006 U S Dist LEXIS 54210 (E D Mich, Aug 4, 2006) . . . 33

*Critikon Inc v Becton Dickinson Vascular Access, Inc,*
  28 U S P Q 2d 1362 (D Del 1993) . . . . . . . . . . . . . 33

*Decade Indus v Wood Tech, Inc,*
  100 F Supp 2d 979 (D Minn 2000) . . . . . . . . . . . . . 34

*Dentsply Int'l, Inc v Great White, Inc,*
  132 F Supp 2d 310 (M D Pa 2000) . . . . . . . . . . . . . 32

*Dippin' Dots v Mosey,*
  44 U S P Q 2d 1812 (N D Tex 1997) . . . . . . . . . . . . 32

*Drexelbrook Controls, Inc v Magnetrol Int'l, Inc,*
  720 F Supp 391 (D Del 1989) . . . . . . . . . . . . . . . 31

*Ebay, Inc v Mercexchange, LLC*
  126 S Ct 1837 (2006) . . . . . . . . . . . . . . . . . . 33

*H H Robertson Co v United Steel Deck, Inc,*
  820 F 2d 384 (Fed Cir 1987) . . . . . . . . . . . . . . . 30

*Hybritech, Inc v Abbott Labs,*
  849 F 2d 1446 (Fed Cir 1988) . . . . . . . . . . . . . . 37

*Impax Labs, Inc v Aventis Pharms, Inc,*
  235 F Supp 2d 390 (D Del 2002) . . . . . . . . . . . . . 17

*Jacobson v Cox Paving Co*
  No 89-1786-PHX PGR, 1991 U S Dist LEXIS 17787 (D Ariz May 16, 1991) . 37, 38, 39

*Kaufman Co, Inc v Lantech, Inc,*
  807 F 2d 970 (Fed Cir 1986) . . . . . . . . . . . . . . . 31, 32

iii

TABLE OF AUTHORITIES
(continued)

Page

*Lamps Plus, Inc. v. Dolan,*
No. 3:01 CV-1537-K, 2003 WL 22435702 (N.D. Tex. Aug. 23, 2003) . . . . . . . . . . . . . . 17

*Lubrizol Corp. v. Exxon Corp.,*
696 F. Supp. 302 (N.D. Ohio 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*New Eng. Braiding Co. v. A.W. Chesterton Co.,*
970 F.2d 878 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Oakley, Inc. v. Sunglass Hut Int'l,*
316 F.3d 1331 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 30, 33, 34

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
429 F.3d 1364 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Polymer Tech., Inc. v. Bridwell,*
103 F.3d 970 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Purdue Pharma L.P. v. Boehringer Ingelheim Corp.,*
237 F.3d 1359 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Smith Int'l v. Hughes Tool Co.,*
718 F.2d 1573 (Fed. Cir. 1983) *cert. denied,* 464 U.S. 996 (1983) . . . . . . . . . . . . . 33, 39

*Solarex Corp. v. Advanced Photovoltaic Sys., Inc.,*
No. 93-229-JJF, 1995 WL 314742 (D. Del. Jan. 6, 1995) . . . . . . . . . . . . . . . . . . . 31, 33

*Spalding & Evenflo Cos., Inc. v. Acushnet Co.,*
2 U.S.P.Q. 2d 1070 (D. Mass. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp.,*
127 F. Supp. 2d 1315 (D. Utah 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Verizon California, Inc. v. Ronald A. Katz Tech. Licensing,*
326 F. Supp. 2d 1060 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
No. 00 C 6517, 2003 WL 21911241 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 17

**STATUTES**

35 U.S.C. § 282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## I.    NATURE AND STAGE OF THE PROCEEDINGS

IGT filed this patent infringement suit against defendants Bally Gaming International,

Inc , Bally Technologies, Inc  and Bally Gaming, Inc  (collectively "Bally") on April 28, 2006,

shortly after confirming that the first installations of Bally's infringing bonusing products were

actually in use at casinos  Shortly after filing suit, on May 9, 2006, IGT filed a motion for

expedited discovery, which was denied by the Court on May 15, 2006  IGT continued its efforts

to obtain discovery from Bally to obtain the evidence that supports this motion for a preliminary

injunction by serving its first requests for documents on May 26, 2006  On July 24, 2006, IGT

filed a motion to dismiss Bally's counterclaim counts X, XI and XII  Bally filed an opposition to

this motion on August 18, 2006  IGT filed a reply in support of its motion to dismiss on

September 1, 2006  IGT now files this motion for a preliminary injunction after receiving Bally's

first production of documents only last month

## II.    SUMMARY OF THE ARGUMENT

Plaintiff IGT seeks a preliminary injunction enjoining Bally from infringing IGT's U S

Patent Nos  RE 37,885 (the "'885 patent"), RE 38,812 (the "'812 patent"),  6,832,958 (the

"'2,958 patent"), 6,431,983 (the "'983 patent") and 6,620,046 (the "'046 patent") [1]  IGT's patents

protect its bonusing systems and products, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Declaration of David P

Dalke in Support of IGT's Motion for a Preliminary Injunction ("Dalke Decl "), dated October 30

and filed contemporaneously herewith, Ex  1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The claims of two of IGT's patents-in-suit have

---

[1] IGT intends to assert all nine patents-in-suit at trial  To simplify issues for purposes of this
motion, IGT asserts only a small number of the infringed claims selected from a subset of the
patents-in-suit

1

already been found valid by a jury and were again found patentable by the PTO during reissue proceedings in view of the prior art cited in the litigation. Moreover, the remaining claims at issue benefit from a presumption of validity bolstered by the commercial success of the covered inventions.

As demonstrated by the declaration of expert Bart Lewin and the accompanying exhibits filed contemporaneously herewith, Bally's bonusing products clearly infringe IGT's patents. Based on this clear showing of infringement and the strong likelihood that the patents' validity will be upheld, IGT is entitled to a presumption of irreparable harm. Nevertheless, ample evidence demonstrates that IGT has been and will continue to be irreparably harmed as a direct result of Bally's infringement. First, IGT is being irreparably harmed by lost opportunities to leverage the sales of its patented systems into sales of products not covered by the patents-in-suit. Customers who purchase IGT's patented system are very likely to purchase additional, non-patented products and services – including casino management and slot accounting systems – as part of the package. Accordingly, a lost sale of the patented bonus products also results in a lost opportunity to sell numerous other products. In addition, many sales of Bally's infringing bonusing products are accompanied by sales of casino management and accounting systems and other products, including slot machines. Courts have found irreparable harm under such circumstances because the lost opportunities for sales of non-patented products cannot be adequately quantified and compensated by money damages.

