# EXHIBIT R



UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MIKOHN GAMING CORP.,

          Plaintiff,

      v.

ACRES GAMING, INC.,

          Defendant,

Before: WALLACH, Judge
Case No.: CV-S-97-1383-EJW (LRL)
(Base File)

Decided: July 27, 2000

Schreck Morris (Adam P. Segal and Steve Morris), Las Vegas, NV, and Mitchell Silberberg & Knupp LLP (Steven E. Shapiro and George M. Borkowski), Los Angeles, CA, for Mikohn Gaming Corporation.

Perkins Coie LLP (Jerry R. Riedinger, Michael D. Broaddus, and John C. Stewart), Seattle, WA, and Jolley, Urga, Wirth & Woodbury (William R. Urga and Gregory G. Gordon), Las Vegas, NV, for Acres Gaming, Inc.

McAndrews, Held & Malloy, Ltd. (Lawrence M. Jarvis and Gregory C. Schodde), Chicago, IL; Ian F. Burns & Associates (Robert C. Ryan and Ian F. Burns), Reno, NV; and Casino Data Systems (Bruce W. Benson), Las Vegas, NV, for Casino Data Systems.

## ORDER

### I

### INTRODUCTION

On May 25, 2000, Magistrate Judge Lawrence R. Leavitt issued his Report and

Recommendation (Findings of Fact & Conclusions of Law Re: Claim Construction) ("Magistrate

Judge's Report" or "Report") in the above-captioned case. Casino Data Systems ("CDS") and

IGTB056183

Acres Gaming, Inc. ("Acres") have filed objections to this Report; Mikohn Gaming Corp. has

not. For the reasons set forth below, the court sustains one of Acres's objections, and overrules

all other objections. To the extent objections are not sustained, the court adopts the Magistrate

Judge's Report.

## II

## BACKGROUND

The court incorporates by reference the background facts and description of the patents in

suit presented in the Magistrate Judge's Report, a copy of which is attached.

## III

## STANDARD OF REVIEW

The court reviews the Magistrate Judge's Report under the "contrary to law" standard

applicable to legal questions upon which a magistrate judge has made recommendations in

nondispositive matters. Fed. R. Civ. Pro. 72(a) (2000).[1] The Magistrate Judge's Report is a

---

[1]The rule provides:

Nondispositive Matters. A magistrate judge to whom a pretrial matter not
dispositive of a claim or defense of a party is referred to hear and determine shall
promptly conduct such proceedings as are required and when appropriate enter
into the record a written order setting forth the disposition of the matter. Within
10 days after being served with a copy of the magistrate judge's order, a party may
serve and file objections to the order; a party may not thereafter assign as error a
defect in the magistrate judge's order to which objection was not timely made.
*The district judge to whom the case is assigned shall consider such objections and
shall modify or set aside any portion of the magistrate judge's order found to be
clearly erroneous or contrary to law.*

Fed. R. Civ. P. 72(a) (2000) (emphasis added). Rule 72(a) implements 28 U.S.C. § 636(b)(1)(A)
(1994), entitled "Jurisdiction, powers, and temporary assignment"of Magistrate judges.

2

IGTB056184

recommendation on a nondispositive matter because construction of the claims of a patent is only the first step in determining whether a party has infringed upon that patent. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (aff'd 517 U.S. 370).

Claim construction, including allegedly fact-based questions involved, is purely a question of law. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996) ("We hold that the construction of a patent, including terms of art within its claim, is ['a matter of law'] exclusively within the province of the court."); see Cybor Corp. v. FAS Technologies, Inc. 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc) ("[C]laim construction, as a purely legal issue, is subject to de novo review on appeal.").

The "contrary to law" standard has been widely interpreted to give plenary review power to the District Court. See Haines v. Liggett Group Inc., 975 F.2d 81, 91 (3d Cir. 1992) ("[T]he phrase 'contrary to law' indicates plenary review as to matters of law."); Medical Imaging Centers of America, Inc. v. Lichtenstein, 917 F. Supp 717, 719 (S.D. Cal. 1996) ("Section 636(b)(1) [the statute implemented by Fed. R. Civ. P. 72(a)], however, has been interpreted to provide for de novo review by the district court on issues of law."); Computer Economics, Inc. v. Gartner Group, Inc., 50 F. Supp. 2d 980, 983 (S.D. Cal. 1999) ("[T]he 'contrary to law' standard permits independent review of purely legal determinations by a magistrate judge"); Weekoty v. United States, 30 F. Supp. 2d 1343, 1344 (D. N.M. 1998) ("When reviewing a question of law [under Fed. R. Civ. P. 72(a)], however, the standard is de novo"); 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 3069 (2d ed. 1997) ("Regarding legal issues, the language 'contrary to law' appears to invite plenary review.")

3

IGTB056185

The court is not limited by the parties' objections in its review of the Magistrate Judge's Report. It can review any part it finds appropriate. <u>Britt v. Simi Valley Unified School District</u>, 708 F.2d 452, 454 (9th Cir. 1983) ("The court's power to 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate' exists whether objections have been filed or not. <u>Lorin</u> [<u>Corp. v. Goto & Co., Ltd.</u>,] 700 F.2d [1202] at 1206 [8th Cir. 1983]. . . . Supervision by the district court means nothing if purely legal issues decided by the magistrate are not reviewed routinely."); <u>see</u> Fed. R. Civ. P. 72(a) (stating that the court can set aside "any" portion of the magistrate judge's ruling found to be contrary to law, and not limiting that review to the objections of the parties).

# IV

## ANALYSIS

CDS and Acres each filed a series of objections to the Magistrate Judge's Report. One term was objected to by both parties. The court will address each party's objections in turn, and then address the term to which both object.

## A

### Acres's Objections

Acres objects to several of the Magistrate Judge's recommendations. The court sustains its objection as to "data establishing criteria," and overrules all other objections.

4

IGTB056186

1

## Acres Is Correct That the Word "Criteria" in the Phrase "Data Establishing Criteria" Can Be Singular or Plural

The argument over the definition of the phrase "data establishing criteria" centers on the word "criteria." The Magistrate Judge found that "criteria" is a plural noun, that Acres chose to use it instead of the singular "criterion," and that therefore more than one rule or standard must be established when a command is issued "over the network including data establishing criteria" in the bonusing invention. Report at ¶¶ 74-75.

Acres argues that "criteria" is widely used as a singular noun, despite its technical plurality, that those skilled in the art acknowledge it as singular, and that the specification shows an example of only a single test for bonus eligibility. Acres Gaming's Objections to the Magistrate Judge's Report and Recommendation Re: Claim Construction ("Acres's Objections") at 23. It claims that "criteria" is clearly used as a singular noun in the patent specification. Id.

The court finds the Magistrate Judge's definition of "data establishing criteria" to be contrary to law, and sustains Acres's objection. The court must construe the terms of the claims according to their customary meaning and consistently with the patent specification.

The construction of patent terms begins with the terms themselves. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."). They are to be given their customary and ordinary meaning absent a clear statement

5

IGTB056187

in the patent specification that the patentee gave a special definition to the term. Id. ("Although

the words in a claim are generally given their ordinary and customary meaning, a patentee may

choose to be his own lexicographer and use terms in a manner other than their ordinary meaning,

as long as the special definition of the term is clearly stated in the patent specification or file

history."); Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615,

620 (Fed. Cir. 1995) (stating that one must look to the words of the claims "to which we ascribe

their ordinary meaning unless it appears the inventor used them otherwise."). Claim language is

not to be read in isolation, however. It must be interpreted in light of the patent specification.

United States v. Adams, 383 U.S. 39, 49 (1966) ("[I]t is fundamental that claims are to be

construed in the light of the specifications and both are to be read with a view to ascertaining the

invention, Seymour v. Osborne, 11 Wall. 516, 547 (1871)); Schriber-Schroth Co. v. Cleveland

Trust Co., 311 U.S. 211, 217 (1940) ("The claims of a patent are always to be read or interpreted

in the light of its specifications.").

        In this case, "criteria" is technically a plural noun. It is sometimes, albeit improperly,

used as a singular. See American Heritage Dictionary of the English Language (3d ed. 1996) at

442 ("Like the analogous etymological plurals *agenda* and *data*, *criteria* is widely used as a

singular form. Unlike them, however, it is not yet acceptable in that use.") Any ambiguity is

resolved by reference to the patent specification in which Acres describes an embodiment of the

invention in which player eligibility is determined by one test. The example given is that the

player must play 20 coins within three minutes in order to be eligible for bonus play. '817 Pat. at

col. 26, ll. 29-31. If "criteria" must be plural, then the example given in the specification itself

falls outside of the patent claim.

                                                6

IGTB056188

In construing the term's ordinary meaning consistently with the patent specification, the court finds that while Acres used poor English, it was not limiting itself to two or more qualifying rules when it used the phrase "data establishing criteria" in its patent claim. The court therefore holds that the phrase "data establishing criteria" means "one or more standards, rules or tests to determine whether a bonus is paid." Acres's objection is sustained.

## 2

### Acres's Argument That "Gaming Device" Does Not Include Manual Table Games is Refuted by the Specification.

The Magistrate Judge found that the term "gaming device" encompasses "gaming tables." Report at ¶ 26. This conclusion was based on the clear language of the specification. It states:

> The system supports a multiplicity of various gaming devices. The gaming devices 12-16 and 22-26 shown in FIG. 1 are the type having a pull handle for initiating a game, e.g., slot machines. However, the invention is not limited to such gaming devices. The gaming devices shown in FIG. 1 can also be gaming tables or push button operated machines as well, e.g. video poker. As will be described hereinafter, the system supports any gaming device providing traditional discrete connections, e.g., coins-in, coins-out, etc., as well as those having serial interfaces, as described below.

'961 Pat. at col. 7, ll. 8-17 (emphasis added). See Report at ¶ 25.

The Magistrate Judge also found the specification was clear that only gaming devices that can be operated on a computer network can actually be used for the invention. Report at ¶ 27. However, gaming tables not capable of being operated on a network still qualify as "gaming devices" under the Magistrate Judge's construction; they are simply not capable of being used in the invention.

7

IGTB056189

Acres argues that only table games that can accept a wager, determine a win or loss, and pay winning amounts in a fully automated fashion while communicating status information to other devices in a network can be "gaming devices" as the term is used in the patent. Acres's Objections at 4. At the very least, Acres argues, to be a "gaming device," the machine must be capable of being operated in a computer network and making automated payments. Id.

Acres's proposed definition of "gaming device" is too limiting. The specification makes it clear that any gaming device actually used in the invention must be capable of operating on a network, but it does not define the term "gaming device" that narrowly. Therefore, the court overrules Acres's objection.

3

**Acres's Argument That "Bonus Payout Table" Means "Bonus Payout Schedule,"
so it Can Be in Forms Other than a "Table" is Unsupported by the Specification.**

The Magistrate Judge found that "bonus payout table" means "a table that associates specific bonus payouts with specific winning combinations on a gaming device," Report at ¶ 42, and that a "table" is "a collection of data in which each item is uniquely identified by a label or position relative to other items," id. at ¶ 38.

Acres argues that a "bonus payout table" is the same as a "bonus payout schedule." Acres's Objections at 10. Since they are synonymous, it argues, a "bonus payout table" can be organized in data structures other than a "table," as it is defined above. Id. at 7, 13-14. Acres argues that "[n]othing in the specification states or even suggests that the term 'bonus payout

8

IGTB056190

schedule' is any way different from the term 'bonus payout table.'" Id. at 10. Those arguments fail.

Acres admits that the terms "payout table" and "payout schedule" have different meanings, but claims that "bonus payout table" and "bonus payout schedule" are used interchangeably in the specification. Id. at 7, 9-10. Acres points to no evidence that applying "payout table" and "payout schedule" to bonusing changes their meanings such that they become synonymous, and the court finds nothing in the claims or specification to support Acres's assertion. As the Magistrate Judge noted, "[i]n the specification, the term 'bonus payout table' appears in only one place." Report at ¶ 37. In that one place the term is not defined, and there is no evidence that Acres intended to afford it a meaning wholly different than its non-bonusing counterpart "payout table." See '961 Pat. at col. 9, ll. 60-67.

Acres argues, however, that the specification "extensive[ly] descri[bes] . . . the various payout schedules and tables, including the 'bonus payout table,'" so the Magistrate Judge erred in referring to dictionaries to define "table." Acres's Objections at 10. This argument inherently relies on equating "bonus payout table" with "bonus payout schedule." As stated above, "bonus payout table" is used in the specification only once. It is not extensively described. The only way the court could find it is described is to find that it is synonymous with "bonus payout schedule;" the court finds no support in the specification for such a finding.

Consulting technical dictionaries to define "table" is therefore proper. To look to extrinsic evidence, the court must first find the claims and specification unclear as to the

9

IGTB056191



definition of the term. <u>Vitronics</u>, 90 F.3d at 1584 ("[T]here will be instances in which intrinsic

evidence is insufficient to enable the court to determine the meaning of the asserted claims, and

in those instances, extrinsic evidence . . . may also properly be relied on to understand the

technology and to construe the claims.") The specification "merely states what the bonus payout

table accomplishes," and "does not define the term." Report at ¶ 37.

The Magistrate Judge consulted technical dictionaries. <u>Id</u>. at ¶¶ 37-38. As the Federal

Circuit discussed in <u>Vitronics</u>:

> Although technical treatises and dictionaries fall within the category of extrinsic
> evidence, as they do not form a part of an integrated patent document, they are worthy of
> special note. Judges are free to consult such resources at any time in order to better
> understand the underlying technology and <u>may also rely on dictionary definitions when
> construing claim terms, so long as the dictionary definition does not contradict any
> definition found in or ascertained by a reading of the patent documents</u>.