In addition, casinos typically upgrade these systems only once every five to seven years. Therefore, a lost sale results in a lost opportunity to sell numerous other products over a number of years. Moreover, because only a limited number of customers are in the market for new and upgraded systems at any given time, every lost sale is a significant lost opportunity. The harm from such a lost sale is impossible to predict because it depends on the future growth and purchasing decisions of customers. Also, because customers purchase a new system only once every five to seven years, customers who purchase an infringing system between now and the

2

resolution of this litigation may not be in the market for a new or upgraded system until after several of the patents-in-suit expire in 2014  Accordingly, in the absence of a preliminary injunction, IGT will later be forced to choose between requiring its customers and potential customers to remove their newly-purchased infringing systems or forgoing any remedy for these infringing sales  IGT is also being irreparably harmed by loss of market share and the commoditization of its bonusing inventions  Accordingly, in order to prevent further irreparable harm to IGT's business, IGT respectfully requests the Court to grant a preliminary injunction enjoining Bally from continuing to infringe the '812, '885, '2,958, '983 and '046 patents

III.    **STATEMENT OF FACTS**

    A.    **The Patented Bonusing Inventions.**

        1.    **IGT's Bonusing Inventions**

In October 2003, IGT acquired Acres Gaming Incorporated ("Acres Gaming") and all of its intellectual property, including eight of the nine patents-in-suit  These patents and the bonusing system developed by Acres Gaming form the core of IGT's bonusing-related products, which have enjoyed considerable commercial success  (*See* Declaration of Reed M  Alewel in Support of IGT's Motion for a Preliminary Injunction ("Alewel Decl "), dated October 27, 2006 and filed contemporaneously herewith, at ¶¶ 7-10; Dalke Decl , Ex  1)  The patents-in-suit describe methods and systems for providing bonuses to players of gaming devices that are electronically linked together over a network  A "bonus" refers to an award given to a player irrespective of whether the player wins or loses a particular game  The purpose of bonusing is to increase player loyalty, for example by providing unusual or unexpected rewards, by providing play-promoting incentives such as non-cashable credits and by entertaining players  The patented inventions provide several advantages to casino operators

First, the patented inventions provide casino operators increased flexibility in bonusing their players by describing an automated method for selecting a subset of gaming devices to participate in a particular promotion  (*See, e g* , '885 and '812 patents )  Before this innovation,

3

for example, machines participating in a progressive bonus promotion were hard-wired together to form a bank and all of the machines in that bank would participate in the bonus promotion (*See* '885 patent, col 2 ) This arrangement made changing the selection of gaming machines participating in a bonus event expensive and inconvenient because the hard-wired connections would have to be changed  IGT's patented system allows casino management to preselect, by entering criteria at a workstation, the gaming devices and categories of players that will participate in a particular bonus

Second, the patented inventions allow casino operators to provide incentives to certain players, for example by providing awards based on level of play or by rewarding play during a specified time period or on particular machines  Moreover, in order to prevent patrons who receive bonuses from using them at a competing location, casino operators may elect to make promotional credits non-cashable  Finally, the patents-in-suit describe methods and systems for funding and awarding bonuses to players  For example, the '046 patent describes a method whereby a bonus award is funded independently of wagers accepted at a gaming device and awarded to an eligible player

### 2.    The Development Of IGT's Inventions

Eight of the patents-in-suit describe inventions developed by John Acres and two co-inventors  The remaining patent describes an invention by Rick Rowe, now IGT's Vice President of Business Development  These inventions have enabled casino operators to provide exciting and flexible bonuses to players, propelling bonusing in the gaming industry to new heights  Enhancing player loyalty by providing complimentary awards has been known in the industry for decades  Providing awards to slot machine players based on game play was difficult before automated methods for tracking player activity were developed  An early method for rewarding players based on player activity involved connecting a ticket printer to slot machines that would issue a ticket for a certain amount of game play  This system had many disadvantages – for example, tickets were easily counterfeited and could not be replaced if they were lost

4

John Acres, the primary or sole inventor of eight of the nine patents-in-suit, described the development of a revolutionary method for tracking player activity during his testimony in a prior litigation involving some of the claims at issue here. (*See* Request For Judicial Notice, Ex 1 (Excerpts of Transcript of Proceedings in *Acres Gaming Inc v Mikohn Gaming Corp et al*, No 97-1383 (D Nev) ("*Mikohn* litigation")).) Mr Acres explained that he conceived the idea for issuing player's cards that would be associated with a player account while on a trip to South Africa, when he stayed at a hotel that issued him a card instead of a traditional room key for accessing his room. (Request For Judicial Notice, Ex 1 (Trial Tr at 220).)

> [T]he idea just came across that ... this would be a great way to replace the ticket dispensers  Instead of having [ticket dispensers] on the sides of machines .  why not take the card meter idea that they used at the hotels and this display and put a display and card reader on every machine in the casino? And then give the players cards  And when they would slide them in, we would have a computer that recognized that it was Jane Smith who put in her card  And then we would automatically count all the coins played and then give her points electronically instead of with tickets  And that's where the whole idea of player tracking that you see in just about every casino today came from

Request For Judicial Notice, Ex 1 (Trial Tr at 221-22).

At first, separate systems performed the player tracking and slot accounting functions Acres Gaming was the first to merge player tracking and slot accounting functions into one system  This system was disclosed in U S Patent No 5,655,961 (the "'961 patent")  Several of the patents-in-suit, including the reissued '885 and '812 patents, are descendants of the '961 patent and share virtually the same specification  The merger of player tracking and slot accounting functions allowed casinos to provide bonusing to particular players and during specified times using data such as time of play, duration of play, number of coins in and coins out, games played and jackpots won  (*E g*, '885 patent, col 3)  Moreover, the inventions disclosed in the '812 and '885 patents allow casinos greater flexibility to configure bonus promotions by describing a method for preselecting a subset of gaming devices to participate in a promotion, instead of dedicating an entire bank of machines to a particular promotion

5

Acres Gaming's first major installation of its bonusing technology, at Crown Casino in Melbourne, Australia, was very successful  (Alewel Decl  ¶ 6 )  But the inventions did not immediately enjoy the same success in the United States.  Id  at ¶ 7  Casinos and players in the United States did not initially recognize and understand the benefits of the bonusing system and sales were slow for several years  Id  As a result of substantial expense and effort by Acres Gaming, however, casino operators were eventually persuaded of the great benefits of the bonusing inventions  Id  at ¶¶ 7-10  Sales steadily increased and Acres Gaming's bonusing concepts became recognized as one of the greatest innovations in the history of the gaming industry  Id  at ¶ 7

### 3.    IGT's Patented System

The patents-in-suit protect IGT's patented Advantage Bonusing system, which is part of a suite of products known as the IGT Advantage Casino System (originally developed by Acres Gaming).  (Alewel Decl  ¶ 5 )  The system gathers information from a casino's electronic gaming machines and allows casino operators to use that information to monitor and control bonusing promotions.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████



The EGMs – referred to as "gaming devices" in the patents – may include slot machines, video poker machines or gaming tables (*E.g.*, '812 patent, col. 7, lines 18-24.) Gaming devices may be equipped with a card reader for accepting players' club cards and a touch-screen display called NexGen™ to facilitate two-way communication between the player and the system



RLF1-3076564-1



The DCN includes a DCN controller and memory  (*E g* , *id* )  The memory stores instructions for the DCN controller and stores information regarding gaming device activity.  *Id*  As claimed in the '812 patent, the DCN memory and controller are referred to as "a memory connected to a controller associated with only one of the gaming devices."  (*See* Declaration of Bart A. Lewin In Support Of IGT's Motion For A Preliminary Injunction ("Lewin Declaration" or "Lewin Decl "), dated October 30, 2006 and filed contemporaneously herewith, at ¶ 42 )

In one embodiment, the patents describe the host computer as a file server that includes a high performance personal computer or work station having a large hard disk capacity for storing the gaming device activity  (*E g* , '812 patent, cols 7-8 )

(*See* '812 patent, cols  19-20 )







###### 4. The Patented Bonusing Products Are Critical to IGT's Systems Sales Strategy

Bonusing products are critical to the sale of gaming systems – which may include

software and hardware for player interfaces, accounting and casino management, and