<u>Vitronics</u>, 90 F.3d at 1584, n.6 (emphasis added).

The technical dictionary definition of "table" applied by the Magistrate Judge does not

contradict the patent documents, as they do not describe or define "bonus payout table." <u>See</u>

'961 Pat. at col. 9, ll. 60-67. In light of the Federal Circuit's specific approval of using technical

dictionaries in patent cases, the court finds this evidence persuasive, and agrees with the

Magistrate Judge's construction of the term "table." Acres's objection is overruled.

IGTB056192

4

**Acres Argues That "Activating a Bonus Payout Table in a Gaming Device"
Does Not Require the Bonus Payout Table to Remain
Activated for More than One Game, but the Claim Language and
Prosecution History Show it Does.**

The Magistrate Judge concluded that the prosecution history provided clear evidence that

the phrase "activating a bonus payout table in a gaming device" requires that the bonus payout

table remain activated for more than one game. Report at ¶¶ 47, 49.

Acres argues that no such requirement exists. Acres's Objections at 14. It argues that the

statements in the prosecution history relied upon by the Magistrate Judge were made to

overcome a prior art objection raised by the Patent Office, and that the statements were made to

clarify that the bonusing invention does not require that the games in progress be interrupted and

a new bonus game initiated upon activation of the bonus payout table. Id. at 15-16.

The Magistrate Judge relied upon the prosecution history. Report at ¶ 49. In response to

the Patent Office's rejection of what became claim 1 of the '961 patent as being clearly

anticipated by prior art, Acres added the limitations "permitting continued play of the preselected

game at the gaming devices" and "paying the gaming-device in accordance with both payout

tables after each game for so long as the bonus payout table remains activated" in order to

overcome a prior art rejection by the Patent Office. Id.

In overcoming the rejection, Acres made the following statement to the Patent Office:

> [W]hen a bonus payout table is activated in accordance with the method of the
> present invention, the game being played at each gaming device continues; there

11

is no cessation of games in progress nor is a different game initiated when the game in progress is complete. Rather, play continues as before at the gaming devices. In addition, the method of the present invention now includes the limitation of paying to each gaming device based on a first payout table and paying based on both payout tables after the bonus payout table is activated.

'961 Prosecution History, Paper No. 4 at 11 (Jan. 26, 1996) (emphasis added).

The court agrees with the Magistrate Judge's analysis. Paying in accordance with the payout tables "after each game for so long as the bonus payout table remains activated" requires that the bonus payout table remain activated for more than one game. In Mikohn's brief below, and in arguments at the Markman hearing held by the Magistrate Judge, Mikohn argued that "each" means "every one of two or more considered separately," and that therefore if "each" game is paid out according to those tables, then more than one game must be played in the bonus mode. Mikohn Gaming Corporation's Proposed Findings of Fact and Conclusions of Law (#378A) at 23-24 & n.11, quoting Webster's New World Dictionary at 437. That analysis has merit. Acres's objection is overruled.

## 5

### Acres Seeks Clarification That Standard Pay Commands Are Not "Reconfiguration Commands."

The Magistrate Judge concluded that a "reconfiguration command" is "a command that rearranges the previous configuration of the gaming device so that the gaming device pays out extra money it would not have paid in its previous configuration." Report at ¶ 71.

12

IGTB056194

Acres requests a clarification. Acres's Objections at 27. In the '459 patent specification there is a list titled "Examples of Reconfiguration Commands." '459 Pat. at col. 23, ll. 42-49. The list includes "bonus pay" commands. Id. The Magistrate Judge drew a distinction between standard pay commands and bonus pay commands. The Report states "Acres was distinguishing 'reconfiguration commands,' which changes [sic] the mode of the gaming device to cause the payment of a bonus, from standard 'pay commands,' which cause the payment of standard jackpots." Report at ¶ 70. The clarification Acres seeks is simply that the standard pay commands are not reconfiguration commands. Acres's Objections at 27.

The court finds that the Magistrate Judge did hold that standard pay commands are not reconfiguration commands. The Magistrate Judge quoted from the prosecution history and then made the statement above. This court agrees with the Magistrate Judge that "simple 'pay commands' are not 'reconfiguration commands.'" Report at ¶ 70. Therefore, Acres's request for clarification is denied as unnecessary.

6

**Acres Argues That "Command," as Used in Specified Claims, Is
Broader than "Reconfiguration Command," but the Language of the Claims
Limits the Reference to "Reconfiguration Command."**

The Magistrate Judge found that the term "command" as used in claims 1 and 10 of the '882 patent and claims 1, 21, 22, and 24 of the '817 patent refers to a "reconfiguration command." Report at ¶¶ 72-73.

13

IGTB056195

Acres argues that a "command" can have many meanings, and that a person skilled in the art would interpret the term more broadly than simply as a "reconfiguration command." Acres's Objections at 27.

The results of the commands described in the relevant claims, however, are precisely the results from a reconfiguration command. See '882 Pat. at col. 38, ll. 8-24 (claim 1 describing a method in which a command is issued over the network to preselected gaming devices in response to initiation of bonus play period and "paying a bonus at each of said preselected gaming devices in accordance with the command"); '882 Pat. at col. 39, ll. 9-26 (claim 10 describing a method in which a command is issued over the network "to one of preselected gaming devices responsive to a predetermined event; and paying at said one gaming device in accordance with the command"); Report at ¶ 73.

The construction of the term "command" as used in these specific claims does not encompass all possible usages. As used in the relevant claims, "command" refers to a "reconfiguration command." Acres's objection is overruled.

7

**Acres Contends That "Preselecting Less Than All" Can Include Determining Whether a Player Has Met Predefined Eligibility Criteria but the Magistrate Judge Correctly Found That it Cannot.**

The Magistrate Judge determined that "preselecting less than all of the gaming devices" means "to pick out beforehand from among the gaming devices some, but not all, of the gaming

14

IGTB056196



devices to participate in the method being claimed." Report at ¶ 54. The Magistrate Judge

further found that preselection must occur prior to the setting of eligibility criteria because such

criteria are established by the reconfiguration command, which is sent to the "preselected"

gaming devices. Id. at ¶¶ 55, 60. This conclusion was reached after a review of the

specification, which states:

> Each promotion involves sending a reconfiguration command from the floor controller to
> a gaming device that has been selected to be part of a given promotion over the associated
> network. Upon receipt of the reconfiguration command, the gaming device reconfigures
> its payout schedule in accordance with the received reconfiguration command.

'961 Pat. at col. 2, ll. 61-67; See Report at ¶ 58.


Acres argues that the court should distinguish between the term "select," which is used in

the specification, and "preselect," which is used only in the claims. Acres's Objections at 20. It

further argues that the Magistrate Judge incorrectly assumed that reconfiguration commands

must contain eligibility criteria, and points to other types of reconfiguration commands in

support of its argument. Id. Finally, it argues that the claims at issue are not method claims, so

no chronological steps are involved, and that therefore the Magistrate Judge's finding that the

preselection occurs prior to the reconfiguration command containing the data establishing player

eligibility criteria is erroneous. Id. at 20-21.


The Magistrate Judge's Report was correct in holding that "preselecting less than all"

does not include determining whether a player has met predefined eligibility criteria. Acres's

argument that "preselect" means something other than "picking out beforehand" is contrary to

the common meaning of the word. While it is established law that patent writers can be their

15

IGTB056197



own lexicographers, <u>Vitronics</u>, 90 F.3d at 1582, nothing in the patent specification or claims indicates that any unusual meaning was attached to the word "preselect." In the absence of evidence to that effect, the court will not find a special meaning.

Acres's argument that reconfiguration commands need not include player eligibility criteria, Acres's Objections at 20, is supported by the specification, but it does not preclude reconfiguration commands from including data establishing criteria. The Magistrate Judge's finding that player eligibility criteria, when used, is contained in a reconfiguration command, does not assume that all reconfiguration commands contain such criteria.

Finally, the plain language of the claims at issue and the specification shows that reconfiguration commands are sent to the machines after they are preselected. Claim 1 of the '882 patent, for example, says:

> A method of operating gaming devices interconnected by a host computer having a user-operated input device comprising:
>
> . . .
> > <u>preselecting less than all</u> of the gaming devices interconnected by the host computer responsive to a user-effected action at the input device which identifies the preselected gaming devices with the respective associated address codes;
> > . . .
> > <u>issuing a command over the network to each of said preselected gaming devices</u> responsive to initiation of the bonus play period. . . .

'882 Pat. at col. 38, ll. 8-22 (emphasis added).

Since "command" in this claim has previously been defined to refer to a "reconfiguration command," and it is sent to a "preselected gaming device," it is clear that preselection must occur

16

IGTB056198



prior to the issuance of the reconfiguration command. That the reconfiguration command contains the player eligibility criteria is clear from the specification, as detailed in the Magistrate Judge's Report ¶¶ 59-61.

Furthermore, the parties agree that "preselecting less than all" should be interpreted consistently throughout the patents in suit. Report at ¶ 52. While Acres is correct that claim 1 of the '459 patent is not a method claim, claims 1 and 10 of the '882 patent which begin "a method of operating gaming devices," are method claims. If the term is to be interpreted consistently, the court cannot ignore the method claims when defining the phrase.

For these reasons, the court overrules Acres's objection.

**8**

**Acres Contends That "To One Of" Means "To One or More Of," but the Clear Language of the Phrase Controls.**

The Magistrate Judge determined that the phrase "to one of" as used in claim 10 of the '882 patent means "*to one, and only one*" of the gaming devices. Report at ¶ 87 (emphasis in original). The claim reads, in relevant part, "issuing a command over the network <u>to one of</u> said preselected gaming devices responsive to a predetermined event; and paying at said one gaming device in accordance with the command." '882 Pat. at col. 39, ll. 22-26 (emphasis added).

Acres argues that "to one of" means "to one or more of" the gaming devices, and cites to the specification and the prosecution history where Acres specifically referred to more than one

17

IGTB056199

device. Acres's Objections at 24-25. These cites make it clear that other parts of the patent do involve one or more gaming devices, but do not support Acres's argument that "to one of" in this claim refers to one or more of the devices. Instead, they demonstrate that if Acres had meant to say "to one or more of" in claim 10 of the '882 patent, it knew how to state it clearly. It instead chose to say "to one of." The clear language of "to one of" means that only one gaming device receives the command referred to in the claim.

The last clause of the claim further supports this conclusion. It refers to "paying at said one gaming device." That language clearly refers to only one gaming device. The court sees no reason to depart from the plain meaning of the phrase, and therefore overrules Acres's objection.

**B**

**CDS's Objections**

CDS very briefly states its objections. For the reasons set forth below, all are overruled.

**1**

**CDS Argues That "Associating Each Gaming Device with a Unique Address Code"
Means That Each Device Must Be Assigned an Address
Unique from All Other Gaming Devices Without Regard to
Network Connections, but the Specification Is Clear That it Does Not.**

The Magistrate Judge found that the phrase "associating each gaming device with a unique address code" means that each one of the gaming devices has its own address distinct from the address of any other gaming device in the network. Report at ¶ 77. The result is that devices are addressed in terms of the controllers to which they are linked ("[G]aming device #13 connected to controller #3 is distinct from gaming device #13 connected to controller #4."). Id.

18



The Magistrate Judge rejected CDS's contention that each gaming device must have its own unique identification number independent from its network connections. Id. CDS renews its argument here in the form of an objection. Casino Data Systems' Objection to Magistrate Judge Leavitt's Report & Recommendation Re: Claim Construction ("CDS's Objections") at 2. It contends that for the addresses to be "unique," the gaming devices cannot share an address with any other gaming device. Id. However, the Magistrate Judge found, and the court agrees, that the specification is clear on this point when it describes in technical detail the machines' set up. See Report at ¶¶ 78-79.

Therefore, the court overrules CDS's objection.

**2**

**CDS Argues That the Term "Bonus Pool" Cannot Mean the Same Thing as a "Progressive Jackpot Amount" or "Payout Amount" but the Magistrate Judge's Report Does Not Imply That it Does.**

The Magistrate Judge found that the "bonus pool" is "a pool that collects money that may be paid as the *entire amount* of the bonus collected" (claim 19 of the '882 patent) or "as a *portion* of the amount of the bonus" (claim 22 of the '817 patent), and that "progressive awards can be paid from the 'bonus pool.'" Report at ¶¶ 93-95 (emphasis in original).

CDS argues that this construction of "bonus pool" means that it is "the same as the progressive jackpot amount," and that this is incorrect because a "bonus pool" is different than a "bonus payout." CDS's Objections at 2-3.

19

IGTB056201

The court does not find CDS's argument persuasive. The Magistrate Judge's construction does not equate "bonus pool" with a "progressive jackpot amount." It simply states that progressive awards may be paid from the "bonus pool." It does not say that the terms are equal or interchangeable. Furthermore, CDS's argument that a "bonus payout" is something different than a "bonus pool" presupposes that a "progressive jackpot amount" is a "bonus payout." Since the Report does not equate a "progressive jackpot amount" with a "bonus pool," CDS's argument fails.

The court finds that the Magistrate Judge's construction of the term is logical and in accordance with the plain meaning of the term "bonus pool" and of the specification. Therefore, the court adopts the Magistrate Judge's construction of "bonus pool" and overrules CDS's objection.