10

communications networks – because bonusing is in large part what differentiates these basic systems from one another  (Alewel Decl at ¶ 14 )  Indeed, from the outset, the advantages of IGT's patented bonusing inventions have led directly to sales of related systems  (Request For Judicial Notice, Ex  1 (Trial Tr  at 160:15-24; 163:25-167:9) ("[B]asic systems are offered by, you know, a lot of people     [B]onusing is really what differentiates us and is frequently why customers come to us      ") )  IGT's Advantage Bonusing system is a core component of IGT's Advantage Casino System, which includes accounting, player and floor management applications  (Alewel Decl  at ¶¶ 14-16 )  Customers rely on bonusing products to "promote player loyalty, distinguish themselves from their competitors and drive incremental revenue to their casino "  (*Id* at ¶ 14 )  Consequently, customers' decisions to purchase IGT's Advantage Casino System are often largely based on the bonusing capabilities IGT offers  (*See id* at ¶¶ 14-16 )

### 5.    IGT's Bonusing Patents Are Adjudicated Valid And Reaffirmed By The PTO During Reissue Proceedings.

Bally is not the first company to try to copy the success of IGT's bonusing technologies by infringing the patents-in-suit  In the *Mikohn* litigation, a jury upheld the validity of claims covering certain key Acres bonusing inventions and found that Mikohn Gaming Corp 's "Money Time," a bonusing product that initiated a bonus period at a selected group of gaming devices, infringed several of those claims  (Request For Judicial Notice, Ex  2 (Special Verdict) )  Specifically, the jury upheld claims 10 and 11 of U S  Patent No  5,752,882 (the "'882 patent") – reissued as claims 10 and 11 of RE 37,885 – and claims 1, 21, 24 and 29 of U S  Patent No  5,836,817 (the "'817 patent") – reissued as claims 1, 21, 24 and 29 of RE 38,812  (Request For Judicial Notice, Exs  2 and 3 (Special Verdict and Order entering judgment against Mikohn) )  No claims were found invalid  *Id*  In addition, all asserted claims of the '817 patent were found to be infringed by Mikohn's Money Time bonusing product  (Request For Judicial Notice, Ex  2 )

Notably, after the jury found the '817 and '882 patents valid, the PTO reaffirmed the validity of the claims, deeming them patentable during reissue proceedings in which the prior art,

pleadings, expert reports, and other documents cited and generated in the *Mikohn* litigation were submitted to the Patent Examiner for review.

**B.    Bally Infringes IGT's Bonusing Patents.**



[REDACTED] Having developed, marketed and sold numerous infringing bonusing products, Bally proclaims that its new Power Bonusing products are "the industry's most complete and proven package of bonusing, gaming and promotions." (Dalke Decl, Ex. 5 (Power Bonusing Webpage).) Bally's willingness to infringe IGT's patents has already been demonstrated. In 2004, IGT obtained a judgment for patent infringement against Bally for more than $7 million dollars. (D.I. 54 at Ex. A; D.I. 69 at Ex. 4.)

2.    **Bally Touts Its Infringing Power Bonusing Products And Leverages These Infringing Sales Into Sales Of Complete Management Systems And Gaming Devices.**

In September 2005, Bally announced that its "Bally Power Bonusing suite of products" would be showcased at the Global Gaming Expo held that month. (Dalke Decl., Ex. 6.) On the same day, Bally announced a deal with Boyd Gaming to install the infringing Bally Power Rewards bonusing product at two of Boyd Gaming's Las Vegas locations, including South Coast Hotel and Casino. (Dalke Decl., Ex. 7.) Boyd Gaming's purchase, which also included nearly 5,000 slot machines, "complete slot and casino management systems," and Bally's iVIEW touch-screen displays, was driven by Bally's ability to provide the infringing bonusing product. (*See id.*

---

2 [REDACTED]

13

(COO of Boyd Gaming's Coast Casinos division explained that "[o]ne of the driving forces behind this deal was the enhancement of the entertainment experience for our players    ") )

In November 2005, Bally announced the opening of Penn National Gaming, Inc 's Hollywood Slots property in Bangor, Maine, which included a slot floor with 30 percent Bally slot machines, and "a complete slot accounting and casino management solution" from Bally (Dalke Decl , Ex 8 ) The purchase of Bally's systems and machines was again made in connection with a plan to introduce an infringing Bally Power Bonusing product at the property – in this case, Bally Power Promotions   *Id*

Sometime in December 2005, the Borgata Hotel Casino and Spa in New Jersey commenced operating its PowerPrize Jackpot, Borgata's brand name for Bally's infringing Power Winners product   (Dalke Decl , Ex 9 ) A Bally press release announced that Borgata had "gone live" with Power Winners and placed an accompanying order for more than 4000 iVIEW display devices, which would allow Borgata to display Power Winners bonusing "in a dynamic new way "  *Id*  Also in December, South Coast Hotel in Las Vegas opened with the infringing Bally Power Bonusing technology and related systems in place   (Dalke Decl , Ex 10 )

In April 2006, Bally announced that the Greektown Casino in Detroit, Michigan had purchased 800 iVIEW interactive displays in order to "enhance the launch and deployment of the Bally Power Bonusing technology at our slot machines "  (Dalke Decl , Ex 11 ) Greektown Casino had previously purchased an upgraded slot management system in "preparation[] for the deployment of Bally Power Bonusing functionality "  *Id*

In the same month, Bally announced another deal with Boyd Gaming, under which Bally agreed to supply Boyd Gaming with "casino management, slot accounting and bonusing solutions across *all Boyd Gaming properties nationwide* in an agreement that is structured to provide standardized technology for a total of approximately 30,000 slot machines        "  (Dalke Decl, Ex 12 (emphasis added) )  Again, Bally leveraged its ability to offer the infringing bonusing technology into sales of complete systems   *Id*  ("Boyd Gaming will also offer its players Bally

14

Power Rewards from the suite of Bally Power Bonusing products and have the option to purchase additional bonusing technology ") Boyd Gaming's Senior Vice President of Operations observed, "[T]his agreement with Bally will also create some exciting benefits for our guests, including improved player's club offerings and an expanded level of bonusing events and other player rewards " *Id*

In May 2006, Bally announced the sale of 500 iVIEW display devices to Chukchansi Gold Resort & Casino in California, which would run the infringing Bally Power Rewards, Bally Power Sweepstakes and Bally Power Promotions bonusing products (Dalke Decl , Ex 13 )

Following the filing of this lawsuit, Bally's infringing activities have only increased On May 31, 2006, Bally announced an agreement to sell the infringing Bally Power Bonusing technology along with up to 4,752 iVIEW devices to the Lincoln Park racino in Lincoln, Rhode Island after a "thorough competitive review " (Dalke Decl , Ex 14 ) Lincoln Park's decision to purchase Bally's system was based on the "strength of [Bally's] product lineup, particularly Bally Power Bonusing " *Id* The infringing products purchased in this deal include Bally Power Winners, Bally Power Rewards, Bally Power Sweepstakes and Bally Power Promotions *Id*

On July 11, 2006, Bally announced agreements to provide its infringing bonusing products and accompanying casino management and accounting systems to three gaming facilities in Texas, Washington and Colorado (Dalke Decl., Ex 15 ) The facilities planned to use at least Bally's infringing Bally Power Rewards technology *Id* Two days later, Bally announced a contract to provide a "complete systems solution" and more than 300 slot machines to the French Lick Resort & Casino scheduled to open in French Lick, Indiana (Dalke Decl , Ex 16 )