## 3

**CDS Argues That the Phrase "Issuing a Command to Cause a Bonus to Be Paid Upon the Occurrence of a Predetermined Event" Means That Upon the Issuance of a Command, a Bonus Is Paid, But It Means That the Bonus Is Paid When the Predetermined Event Occurs.**

The phrase "issuing a command to cause a bonus to be paid upon the occurrence of a predetermined event" can be interpreted in two ways. First, upon the issuance of the command, the bonus is paid. Second, upon the occurrence of a predetermined event, a bonus is paid. The Magistrate Judge construed it to mean the latter. Report at ¶ 100. The court agrees.

IGTB056202

The Magistrate Judge found the claim language ambiguous. After looking to the specification, the Magistrate Judge concluded that the reconfiguration command specifies that a jackpot is to be paid upon the occurrence of a predetermined event. Id. The relevant portion of the specification states, "[T]he reconfiguration command can specify that the mystery jackpot is to occur after a certain number of coins, a certain number of handle pulls, or a variety of other conditions specified by the reconfiguration commands." '961 Pat. at col. 36, ll. 29-33.

The Magistrate Judge acknowledged that the claim could be read the other way, but stated that CDS pointed to no evidence in the specification to support that claim. Report at ¶¶ 99-100. Since it had two possible readings of the claim and only one supported by the specification, the Magistrate Judge concluded that the supported construction was correct. Id. at ¶ 100.

CDS now objects to the Magistrate Judge's finding, but again points to no evidence in support of its reading. CDS's Objections at 3. In fact, CDS merely states its contention that "'upon the occurrence of a predetermined event' modifies 'issuing a command.'" Id.

The court agrees with the Magistrate Judge that the phrase could be read either way, but that the specification supports only the Magistrate Judge's finding. Therefore, the court overrules CDS's objection and adopts the Magistrate Judge's Report as to this phrase.

21

IGTB056203

## C

### CDS and Acres Both Object to the Magistrate Judge's Construction of "Paying at Said One Gaming Device"

The Magistrate Judge found that the phrase "paying at said one gaming device" means that an automatic payment is made by the gaming device, and that such payment was made by only one such device. Report at ¶ 88. Acres and CDS both object.

Acres argues that payment can be made at more than one device. Acres's Objections at 26. Its argument is the same as its argument presented above for the phrase "to one of," and it fails for the same reasons that argument failed. The clear language of the claim is that payment is made at only one gaming device.

CDS argues that the payment need not be automatic, but can also be made manually so long as it is made at the location of the gaming device. CDS's Objections at 2.

The Magistrate Judge fully addressed this issue, however, and the court agrees with and adopts the analysis. See Report at ¶¶ 88-91. The specification describes bonus awards being paid automatically, the machine itself paying out the jackpot, and the invention filling a need for automated payment of bonus awards because the manual method is "cumbersome and inefficient." '961 Pat. at col. 2, ll. 9-18; see Report at ¶ 91. The specification is clear that payments are made automatically by the gaming device.

22

IGTB056204

For the reasons stated by the Magistrate Judge in the Report at ¶¶ 88-91, the court rejects both Acres's and CDS's objections.

## V

### CONCLUSION

The court therefore sustains Acres's objection to the term "data establishing criteria" and overrules all other objections. Except for "data establishing criteria," the court adopts the Magistrate Judge's Report regarding the construction of the claims at issue.

_Evan J. Wallach_
Evan J. Wallach, Judge

Date:    July 27, 2000
         New York, New York

23

IGTB056205

# EXHIBIT S

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

MIKOHN GAMING CORP.,                    )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )
                                        )
ACRES GAMING, INC.,                     )
                                        )
            Defendant                   )
                                        )
ACRES GAMING, INC.,                     )
                                        )       CV-S-97-1383-EJW (LRL)
            Plaintiff,                   )       (Base File)
                                        )
v.                                      )
                                        )
MIKOHN GAMING CORPORATION; NEW          )
YORK NEW YORK HOTEL & CASINO LLC;)
CASINO DATA SYSTEMS; and SUNSET         )
STATION HOTEL & CASINO,                 )
                                        )
            Defendants.                 )
                                        )
_____)

## REPORT & RECOMMENDATION
(Findings of Fact & Conclusions of Law Re: Claim Construction)

This action involves patent infringement claims brought by Acres Gaming, Inc. ("Acres")

against Casino Data Systems, Inc. ("CDS") and Mikohn Gaming Corporation ("Mikohn"). The

matter presently before the Court is the construction of the asserted claims of United States Patent

IGTB056206

Nos. 5,655,961 (the "961 patent"), 5,752,882 (the "882 patent"), 5,820,459 (the "459 patent") and 5,836,817 (the "817 patent")(referred to collectively as "the patents in suit") held by Acres. More specifically, the Court is called upon to construe the meaning of various claim terms and phrases disputed by the parties.

In January 2000, the Court held a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995)(enbanc), *aff'd*, 517 U.S. 370 (1996), to determine the meaning of the disputed claim terms and phrases. At the hearing, the Court allowed the parties to present expert testimony for the purpose of providing the Court with background in this technical area. In addition to the evidence and arguments presented by the parties at the *Markman* hearing, the court has considered numerous pre-hearing and post-hearing briefs and other filings. Based thereon, the undersigned recommends that the Court adopt the following findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

### I. INTRODUCTION

1.    The '961 patent, titled "Method of Operating Networked Gaming Devices," was applied for on October 12, 1994 and issued on August 11, 1997. (Mikohn Br. p. 1 at ¶ 2; Acres Br. p. 1 at ¶ 1.)[2]

2.    The '882, '459 and '817 patents are each titled "Method and Apparatus for Operating

---

[1]    To the extent, if any, that the findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent, if any, that matters expressed as conclusions of law may be deemed findings of fact, they shall also be considered findings of fact. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

[2]    Citations to "Mikohn Br." and "Acres Br." refer to Mikohn's Proposed Findings of Fact and Conclusions of Law (#378A) and Acres' Proposed Findings of Fact and Conclusions of Law (#380), respectively. Future citation to "CDS Br." will refer CDS' Post Markman Hearing Memorandum (#372).

2

AO 72

Networked Gaming Devices." (Mikohn Br. p. 1 at ¶ 3.) The applications for the '882, '459 and '817 patents were each filed on June 6, 1995. (Acres Br. p. 1 at ¶ 2.) The patents issued on May 19, 1998, October 13, 1998, and November 17, 1998, respectively. Each of the '882, '459 and '817 patents is a division of the '961 patent. (Mikohn Br. p. 1 at ¶ 3.)

3.     The patents in suit share the same specification (i.e., the text and drawings).[3] (Mikohn Br. p. 1 at ¶ 4; Acres Br. p. 1 at ¶ 1.) Only the claims of the patents in suit differ, although many use similar terms and phrases. (Acres Br. p. 1 at ¶ 1.)

4      The patents in suit relate "generally to gaming devices, and more particularly to a method and apparatus for controlling gaming devices interconnected by a computer network." ('961 Patent Specification ("'961 Pat.") at col. 1, ll. 1-5.)[4] The specification describes the following system:

> A system for operating networked gaming devices is described. The system according to the invention allows a casino in which the system is installed to run promotions or bonuses on any properly equipped gaming machines while simultaneously gathering player tracking and accounting data from all machines.

(Id. at col. 2, ll. 45-50.)

5.     The basic architecture of the patented system involves a "host computer" connected to a plurality of "gaming devices." (Id. at col.2, ll. 54-56 ("The system includes a plurality of gaming devices or machines connected to an associated floor controller over a network"); col. 6, ll. 20-24; col. 7, ll. 1-7; Fig. 1).) The specification describes the patented system as follows:

---

[3]  As will be discussed herein, the specification is a detailed written description of the patent.

[4]  Because the patents in suit share the same specification, the Court will cite to the '961 patent specification unless otherwise noted.

3

IGTB056208

> The system includes the following capabilities: remote reconfiguration, accounting data extraction, integrated player tracking, and cashless play. Remote reconfiguration includes sending a reconfiguration command from a host computer to one or more of the gaming devices. The gaming devices, on receiving a reconfiguration command will reconfigure its [sic] jackpot payout schedule in accordance with the reconfiguration command.

(Id. at col. 6, ll. 24-31); (Mikohn Br. p. 1 at ¶ 5.)

6.    The patented system allows the casino to "select" which gaming devices are to be used in a specific promotion: "The system provides the capability for the casino to select which of the plurality of machines are used in any given promotion. The system further allows any number of different promotions to operate simultaneously." ('961 Pat. at col. 2, ll. 50-53.)

7.    A gaming device that has been selected to be part of a specific promotion receives a "reconfiguration command," causing the gaming device to reconfigure its "payout schedule":

> Each promotion involves sending a reconfiguration command from the floor controller to a gaming device that has been selected to be part of a given promotion over the associated network. Upon receipt of the reconfiguration command, the gaming device reconfigures its payout schedule in accordance with the received reconfiguration command.

(Id. at col. 2, ll. 61-67.)

8.    The specification expressly provides descriptions of four different promotions: (1) multiple jackpot; (2) mystery jackpot; (3) bonus jackpot; and (4) progressive jackpot. (See id. at col. 3, ll. 2-12; col. 6, ll. 48-57; col 25, ll. 41-47; col. 25, l. 48 to col. 26, l. 24.) The specification states, however, that many other embodiments of the bonusing invention are possible. (See id. at col. 3, ll. 2-8.)

4

IGTB056209

9.    In the multiple jackpot promotion, a gaming device that is selected to be part of this promotion "reconfigures its payout to be a multiple of its default payout schedule." (Id. at col. 3, ll. 3-5.)

10.    According to the patent specification, a "mystery" jackpot is a jackpot that is paid to a player "even when a jackpot was not won." (Id. at col. 36, ll. 27-30.) As explained in the patent specification, the mystery jackpot "reconfiguration command can specify that the mystery jackpot is to occur after a certain number of coins, a certain number of handle pulls, or a variety of other conditions specified by the reconfiguration commands." (Id. at col. 36, ll. 29-33); (Mikohn Br. p. 3 at ¶ 10.)

11.    In the bonus jackpot promotion, a gaming device that is selected to be part of this promotion "reconfigures its payout schedule to payout an additional bonus amount when certain conditions are met." ('961 Pat. at col. 3, ll. 5-7.)

12    In the progressive jackpot promotion, "two or more gaming devices are combined in a progressive jackpot having a progressive jackpot payout schedule." (Id. at col. 20, ll. 16-18.) As explained by the patent specification, the progressive jackpot promotion involves a reconfiguration command that is sent to a plurality of gaming devices:

> Another reconfiguration command allows any number of machines on the network to be combined in a common jackpot having a common jackpot payout schedule, wherein the reconfiguration command reconfigures the selected machines to payout in accordance with the common jackpot payout schedule. In this case, the reconfiguration message would be queued up for each of the selected machines to be combined in a common jackpot. One example of a common jackpot is a progressive jackpot.

5

IGTB056210

(Id. at col. 36, ll. 5-13); (Mikohn Br. p. 3 at ¶ 12.)

13.   Acres alleges Mikohn infringes the following claims of the patents in suit: claim 1 of the '961 patent; claims 1, 2, 10, 11 and 18 of the '882 patent; claims 1, 4, 8, 15, 16 and 18 of the '459 patent; and claims 1, 21, 24 and 29 of the '817 patent. Acres alleges CDS infringes the following claims of the patents in suit: claims 10 and 19 of the '882 patent; and claim 22 of the '817 patent.

14.   At issue is the meaning of a number of the terms and phrases in the above claims. Many of the disputed terms and phrases are used in more than one claim. The Court's construction of a term or phrase in a particular claim shall be applied consistently throughout the patents in suit unless otherwise noted.

## II. LEGAL STANDARD

15   Two steps are involved in a patent infringement analysis: "the proper construction of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed.Cir.1996). Only the first step, claim construction, is before the Court.

16.   The issue of claim construction is a matter of law for the court. *See Markman*, 52 F.3d at 979. The purpose of claim construction analysis is to determine the meaning given to each disputed term by a person of ordinary skill in the relevant art. *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1578 n.4 (Fed.Cir.1993). "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of the record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582. The intrinsic evidence "constitute[s] the public record of the patentee's claim, a record on which the public is entitled to

6

IGTB056211

rely." *Id.* at 1583. "Such intrinsic evidence is the most significant source of the legally operative

meaning of disputed claim language." *Id.* at 1582. Indeed, "[i]n most situations, an analysis of the

intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Id.* at 1583.

17.     Construction of a claim, however, begins with the words themselves. *Bell Communications

Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619-20 (Fed.Cir.1995). "[T]he

language of the claim defines the scope of the protected invention." *Id.* at 619. Words in a claim

are generally given their customary and ordinary meaning. *Vitronics*, 90 F.3d at 1582. That is,

"a court must presume that the terms in the claim mean what they say, and, unless otherwise

compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson

Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir.1999). The ordinary meaning

of claim terms and phrases cannot be changed by reference to the specification or other intrinsic

evidence "unless the *language of the claims invites reference* to those sources." *Id.* at 989-90

(emphasis added). Thus, where the language of the claim does not invite reference to other sources,

the ordinary meaning of the words used in a claim will prevail and the analysis ends. *See id.* at

989-90.

18.     Thus, it may be "necessary to review the specification to determine whether the inventor has

used any terms in a manner inconsistent" with their plain meaning. *Vitronics*, 90 F.3d at 1582.