On July 17, 2006, Bally announced an agreement to provide the infringing Power Winners, Power Bank and Power Rewards products to the Seminole Tribe of Florida, along with iVIEW devices for six gaming locations and more than 6,200 machines (Dalke Decl , Ex 17 )

15

In August, Bally announced a contract to provide a complete casino management system, including the infringing Bally Power Bonusing products to Philadelphia Park Casino in Bensalem, Pennsylvania. (Dalke Decl., Ex. 18.) Bally proclaimed that customers are now recognizing "how our lineup of Bally Power Bonusing products can enhance the player experience while driving additional revenue." *Id.* And only last month, Bally announced two more contracts to provide casino management and bonusing systems to Gulfstream Park racino in Florida and Mohegan Sun at Pocono Downs in Wilkes-Barre, Pennsylvania. (Dalke Decl., Ex. 19; Ex. 20.) In addition to the infringing Power Bonusing products, both sales included iVIEW devices, slot machines, and casino management systems. Moreover, both sales were driven by the availability of Bally's infringing bonusing technology. (Dalke Decl., Ex. 19.) ("We're confident that a combination of games and bonusing technology from Bally will attract players and provide visitors to Gulfstream Park an exciting and entertaining gaming experience."); Dalke Decl., Ex. 20 ("The Bally Power Bonusing features are excellent tools for creating excitement on the floor    .")

As set forth above, Bally first announced that it had entered into contracts to sell its infringing bonus products in the fall of 2005 and the first installations of the infringing products appear to have commenced some time in December 2005. After confirming that the infringing bonusing functionality was actually in use at casinos, IGT filed suit in April 2006 and immediately began its discovery efforts. Despite IGT's diligent discovery efforts, however, Bally did not produce a single document until just last month. Since that time, IGT has worked diligently to analyze the evidence produced by Bally and prepare this motion for a preliminary injunction.

## IV.    ARGUMENT

A patentee is entitled to a preliminary injunction against continued patent infringement when it demonstrates (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) that the balance of hardships tips in its favor; and (4) that the

16

public interest favors an injunction  *E g , Oakley, Inc  v  Sunglass Hut Int'l*, 316 F 3d 1331, 1338-39 (Fed  Cir  2003); *Impax Labs , Inc  v  Aventis Pharms , Inc* , 235 F  Supp  2d 390, 392 (D  Del  2002)  Here, consideration of these four factors demonstrates that IGT is entitled to an injunction against Bally's continued infringement of IGT's patents through the manufacture, use, sale and offer for sale of its Bally Power Bonusing products.

     A.     **IGT is Likely To Succeed On The Merits Of Its Patent Infringement Claims.**

          1.     **Bally Infringes IGT's Patents.**

To obtain a preliminary injunction against patent infringement, a patentee must demonstrate a reasonable likelihood of succeeding on the merits against the defendant's validity challenges and a reasonable likelihood of prevailing on the infringement issue at trial  *E g , Oakley, Inc* , 316 F 3d at 1344  IGT can meet that burden by offering evidence that each claim limitation is likely present in Bally's accused products  *Id*  This analysis involves two steps: determining the scope and meaning of the asserted claims and comparing the claims to the allegedly infringing product  *Id*  at 1339.

These two steps of the infringement analysis are discussed below for each claim and examined in greater detail in the accompanying Lewin Declaration  Several terms used in these claims were construed in prior litigation involving the claims of the '885 and '812 patents  Certainly, the prior claim construction order "can be viewed as persuasive and highly relevant" to this Court's determination of the scope of the claims.  *See Verizon California, Inc  v  Ronald A  Katz Tech  Licensing*, 326 F  Supp  2d 1060, 1069 (C D  Cal  2003); *Wilson Sporting Goods Co  v  Hillerich & Bradsby Co* , No  00 C 6517, 2003 WL 21911241 at *3 (N D  Ill  Aug  8, 2003); *Lamps Plus, Inc  v  Dolan*, No  3:01 CV-1537-K, 2003 WL 22435702 at *2 (N D  Tex  Aug  26, 2003).

For purposes of this motion, IGT asserts that Bally Power Winners, Bally Power Rewards and Bally Power Promotions each infringe one or more of the following six claims discussed below ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

████████████████████████████ These systems generally provide functionality for marketing, player management, player tracking, player accounting, slot monitoring, slot accounting, slot operations and bonusing. (Lewin Decl. ¶ 26.)

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ As demonstrated below and in the Lewin Declaration, Bally Power Winners infringes at least claim 10 of the reissued '885 patent, claim 1 of the '983 patent, claim 7 of the '2,958 patent and claims 1 and 6 of the '046 patent.

Bally Power Rewards can be used to "award bonuses to players when a specified dollar amount or point level is attained in a predefined timeframe," "personalize promotions and messages to individuals or patron groups," "fully automate and control player's club cash-back programs," and "encourage play during days and times by awarding players bonus points worth a multiple of the base points they would normally earn." (Lewin Decl. at ¶ 23.) Bally Power Rewards infringes at least claim 1 of the '885 patent, claim 21 of the '812 patent, claim 1 of the '983 patent and claim 7 of the '2,958 patent.

Bally Power Promotions can be used to "offer easy conversion of points and promotional dollars into playable credits," "encourage slot play with points and offers downloadable directly to the machine," "provide player's club account balances from the machine display" and "integrate convenient cash incentives into your casino's existing promotional programs." (Lewin Decl. ¶ 24.) Bally Power Promotions infringes at least claim 1 of the '983 patent.

### a.  Claim 10 Of The Reissued '885 Patent

Claim 10 of the '885 patent describes a method of preselecting less than all devices interconnected on a network to participate in a bonus promotion. The inventors claimed:

18

A method of operating gaming devices interconnected by a host computer having a user-operated input device comprising:

associating each gaming device with a unique address code;

preselecting less than all of the gaming devices interconnected by the host computer responsive to a user-effected action at the input device which identifies the preselected gaming devices with the respective associated address codes;

using the network to track activity of the preselected gaming devices;

issuing a command over the network to one of said preselected gaming devices responsive to a predetermined event; and

paying at said one gaming device in accordance with the command

(1)    Claim Scope

The claim construction decisions in the *Mikohn* litigation are instructive as to the scope of this claim  The "gaming devices" referred to in the patent can include, for example, slot machines, video poker machines and gaming tables   (Lewin Decl  at ¶ 42 )  These devices are connected by a network to a host computer   The user-operated input device introduced in the preamble of claim 10 is a device used by the casino operator to input information regarding a bonus, including information used to identify the games that will participate in a bonus event (Lewin Decl  ¶ 37 )  The steps in claim 10 can be abbreviated as "associating," "preselecting," "track[ing]," "issuing a command," and "paying "

The first step of claim 10 requires "associating each gaming device with a unique address code "  In the *Mikohn* litigation, the court recognized that the unique address code may constitute a combination of an identification number of the gaming device or DCN and the floor controller to which the device is linked   (Lewin Decl  ¶ 37 )  In other words, gaming devices may be addressed in terms of their network connections   *Id*

The "preselecting" step simply means to "pick out beforehand from the gaming devices some, but not all, of the gaming devices to participate in the method being claimed "  *Id*  Preselection occurs responsive to an action by the casino operator at the input device   *Id*  In the *Mikohn* litigation, the court recognized that this step does not require that the user type in the

19

address codes of the preselected gaming devices  Rather, the claim permits "a computer,

responsive to a user-effected action at the input device, to identify the preselected gaming devices

with the respective associated address codes "  *Id*  In addition, the *Mikohn* court also concluded

that "responsive" should not be interpreted contrary to its ordinary meaning to require that

preselection occur "as an immediate and direct result" of a user-effected action  *Id*