"The specification contains a written description of the invention which must be clear and complete

enough to enable those of ordinary skill in the art to make and use it." *Id.* The specification,

therefore, is always relevant to the claim construction analysis and usually is dispositive." *Id.* "[I]t

is the single best guide to the meaning of a disputed term." *Id.* A patentee, therefore, who invites

7

IGTB056212

reference in the claim language to intrinsic evidence "may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning *as long as the special definition of the term is clearly stated in the patent specification or file history.*" *Id.* (emphasis added). "In other words, where the inventor does not clearly explain the adoption of an uncommon or new definition for a claim term, the common meaning of that term to one of ordinary skill in the art controls." *Loral Fairchild Corp. v. Victor Co.,* 906 F.Supp. 798, 803 (E.D.N.Y. 1995).

19.     A court may also consider the prosecution history of a patent in its claim construction analysis. *Markman,* 52 F.3d at 980. The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics,* 90 F.3d at 1582. "As such, the [prosecution history] is often of critical significance in determining the meaning of the claims." *Id.* at 1583.

20.     In those cases where the intrinsic evidence discussed above unambiguously defines a term, "reliance on any extrinsic evidence is improper." *Id.* Thus, only where the intrinsic evidence is insufficient to enable a court to determine the meaning of a disputed term may the court rely on extrinsic evidence to understand the technology and to construe the claims. *Id.* at 1584.

> Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. However,...extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; *it may not be used to vary or contradict the claim language.* Nor may it contradict the import of other parts of the specification. Indeed, *where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled no*

8

> *weight...Nor may the inventor's subjective intent as to claim scope,*
> *when unexpressed in the patent documents have any effect.* Such
> testimony cannot guide the court to a proper interpretation when the
> patent documents themselves do so clearly.

*Id.* (emphasis added) (internal citations omitted).

21.     "The Federal Circuit has admonished that claims should preferably be interpreted without

recourse to extrinsic evidence such as expert testimony, other than perhaps dictionaries or reference

books, and that *expert testimony should be received only for the purpose of educating the judge.*"

*EMI Group North America, Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed.Cir.1998) (emphasis

added), *cert. denied*, 119 S.Ct. 1756 (1999). Expert testimony, therefore, "is not to be relied upon

for purposes of claim interpretation, other than to aid the judge in understanding the technology."

*Id.* (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 n.3, 1455-56 (Fed.Cir.1998) (en

banc)).

22.     As mentioned above, treatises and dictionaries also fall within the category of extrinsic

evidence. However, the court is "free to consult such resources at any time in order to better

understand the underlying technology and may also rely on dictionary definitions when construing

claim terms, so long as the dictionary definition does not contradict any definition found in or

ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d. at 1584 n. 6. Thus, federal

courts may rely on dictionary definitions to ascertain a term's ordinary meaning so long as it does

not contradict a definition that is *clearly stated* in the patent specification or file history. *See, e.g.,*

*York Prods., Inc. v. Central Tractor Farm and Family Center*, 99 F.3d 1568, 1572-73

(Fed.Cir.1996).

9

IGTB056214

23.    As previously discussed, this Court's analysis is limited to the proper construction of the terms and phrases that are in dispute. The Court, therefore, will decline to address any issues raised by the parties that touches upon issues of actual infringement. Actual infringement, the second step in infringement analysis, is a question of fact appropriate for resolution by the jury, or on summary judgment where a reasonable fact finder finds no infringement. *See Design-Rite, Inc., v. J. V. Mfg., Inc.*, 29 F. Supp. 2d 379 (E.D. Mich. 1998).

III. ANALYSIS

1. "Gaming Device"

24.    The parties dispute the meaning of the term "gaming device" in claim 1 of the '961 patent, claims 1 and 10 of the '882 patent, claim 1 of the '459 patent, and claims 1, 21, 22 and 24 of the '817 patent. Mikohn and CDS argue that the term "gaming device" means "any device used in gaming." More specifically, they argue that a "gaming device" can be a manually operated table game. Acres argues that the term "gaming device" means "an automatic device that performs at least the three automatic functions of (1) accepting wagers, (2) determining win or loss, and (3) providing for coin-out--i.e., automatically paying any winning amounts." Acres argues that the only table games that would fall within the meaning of "gaming devices" are those that are "fully automated."

25.    The real crux of the dispute between the parties is whether manually operated table games fall within the meaning of "gaming devices" as that term is used in relation to the patents in suit. The claim language does not shed light on what types of table games are included within the meaning of the term "gaming device." The Court, however, need look no further than the

10

IGTB056215

specification to find the answer. The specification, in pertinent part, reads:

> The system supports a multiplicity of various gaming devices. The gaming devices 12-16 and 22-26 shown in FIG. 1 are the type having a pull handle for initiating a game, e.g., slot machines. *However, the invention is not limited to such gaming devices. The gaming devices shown in FIG. 1 can also be gaming tables or push button operated machines as well,* e.g. video poker. As will be described hereinafter, the system supports any gaming device providing traditional discrete connections, e.g. coins-in, coins-out, etc., as well as those having serial interfaces, as described below.

(961 Pat. at col. 7, ll. 8-17) (emphasis added).

26.    The specification provides that "gaming tables" are included within the meaning of the term "gaming devices." It does not state that only *certain types* of "gaming tables" meet this definition. The clear import, therefore, is that there are no restrictions on the types of "gaming tables" that meet the definition of a "gaming device." If Acres wanted to limit the types of table games to only those that are "highly automated," it could have done so by inserting appropriate language into the specification, which would have alerted one skilled in the art to the definition it now urges upon this Court. The specification, however, contains no such language.

27.    Moreover, the definition of "gaming devices" set forth in the patent specification is not affected by the sentence in the patent specification stating that "the system supports any gaming device providing traditional discrete connections, e.g., coins-in, coins-out, etc., as well as those having serial interfaces, as described below." First, the sentence includes the phrase "supports any gaming device providing." A sentence cannot define a term if the sentence itself uses the term. Second, as is plain from a fair reading of the sentence, the sentence only describes aspects of "gaming devices" that might be used in practicing the invention -- it does not define the term

11

"gaming devices." It merely states that the system can use gaming devices "providing traditional discrete connections" or "having serial interfaces." Moreover, that "gaming devices included as part of the invention" will generally have "traditional discrete connections" or "serial interfaces" is addressed by the patent claim in that claim 1 of the '961 patent provides for a "method of operating gaming devices configured to play a preselected game interconnected by a computer network to a host computer..." Obviously, any gaming device used in the patented invention will have to have some means by which it can be "interconnected by a computer network to a host computer." (Mikohn Br. at p. 10.)

28. Acres also argues that the term "gaming device" should be defined according to N.R.S. § 463.0155, which defines "gaming device" as "any equipment or mechanical, electromechanical or electronic contrivance, component or machine used remotely or directly in connection with gaming or any game which affects the result of a wager by determining win or loss." Nowhere does the specification state that the meaning of the term "gaming device" is governed by that statute, or any other statute. "[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning *as long as the special definition of the term is clearly stated in the patent specification or file history.*" *Vitronics*, 90 F.3d at 1582 (emphasis added). The only evidence relied upon by Acres in support of its argument is expert testimony presented at the *Markman* hearing. Because the specification unambiguously includes all types of gaming tables within the meaning of the term "gaming devices," the Court will not consider such extrinsic evidence. Moreover, as CDS points out, the definition given by N.R.S. § 463.0155 to the term "gaming device" actually supports CDS and Mikohn's position because it defines that term to

12

IGTB056217

include "*any equipment...used directly or remotely in connection with gaming...*" Id. (emphasis added). Clearly, a manual table game falls within this definition.

29.    Finally, Mikohn argues that the "host computer" recited in claim 1 of the '961 patent is a separate and distinct entity from a "gaming device." Acres agrees with Mikohn on this point: "Acres agrees with Mikohn that the "host computer" recited in claim 1 of the '961 patent is not also one of the 'gaming devices' that are separately recited in claim 1." (Acres' Reply Brief Concerning Claim Construction for the '961 and '882 patents (#365) at p. 5.) No additional discussion on this point, therefore, is required.

30.    Based on the plain language of the specification, the Court agrees with CDS and Mikohn that manual gaming tables are included within the meaning of the term "gaming device." Moreover, the Court finds, based on the plain language of the specification quoted above, that a "gaming device" refers generally to any equipment used in connection with gaming. Finally, the Court agrees with the parties that the "host computer" recited in claim 1 of the '961 patent is not also one of the "gaming devices" that are separately recited in claim 1.

2.    "Computer" & "Host Computer"

31.    Mikohn and Acres dispute the meaning of the terms "computer" and "host computer" in claim 1 of the '961 patent. Claim 1 recites:

> A method of operating gaming devices configured to play a preselected game interconnected by a computer network to a host computer comprising:
> permitting players to play the preselected game at the gaming devices;
> paying to each device in accordance with a first payout table after each game;
> monitoring the activity of the gaming devices over the network;

13

IGTB056218

detecting the amount of money played on the gaming devices;
allocating a predetermined percentage of the money played to a bonus
pool;
determining the level of the bonus pool;
activating a bonus payout table in a gaming device after the bonus
pool level exceeds a turn-on level;
permitting continued play of the preselected game at the gaming
devices; and
paying the gaming-device in accordance with both payout tables after
each game for so long as the bonus payout table remains activated.

(961 Pat. at col. 37, l. 63 to col. 38, l. 17.)

32.     Mikohn argues that the term "computer" should be construed to mean "any kind of device capable of processing information to produce a desired result." In addition, Mikohn argues that the term "host computer" should be construed to mean "a controlling computer in a multiple computer operation." Mikohn relies on the dictionary definitions of those terms in support of its proposed constructions. Acres has no particular quarrel with the various dictionary definitions of the term "computer" offered by Mikohn. (Acres' Reply Brief Concerning Claim Construction for the 961 and 882 patents (#365) at p. 5.) Acres does disagree with Mikohn's definition of that term, however, insofar as it relates to the term "host computer." According to Acres, not every device that satisfies the various definitions of "computer" offered by Mikohn could constitute the "host computer." (Id.) Acres argues that, at a minimum, "the host computer must be capable of operating a network of gaming devices to implement the bonusing invention." It is not exactly clear from reading the claim language what attributes the "host computer" must have in order to function according to the claimed invention. Once again, however, the Court need not look far for the answer. Based upon a reading of the specification the Court agrees with Acres' proposed

14

construction of the term "host computer."

33.    All of the asserted claims of the patents in suit specify that a "host computer" is used in the bonusing invention. (See '961 Pat., claim 1; '882 Pat., claims 1, 2, 10, 11, 18, 19; '459 Pat., claims 1, 4, 8, 15, 16, 18; '817 Pat., claims 1, 21, 22, 24, 29.) The specification describes uses of the host computer in *implementing the bonusing invention*. (See e.g., col. 6, ll. 27-29 ("Remote reconfiguration includes sending a reconfiguration command from a host computer to one or more of the gaming devices")); (col. 8, ll. 38-40 ("The module allows the host computer to uniquely identify the gaming device on the network, including the device type").) The specification also gives examples of the types of devices that may be used as the host computer. (See col. 8, ll. 29-32 ("In fact, because the file server 32 is essentially a virtual hard disk for the floor controllers 18 and 32, the floor controllers and the file server can be considered a single host computer for the system 10")); (Acres Br. at p. 70.)

34.    Clearly, the functions of the "host computer" described in the specification are more sophisticated than Mikohn's broad definition of "any kind of device capable of processing information to produce a desired result." A plain reading of the specification would alert one skilled in the art that the "host computer" described in the patent must be capable of operating a network of gaming devices to implement the bonusing invention. Because the specification is clear, the Court need not consider the extrinsic evidence offered by Mikohn.

35.    The Court, therefore, construes the term "host computer" consistent with Acres' proposed construction: a computer having the ability to communicate via a network with the gaming devices to implement the bonusing inventions.

15

IGTB056220

3.  "Bonus Payout Table"

36.    Mikohn and Acres dispute the meaning of the term "bonus payout table" in claim 1 of the '961 patent.  Mikohn argues that the term "bonus payout table" means "a table that associates specific bonus payouts with specific winning combinations on a gaming device."  Acres argues that Mikohn's construction of the term "bonus payout table" improperly limits the meaning of the term "to just one of a number of different ways of accomplishing a 'bonus payout table.'"  According to Acres, the term "bonus payout table" means "a system for determining the amount and timing or conditions precedent to a bonus payment."

37.    The term "bonus payout table" is not defined in claim 1 of the '961 patent.  The Court, therefore, must look to intrinsic evidence for guidance.  In the specification, the term "bonus payout table" appears in only one place.  Under the heading "Serial Machine Interface," the specification uses the term "bonus payout table" in describing how a data communication node ("DCN") controller communicates reconfiguration commands to a machine.  The specification provides, in relevant part:

> The serial machine interface is the means by which the DCN controller communicates certain reconfiguration data, referred to as reconfiguration commands to the machine.  These reconfiguration commands cause the machines to activate a *bonus payout table* to allow the machine to append bonus payments to their standard jackpot payouts, as specified by their payout table, during certain bonus activities.