The "track[ing] step requires "using the network to track activity of the preselected

gaming devices "  Examples of gaming activity that may be tracked include number of coins-in,

games played, jackpot occurrences, time of play, duration of play and card-in  (Lewin Decl  at

¶ 37 )

The "predetermined event" in the "issuing a command" step may include such events as a

passage of a certain period of time, a certain number of coins in or a jackpot – which involves, for

example, the generation by a random number generator of a number that satisfies predetermined

criteria  *Id*  The "paying" step is satisfied by "automated payments made by the gaming device,"

for example, downloading credits over the network to the gaming device's credit meter or

crediting bonus points to the player via the gaming device  *Id*

(2)    **Bally Power Winners and Bally Power Rewards**
**Infringe Claim 10 Of The Reissued '885 Patent.**

Both Bally Power Winners and Bally Power Rewards contain each limitation of claim 10

of the '885 patent  Both bonusing products perform the step of "associating "

Bally Power Winners performs the step of "preselecting "  *Id*



To perform the "track[ing]" step, Bally Power Winners and Power Rewards operate in conjunction with Bally's slot accounting and player tracking systems, which continually track gaming device activity. For example, Bally explains that "SDS provides a fully integrated slot information system that continually monitors your casino's slot machines, other gaming devices and customers' activity through game monitoring units (GMUs) within each slot machine." (Lewin Decl ¶ 38 )

Bally Power Winners and Bally Power Rewards perform the step of "issuing a command responsive to a predetermined event " As explained above, a predetermined event may include such events as a passage of a certain period of time, a certain number of coins in or a jackpot (Lewin Decl at ¶ 37 )

RLF1-3076564-1



Power Rewards thus issues a command over the network responsive to a predetermined event

Both Power Winners and Power Rewards pay at the gaming device in accordance with the command

### b.    Claim 21 Of The Reissued '812 Patent

Claim 21 of the '812 patent describes a method for paying a bonus to a player via one of a selected plurality of networked gaming devices  The inventors claimed:

> A method of operating gaming devices interconnected by a computer network to a host computer comprising:
>
> selecting a plurality of the gaming devices;
>
> issuing a command over the network including data establishing criteria to cause a bonus to be paid via one of said selected gaming devices upon the occurrence of a predetermined event;
>
> storing the command in a memory connected to a controller associated with only one of the gaming devices;
>
> transmitting data indicative of gaming device activity from the gaming device to the controller;
>
> transmitting a pay command from the controller to the gaming device upon the occurrence of the predetermined event: and
>
> paying the bonus via the gaming device responsive to receipt of the pay command

### (1)    Claim Scope

The steps required by the claim may be abbreviated as (1) selecting, (2) issuing a command, (3) storing the command, (4) transmitting data, (5) transmitting a pay command, and (6) paying the bonus  The "selecting" step is performed, for example, when the casino operator configures a bonus promotion to run on selected gaming devices  (Lewin Decl  at ¶ 42 )

The next step describes issuance of a command "including data establishing criteria to cause a bonus to be paid "  In the *Mikohn* litigation, the court stated that this "data establishing criteria" refers to "one or more standards, rules or tests to determine whether a bonus is paid "  (Lewin Decl  at ¶ 42 )  For example, a command might specify that an existing award is increased or multiplied under certain conditions   (Lewin Decl  ¶ 42 )

In the "storing" step, the command is stored in a memory connected to a controller associated with only one of the gaming devices  In an embodiment described in the patent, the "controller" is the "DCN controller," a device that handles the communication between the gaming device and the network   (Lewin Decl  at ¶ 42 )  In the "transmitting data" step, data such as coin-in, games played and jackpot occurrences are transmitted from the gaming device to the controller   (Lewin Decl  at ¶ 42 )  A pay command is transmitted "upon the occurrence of the predetermined event "  The predetermined event may include such events as a passage of a certain period of time, a certain number of coins in or a jackpot – which involves, for example, the generation by a random number generator of a number that satisfies predetermined criteria (Lewin Decl  at ¶ 42 )  Lastly, the claim requires "paying the bonus via the gaming device responsive to receipt of the pay command "  This "paying the bonus" step is performed by automated payment at the gaming device, such as downloading credits over the network to the gaming device's credit meter   (Lewin Decl  at ¶ 42 )

### (2)    Bally Power Rewards Infringes Claim 21 Of The Reissued '812 Patent.

As demonstrated by the detailed claim charts in the Lewin Declaration, Bally Power Rewards performs each step of claim 21 of the '812 patent  (Lewin Decl  ¶ 43 )  

23



Bally Power Rewards performs the "selecting" step

Bally Power Rewards enables casino operators to "issu[e] a command over the network including data establishing criteria to cause a bonus to be paid " 

(*See* Lewin Decl. at ¶ 42 (stating that, for example, a predetermined number of coins-in constitutes a predetermined event) )

---

[3] Points may be awarded, for example, based on levels of play and may be converted to playable credits or other awards  (Lewin Decl  ¶¶ 23-24 )

24



### c.    Claim 1 Of The '983 Patent

In the past, casinos provided promotional incentives which could be redeemed for free coins or tokens.  (Lewin Decl. at ¶ 47.)  The player could cash in the coins or tokens without playing the machines, however.  (Lewin Decl. ¶ 47.)  Claim 1 of the '983 patent describes a method for awarding promotional incentives that cannot be cashed out by the player.  (Lewin Decl. ¶ 47.)

The inventor claimed:

A method for providing incentive to play gaming devices connected by a network to a host computer comprising:

associating each gaming device with an input device for receiving player identification;

associating unique player identification with a gaming device player;

creating a player account accessible by the host computer;

associating the unique player identification with the player account;

applying a promotional credit to the player's account;

permitting the player to access the account,

transferring promotional credit in the account to the gaming device;

permitting the player to wager the promotional credit; and

preventing the promotional credit from being cashed out by the player

### (1)    Scope Of The Claim

Claim 1 of the '983 patent describes a method for providing incentives to play gaming devices interconnected by a network. The first step of the claim describes associating each gaming device with an input device for receiving player identification. In an embodiment of the invention described in the patent, the input device is a card reader capable of reading cards issued to players. (Lewin Decl. ¶ 47.) The next three steps of the claim describe creating a player account and associating that account with a player using a unique identification. (Lewin Decl. ¶ 47.) The patent describes an embodiment whereby a unique player identification number is coded into a card with a corresponding player account maintained on the network. (Lewin Decl. ¶ 47.) The remaining steps of the claim describe applying a promotional credit to the player's account, permitting the player to access the account, and transferring the promotional credit to the gaming device. ('983 patent, claim 1.) The promotional credit may be wagered, but cannot be cashed out by the player. Id.