('961 Pat. at col. 9, ll. 60-67) (emphasis added).  As can be seen from the above-quoted language, the specification does not define the term "bonus payout table;" rather, it merely states what the bonus payout table accomplishes once it is activated by a reconfiguration command.  The Court,

16

therefore, must construe the term "bonus payout table" according to its ordinary meaning. *York Products*, 99 F.3d at 1572 (Fed.Cir.1996) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning"). The Court is permitted to review dictionary definitions to determine the ordinary meaning of the term "bonus payout table." *See, e.g., id.*

38.    The term "table" is defined in the ILLUSTRATED DICTIONARY OF MICROCOMPUTERS, Third edition (1990), p. 387 as "[a] graphically arranged collection of data in which each item is uniquely identified by a label or position relative to other items. The items are usually laid out in rows and columns for reference or stored in memory as an array." The term is defined in the MICROSOFT COMPUTER DICTIONARY, Fourth edition (1999), p. 434 as follows:

> In programming, a data structure usually consisting of a list of entries, each entry being identified by a unique key and containing a set of related values. A table is often implemented as an array of records, a linked list, or (in more primitive languages) several arrays of different data types, all using a common indexing scheme.

The OXFORD DICTIONARY OF COMPUTING, Fourth edition (1997), p. 493, provides the following definition of the term "table":

> A collection of records. Each record may store information associated with a key by which specific records are found, or the records may be arranged in an array so that the index is the key. In commercial applications the word table is often used as a synonym for matrix or array.

Based on these definitions, the Court agrees with Mikohn that the term "table" means "a collection of data in which each item is uniquely identified by a label or position relative to other items."

17

AO 72

(Mikohn Br. at p. 17.)

39.   Mikohn contends that the term "payout table" is a term of art that means "a table in a gaming device that is referenced in order to determine the appropriate payout for a particular winning combination." Acres argues that the term means "anything that associates a specific game outcome with a specific award amount." Because this term cannot be readily defined by the intrinsic evidence, the Court is permitted to rely on the prior art proffered by Mikohn in construing this term:

> [A] court in its discretion may admit and rely on prior art proffered by one of the parties, *whether or not cited in the specification or the file history*. This prior art can often help to demonstrate how a disputed term is used by those skilled in the art. Such art may make it unnecessary to rely on expert testimony and may save much trial time. As compared to expert testimony, which often only indicates what a particular expert believes a term means, prior art references may also be more indicative of what all those skilled in the art generally believe a certain term means.

*Vitronics*, 90 F.3d at 1584 (emphasis added).

40.   The definition of a "payout table" as a table that relates payout to game outcome is repeatedly and consistently used in relevant literature. (See, e.g., U.S. Patent No. 5,019,973, filed March 8, 1989, to *Wilcox et al.* ("The game is won or lost when the card hand as configured is compared to the *ranking of card hands* on the *payout table*, which also determines the amount of the payout, if any")(emphasis added)(Exh. 8 at Abstract, ll. 12-15))[5]; (U.S. Patent No. 5,255,915, filed October 23, 1991, to *Miller* ("The method comprises first providing a *payout table* defining

---

[5]   All exhibits cited in this paragraph can be found in Mikohn Gaming Corporation's Extrinsic Evidence Filed in Support of its Proposed Claim Constructions (#355).

18

a predetermined set of *winning hands* of different ranks and payout values selected from a single deck of cards, each card having a different face value and suit, with at least some of the winning hands being combinations of six cards, with the remaining hands from the deck not included within the predetermined set of winning hands not having any payout value") (emphasis added) (Exh. 9 at col.1, l. 64 to col. 2, l. 4)); (U.S. Patent No. 5,356,140, filed April 14, 1993, to *Dabrowski et al.* ("After the draw has occurred, the player is paid an amount based on the number of coins wagered and reflecting whatever *winning combination* he has achieved according to the *payout table* at the top of the display screen") (emphasis added) (Exh. 10 at col.5, ll. 35-39)); (U.S. Patent No. 5,401,024, filed May 9, 1994, to *Simunek* ("A typical *payout table* for use with this embodiment is listed below wherein each video reel contains three characters, namely a "7," a bar and a cherry. The player is paid a certain amount per character obtained after the reels are spun, the amount increasing for increasing numbers of matched spots") (emphasis added) (Exh. 11 at col. 4, ll. 1-6)); (U.S. Patent No. 5,449,173, filed September 26, 1994, to *Thomas et al.* ("Based on the *number selected*, a *payout table*, stored in the ROM memory 34 (FIG.3), is consulted to determine how many additional coins are to be paid out")(emphasis added)(Exh.12 at col. 3, ll. 51-53)); (U.S. Patent No. 5,489,101, filed June 6, 1995, to *Moody* ("A *payout table* is provided that pays the player various multiples of his wager depending on the *rank of poker hand* that the player achieves")(emphasis added)(Exh. 13 at col. 2, ll. 26-28)); (U.S. Patent No. 5,531,440, filed September 29, 1994, to *Dabrowski et al.* ("A *payout table* is established based on the number of coins or tokens wagered by the player and the *type of poker hand achieved*"(emphasis added)(Exh. 13 at col. 1, ll. 38-41)); (Mikohn Br. at p. 18.)

19

IGTB056224

41.     The language cited in the above-referenced patents buttresses Mikohn's argument that to one skilled in the art, the term "payout table" means "a table in a gaming device that is referenced in order to determine the appropriate payout for a particular winning combination." Acres, however, points to the mystery jackpot promotion as evidence that a "winning combination" is not necessary to the payment of a bonus. It is true, as previously discussed, that the mystery jackpot promotion is not based on game outcome. However, there is nothing in the patent or prosecution history that states or even suggests that a *bonus payout table* includes a mechanism for paying a mystery jackpot. The Court, therefore, will adopt Mikohn's construction of that term without consideration of the expert testimony offered by Acres in support of its proposed construction.

42.     With the terms "table" and "payout table" now defined, the Court looks again to the specification to determine the meaning of the term "bonus payout table." In pertinent part, the specification reads: "These reconfiguration commands cause the machines to *activate a bonus payout table* to allow the machine *to append* bonus payments to their *standard jackpot payouts*, *as specified by their payout table*, during certain bonus activities." ('961 Pat. at col. 9, ll. 60-67) (emphasis added). Based on a plain reading of the specification, the Court agrees with Mikohn that a "bonus payout table" is a table that associates specific bonus payouts with specific winning combinations on a gaming device.

43.     This construction of the term "bonus payout table" is confirmed by the prosecution history. In response to an office action wherein Acres sought to overcome a prior art rejection of claim 1 (which was originally claim 55), Acres stated as follows:

> [T]he method of the present invention now includes the limitation of

20

IGTB056225

> paying to each gaming device based on a first payout table and paying based on both payout tables after the bonus payout table is activated. Thus, *winning combinations* occurring multiple times at single preselected device are paid based on both payout tables after the bonus payout table is activated.

(Mikohn's Proposed Claim Construction for U.S. Patent No. 5,655,961(#351), Ex. 4 at p. 11) (emphasis added). Claims may not be construed one way in order to obtain their allowance and then in a different way against an accused infringer. "[T]he prosecution history (or file wrapper) limits the interpretation of the claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. American Cyanamid Co*, 774 F.2d 448, 452 (Fed.Cir.1985). "Other players in the marketplace are entitled to rely on the record made in the Patent Office in determining the meaning and scope of the patent." *Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1208 (Fed.Cir.1992), *cert denied*, 506 U.S. 1053 (1993); (Mikohn Br. at p. 21.)

44.    Moreover, the one and only example of a "bonus payout table" given by the '961 patent specification is a collection of payout values stored as an array. The '961 patent specification states:

> In another embodiment of the bonus time promotion, a bonus amount is awarded in addition to the payout according to the default of the payout schedule of the machine. The *amount of the bonus jackpot* is specified in subfield (E) of the bonus time data. For example, this bonus time promotion might *include five bonus amounts of $10, $25, $50, $100 and $500*, which is specified by subfield (E). *When a player hits a particular jackpot, whichever bonus amount is specified by the bonus amount subfield this amount is automatically paid out in addition to the payout amount determined by the machine's default payout schedule.*

('961 Pat. at col. 26, ll. 10-21)(emphasis added); (Mikohn Br. at p. 22.) Thus, the '961 patent

21

IGTB056226

specification, and the arguments made by Acres to the Patent Office in order to obtain issuance of claim 1, provide further support for the definition of "bonus payout table" proposed by Mikohn.

45.    Acres argues, however, that the specification uses the term "bonus payout table" and "bonus payout schedule" interchangeably and that, therefore, the term "bonus payout table" should be accorded the broader definition of a "bonus payout schedule." Acres relies on expert testimony in support of its argument. Nevertheless, as Mikohn points out, the specification does not accord the same meaning to "payout table" and "payout schedule." For example, the specification repeatedly states that a "reconfiguration command" reconfigures a gaming device's "payout schedule" while it acknowledges, at the same time, that it cannot reconfigure the gaming device's "payout table." (Compare '961 Pat. at col. 20, ll. 2-4 ("Upon receipt of the reconfiguration command, the gaming device reconfigures its payout schedule") with col. 6, ll. 43 ("The preferred embodiment currently activates only the bonus payout schedule responsive to the reconfiguration command, while not altering the payout table) ) Clearly, in the context of the '961 patent, "payout table" and "payout schedules" are accorded different meanings.

46.    Based on the foregoing, the Court construes the term "bonus payout table" to mean a table, as that term has been previously defined, that associates specific bonus payouts with specific winning combinations on a gaming device.

4.    "Activating a Bonus Payout Table in a Gaming Device"

47.    Mikohn and Acres dispute the meaning of the phrase "activating a bonus payout table in a gaming device" in claim 1 of the '961 patent. Mikohn argues that to "activate" the bonus payout table means "to enable the bonus payout table such that it is referenced each time the gaming device

22

IGTB056227

is played by the player." In addition, Mikohn argues that the "bonus payout table" must "remain activated on the same gaming device for more than one game." Acres argues that the phrase means "taking an action that permits one or more bonus awards to be paid in accordance with the bonus payout table if specified conditions are met." According to Acres, there is no requirement that the bonus payout table be referenced each time a gaming device is played.

48.    Mikohn relies primarily on the testimony of its expert in support of its argument that the payout table must be referenced each and every time a gaming device is played. As Acres points out, however, the specification, although supporting such a construction, contains no language that would limit it solely to this narrow construction. Mikohn's proposed construction would run contrary to the general rule "that the claims of a patent are not limited to the preferred embodiment, unless by their own language." *See Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir. 1999). The Court, therefore, will not read into the patent a requirement that is not supported by the intrinsic evidence.

49.    The Court does agree, however, with Mikohn insofar as it argues that the bonus payout table must remain activated for more than one game. Although the claim language and specification is unclear on this point, the prosecution history supports such a conclusion. In order to overcome a prior art rejection, Acres added the limitations "permitting continued play of the preselected game at the gaming devices" and "paying the gaming-device in accordance with both payout tables after each game for so long as the bonus payout table remains activated." In the response to the office action wherein these new limitations were added, Acres stated:

> [W]hen a bonus payout table is activated in accordance with the

23

IGTB056228

> method of the present invention, *the game being played at each
> gaming device continues; there is no cessation of games in progress*
> nor is a different game initiated when the game in progress is
> complete. Rather, play continues as before at the gaming devices.
> In addition, the method of the present invention now includes the
> limitation of *paying to each gaming device* based on a first payout
> table and paying based on both payout tables after the bonus payout
> table is activated

(Mikohn's Proposed Claim Construction for the '961 patent, Ex. 4 at p. 11) (emphasis added);

(Mikohn Br. at p. 24.) Based upon this clear evidence, the Court declines to consider the expert

testimony offered by Acres in support of its argument to the contrary.

50. Acres' argument that the phrase "activating a bonus payout table" means "taking an action

that permits one or more bonus awards to be paid in accordance with the bonus payout table if

specified conditions are met" will be rejected on the same grounds the Court rejected Acres'

proposed construction of the term "bonus payout table." As discussed earlier, the Court construed

that term as meaning that bonuses are paid based upon specific winning combinations. The Court,

therefore, will not address this point further.

51. Finally, Mikohn makes additional arguments regarding the construction of the phrase

"activating a bonus payout table" that were not addressed by Acres. First, Mikohn argues that the

bonus payout table must exist on the gaming device prior to its being "activated." Claim 1 of the

'961 patent describes "activating a bonus payout table *in* a gaming device after the bonus pool level

exceeds a turn on level." (961 Pat. at col. 38, ll. 11-12.) The clear import of that sentence is that

the bonus payout table is already existing in the gaming device prior to being "activated." The

Court, therefore, agrees with Mikohn on this point. Second, Mikohn argues that the "gaming

24

device" referred to in the claim element "activating a bonus payout table in a gaming device" is one of the gaming devices playing a preselected game interconnected to the host computer. Support for Mikohn's argument is found in the preamble to claim 1 which claims "[a] method of operating gaming devices configured to play a preselected game interconnected by a computer network to a host computer…" (Id. at col. 37, ll. 62-65.) The Court, therefore, agrees with Mikohn on this additional point.

### 5. "Preselecting Less Than All"

52.    The parties dispute the meaning of the phrase "preselecting less than all" in claims 1 and 10 of the '882 patent and claim 1 of the '459 patent. The parties agree that the phrase should be construed consistently throughout the patents in suit. The parties cite primarily to claim 1 of the '459 patent in their briefs. That claim recites:

> A system for operating a plurality of gaming devices, the system comprising:
> a host computer, said host computer including means for generating a reconfiguration command;
> a user-operated input device connected to said host computer;
> a network interconnecting the gaming devices to the host computer;
> *means for preselecting less than all of the gaming devices interconnected to the host computer responsive to user-effected action at said input device*;
> means within the computer for transmitting the reconfiguration command to one of the preselected gaming devices;
> means within each gaming device for receiving the reconfiguration command transmitted to the gaming device; and
> means within each gaming device for reconfiguring the gaming device responsive to the received reconfiguration command, wherein the gaming device pays a bonus in accordance with the received reconfiguration command.