### (2)    Bally Power Winners, Bally Power Rewards and Bally Power Promotions Infringe Claim 1 Of The '983 Patent.

As demonstrated in detail in the claim chart at paragraph 48 of the Lewin Declaration, each of Bally Power Winners, Bally Power Rewards and Bally Power Promotions infringes claim 1 of the '983 patent ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

26



Accordingly, all three of these bonusing products infringe claim 1 of the '983 patent

### d.    Claim 7 Of The '2,958 Patent

Claim 7 of the '2,958 patent describes a method for selecting gaming devices on a network to participate in a bonus period of a specified duration  The patent explains that gaming devices may be underutilized during certain hours of the day  Claim 7 describes a method to promote play on such devices  Claim 7 reads:

> A method for operating gaming devices interconnected by a network, comprising:
>
> determining a duration for the bonus period;
>
> determining a start for a bonus period;
>
> selecting gaming devices on the network for the bonus period;
>
> transmitting a characteristic of the bonus period to the selected gaming devices; and
>
> transmitting the duration for the bonus period to the selected gaming devices

### (1)    Scope Of The Claim.

The first two steps of claim 7 of the '2,958 patent require determining a duration and a start for a bonus period  The specification states, for example, that a "bonusing event may be triggered from midnight to 4:00 a m  on weekdays "  (Lewin Decl ¶ 52 )  The remaining steps require selecting gaming devices to participate in the bonus and transmitting the duration and a characteristic of the bonus period to the selected gaming devices  (Lewin Decl ¶ 52 )  The characteristic may specify, for example, that a machine will pay a multiple of the award it normally pays  (Lewin Decl ¶ 52 )

27

(2)    **Bally Power Winners and Bally Power Rewards Infringe Claim 7 Of The '2,958 Patent.**



e.    **Claim 1 Of The '046 Patent**

Some bonuses are funded based on a percentage of wagers played at a gaming device or group of gaming devices  The '046 patent describes a method and system for awarding a bonus at a gaming device that is funded independently of wagers placed at the gaming device  In claim 1, the inventor claimed:

A method of providing a bonus to a player of a gaming machine comprising:

accepting a wager establishing entitlement of said player to play a game presented at said gaming machine;

funding a bonus award independent of said wager accepted from said player;

accepting player identification information at said gaming machine;

configuring bonus event information regarding a bonus award;

determining if said player is entitled to participate in said bonus event using at least said player identification information;

if said player is entitled to participate in said bonus event, determining if said player is a winner of said bonus event based upon one or more criteria for winning said bonus event; and

if said player is the winner of said bonus event, awarding said bonus award

(1)    **Scope Of Claim 1.**

According to the invention of the '046 patent, a bonus award is funded independently of wagers accepted at the gaming device  The first step of claim 1 describes a gaming device that

28

accepts a wager entitling a player to play a game at the device  The next step requires that a bonus award be funded independently of that wager  The claim requires accepting player identification information at the gaming device  The patent explains that the player may be identified by using a player tracking device  (Lewin Decl  ¶ 57 ) The "configuring" step may be performed when "the bonus system host is arranged to determine the eligibility of players to participate in a bonus event and to determine the winners of the bonus event "  (Lewin Decl ¶ 57 )  Eligibility may be determined by a player's use of a player tracking device, such as by inserting a card containing player identification information into a card reader  (Lewin Decl ¶ 57 )  The system's determination of a winner may be independent of any outcome of the game presented to the player.  (Lewin Decl  ¶ 57 )

        (2)    **Bally Power Winners Infringes Claim 1 Of The '046 Patent.**

Bally Power Winners infringes claim 1 of the '046 patent.  (Lewin Decl ¶ 58 )



        f.    **Claim 6 Of The '046 Patent**

Claim 6 of the '046 patent claims a system for awarding an independently funded bonus as described in claim 1  Claim 6 reads:

A gaming system comprising:

a plurality of gaming machines configured to present at least one game upon a wager by a player;

a player tracking device associated with each gaming machine, said player tracking devices including a card reader, keypad and at least one display, each player tracking device configured to receive information regarding the gaming machine with which it is associated;

29

a player tracking host arranged to store data regarding activities of players of said gaming devices;

a communications network linking said player tracking devices with said player tracking host over which information is transmitted; and

a bonus system host, said bonus system host configured to generate bonus information regarding a bonus award funded independently of wagers placed with said gaming machines and to transmit bonus award information to said player tracking devices of said gaming machines via said communications network.

### (1)    Scope of Claim 6.

Claim 6 describes a system including gaming devices with player tracking devices, a player tracking host, a communications network linking the player tracking devices with the player tracking host and a bonus system host configured to generate information regarding an independently funded bonus award.  The player tracking host may comprise a single computer or multiple computers on the network, and the player tracking and bonus system hosts may be the same device.  (Lewin Decl. ¶ 61.)  The player tracking host need only contain appropriate hardware and/or software to permit it to send and receive player tracking-related information (Lewin Decl. ¶ 61.)

### (2)    Bally Power Winners Infringes Claim 6 Of The '046 Patent.



### 2.    IGT's Patents Have Previously Been Found Valid By A Jury And By The PTO During Reissue Proceedings.

A patent is presumed valid.  35 U.S.C. § 282.  The party attacking the validity of a patent bears the burden of proving invalidity.  *Oakley*, 316 F.3d at 1339 (*citing H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed. Cir. 1987))  In the context of a preliminary

injunction, when a party raises a substantial question concerning the validity or enforceability of a patent, the party seeking the injunction must show that the invalidity or unenforceability defense lacks substantial merit *Id* at 1340 ("While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit ") (*quoting New Eng Braiding Co v A W Chesterton Co*, 970 F 2d 878, 883 (Fed Cir 1992)) A showing of validity can be strengthened by a prior adjudication of validity, a successful reexamination or reissue, and other direct evidence such as commercial success and licensing activity demonstrating industry acquiescence *See Amazon com, Inc v Barnesandnoble com, Inc*, 239 F 3d 1343, 1359 (Fed Cir 2001); *Kaufman Co, Inc v Lantech, Inc*, 807 F 2d 970, 973-74 (Fed Cir 1986); *Drexelbrook Controls, Inc v Magnetrol Int'l, Inc*, 720 F Supp 397, 400 (D Del 1989) Here, the validity of IGT's patents-in-suit is supported by each of these three types of evidence

First, IGT's showing of validity is strengthened by the fact that these patents are reissues of patents found valid in a prior litigation *See Amazon com, Inc*, 239 F 3d at 1359 (a clear case of validity "might be supported    for example, by showing that the patent in suit had successfully withstood previous validity challenges in other proceedings"); *Solarex Corp v Advanced Photovoltaic Sys, Inc*, No 93-229-JJF, 1995 WL 314742 at *3 (D Del Jan 6, 1995) (noting that the court "may give considerable weight to a prior adjudication of validity in determining the likelihood of success on the merits on the issue of validity") In 2001, a jury upheld U S Patent Nos 5,836,817 and 5,752,882 In the *Mikohn* litigation, Mikohn asserted that the '882 and '817 patents were invalid based on several prior art references In a special verdict, however, the jury found that Mikohn failed to show that the claims of the asserted patents were invalid and found that the asserted claims were infringed (Request For Judicial Notice, Ex 2 (Special Verdict) )

Second, Bally's burden of demonstrating a substantial question of patentability is further heightened because two of the asserted patents, the '885 and '812 patents, were reissued by the

31

PTO after consideration of the pleadings, prior art, and expert opinions submitted in the *Mikohn* litigation   *See Kaufman Co ,* 807 F 2d 970, 973 ("Where the patent in suit has been reissued under the provisions of 35 U S C  §§ 251 and 252, after consideration by the PTO of art not considered during the original prosecution, the presumption of validity remains intact, and the challenger's burden of proof imposed by that presumption, as an evidentiary matter, is usually more difficult to sustain ")