('459 Pat. at col. 37, l. 60 to col. 38, l. 14) (emphasis added).

25

53.    Mikohn argues that the phrase "preselecting less than all" means "the capability of the casino to pick out the machines that will be used in a given promotion." CDS argues that the phrase means "selecting, i.e., determining which of the interconnected gaming devices will participate in the method being claimed." Acres argues the phrase should be construed to mean "that some, but not all, of the gaming devices are associated together."

54.    The term "preselecting" is not used in the specification. Instead, the specification repeatedly uses the term "select." The dictionary definition of "select" is "to pick out from among several" or to single "out in preference." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1984), p. 1057.    The dictionary definition of "preselecting" is "to select beforehand." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986), p. 1793. No language in the specification contravenes the plain meaning of those terms as defined above. Reading the plain meaning of those terms into the phrase "preselecting less than all of the gaming devices" leads to the construction of that phrase as follows: to pick out beforehand from among the gaming devices some, but not all, of the gaming devices to participate in the method being claimed.

55.    Mikohn and Acres further dispute whether the "preselecting less than all" step is separate and distinct from the step of determining whether a particular player's activities on a gaming device have met certain preselected eligibility criteria. Acres argues that the specification does not require such a distinction and that the "preselecting less than all" function is satisfied by the step of determining whether a player's activities on a gaming device meet certain preselected eligibility criteria. Mikohn argues that the two steps are separate and distinct and that, therefore, the step of determining eligibility does not satisfy the "preselecting less than all" function. According to

26

IGTB056231

Mikohn, the function of "preselecting less than all" must occur before the bonus eligibility criteria is set. Based upon a review of the specification and prosecution history, the Court agrees with Mikohn.

56.    The specification describes the following system for operating networked gaming devices:

> A system for operating networked gaming devices is described. The system according to the invention allows a casino in which the system is installed to run promotions or bonuses on any properly equipped gaming machines while simultaneously gathering player and tracking and accounting data from all machines.

('961 Pat. at col. 2, ll. 45-50); (Mikohn Br. at p. 27.)

57.    The system allows the *casino operator* to "select" which gaming devices to link to a specific promotion: "The system provides the capability for *the casino to select* which of the plurality of machines are used in any given promotion. The system further allows any number of different promotions to operate simultaneously." ('961 Pat. at col., ll. 50-53) (emphasis added); (Mikohn Br. at p. 27.)

58.    It is, *after* the casino has selected "which of the plurality of machines" are to be used in a specific promotion, that the system sends a "reconfiguration command" to the selected gaming devices:

> Each promotion involves sending a reconfiguration command from the floor controller to a gaming device *that has been selected* to be part of a given promotion over the associated network. Upon receipt of the reconfiguration command, the gaming device reconfigures its payout schedule in accordance with the received reconfiguration command.

('961 Pat. at col. 2, ll. 61-67) (emphasis added); (Mikohn Br. at p. 28.)

27

IGTB056232

59.    As the specification makes plain, it is this "reconfiguration command" that sets the bonusing

eligibility criteria in each of the gaming devices.  The specification defines a "reconfiguration

command" as a command sent the gaming device that contains "reconfiguration data."  The

specification states:

> The first step of processing this type of message is for the DCN to
> determine what type of data is included in the message. [T]here are
> three types of data that can be included in this message type:  *a*
> *reconfiguration command*, card data, or other minor data.  The DCN
> makes this determination...by analyzing one of the bytes in the data
> packet of the message.  This byte will be referred to herein as the
> command byte.  *If the command byte indicates that the message*
> *contains reconfiguration data, i.e., the command byte equals a*
> *reconfiguration command, the DCN stores the reconfiguration data*
> *in a predefined data structure in memory.*

('961 Pat. at col. 25, ll. 12-23) (emphasis added); (Mikohn Br. at p. 28.)

60.    The preferred "reconfiguration data structure" has three basic fields: (1) bonus type field;

(2) mystery jackpot data field; and (3) bonus time data field.  ('961 Pat. at col. 25, ll. 25-47.)  The

"bonus time data" field includes a subfield (D) specifying "Minimum Activity Level."  (Id. at col.

25, l. 37 and at col. 26, ll. 1-10.)  The specification expressly provides that this subfield "can be

used to specify the minimum activity level required by the player in order to be eligible for the

bonus time jackpot." (Id. at col. 26, ll. 3-5.)  Given that in the preferred embodiment of the patent

a gaming device must be "selected" for participation in a given promotion *before* a "reconfiguration

command" is sent to that device, it is clear that determining whether a player has met predefined

eligibility criteria cannot be and is not the same as "preselecting less than all" the gaming devices.

*See Vitronics*, 90 F.3d at 1583-84 (noting that claim interpretations excluding the preferred

28

IGTB056233

embodiment are heavily disfavored).

61.    Moreover, the plain language of claim 1 of the '459 patent further demonstrates that the reconfiguration command is sent to a gaming device only after the gaming device has been selected. One of the limitations set forth in claim 1 is: "means within the computer for transmitting the reconfiguration command to one of the *preselected* gaming devices." ('459 Pat. at col. 38, ll. 4-6) (emphasis added). The clear import of this language is that the reconfiguration command is transmitted to a gaming machine that has already been *preselected*, which means that the preselection *precedes* the reconfiguration step. (Mikohn Br. at p. 29.)

62.    Additional support for Mikohn's position is found in the specification. As already mentioned, while the term "preselecting" is not found in the specification, Acres makes frequent use of the terms "select" and "selected" in describing its purported invention. Dispositively, Acres' *only* use of those terms is to describe a *casino's* picking particular gaming machines to be *later reconfigured* for bonus play. (See '961 Pat. at col. 2, ll. 50-52 ("The system provides the capability for *the casino to select* which of the plurality of machines are used in any given promotion") (emphasis added)); (col. 2, ll. 61-64 ("Each promotion involves sending a reconfiguration command from the floor controller to a gaming device *that has been selected* to be part of a given promotion over the associated network")(emphasis added)); (col. 18, ll. 63-65 ("In addition, the floor controller is responsible for *transmitting a reconfiguration command to a selected one or more of the gaming devices* during certain bonus conditions") (emphasis added)); (col. 19, ll. 61-63 ("The system provides the capability for the *casino to select* which of the plurality of machines are used in any given promotion") (emphasis added)); (col. 19, l. 66 to col. 20, l. 2 ("Each promotion

29

IGTB056234

involves sending a reconfiguration command from the floor controller to a gaming device *that has been selected* to be part of a given promotion over the associated network")(emphasis added)); col. 36, ll. 5-12 ("Another reconfiguration command allows any number of machines on the network to be combined in a common jackpot having a common jackpot payout schedule, wherein the reconfiguration command *reconfigures the selected machines* to payout in accordance with the common jackpot payout schedule. In this case, the *reconfiguration message would be queued up for each of the selected machines* to be combined in a common jackpot")(emphasis added). In contrast, where discussing reconfiguration commands that set standards for minimum play at the "*gaming devices*," the patent specification discusses "conditions under which the *player* is eligible for this bonus time jackpot award." (Id. at col. 26, ll. 8-10) (emphasis added). Clearly, player eligibility is a completely different concept from "preselecting less than all of the gaming devices." Further, nowhere in the patent specification is it stated or implied that a casino operator can change player eligibility standards with a user-effected action at the input device of a host computer. (Mikohn Br. at p. 29.)

63.    Moreover, the prosecution history of the '459 patent provides further support for Mikohn's argument. The original patent application upon which the '459 patent is based was filed with the U.S. Patent Office on October 12, 1994. It included 61 claims. A discrete group of those claims was specifically directed to "selecting" gaming devices for purposes of sending a reconfiguration command. A second discrete group of claims was specifically directed to "determining" whether a particular player satisfied specified eligibility criteria. As is plain from a comparison of these original claims, Acres was using the term "selecting" to mean something entirely different than the

30

IGTB056235

term "determining." (*Compare* original claims 1, 9, 10 (using the term "selecting") with (original claims 24, 26, 27 (using the term "determining") at Mikohn's Proposed Claim Construction for the '459 patent (#350), Ex. 1 at pp. 71-76.)

64.    Finally, CDS and Acres argue over whether the gaming devices that are *not preselected* continue to function as stand-alone games. CDS argues that no such requirement for "preselection" is stated by the claim language or the specification. Acres argues, however, that one skilled in the art would understand that a gaming device that is not preselected to participate in a bonusing promotion may still function as either a stand-alone game or as a member of other preselected groups of linked games. The Court agrees with CDS that neither the claim language nor the specification state this as a requirement for "preselection." Accordingly, the Court will not graft onto the claim the extra limitation for "preselection" offered by Acres.

### 6.    "Responsive to User-Effected Action"

65.    Mikohn and Acres also dispute the meaning of the phrase "responsive to user-effected action" in claims 1 and 10 of the '882 patent and claim 1 of the '459 patent. Claim 1 of the '459 patent, for example, reads in relevant part: "means for preselecting less than all of the gaming devices interconnected to the host computer responsive to user-effected action at said input device." ('459 Pat. at col. 38, ll. 1-3.) The parties agree generally that the claims involve a casino operator at the host computer who selects gaming devices by typing in the address of each selected gaming device. Mikohn, relying on the meaning of the term "responsive," argues that the phrase also means that the act of preselection must be an *immediate and direct result* of the user-effected action. Acres argues that nothing in the specification or the claims of the patents in suit would convey to

31

a person skilled in the art the meaning Mikohn proposes. Acres argues that one skilled in the art would understand that "responsive" simply conveys the concept of "in response to," without any limitation on the timing of the response and without any requirement that the preselection be responsive solely to the entering of data by the casino.

66.    Nothing in the claim language indicates that the term "responsive" should be read contrary to its ordinary meaning. The ordinary meaning of the term "responsive" simply means "in response to." The term "response" simply means something done in "answer" to, a "reply" or a "reaction." WEBSTER'S NEW WORLD DICTIONARY, Second edition (1972), p. 1211. The ordinary meaning of the term "response" or "responsive" *does not include within its definition any time limit requirement*. Mikohn provides no evidence supporting its claim that the act of "preselection" must be *direct and immediate* result of the entering of data by the casino. The Court, therefore, will not alter the plain meaning the term "responsive" to include a time limitation requirement.

### 7.  "Reconfiguration Command"

67.    Mikohn and Acres dispute the meaning of the term "reconfiguration command" in claim 1 of the '459 patent. The full text of that claim is set forth above. The claim describes, in pertinent part, a system in which a "reconfiguration command" is sent to a preselected gaming device which, upon receiving the "reconfiguration command," reconfigures the gaming device, causing the gaming device to pay a bonus in accordance with the received "reconfiguration command." ('459 Pat. at col. 37, l. 60 to col. 38, l. 14.) The parties appear to agree on the general definition of "reconfiguration command." Mikohn argues, based upon the plain meaning of "configure," that a "reconfiguration command" is a command that rearranges the previous configuration of the

32

IGTB056237

gaming device. Acres, in not so different words, contends that a "reconfiguration command" is a command that causes a gaming device to be reconfigured. The Court agrees with these general definitions and, in the interest of clarity, will adopt the general construction of that term as proposed by Mikohn: a command that rearranges the previous configuration of the gaming device. However, the dispute does not end here.

68.    The crux of the dispute between Mikohn and Acres is whether a "pay command" is a "reconfiguration command" as described by the patent. Mikohn argues that a simple "pay command," which causes a gaming device to pay a specified amount, cannot be included within the definition of a "reconfiguration command" because "pay commands" do not reconfigure the gaming device to which it is sent. Acres argues that the specification expressly defines "reconfiguration commands" to include "pay commands." In particular, the parties dispute whether one skilled in the art would understand that the reconfiguration commands listed in Table 1 of the specification are types of pay commands. Table 1 reads as follows:

> Table 1-Examples of Reconfiguration Commands
> 1. Bonus Pay From Hopper (Coin Format)
> 2. Bonus Pay to Credit Meter (Coin Format)
> 3  Bonus Pay from Hopper (Dollar Format)
> 4. Bonus Pay To Credit Meter (Dollar Format)
> 5. Add Non-cash outable credits to Game
> 6. Begin Double Jackpot Time
> 7. Stop Double Jackpot Time

('961 Pat. at col. 23, ll. 36-45.)

69.    Acres, relying on the testimony of its expert, argues that one skilled in the art would understand the above examples to be types of pay commands. Mikohn's expert disagrees, stating

33

IGTB056238

that "pay commands" are never referred to as "reconfiguration commands." However, the Court

need not rely on the testimony of these experts.

70.    In response to an office action wherein Acres sought to overcome an obviousness rejection

for claim 1 (which was originally claim 28), Acres stated as follows:

> Claim 28 is also amended to further define the means within the
> gaming device for reconfiguring the gaming device as causing the
> gaming device to pay a bonus.  This makes clear that the
> reconfiguration relates to a bonus award *over and above any regular
> jackpot awarded* by the regulated schedule in the gaming device. –
> *This distinguishes from* Tracy in which [a] single gaming machine
> responds to payout and control signal information from a progressive
> controller dedicated to a bank of machines by making *a required
> payout of a progressive jackpot after a jackpot is detected at the
> gaming device.*

(CDS Post Hearing Appendix, Volume 2 at Ex ZZ, pp. 217-18) (emphasis added). It is clear from

the above history that Acres was using the term "reconfiguring" to mean changing the mode of the

gaming device to pay out extra money it would not have paid in its previous standard jackpot mode.