Finally, the validity of all the patents in suit is supported by industry acquiescence and acknowledgement of the vast commercial success of the covered products   *See Amazon com, Inc ,* 239 F 3d 1343, 1359 ("Further support for such a clear case [of validity] might come from a long period of industry acquiescence in the patent's validity "); *Dentsply Int'l, Inc  v  Great White, Inc ,* 132 F  Supp  2d 310, 314 (M D  Pa  2000) ("[W]here the products covered by the patents have enjoyed considerable, and undisputed, commercial success, and where competitors have avoided the patents, the presumption of patent validity is especially strong ") ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Testimony in the *Mikohn* litigation further demonstrates that the bonusing inventions have successfully driven sales of related systems for years   Request For Judicial Notice, Ex  1(*Mikohn* Trial Transcript at 160-67 )  Moreover, industry acclaim of the patented bonusing inventions further supports IGT's showing of validity   *See Dippin' Dots v  Mosey,* 44 U S P Q  2d 1812, 1817 (N D  Tex  1997) (showing of validity strengthened by affidavit testimony regarding widespread commercial success and awards and praise from individuals in the industry)  Finally,

industry observers and customers recognize that the bonusing concepts "pioneered" by Acres Gaming are among the greatest innovations in gaming history and that their use results in "significantly" improved revenue growth  (Alewel Decl. at ¶ 10 )  Strictly Slots magazine called the Acres bonusing concepts one of the twenty greatest innovations in the history of slots.  (*Id* )

In sum, the validity of the asserted claims is supported by every type of relevant evidence  Several of the asserted claims have been upheld by a jury and reaffirmed by the PTO through reissue proceedings  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

**B.**    **An Injunction Is Necessary To Prevent Irreparable Harm To IGT.**

      **1.**    **IGT Is Entitled To A Presumption Of Irreparable Harm Based On Its Clear Showing Of Likelihood Of Success On The Merits.**

The strong showing that IGT has made with regard to its likelihood of success on the merits entitles it to a presumption of irreparable harm.  *Oakley, Inc v Sunglass Hut Int'l* , 316 F 3d 1331, 1345 (Fed  Cir  2003); *Amazon.com*, 239 F 3d at 1350 ("Irreparable harm is presumed when a clear showing of patent validity and infringement has been made "); *Solarex*, 1995 WL 314742 ("irreparable harm can be presumed where a strong showing of validity and infringement can be made" because the "infringer should not be allowed to continue his infringement in the face of such a holding") (citing *Smith Int'l, Inc v Hughes Tool Co* , 718 F 2d 1573, 1581 (Fed Cir  1983)); *see also Critikon Inc v Becton Dickinson Vascular Access, Inc* , 28 U S P Q  2d 1362, 1370 (D  Del  1993) ("If courts refuse to grant preliminary injunctions where the infringement is as clear as it is in this case, the rights of patent holders will become diluted, and potential infringers will be encouraged to play the odds ") [4]  In *Oakley*, even though the "merits

---

[4] The Supreme Court's decision in *Ebay, Inc. v Mercexchange, LLC*, 126 S  Ct  1837 (2006), which set forth the proper analysis for *permanent* injunctive relief, did not invalidate the presumption of irreparable harm in the context of *preliminary* injunctive relief  *Christiana Indus Inc v Empire, Elecs , Inc* , No  06-12568, 2006 U S  Dist  LEXIS 54210 (E D  Mich , Aug  4,

issues    [were] close," the Federal Circuit agreed that the patentee was entitled to a presumption of irreparable harm  316 F 3d at 1345  The presumption was "well-supported" because the district court found that the defendant was set to release "huge numbers" of the accused product  *Id*  Similarly, as set forth above, Bally has very recently signed a large number of contracts to provide the infringing product and associated systems and devices  Thus, the presumption that IGT will be irreparably harmed by Bally's continued infringement is well-supported  *Id*

        2.      **Even Without The Presumption, Ample Evidence Supports A Finding That Continued Infringement Will Cause Irreparable Harm To IGT.**

              a.      **Sales Of The Patented Product Lead To Sales Of Products Not Covered By The Patents.**

Even if the Court were to deny IGT the benefit of the presumption of irreparable harm, there is ample evidence to support a finding that Bally's infringing activities have and will continue to irreparably harm IGT  First, because sales of the patented bonusing products virtually always include sales of related systems and other products, IGT will be irreparably harmed by the loss of sales of related products and services not covered by the patents-in-suit  It is well settled that a patentee may be irreparably harmed by infringing conduct where sales of the patented product lead to sales of related products  *See 3M Unitek Corp v Ormco Co* , 96 F  Supp  2d 1042, 1051 (C D  Cal  2000); *Decade Indus v Wood Tech , Inc* , 100 F  Supp  2d 979, 983 (D  Minn  2000) (irreparable harm exists where continued infringement will frustrate patentee's general business plan in which the success of the patented product will provide an opportunity for the patentee to leverage its entire product line into retail stores); *Spalding & Evenflo Cos , Inc v Acushnet Co* , 2 U S P Q  2d 1070, 1071 (D  Mass  1986) (patentee is irreparably harmed by loss of revenue from non-patented golf product line)

_____
2006) ("[T]his Court agrees that *Ebay* did not invalidate the presumption  The *Ebay* Court addressed the proper analysis for *permanent* injunctive relief.")



    **b.**    **Sales Of The Patented Product Establish Long-Lasting Customer Relationships.**

Second, because casinos generally upgrade or replace casino management and slot accounting systems only once every five to seven years, Alewel Decl at ¶ 19, a sale of the patented product will lead to a long-lasting customer relationship and several years of sales of related products and services  In *3M Unitek*, the court found that the patentee would suffer irreparable harm if defendants were permitted to continue selling the accused orthodontic brackets  *3M Unitek*, 96 F Supp 2d at 1051  According to the patentee, because orthodontists generally develop a relationship with product suppliers, plaintiff's ability to sell its non-patented products would also be harmed if the defendants were permitted to continue using the accused product to develop relationships with orthodontists  *Id*  Because the patented brackets were used by patients for one to three years, defendants would likely be able to maintain their relationship with the treating orthodontist for at least that period  *Id*  The court agreed and found that this

type of irreparable harm is almost always the result where the accused product competes directly with the patented product  *Id*

     Bally's infringing bonusing products compete directly with IGT's patented products (Alewel Decl  ¶ 13 )  As in *3M Unitek*, a sale of Bally's infringing product allows Bally to establish a customer relationship and effectively lock IGT out for several years  Indeed, even when the customer chooses to upgrade its system in several years, it is likely to choose the system it is more familiar with from the supplier with whom it has established a relationship  ██

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████ Bally's current sales of its infringing products are likely to lead to the same type of established relationship, inflicting future harm on IGT that is impossible to calculate

     Similarly, Bally is using sales of the infringing bonusing products to develop relationships with customers and sell products not covered by the patents-in-suit to those customers  For example, Bally recently announced a sale of bonusing products, a major system upgrade and up to 4,752 iVIEW devices to Lincoln Park racino  (Alewel Decl  ¶ 27; Dalke Decl  Ex  14 ) ██████████████████████████████████████████████████████████

██████ According to the press release, the sale was driven in part by Bally's infringing product, Bally Power Bonusing  *Id*  ██████████████████████████████████████

██████████████████████████████████████████████████████████████

██████

     Because it is difficult to ascertain the motivation for purchases of related products not covered by the patents-in-suit, the patentee's damages based on such lost sales are impossible to fully quantify  *See Transonic Sys , Inc  v  Non-Invasive Med  Techs  Corp*, 127 F  Supp  2d 1315, 1321 (D  Utah 2000) ("[I]n order to calculate damages, it is necessary to know what motivated each customer when purchasing a [product containing patented and non-patented features]  This makes damages calculations nearly impossible ")

36

c.    IGT Cannot Be Adequately Compensated For Sales And
Installations Of The Infringing Product Made Between Now
And Trial.