In other words, Acres was distinguishing "reconfiguration commands," which changes the mode

of the gaming device to cause the payment of a bonus, from standard "pay commands," which cause

the payment of standard jackpots.  The Court, therefore, agrees with Mikohn that simple "pay

commands" are not "reconfiguration commands."

71.    In addition, the Court finds that the general definition given to the term "reconfiguration

command" above should be narrowed in light of the prosecution history and plain language of the

claim itself.  The Court, therefore, adopts the following construction of the term "reconfiguration

command": a command that rearranges the previous configuration of the gaming device so that the

34

AO 72

gaming device pays out extra money it would not have paid in its previous configuration.

## 8. "Command"

72.    The parties dispute the meaning of the term "command" in claims 1 and 10 of the '882 patent and claims 1, 21, 22 and 24 of the '817 patent. CDS and Mikohn argue that the term "command" always refers to "reconfiguration commands." Acres argues that nothing in the claims requires that the claimed "command" must necessarily be a reconfiguration command. According to Acres, a reconfiguration command is just one of many commands and messages described in the patent.

73.    As discussed above, the Court construes the term "reconfiguration command" to mean a command that rearranges the previous configuration of the gaming device so that the gaming device pays out extra money, i.e. a bonus, it would not have paid in its previous configuration. The issue presented here is whether the term "command," as that term *appears in the claims in dispute*, means a "reconfiguration command." A plain reading of the *claim language* reveals that it does  (See '882 Pat. at col. 38, ll. 8-24 (Claim 1 describing method in which command is issued over the network to preselected gaming devices in response to initiation of the bonus play period and "paying a bonus at each of said preselected gaming devices in accordance with the command"); at col. 39 at 9-26 (Claim 10 describing method in which command is issued over the network "to one of preselected gaming devices responsive to a predetermined event; and paying at said one gaming device in accordance with the command"); '817 Pat at col. 38, ll. 27-47 (Claim 1 describing method in which command is issued over the network and paying a bonus in response to receiving a pay command); at col. 40, ll. 33-49 (Claim 21 describing method in which command is issued over the network to cause a bonus to be paid upon the occurrence of a predetermined event and "paying the

35

bonus via the gaming device responsive to receipt of the pay command"); at col. 40, ll. 50-62 (Claim

22 describing method in which a command is issued over the network to cause a bonus to be paid

upon the occurrence of a predetermined event); at col. 41, l. 13 to col. 42, l. 8) (Claim 24

describing method in which a pay command is issued to the gaming device upon the occurrence of

the predetermined event and "paying the bonus via the gaming device responsive to receipt of the

pay command").) "[A] court must presume that the terms in the claim mean what they say" unless

the "language of the claims invites reference to" other sources. *Johnson Worldwide*, 175 F.3d at

989-90. Here, the claims in dispute clearly use the term "command" to mean a "reconfiguration

command" and, therefore, do not invite reference to the specification or any other source.

Accordingly, the Court will construe the term "command" as it is plainly used in the claims

themselves: a command, as that term is used in claims 1 and 10 of the '882 patent and claims 1, 21,

22 and 24 of the '817 patent, means a reconfiguration command.

### 9. "Data Establishing Criteria"

74.    Mikohn and Acres dispute the meaning of the phrase "data establishing criteria" in claims

1, 21 and 24 of the '817 patent. The parties seek uniform construction of this phrase throughout

the three claims. In claim 1 of the '817 patent, for example, the claim describes "issuing a

command over the network *including data establishing criteria* to cause a bonus to be paid from the

pool via one of said selected gaming devices upon the occurrence of a predetermined event." ('817

Pat. at col. 38, ll. 34-37) (emphasis added). The crux of the dispute between the parties is over the

term "criteria." While both parties agree that the phrase "data establishing criteria" refers to

information that sets up standards, rules or tests to determine whether a bonus is paid, Acres argues

36

IGTB056241

that the phrase may also refer to *one rule or standard.* Mikohn disagrees, arguing that "criteria," by its ordinary meaning, is plural for the term "criterion." Acres contends, however, that one skilled in the art would understand that the term "criteria" is widely used in the singular form.

75.    The general rule is "that terms in the claim are to be given their ordinary and accustomed meaning." *Johnson Worldwide*, 175 F 3d at 989. In other words, "a court must presume that the terms in the claim mean what they say..." *Id.* Only when a term used in a claim invites reference to other sources for clarification should a court look beyond the claim language to seek a definition other than its plain meaning. *Id.* at 989-90. Here, Acres chose to use the term "criteria" instead of the singular "criterion" in describing claims 1, 21 and 24 of the '817 patent. The ordinary use of the term "criteria" is in the plural. Because the claim language is clear, the Court need not look to other sources to define this term.

10    "Associating Each Gaming Device with a Unique Address Code"

76.    CDS and Acres dispute the meaning of the phrase "associating each gaming device with a unique address code" in claim 10 of the '882 patent. The full text of that claim is set forth above. In pertinent part, that claim describes:

> A method of operating gaming devices interconnected by a host
> computer having a user-operated input device comprising:
> associating each gaming device with a *unique address code*;
> preselecting less than all of the gaming devices interconnected by the
> host computer responsive to a user-effected action at the input device
> which identifies the preselected gaming devices with the respective
> *associated address codes*;

('882 Pat. at col. 39, ll. 9-19) (emphasis added).

77.    CDS argues that the phrase "associating each gaming device with a unique address code"

37

IGTB056242

means that "each gaming device is connected to a unique address code that is unique among the entire network of gaming devices." In other words, each gaming device has its own unique identification number, *independent of the network connections of which it is a part*. Acres argues that CDS' proposed construction describes only one among many possible techniques for associating each gaming device with a unique address code. Acres argues that another technique described by the patent is a technique in which the gaming devices are distinctly addressed *in terms of their network connections*--i.e., gaming device #13 connected to controller #3 is distinct from gaming device #13 connected to controller #4. Under this example, the uniqueness of each gaming devices' address depends on the controller of which it is a part. Acres argues, therefore, that the phrase "associating each gaming device with a unique address code" should be construed to mean that each one of the "gaming devices has its own address distinct from the address of any other of those gaming devices." The Court agrees with Acres for the following reasons:

78.      Although the claim language is unclear on this point, the specification describes in detail how the preferred embodiment of the bonusing invention assigns a unique address to each gaming device. See generally '961 Pat. at col. 34, l. 1 to col. 35, l. 4 (titled "Assigning Gaming Device Addresses"). The specification explains that in the preferred embodiment the gaming devices connected to a particular floor controller are each assigned a unique one-byte address consisting of a shorthand representation of the four-byte unique identification number associated with the Data Communication Node ("DCN") contained in each gaming device. (See id. at col. 34, ll. 2-15.) Because a one-byte address allows up to 256 unique addresses, up to 256 gaming devices connected to a particular floor controller can be associated with a unique address code:

38

> As described above, in the preferred embodiment of the invention, the floor controller uses a shorthand token representation of the DCN's unique identification number to address the DCN. In the preferred embodiment, a singe byte address is used to address is used to address a DCN on any given current loop. This one-byte address allows up to 256 DCNs to be supported on any given current loop network.

(Id. at col. 34, ll. 2-8); (Acres Br. p. 35 at ¶ 73.)

79.    The system described in the patent can include multiple floor controllers, with each floor controller connected to multiple current loop networks, and with each current loop network connecting multiple gaming devices, to support as many as 8,192 separate gaming devices in total. (See '961 Pat. at col. 7, ll. 1-7; col. 19, ll. 1-11.) Together with identification of the current loop network, the single byte address providing 256 distinct values can then uniquely identify as many as 8192 different gaming devices.  (Mikohn Br. p. 36 at ¶ 74.)

80.    CDS contends that for purposes of implementing the bonusing invention, one skilled in the art would understand that the specification only describes a technique in which the four-byte identification number assigned to each DCN is associated with each gaming device as a unique address code. The specification explains, however, that this technique is cumbersome because the use of a four-byte address instead of a one-byte address creates unnecessary traffic on the network:

> In the preferred embodiment, only 64 such DCNs are connected to a single current loop network and therefore the singe byte address is more than adequate. The single byte address substantially reduces the amount of traffic on the current loop network by reducing the number of bytes from four in the unique identification number to one for the shorthand token representation.

('961 Pat. at col. 34, ll. 8-15); (Acres Br. p. 36 at ¶ 75.) Thus, the specification is clear that the

39

AO 72

1    invention is not limited solely to the single addressing technique proposed by CDS.

2    81.    CDS argues, however, that the meaning Acres attaches to the phrase "associating each

3    gaming device with a unique address code" does not make sense when it is read in connection with

4    the following portion of the specification:

5

6            The personality board...provides a unique identification number that
             the host computer can use to uniquely address the gaming device.
7            *The personality board allows the devices to be readily removed and
             reinstalled in the network without any manual reconfiguration by the
8            operator, such as resetting dip switches.*

9    ('961 Pat. at col. 16, ll. 41-49) (emphasis added).    CDS contends that under Acres' definition of

10   the phrase "associating each gaming device with a unique address code," gaming devices could not

11   be removed and reinstalled without manually resetting DIP switches.    CDS contends that the gaming

12   devices can be removed and reinstalled without the use of manual DIP switches only if each gaming

13   device has its own unique identification number, independent of the network connections of which

14   it is a part.    As Acres points out, however, that portion of the specification discussing the removal

15   and reinstallation of gaming devices without manual reconfiguration describes only one embodiment

16   of the invention.    The Court will not limit the scope of the claims to cover just one of the

17   embodiments described in the specification.    *See, e.g., Speciality Composites v. Cabot Corp.*, 845

18   F.2d 981, 987 (Fed. Cir. 1988).

19   82.    CDS's construction of the phrase "associating each gaming device with a unique address

20   code" is limited to just one approach for addressing gaming devices, and improperly ignores other

21   embodiments described in the patent specification.    *See Karlin Technologies*, 177 F.3d at 973.

22   Indeed, the claim construction urged by CDS excludes the preferred embodiment described in the

23

24

25

26

                                          40

patent. *See Vitronics*, 90 F.3d at 1583-84 ("Such an interpretation [excluding the preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support..."). Accordingly, the Court rejects CDS' proposed construction of that phrase.

11. "Predetermined Event"

83. CDS and Acres dispute the meaning of the term "predetermined event" in claim 10 of the '882 patent and claim 22 of the '817 patent. Both claims describe a process involving the issuance of a command over the network in response to or upon the occurrence of a "predetermined event," which causes payment. See '882 Pat. at col. 39, ll. 22-26 ("issuing a command over the network to one of said preselected gaming devices responsive to a predetermined event; and paying at said one gaming device in accordance with the command"); '817 Pat. at col. 40, ll. 60-62 ("issuing a command over the network to cause a bonus to be paid from the pool by one of said preselected gaming devices upon the occurrence of a predetermined event"). The parties agree generally that a "predetermined event" is an event that is predetermined as to the fulfillment of a time condition or other condition. The parties disagree, however, as to the types of examples that can constitute a "predetermined event." The parties dispute, for example, whether "hitting a jackpot" or "any coin in event" qualifies as a predetermined event. CDS argues that such events do not qualify as "predetermined events" to the extent they are random. CDS argues, for example, that a "coin-in event" would be a "predetermined event" only if it were based on a predetermined number of coins-in. Acres argues that no such requirement exists and that CDS is improperly limiting the term "predetermined event" to exclude events such as coin-in events, jackpot events and bonus pool threshold events.

41

84.    The specification does not specifically define the term "predetermined event." The

specification, however, describes "predetermined events" as triggers which are preset:

> The floor controller also monitors the system for certain event
> triggers in step 532. These triggers can be stored in the data base and
> fetched by the floor controller during its power-up procedures. *These
> triggers indicate if and when certain events occur.* Examples of event
> triggers include: *the drop period, the end-of-day, the bonus period,*
> etc. If an event has occurred, the floor controller handles the event
> in step 534...[One type of event] can be referred to as a bonusing
> event. The floor controller checks to see whether the event is a
> bonusing event in step 540. The *bonusing events can also be* –
> *triggered by the time of day.* For example, *the bonusing event may
> be triggered from midnight to 4:00 a.m. on weekdays.* The bonusing
> periods can be specified in the data base. If the triggered event is a
> bonusing event, the floor controller inserts a corresponding
> reconfiguration message in the output message queue in step 542.
> The reconfiguration message includes a reconfiguration command that
> is sent to an appropriate machine. *The machine, upon receiving the
> reconfiguration command, reconfigures its payout schedule in
> accordance with the received reconfiguration command.*

('961 Pat. at col. 35, ll. 26-56) (emphasis added). As can be seen from the specification, the events

described are those that are determined in advance of their occurrence. The specification does not

include in its discussion of triggering events, events that are random in occurrence. (See id; at col.

35, l. 61 to col. 36, l. 4.) Thus, the Court agrees with CDS that events which are random cannot

be "predetermined events" as that term is described in the specification. Moreover, the plain

meaning of the term "predetermine" supports such a view. The term "predetermine" is defined as

"[t]o determine, decide, or establish ahead of time." WEBSTER'S II NEW RIVERSIDE

UNIVERSITY DICTIONARY (1984), p. 926. Clearly, an event that is random cannot be

determined, decided or established in advance of its occurrence. The Court, therefore, will construe

42

the term "predetermined event" as follows: any non-random event that is determined, decided or established in advance of its occurrence.