Several of the patents-in-suit, including the '812, '885 and '2,958 patents will expire in

2014. If allowed to go forward, sales and installations of Bally's infringing product made

between now and the end of a trial may still be in place at casinos when the patents expire unless

IGT seeks to require its current casino customers and potential customers to remove those

systems -- a strategy that would surely harm customer relationships. Accordingly, without a

preliminary injunction, IGT will be forced to either damage customer relationships by requiring

that casinos remove their newly purchased infringing systems or forgo any remedy at all because

many customers who purchase systems in the next one to two years will not be seeking upgrades

until the patents have expired. *See Hybritech, Inc. v. Abbott Labs*, 849 F. 2d 1446, 1456 (Fed.

Cir. 1988) ("[B]y the time the litigation is finished, it is entirely possible that the value of the

patent will be gone "); *Augat, Inc. v. John Mezzalingua Assocs., Inc.*, 642 F. Supp. 506, 508

(N.D.N.Y. 1986) ("[D]elay operates in clear derogation of the Patent Statute's protection of the

right to exclude ").

d.    The Introduction Of Bally's Infringing Products Has
Changed The Marketplace By Creating The Perception That
The Patented Product Is A Commodity.

IGT's bonusing products are critical to IGT's ability to differentiate its Advantage Casino

System from competing systems. (Alewel Decl. at ¶¶ 14, 23.) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ The introduction of the Bally Power Bonusing products is harming IGT's

ability to distinguish its systems on the basis of its patented bonusing products, however, because

the infringing products create the perception that the bonusing products are commodities.

(Alewel Decl. at ¶¶ 24-25.) *See Polymer Tech., Inc. v. Bridwell*, 103 F. 3d 970, 975-76 (Fed. Cir.

1996) ("Competitors change the marketplace "); *Jacobson v. Cox Paving Co.*, No. 89-1786-PHX

---

5 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

RLF1-3076564-1

PGR, 1991 U S  Dist  LEXIS 17787 at *44-45 (D  Ariz  May 16, 1991) (damage to pricing

structure supports finding of irreparable harm)  For example, Bally recently announced a sale of

casino management systems, slot management systems and Bally Power Bonusing products to

Philadelphia Park Casino in Pennsylvania   (Alewel Decl  at ¶ 24 )  ████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

*Id*  These lost sales and the deeper discounts IGT is forced to offer to compete with Bally reduce

IGT's ability to recoup its substantial investment in market development as well as in research,

innovating and acquiring bonusing technology   (Alewel Decl  ¶¶ 6-9, 23 )  *See Jacobson*, 1991

U S  Dist  LEXIS 17787 at *44-45 (patentee's substantial investment in market development

supports finding of irreparable harm)

Finally, because IGT and Bally directly compete to influence the same customers, Bally's

sales of its infringing products harm IGT's market share   Because market share is so difficult to

recover, loss of market share constitutes irreparable harm   *See Lubrizol Corp  v  Exxon Corp ,*

696 F  Supp  302, 317-18, 323 (N D  Ohio 1988) (finding irreparable harm from loss of market

share because, when customers are reluctant to switch suppliers, loss in market share may last

several years)   In addition, harm to IGT's pricing structure caused by Bally's directly competing

product constitutes irreparable harm  (Alewel Decl  ¶ 23 ); *Purdue Pharma L P  v  Boehringer*

38

*Ingelheim Corp.*, 237 F.3d 1359, 1367 (Fed. Cir. 2001) (likelihood of price erosion supported

finding of irreparable harm); *Jacobson*, 1991 U.S. Dist. LEXIS 17787 at *44-45

    C.    **The Balance Of Hardships Weighs In Favor Of Granting A Preliminary Injunction.**

    The balance of hardships weighs in favor of granting a preliminary injunction preventing

Bally's continued infringement. As set forth above, IGT is being irreparably harmed by lost

opportunities to leverage sales of its bonusing technology into sales of casino management and

accounting systems, by lost opportunities to establish long-term relationships with customers, and

by harm to the pricing structure and reputation of its patented products. By contrast, while Bally

has announced a large number of infringing sales, most of these announcements refer to

agreements to provide the infringing product – only a small number of customers appear to have

actually "gone live" with the infringing product thus far.

    More important, any harm to Bally due to loss of market share or customer relationships

does not warrant denial of a preliminary injunction. "Simply put, an alleged infringer's loss of

market share and customer relationships, without more, does not rise to the level necessary to

overcome the loss of exclusivity experienced by a patent owner due to infringing conduct."

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005)



*See Smith Int'l v. Hughes Tool Co.*, 718 F.2d 1573,

1581 (Fed. Cir. 1983) *cert. denied*, 464 U.S. 996 (1983) (public policy and balance of harms

favored patentee where accused infringer knew of patents and took a calculated risk that it would

infringe)

     **D.**    **No Countervailing Interest Outweighs The Public's Interest In Protecting Valid Patent Rights.**

Public policy favors protecting the rights secured by valid patents. *Smith Int'l*, 718 F 2d at 1581; *Solarex Corp ,* 1995 WL 314742 at * 8. Allowing infringement to continue during the pendency of this action undermines this policy. *Id.* Because no countervailing public interest in this case outweighs the policy of enforcing valid patent rights, a preliminary injunction should issue.

**V.**    **CONCLUSION**

The validity of the asserted patents is demonstrated by a prior adjudication of validity, the PTO's reaffirmation of validity after reissue proceedings, and

                                    Overwhelming evidence

demonstrates that Bally's products infringe the asserted patents, including Bally's own descriptions of its products' functionality and the expert declaration filed herewith. Based on IGT's clear showing that it is likely to succeed on its infringement claims, the Court should presume irreparable harm. Nevertheless, even without this presumption, ample evidence demonstrates that IGT has been and will continue to be irreparably harmed by Bally's infringement. Accordingly, IGT respectfully requests that the Court grant a preliminary injunction enjoining Bally from continued infringement of the '812, '885, '2,958, '983 and '046 patents.

OF COUNSEL

David P. Enzminger
Brett J. Williamson
David P. Dalke
Charles A. Thomasian
O'MELVENY & MYERS L.L.P.
400 S. Hope Street
Los Angeles, CA 90071
(213) 430-6000

Dated: October 31, 2006

William J. Wade (#704)
Anne Shea Gaza (#4093)
Matthew W. King (#4566)
Richards, Layton & Finger
wade@rlf.com
gaza@rlf.com
king@rlf.com
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiff IGT

40

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2006, I caused to be served by hand delivery the foregoing

document and electronically filed the same with the Clerk of Court using CM/ECF which will send

notification of such filing(s) to the following:

> Jack B. Blumenfeld, Esquire
> Karen Jacobs Louden, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE 19899

I hereby certify that on November 7, 2006, I caused to be sent by Federal Express the foregoing

document to the following non-registered participants:

| | |
|---|---|
| Charles K. Verhoeven | Edward J. DeFranco |
| Quinn Emanuel Urquhart | Quinn Emanuel Urquhart |
| Oliver & Hedges, LLP | Oliver & Hedges, LLP |
| 50 California Street, 22nd Floor | 51 Madison Avenue |
| San Francisco, CA 94111 | New York, NY 10010-1601 |

*Anne Shea Gaza*

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700