85.    The Court will not, however, decide whether certain coin-in events, jackpot events, bonus threshold events, or other examples listed by the parties can be "predetermined events." That task is not before the Court. The only task before the Court is determining the meaning of the term "predetermined event." Whether certain examples are "predetermined events" touches upon issues of actual infringement. That presents issues of fact, not questions of law to be decided in this Court's interpretation of the disputed claims of the patent.[6]

### 12. "To One Of"

86.    CDS and Acres dispute the meaning of the phrase "to one of" in claim 10 of the '882 patent. Claim 10 recites, in pertinent part: "issuing a command over the network *to one of said preselected gaming devices* responsive to a predetermined event; and *paying at said one gaming device in accordance with the command*." ('882 Pat. at col. 39, ll. 22-26) (emphasis added). CDS argues that the phrase "to one of" means "to one of" and does not mean "to more than one of." That is, CDS contends that the command that is issued over the network can only be sent to one, and only one, gaming device. Acres argues, however, that one skilled in the art would understand that "to one of" can mean more than one. In other words, Acres contends that the phrase means that the command described in claim 10 is issued to at least one gaming device but may be issued to more than one gaming device. The Court agrees with CDS on this point.

---

[6] Indeed, the Court does not have sufficient evidence before it to determine whether each and every example disputed by the parties is a "predetermined event."

43

IGTB056248

87.    Construction of a claim begins with the words themselves, *Bell Communications*, 55 F.3d at 619-20, which are generally given their customary and ordinary meaning. *Vitronics*, 90 F.3d at 1582   Here, the claim specifically states that the command is issued to *one* gaming device. Nothing in the language of the claim itself supports Acres' view that the command is issued to *more than one* gaming device. In addition, the last limitation of the claim refers to paying at *said one* gaming device. The reference to gaming device in the singular bolsters the interpretation that "to one of said preselected gaming devices" means only one gaming device. *See WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1350 (Fed.Cir.1999)   Moreover, nothing in the specification supports Acres' view that the command discussed in claim 10 can be issued to more than one gaming device. In such situations, a court should construe a phrase according to its plain meaning:

> The plain meaning of 'selecting one of said...numbers' is selecting a single number, not a combination of numbers. In addition, the last limitation of the claim refers to 'said selected number.' This reference to 'number' in the singular sense bolsters the interpretation that 'selecting one of said...numbers' is limited to selecting a single number. Nothing in the written description, drawings, or prosecution history indicates that the phrases 'one of said.. numbers' or 'said selected number' should be given anything other than their ordinary meaning.

*Id.* (internal citation omitted).  The Court, therefore, will construe the phrase "to one of," as that phrase is used in claim 10 of the '882 patent, according to its plain meaning:  the command that is issued over the network can be *sent to one, and only one*, gaming device.

13.  "Paying At Said One Gaming Device"

88.    CDS and Acres dispute the meaning of the phrase "paying at one said gaming device in

44

IGTB056249

accordance with the command" in claim 10 of the '882 patent. As discussed above, claim 10

describes: "issuing a command over the network to one of said preselected gaming devices

responsive to a predetermined event; and *paying at said one gaming device* in accordance with the

command." ('882 Pat. at col. 39, ll. 22-26) (emphasis added). CDS argues that the phrase "paying

at said one gaming device" means that payment is made at the gaming device that receives the

command. Acres contends that the phrase means that "payment must be made at one gaming

device, but can be made at more than one gaming device, depending on the content of the

command." The Court disagrees with Acres for the same reasons that were given in the preceding

section. The claim language clearly addresses the gaming device in the singular. Moreover, there

is nothing in the specification that indicates the inventor intended to graft any unique meaning on

to the plain meaning of the phrase "at said one gaming device." The Court, therefore, will construe

the phrase to mean what it says: payment is made at the gaming device that receives the command.

89.    CDS also argues that the phrase "paying at said one gaming device" means that payment is

made *at the location of* the gaming device. Under CDS' proposed construction, "payment can be

made by a dealer, or by the machine, and the payment can be in the form of coins, chips, credits,

or a receipt redeemable for compensation, as long as the transaction occurs at the gaming device."

Acres contends that the phrase means that "payment must be automatic, i.e, *made by the gaming*

*device itself* as opposed to manual payment by a person." The issue, therefore, is whether the term

"at" is used in claim 10 to mean "payment by the gaming device" or "payment at the physical

location of the gaming device."

90.    The patent's intended meaning for the term "at" is not clear from a reading of the claim

45

IGTB056250

language itself. Indeed, dictionary definitions for the term "at" could support either party's view.

Compare WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY(1984), p. 134 at 1a

("In the location of") *with* id. at 9 ("By way of: Through"). Any ambiguity, however, is cleared

upon reading the specification.

91.    The specification reveals that "payments at the gaming device" refers to automated payments

made by the gaming device. For example, the specification discusses that manual payment of bonus

awards is cumbersome and inefficient and that the invention fills a need for automated payment of

bonus awards:

> An example of such bonsuses include a "double jackpot" wherein a
> player hitting a jackpot is paid double the jackpot amount. Currently
> this is implemented by having an attendant manually payout the
> additional payout amount. *This manual technique, however, is*
> *cumbersome and inefficient to administer* because an attendant must
> be constantly supervising the bonusing gaming devices. Accordingly,
> *a need remains for an automated method and apparatus* to provide
> bonusing for gaming devices.

('961 Pat. at col. 2, ll. 9-18) (emphasis added); (Acres Br. p. 40 at ¶ 82.)   In addition, the

specification discusses how bonuses awarded are "*automatically paid out* in addition to the payout

amount determined by the machine's default payout schedule." (See '961 Pat. at col. 26, ll. 16-

21.)(emphasis added).  Further, the specification discusses "automatic mystery jackpots," which

"allow a *machine to payout* a mystery jackpot even when a jackpot was not won." (See '961 Pat.

at col. 36, ll. 26-29) (emphasis added); (Acres Br. p. 41 at ¶ 83 )  Clearly, this language would

have alerted one skilled in the art that the inventor used the phrase "paying at said one gaming

device" to mean automatic payment by the gaming device itself.

46

AO 72

IGTB056251

14.  "Bonus Pool"

92.      CDS and Acres dispute the meaning of the term "bonus pool" in claim 19 of the '882 patent

and claim 22 of the '817 patent.  Claim 19 is a method claim that is dependent on claim 10.  Claim

19 includes all the steps of claim 10 plus the step of "allocating a predetermined percentage of the

cumulative amount wagered at all of the preselected gaming devices to a *bonus pool* and wherein

paying at said one gaming device in accordance with the command *comprises paying said pool* at

said one gaming device."  ('882 Pat. at col., ll. 41-46)(emphasis added).  Claim 22 of the '817

patent describes "allocating a predetermined percentage of the money played to a *bonus pool*; and

issuing a command over the network to cause a bonus to be paid *from the pool* by one of said

preselected gaming devices upon the occurrence of a predetermined event."  ('871 Pat. at col. 40,

ll  58-62) (emphasis added).  CDS argues that a "bonus pool" is "an accounting pool created for the

purpose of turning bonuses on and off" and cannot mean "a progressive escrow account."  CDS

further  argues  that  although  the  claims  state  that  payments  are  made  out  of  the  pool,  the

specification does not describe this function and that, therefore, this claim is invalid as a matter of

law.   Acres argues that CDS is reading a narrow interpretation of the term "bonus pool" into the

claims.  Acres argues that the term "bonus pool" means a "pool for collecting money that may be

paid as one or more bonuses."  In addition, Acres argues that, for purposes of claim 19 of the '882

patent, the limitation of "paying said pool at said one device" limits the invention of claim 10 "to

a progressive jackpot paid to a single player."

93.   - The language of the claims is clear.  In claim 19 of the '882 patent, the term "bonus pool"

is described as a pool that collects money that may be paid as the *entire amount* of the bonus

47

IGTB056252

collected (See '882 Pat at col., ll. 41-46 ("allocating...percentage...of...amount wagered to a bonus

pool and...paying *said pool*) (emphasis added)). In claim 22 of the '817 patent, however, the term

is described as a pool that collects money that may be paid as a *portion* of the amount of the bonus

collected (See '871 Pat. at. col. 40, ll. 58-62. ("allocating...percentage...of...money played to a

bonus pool and...cause a bonus to be paid *from the pool*")(emphasis added).)

94.    Moreover, the Court finds that the specification does discuss paying progressive amounts

from the "bonus pool." The specification describes the progressive jackpot promotion-in which any

number of gaming devices may be combined into a progressive jackpot:

> Another reconfiguration command allows any number of machines on
> the network to be combined in a common jackpot having a common
> jackpot payout schedule, wherein the reconfiguration command
> reconfigures the selected machines to payout in accordance with the
> common jackpot payout schedule. In this case, the reconfiguration
> message would be queued up for each of the selected machines to be
> combined in a common jackpot. One example of a common jackpot
> is a progressive jackpot. Unlike the prior art progressive jackpot
> systems, however, the progressive jackpot according to the invention
> is not limited to a predetermined number of machines. In the prior
> art progressive jackpot systems, a bank of machines are connected to
> a common progressive jackpot controller and only those machines can
> be included in the progressive jackpot. In contrast, any machine on
> the network, including those connected to other floor controllers can
> be combined into a common progressive jackpot.

('961 Pat. at col. 36, ll. 5-22); (Acres Br. p. 25 at ¶ 54.)

95.    The specification describes how the progressive jackpot embodiment described above pays

the progressive amount from the "bonus pool." (See '961 Pat. at col. 36, ll. 37-39.) Indeed, the

specification discusses payment of progressive bonuses in describing how the bonus pool is

managed:

48

IGTB056253

> This system also allows for machines connected to different floor
> controllers to be combined into a single bonusing promotion. In this
> case, one of the floor controllers assumes primary responsibility for
> managing the bonus pool while the other floor controllers act as
> intermediaries between the primary floor controller and the machines
> connected to the other floor controllers. Thus, the system according
> to the invention allows for much greater flexibility in running
> bonusing promotionals that heretofore possible. *Prior art systems*
> *required certain predetermined machines to be connected into a bank*
> *for any given bonus award such as a progressive bonus.* The system
> according to the invention allows any machine in the casino to be
> combined in a bonus type situation. *The system also insures that the*
> *bonusing promotionals will operate substantially in the black, i.e., –*
> *the bonus pool is greater than the bonus payouts.*

('961 Pat. at col. 37, ll, 37-52)(emphasis added); (Acres Br. p. 26 at ¶ 55.) The Court finds that

the specification would alert one skilled in the art that progressive awards can be paid from the

"bonus pool."

96.     Based on these findings, the Court agrees with Acres insofar as it argues that nothing in the

claim language requires narrowing the plain meaning of "bonus pool" to the narrow interpretation

proposed by CDS. *See Johnson Worldwide*, 175 F.3d at 989-90.

97.     The Court, therefore, makes the following conclusions: First, the Court will adopt the plain

meaning of the term "bonus pool." With respect to claim 19 of the '882 patent, the term "bonus

pool" means a pool that collects money that may be paid as the entire amount of the bonus collected.

With respect to claim 22 of the '817 patent, the term means a pool that collects money that may be

paid as a portion of the amount of the bonus collected. Second, the Court concludes that the term

"bonus pool" should be construed to include within its meaning a progressive pool.

      15.   "Issuing a Command to Cause a Bonus to be Paid Upon the Occurrence ...

49

IGTB056254

of a Predetermined Event"

98.    CDS and Acres dispute the meaning of the phrase "issuing a command to cause a bonus to be paid from the pool by one of said preselected gaming devices upon the occurrence of a predetermined event" in claim 22 of the '817 patent. (See 817 Pat. at col. 40, ll. 50-62.) CDS argues that the phrase means that "the command must cause the bonus to be paid." Acres argues that the phrase means that "the bonus is paid upon the occurrence of the predetermined event."

99.    The Court finds that the claim language lends support to both parties' proposed constructions. On the one hand, the claim appears to state that the *command* causes the bonus to be paid. On the other hand, the claim can be read to mean that the bonus is not paid until the occurrence of the *predetermined event*. The Court therefore finds the claim language to be ambiguous. Accordingly, the Court may look to the specification for guidance in interpreting this phrase. *See Johnson Worldwide*, 175 F.3d at 990.

100.    The specification provides support for Acres' position. In discussing the implementation of "automatic mystery jackpots," for example, the specification provides that a reconfiguration command specifies that a jackpot occurs after the occurrence of a predetermined event: "[T]he *reconfiguration command can specify that the mystery jackpot is to occur after* a certain number of coins, a certain number of handle pulls, or a variety of other conditions specified by the reconfiguration commands." ('961 Pat. at col. 36, ll. 29-35)(emphasis added). CDS does not cite to any portion of the specification that would support its proposed construction. Accordingly, the Court concludes that the phrase "issuing a command to cause a bonus to be paid upon the occurrence of a predetermined event" means that the bonus is paid upon the occurrence of the

50

IGTB056255

predetermined event.

## RECOMMENDATION

It is the recommendation of the undersigned United States Magistrate Judge that the Court adopt the foregoing findings of fact and conclusions of law.

DATED this 24th day of May, 2000.

LAWRENCE R. LEAVITT
UNITED STATES MAGISTRATE JUDGE

51

IGTB056256

# EXHIBITS U-X
# REDACTED