IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IGT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civ. No. 06-282-SLR | |
| | ) | |
| BALLY GAMING INTERNATIONAL | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

William J. Wade, Esquire and Anne Shea Gaza, Esquire of Richards, Layton & Finger, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: David P. Enzminger, Esquire and David P. Dalke, Esquire of O'Melveny & Myers LLP, Los Angeles, California.

Jack B. Blumenfeld, Esquire and Karen Jacobs Louden, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Charles K. Verhoeven, Esquire of Quinn Emanuel Urquhart Oliver & Hedges, LLP, San Francisco, California; Edward J. DeFranco, Esquire and Alexander Rudis, Esquire of Quinn Enamuel Urquhart Oliver & Hedges, LLP, New York, New York.

**MEMORANDUM OPINION**

Dated: April 28, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

IGT ("plaintiff") filed this action against Bally Gaming International Inc., Bally Technologies, Inc. and Bally Gaming, Inc. d/b/a Bally Technologies (collectively, "Bally" or "defendants") on April 28, 2006, alleging infringement of U.S. Patent Nos. RE 38,812 ("the '812 patent"), RE 37,885 ("the '885 patent"), 6,832,958 ("the '2958 patent"), 6,319,125 ("the '125 patent"), 6,224,958 ("the '4958 patent"), 6,431,983 ("the '983 patent"), 6,607,441 ("the '441 patent"), 6,565,434 ("the '434 patent"), and 6,620,046 ("the '046 patent"). (D.I. 1)[1] Plaintiff alleges that defendants' "Bally Power Bonusing®" slot machine technology infringes one or more claims of the asserted patents.

On June 30, 2006, defendants filed their answer, and asserted counterclaims for a declaratory judgment of noninfringement, invalidity and unenforceability of each asserted patent (counts I - IX); attempted monopolization in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (count X); false representation in violation of the Lanham Act, 15 U.S.C. § 1125 (count XI); and "intentional interference with business relationships" (count XII). (D.I. 40) Plaintiff moved to dismiss defendants' counterclaim counts X - XII. (D.I. 53) Plaintiff also moved for a preliminary injunction. (D.I. 75) The case was assigned to this judicial officer on April 2, 2007. Following a discovery conference, on June 21, 2007, plaintiff's pending motions were withdrawn. Discovery proceeded and has now since closed. (D.I. 160, 175)

On February 25, 2008, by agreement of the parties, all claims, defenses, and

---

[1] Plaintiff originally filed the complaint in the name of "International Game Technology" (D.I. 1); plaintiff amended its complaint on May 8, 2005 and recaptioned itself "IGT." (D.I. 6)

counterclaims related to the '125, '434, '4958, '046, and '2958 patents were dismissed. (D.I. 152) The parties entered into an agreement on May 14, 2008 removing the '441 patent from issue. (D.I. 165) Remaining at issue is infringement of the '812, '885, and '983 patents, defendants' counterclaims of invalidity and unenforceability of these patents, and defendants' counts X-XII. This case is set for a jury trial commencing May 26, 2009.

Currently pending before the court are seven motions for summary judgment. Plaintiff has filed motions: (1) of infringement (D.I. 178); (2) of validity of the '885 and '812 patents (D.I. 180); and (3) that Bally does not have either an express or implied license to practice the '885, '812, or '983 patents ("no licensing defense") (D.I. 182). Defendants have filed motions: (1) of noninfringement (D.I. 191); (2) of invalidity of the '983 patent (D.I. 193); (3) of invalidity of the '885 and '812 patents (D.I. 219); and (4) that Bally has a valid license defense with respect to the '983 patent (D.I. 221).[2] The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1338.

## II. BACKGROUND

### A. Technology at issue

This suit relates to casino slot machine technology and player rewards. Casino slot machines may be networked together. Networking allows for advantages such as the casino's ability to monitor patrons' slot play and to extract accounting data from

---

[2]Plaintiff objects to the latter two motions as having been filed outside of the schedule and the parties' agreed-upon extensions. The court's consideration of these cross motions, the subject matter of which is already before the court, does not prejudice plaintiff. In addition, defendants have not filed a reply brief in support of either motion.

individual machines. (JA01631-32) Monitoring systems require the use of player-tracking cards (hereinafter "PTC"s) and machines equipped with card-tracking devices. Casinos typically issue PTCs to patrons who sign up for an account through the casino's promotions department, and use PTCs to track play, allow players to obtain rewards or participate in promotions when their PTC is in use, and to enable players to access funds that they previously have deposited with the casino for use at a gaming device or table. The casino maintains a database of its patrons on a host computer. PTCs can be inserted into a tracking device that includes a magnetic card reader, display for messages and a keypad to accept any inputs from the patron; such devices are typically found on slot machines.

Both parties in this case provide software products used by casinos to provide awards to players who are gambling on a networked gaming device such as a slot machine. Such "bonusing" increases player loyalty and entertainment, and can be provided in many ways, such as by special awards or free play credits. A "progressive" jackpot is a common jackpot that increases a small amount for every game played on the machines included within a certain network whereon the progressive is offered.

Defendants manufacture a product suite called Bally Power Bonusing, which includes the following accused products: Power Winners, Power Rewards, Power Promotions, and Power Bank. These systems will be discussed in greater detail *infra* in connection with the court's infringement analyses. Each comprises hardware and software to run on a slot network, the software having main components: a slot management system (or "SMS") and a casino management system (or "CMS"). (D.I. 142 at 8) The SMS handles the slot accounting functions and collects player tracking

3

data such as a player's wages. The SMS provides this data to the CMS, which handles the marketing and reporting functions of the casino. (*Id.*)

There are several components to the slot network. A "host computer" is located at the back end of the system in the control room and maintains a database of PTC holders. A slot interface board, or "controller," is located between the gaming machine and the host computer; it receives and transmits instructions and messages between the components. Finally, the "player account" is the location on the network that records the amount of funds available to a player. Player accounts are often categorized according to the level of gaming activity by the player (*e.g.*, silver, gold or platinum); defendants' products are targeted to specific players as compared to specific gaming devices. (*Id.*)

### B. The Patents in Suit

All three patents in suit share the same named inventors (John F. Acres, Alec Ginsburg, and David Wiebenson) and assignee (Acres Gaming Incorporated ("Acres")) on the face of the patents. Plaintiff acquired each patent when it acquired Acres in 2003.

#### 1. The '885 Patent

The '885 patent is a reissue of U.S. Patent No. 5,752,882 ("the '882 patent"), issued May 19, 1998. The '882 patent was filed on June 6, 1995 as U.S. Patent Application 08/465,915, a divisional application claiming priority to U.S. Patent Application No. 08/322,172, filed October 12, 1994, now U.S. Patent No. 5,655,961 ("the '961 patent"). The reissue application (No. 09/573,470) leading to the '812 patent

4

was filed on May 16, 2000.

Plaintiff asserts that defendants' products infringe claims 1, 10, 22, 33 and 46 of

the '885 patent.  All five independent claims share the backbone reproduced below.

A method of operating gaming devices interconnected by a host computer having a user-operated input device comprising: associating each gaming device with a unique address code; preselecting less than all of the gaming devices interconnected by the host computer responsive to a user-effected action at the input device which identifies the preselected gaming devices with the respective associated address codes; using the network to track activity of the preselected gaming devices [. . .]

In addition to the foregoing, claims 1, 10, 22, 33 and 46 contain additional

limitations, as reproduced below.

1.  [. . .] initiating a bonus play period; issuing a command over the network to each of said preselected gaming devices responsive to initiation of the bonus play period; and paying a bonus at each of said preselected gaming devices in accordance with the command.

10.  [. . .]  issuing a command over the network to one of said preselected gaming devices responsive to a predetermined event; and paying at said one gaming device in accordance with the command.

22.  [. . .] initiating a bonus play period; issuing a command over the network to each of said preselected gaming devices responsive to initiation of the bonus play period; and paying a bonus via each of said preselected gaming devices in accordance with the command.

33.  [. . .]  initiating a bonus play period; generating a message including data related to a payment amount; transmitting the message over the network to at least one of said preselected gaming devices responsive to a predefined event; and paying via at least said one gaming device during the bonus play period in accordance with the message.

46.  [. . .]  issuing a command over the network to at least one of said preselected gaming devices responsive to a predefined event; and paying via at least said one gaming device in accordance with the command.

### 2.  The '812 Patent

5

The '812 patent is a reissue of U.S. Patent No. 5,836,817 ("the '817 patent"),

issued November 17, 1998. The '812 patent is related to the '855 patent; it was issued

from divisional application 08/465,717, the sister application to U.S. Patent Application

08/322,172 (issuing as the '961 patent). The reissue application (No. 09/574,632)

leading to the '812 patent was also filed on May 16, 2000.

Plaintiff asserts that defendants' products infringe claims 21 and 44 of the '812

patent, as reproduced below.

22. A method of operating gaming devices interconnected by a computer
network to a host computer having a user-operated input device comprising:
preselecting less than all of the gaming devices interconnected by the computer
network responsive to a user-effected action at the input device; using the
network to track the amount of money played on the preselected gaming
devices; allocating a predetermined percentage of the money played to a bonus
pool; and issuing a command over the network to cause a bonus to be paid from
the pool by one of said preselected gaming devices upon the occurrence of a
predetermined event.

44. A method of operating gaming devices interconnected by a computer
network to a host computer comprising:  selecting a plurality of the gaming
devices; generating a message including data establishing criteria to cause a
bonus to be paid via one of said selected gaming devices upon the occurrence
of a predetermined event; transmitting the message over the network; storing the
message in a memory connected to a controller associated with only one of the
gaming devices; transmitting data indicative of gaming device activity from the
gaming device to the controller; transmitting a pay command from the controller
to the gaming device upon the occurrence of the predetermined event; and
paying the bonus via the gaming device responsive to receipt of the pay
command. .laddend..ladd.

### 3. The '983 Patent

The '983 patent issued from U.S. Patent Application No. 09/832,425, filed April

10, 2001, a continuation of U.S. Application No. 08/672,217, filed on June 25, 1996,

now U.S. Patent No. 6,244,958. John Acres is the sole named inventor. Plaintiff

6

asserts infringement of claim 1, which reads as follows:

> 1. A method for providing incentive to play gaming devices connected by a network to a host computer comprising:  associating each gaming device with an input device for receiving player identification; associating unique player identification with a gaming device player; creating a player account accessible by the host computer; associating the unique player identification with the player account; applying a promotional credit to the player's account; permitting the player to access the account; transferring promotional credit in the account to the gaming device; permitting the player to wager the promotional credit; and preventing the promotional credit from being cashed out by the player.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The

7

mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Infringement

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A court should employ a two-step analysis in making an infringement determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning and scope. *Id.* Construction of the claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. *Markman*, 52 F.3d at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. *Panduit Corp. v. Dennison Mfg. Co.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). "If any claim limitation is absent from the accused device, there is

8

no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

## 1. Power Rewards

### a. The Power Rewards product[3]

Power Rewards gives players an opportunity to win rewards based on their gaming play. Its functionality has been described by the parties as "Play 'X', Get 'Y'," since an eligible patron that wagers 'X' dollars while a promotion is active will get 'Y' dollars as an award.

A Power Rewards progressive promotion operates in four steps. In the first step, a casino operator sets up a Power Rewards promotion on the host computer by setting the relevant parameters for the promotion. In the Power Rewards context, these parameters are start and end date, the type of award credit, the amount of dollars the player must play to receive the award amount ("Play X"), the number of days the player has to reach the play amount, the award amount the player will receive upon reaching the play amount ("Get Y"), and the types of participating gaming devices. In step two, the casino operator selects a group of players (such as by account status) and assigns

---

[3]The parties do not dispute the functionality of Power Rewards. (D.I. 179 at 8; D.I. 192 at 11-13; D.I. 213 at 3, 21-22; D.I. 218 at 1)

9

the Power Rewards promotion to those players. The promotion becomes active at the start time specified by the operator in step one. In step three, a qualified player places his PTC in a Power Rewards-eligible gaming device. At this time, the host computer sends "transaction #151," containing information about the promotion (such as the Play X, Get Y, and amounts already wagered by a player) to the controller associated with that gaming device. The controller then tracks the amount of credits played by that player during that playing session at that gaming device.

At step four, once a player reaches the appropriate "Play X" amount, the controller causes the "Promo" function key associated with the gaming device to flash. The player can then press the Promo key and choose the amount of "Get Y" credits to put on the gaming device. If the player does not press the Promo key, the "Get Y" amount is stored in a "promotional detail file" at the host computer.

### b. Claim limitations at issue

Plaintiff asserts that Power Rewards infringes claims 21 and 44 of the '812 patent and claims 1, 10, 22, 33 and 46 of the '885 patent.

As a threshold matter, each of these claims requires that a "command" or "message" be issued over the network causing payment to be made to a player. The parties dispute whether transaction # 151 is such a "command" or "message." The parties also dispute whether Power Rewards pays a "bonus" as that term is used in claims 1 and 22 of the '885 patent and claims 21 and 44 of the '812 patent.

Claim 21 of the '812 patent requires "issuing a command over the network including data establishing criteria to cause a bonus to be paid via one of said selected gaming devices upon the occurrence of a predetermined event." Claim 44 of the '812

10

patent requires "generating a message including data establishing criteria to cause a bonus to be paid via one of said selected gaming devices upon the occurrence of a predetermined event." Assuming transaction # 151 is a "command," the parties disagree about whether Power Rewards issues transaction # 151 "upon the occurrence of" a "predetermined event," as required by these claims. Claim 10 of the '885 patent similarly requires "issuing a command over the network to one of said preselected gaming devices responsive to a predetermined event." The parties present the above arguments as to claim 10.

In addition, the parties dispute whether Power Rewards issues transaction # 151 "responsive to initiation of the bonus play period" as required by claims 1 and 22 of the '885 patent. The parties also debate whether Power Rewards pays a reward "in accordance with" transaction # 151, as required by all asserted claims of the '885 patent.

### c. "Command" or "message" (claims 21 and 44 of the '812 patent and claims 1, 10, 22, 33 and 46 of the '885 patent)

Plaintiff asserts that transaction # 151 of Power Rewards is the "command" or "message" containing such a command as defined by the court, which is "a command that rearranges the previous configuration of the gaming device so that the gaming device pays out extra money it would not have paid in its previous configuration." Defendants assert that transaction # 151 is not a reconfiguration command because it does not alter the jackpot or winning payouts on a participating machine; it only provides that if a player "plays X" she will "get Y." (D.I. 192 at 26) All regular payouts remain the same.

11

The reconfiguration command can provide a variety of promotional bonuses described as multiple jackpot bonuses, mystery jackpot bonuses, progressive jackpot bonuses, or player-specific bonuses. ('812 patent, abstract; col. 3, ll. 10-21) Mystery jackpots, for example, may be paid "even when a jackpot was not won." (*Id.*, col. 36, ll. 55-64) The court has defined "bonus" as used in the claims as a payment that can be awarded regardless of the outcome on the gaming device. Consistent with this definition, the court does not limit a "reconfiguration command" to one directing additional payment on a jackpot or winning pull; any payment that the device would not have paid in its previous configuration will suffice.

There is no genuine dispute that transaction # 151 is a "command" or "message" as described by the claims because it directs the machine to "pay Y," or "extra money it would not have paid in its previous configuration." Defendants' expert, Mr. Dwight Crevelt, admits that "an eligible patron receives a Power Rewards reward merely by playing the required amount on eligible machines during the time period set for the promotion, regardless of whether that patron ever won a jackpot on any eligible machine during that promotion." (D.I. 179 at 17, citing JA1904-05) That is, transaction # 151 provides for an award that a player would not receive during regular play ("Y"). The fact that a player may not "Get Y," in the event she does not "Play X," does not change the fact that transaction # 151 was issued or transmitted to the gaming device to cause payment of "Y" under those circumstances.

### d. "Bonus" (claims 1 and 22 of the '885 patent and claims 21 and 44 of the '812 patent)

For similar reasons, defendants' argument that Power Rewards does not pay a

12

"bonus" is unpersuasive. (D.I. 192 at 32) By its order of the same date, the court has construed "bonus" as a "reward or payment in addition to any payout specified by the normal gaming device pay table," which "may be awarded to a player whether the outcome on the gaming device is a win, loss, or no outcome at all." There is no dispute that "Get Y" is a reward or payment in addition to the standard gaming machine payouts; therefore, this limitation is met.

### e. "Upon the occurrence of" or "responsive to" a "predetermined event" (claims 21 and 44 of the '812 patent, claim 10 of the '885 patent)

Claim 10 of the '885 patent requires "issuing a command over the network to one of said preselected gaming devices responsive to a predetermined event." In contrast, claims 21 and 44 of the '812 patent require issuing a "command" (claim 21) or "message" (claim 44) "including data establishing criteria to cause a bonus to be paid via one of said selected gaming devices upon the occurrence of a predetermined event." That is, in the context of the '812 patent, it is not the command itself that is generated in response to the predetermined event – the command contains data including the predetermined event upon which to pay the bonus.

#### i. '885 patent

With respect to the '885 patent, plaintiff argues that the player's insertion of the PTC is the "predetermined event" that causes the "command" itself, transaction # 151, to be generated. (D.I. 239 at 10) Plaintiff cites Mr. Crevelt's expert report, stating that "the transaction # 151 message is sent in response to an eligible patron inserting his card at one of the gaming machines preselected to be a part of the Power Rewards

13

promotion." (*Id.*, citing D.I. 237 at JA1903, ¶¶ 237-38)

By its order of the same date, the court has construed the "issuing a command over the network to one of said preselected gaming devices responsive to a predetermined event" limitation as "issuing a command in reply or reaction to the occurrence of one or more conditions chosen in advance."[4] The court does not limit the term, as defendants suggested, by requiring a determination of what time the triggering condition will occur. (D.I. 218 at 19) While the predetermined event must obviously be "predetermined," or contemplated in advance, its occurrence may be random and still satisfy the court's construction. Put another way, it is the fact of the occurrence, not the timing of the occurrence, that is dispositive. That the event may not happen at all does not mean that the event was not a condition "chosen in advance."

Under the court's construction, the insertion of a PTC qualifies as a "predetermined event" regardless of the fact that the precise time that this may occur is unknown. The parties do not dispute that the insertion of an eligible PTC causes transaction # 151 to be sent to the gaming device. Defendants essentially concede infringement under this construction. (D.I. 218 at 19-20)

### ii. '812 patent

With respect to the '812 patent, plaintiff argues that "Play X" is the

---

[4]By letter dated March 4, 2009, the parties informed the court that they now agree on the following construction of "predetermined event": "a triggering event that is determined in advance of its occurrence." (D.I. 273) The dispute now centers around how the claim is read as a whole and the "upon the occurrence of" and "responsive to" terms. For this reason, the court has construed the limitation as a whole. Notwithstanding, the court discerns no significant difference between its definition of "predetermined event," as incorporated therein, and that posed by the parties.

"predetermined event," or the precedent contained within transaction # 151 that triggers payment ("Get Y"). (D.I. 239 at 4-6) More specifically, the Power Rewards User's Guide provides that Power Rewards "directly credit[s] slot machines with either cashable or non-cashable credits upon playing to a variable set amount in order to achieve the reward." (*Id.*, citing D.I. 237 at JA2074) In plaintiff's view, Power Rewards "pays 'upon the occurrence' of the predetermined event [Play X] because the player is paid at the gaming device 'automatically' (i.e., 'non-manually') 'upon playing to the variable set amount'." (*Id.* at 6)

The debate between the parties centers around the construction of the full limitation: "issuing a command over the network including data establishing criteria to cause a bonus to be paid via one of said selected gaming devices upon the occurrence of a predetermined event." Plaintiff argues that, properly read, the "upon the occurrence of a predetermined event" modifies the "bonus to be paid," rather than the command or message. (D.I. 213 at 28) Defendants assert that "upon the occurrence" modifies the word "command." In their view, Power Rewards "does not infringe because the 'command' is not sent 'responsive to' or 'upon the occurrence of' the start time of the promotion [the 'predetermined event']." (D.I. 192 at 29)

As indicated previously, and as reflected in the court's claim construction order, the court agrees with plaintiff that "it is the payment of the bonus, as opposed to the command, that responds to the predetermined event" pursuant to claims 21 and 44. (D.I. 213 at 28) Removing the adverbial phrases, the limitation reads: "issuing a command . . . to cause a bonus to be paid . . . upon the occurrence of a predetermined event." The plain import of the phrase is that the bonus is paid upon the occurrence of

15

the predetermined event. In the case at bar, the parties do not dispute that "Get Y" (the "bonus") is paid upon the occurrence of "Play X" (the "predetermined event").

The court notes that "predetermined event" appears later in claims 21 and 44, which also require "transmitting a pay command from the controller to the gaming device upon the occurrence of the predetermined event." The court has construed this limitation as "transmitting an instruction related to payment from the controller to the gaming device in response or reply to the occurrence of one or more conditions chosen in advance."

Plaintiff characterizes the "pay command" as "credit the slot machine with the 'Get-This-Amount' converted to credits" identified in the Power Rewards manual. (D.I. 179 at 15, citing D.I. 237 at JA2076) This instruction follows the player's pressing of the "PROMO" key. That is, the manual provides that if the "Amount-Already-Played" "gets greater than or equal to the 'Play-This-Amount,' flash the PROMO button key and stop the accumulation"; thereafter, "[i]f the PROMO button is pressed while it is flashing, credit the slot machine with the 'Get-This-Amount' . . . ." (D.I. 237 at JA2076) In their opening brief, defendants argue that a pay command is not transmitted "upon the occurrence of" "Play X" because a player must initiate the withdrawal of funds by pressing the PROMO button. (D.I. 192 at 31; D.I. 218 at 10)

Defendants consistently interpret both "upon the occurrence of" and "in accordance with" as being synonymous with the term "automatic."[5] With respect to the

_____

[5]Defendants' argument regarding the "upon the occurrence of" limitation parallels that made in the context of the "in accordance with" limitation found in the '885 patent, discussed *infra*.

16

'812 patent, defendants argue that the reward withdrawal process (initiated by pressing the PROMO button) is an intervening step between "Get Y" and the receipt of the reward, bringing Power Rewards outside of the claims.

Defendants cite a single sentence in the specification in support of their construction:  that "a need remains for an automated method and apparatus to provide bonusing for gaming devices."  (D.I. 218 at 12, citing '885 patent, col. 22, ll. 25-27[6]) The patents are directed to eliminating the technique of "having an attendant manually pay out the additional payout amount," and do not describe (or claim) any particular manner of automated payout.  ('812 patent, col. 2, ll. 21-22)  Defendants point to no express disclaimers over a method of payment comprising a withdrawal process with more than one step.  The patents are not directed to a precise method of automated redemption.  For these reasons, the court declines to limit the claims to require an "automatic" payment in the manner advocated by defendants.[7]

### f. "Issuing a command over the network to each of said preselected gaming devices responsive to initiation of the bonus play period" (claims 1 and 22 of the '885 patent)

Claims 1 and 22 of the '885 patent require that the command be issued "responsive to the initiation of the bonus play period."  By its order of the same date, the

_____

[6]Corresponding to col. 2, ll. 36-38 of the '812 patent.

[7]In their claim construction papers, the parties specifically disputed the term "pay command":  plaintiff argued that this is an instruction related to payment, while defendants argued that it is a command causing automatic payment of the bonus.  (D.I. 167)  The parties focus more on the "upon the occurrence of" segment than "pay command" in their summary judgment briefs.  The court has construed the limitation as a whole, noting that payment need not be "automatic" or effected without any additional steps.

court has construed "bonus play period" as "the period during which the bonus promotion is active." According to defendants, the "bonus play period" is the "time during which Power Rewards is configured to start and stop." (D.I. 192 at 27) Plaintiff asserts that the "bonus play period" is initiated when an eligible player inserts his PTC. (D.I. 179 at 26) That is, inserting the PTC causes transaction # 151, including the "Play X, Get Y" pay instruction to be generated. (Id.)

The specification states that a bonus can play until the bonus payout exceeds the bonus pool – an unspecified amount of time. ('885 patent, col. 37, ll. 5-48) For this reason, the court did not limit its construction of "bonus play period" to a pre-specified period of time, as defendants advocated. Nevertheless, the court finds plaintiff's infringement evidence deficient under the court's construction. Power Rewards has a defined start time, specified by the casino operator in step one. Plaintiff does not dispute this point. (D.I. 213 at 3 & n.3; D.I. 179 at 8) Power Rewards thus becomes "active" at the predetermined start time – regardless of whether any players have inserted their PTCs at that time. There is no indication that a Power Rewards promotion commences upon the insertion of a PTC; rather, the insertion of a PTC during an active promotion simply enrolls the player in the promotion. Insertion of the PTC may initiate transaction # 151, but there is no direct link between the start of Power Rewards (by the casino operator in step one) and transaction # 151 (following the insertion of a PTC during an active promotion). Plaintiff points to no such evidence. (D.I. 179 at 27; D.I. 213 at 24; D.I. 239 at 7-8)

### g. Paying "in accordance with" the "command" or "message" (claims 1, 10, 22, 33 and 46 of the '885 patent)

18

The asserted claims of the '885 patent require paying a bonus "in accordance with" the command or message. Defendants assert that Power Rewards does not pay an award in accordance with transaction # 151 because it is undisputed that a player must initiate a series of funds-withdrawal commands on a machine (starting with pressing the PROMO button) in order to actually obtain the award.[8] (D.I. 192 at 30) Defendants assert that payment must be made "automatically" upon the receipt of the command. (D.I. 171) Plaintiff asserts that this limitation is met when transaction # 151 makes the bonus available, regardless of the subsequent withdrawl step(s). (D.I. 213 at 26) According to plaintiff, the relevant innovative aspect of the '885 patent is the automation of the payment process; thus, "automatic" payment is made when a player is eligible for payment at the gaming device without having to receive a manual payout. (*Id.*)

As indicated previously, the court finds plaintiff's position more convincing, and has provided in its claim construction order that "the command or message makes the bonus available. The claims do not require that the bonus is paid 'automatically' or without any subsequent withdrawal steps upon receipt of the pay command." The specification does not support effectively narrowing the claims to require "automatic" payment of the bonus.[9] Defendants point out that the specification does describe a

---

[8]The Power Rewards User's Guide, cited by plaintiff in its infringement chart for this limitation, confirms that the PROMO key must be pressed to convert the "Get-This-Amount" reward to cashable or non-cashable credits as instructed by transaction # 151. (D.I. 179 at 25, citing JA2076 at BALLY236075)

[9]The claim term that the parties sought the court's construction of was not "in accordance with," but "paying." In this context, defendants asserted that "paying" means "paying a bonus . . . automatically upon receipt of the command," while plaintiff

bonus as being "automatically paid," without further detail, but this phrase was contained in a paragraph describing "another embodiment of the bonus time promotion." (D.I. 190 at 35, citing '885 patent, col. 26:24-31) Again, the patents are directed to eliminating manual payouts, and do not describe particular methods of automated payouts.

In their claim construction brief, defendants cite several statements made to the examiner during prosecution of the '885 patent, in which the applicants distinguished the "automatic" payment of the invention from "payment to the player by the cashier." (D.I. 190 at 36-37) None of these statements specifically disclaim or distinguish an automated payment that is immediately usable by the player with one that requires any withdrawal steps. The applicants' use of the word "automatic" in this context is not controlling, especially considering the context of discussing "automated" payments. Defendants point to no express disclaimers over a method of payment comprising a withdrawal process with more than one step.

Based on the foregoing, the court does not restrict the claim to the "automatic" availability of the promotional reward as defendants suggest.[10] The claims require only

---

advocated that "paying" means "making a bonus available at each of the preselected gaming devices in accordance with the command." (D.I. 190 at 34)

[10]The court notes that claims 21 and 44 of the '812 patent also require "paying the bonus via the gaming device responsive to receipt of the pay command." The parties did not specifically dispute the construction of "responsive to" as used in this limitation. (D.I. 167 (claim chart); D.I. 190) Insofar as the court is not aware of any disclaimer with respect to this term, the court's analyses with respect to "upon the occurrence of" and "in accordance with" is equally applicable to the "responsive to" limitation of claims 21 and 44 the '812 patent. The court construes these phrases consistently.

20

that the "command" or "message" (transaction # 151) provides for the payment of the bonus at the gaming device. There is no dispute that a player who "Plays X" will "Get Y" and that the "Get Y" award is available on the gaming device.[11]

### h. Conclusion

For the aforementioned reasons, the court finds the following. Summary judgment of infringement is appropriate on claims 10, 33, and 46 of the '885 patent, insofar as Power Rewards meets the following contested limitations: "command" (claims 10, 46); "message" (claim 33); "initiating a bonus play period" (claim 33); "responsive to a predetermined event" (all claims); "paying at said one gaming device in accordance with the command" (claim 10); and "paying . . . in accordance with the message" (claims 33, 46).

Summary judgment of noninfringement is appropriate on claims 1 and 22 of the '885 patent, insofar as Power Rewards does not issue a "command" (claim 1) or "message" (claim 22) that is "responsive to initiation of the bonus play period" as required by those claims.

Summary judgment of infringement is appropriate on claims 21 and 44 of the '812 patent, insofar as Power Rewards meets the following contested limitations: "command" (claim 21); "message" (claim 44); "issuing a command . . . to cause a bonus to be paid . . . upon the occurrence of a predetermined event" (claim 21); and "generating a message . . . to cause a bonus to be paid . . . upon the occurrence of a

---

[11]This is the case regardless of whether a player actually presses the "PROMO" button or elects not to, foregoing the immediate opportunity to access the award in favor of, perhaps, redemption at another eligible machine.

21

predetermined event" (claim 44).

### 2. Power Winners

#### a. The Power Winners product[12]

Power Winners allows a casino operator to create and run progressive jackpot promotions. Power Winners has two main components: the Power Winners Manager and the Promotional Progressive Engine ("PPE"). The Power Winners Manager includes software that performs "front end" processing. It provides the user interface that the casino marketing manager uses to set a promotion, polls the PPE for promotions that have ended and are ready for a winner to be picked, selects the winning player(s) at the end of the promotion, and calculates the payouts. The PPE performs the "back end" processing for Power Winners; it uses random numbers to periodically check for a winner and, if one is not picked, the progressive jackpot is increased.

A Power Winners progressive promotion operates in six steps.[13] In step one, the casino operator configures the promotion. Similar to Power Rewards, step one includes the operator's entering the parameters for the promotion (including time, date, average win amount, average length of the promotion, player eligibility information, gaming devices to be included, and payment type). In the second step of Power Winners,

---

[12]The parties do not dispute the basic operation of Power Winners. (D.I. 192 at 9-11; D.I. 213 at 3) With respect to each accused product, the court omits pinpoint citations to the record, noting that it has summarized the parties resuscitation of the facts from their opening briefs, and neither party specifically contested the facts in their answering briefs.

[13]As described by plaintiff's expert. Defendants agree that this description is accurate. (D.I. 192 at 9-11, citing D.I. 237 at JA04368 et seq.)

22

these parameters are passed to the PPE, which stores them so that it can process the promotion as its intended start time.

The PPE processes the promotion in the third step. It divides the total approximate time for the promotion into 125 separate "time slices." At each slice, a "ticket" is drawn from a pool of 1,000,000 tickets and if the drawn ticket is a winner, the progressive ends. If the drawn ticket is not a winner, the PPE increases the size of the progressive jackpot and proceeds to the next time slice. In defendants' first version of the PPE, if no winning ticket had been picked by the 125th time slice, the PPE would end the promotion. In Power Winners' current version, the promotion continues until the winning ticket is picked.[14]

In step four, the PPE notifies the host computer that a winning ticket has been picked. The Power Winners application on the host computer then randomly picks a winning player. There are two platforms upon which its SMS and CMS systems can run: the SDS/CMP platform, and the ACSC platform. Power Winners operates differently based on the underlying platform. In the SDS/CMP version of Power Winners, the jackpot is placed in the winning player's account if the promotion is not configured to manually pay out the jackpot. In the ACSC version of Power Winners, Power Rewards is the jackpot notification and partial delivery mechanism.

In step five, the host computer notifies the winners. The parties do not dispute that "transaction # 151 is the Power Rewards, "Play X, Get Y' transaction used by Power Winners to facilitate the transfer of the progressive jackpot to the winning player.

_____

[14]It is not clear from the record when the functionality of the PPE was changed. The parties frame their arguments in terms of the current version of Power Winners.

23

After the ACSC Power Winners application randomly selects a winning player, it sends the 'Play X, Get Y' transaction to the controller associated with the gaming device that hosts the winning player. In this case, the 'Play X' amount is $0 and the 'Get Y' amount is the Power Winners progressive jackpot." (D.I. 192 at 16-17; D.I. 213 at 6, n.6)

In the last step, the winning player withdraws the jackpot. In SDS/CMP Power Winners, the jackpot is withdrawn at this step from the player's account through a series of withdrawal steps at the gaming device; in ACSC Power Winners, a Power Rewards transaction is sent and the player must initiate the withdrawal process by pressing the "PROMO" button on the gaming device, which also involves a series of withdrawal steps. In either format, the winner may withdraw less than the total jackpot awarded.

### b. Claim limitations at issue

Plaintiff asserts that Power Winners infringes claims 10, 33 and 46 of the '885 patent. Specifically, the parties dispute whether Power Winners issues a "command" (claims 10, 46) or "message" (claim 33) over the network "responsive to a predefined event" (claim 33, 46) or to a "predetermined event" (claim 10). The parties also contest whether Power Winners pays a reward "in accordance with" the command or message (all claims) and/or pays "during the bonus play period" (claim 33).

### c. "Command" or "message" (all claims)

Plaintiff asserts that the "command" or "message" is transaction # 151 for ACSC Power Winners, and "DM33" for SDS/CMP Power Winners. (D.I. 213 at 6) For the reasons previously stated, the court agrees that transaction # 151 is a "command" or

"message" under its construction. In the context of Power Winners, transaction # 151 provides a jackpot that was not available under the machine's normal gaming pay table. The court will proceed to address DM33.

The court first notes that plaintiff does not identify DM33 in its infringement claim chart. Plaintiff asserts that the "command" or "message" relating to payout is made by the PPE in response to the drawing of a winning ticket. (D.I. 179 at 31 (claim chart)) In support, plaintiff cites defendants' "Promotional Progressive Engine (PPE) Installation Guide," dated 2006, which provides that the PPE determines a winner when a winning ticket is drawn, but does not describe a particular instruction to pay an award. (*Id.*, citing D.I. 237 at JA2227-28) Plaintiff also cites Mr. Crevelt's expert report, in which he states that, after a winning patron is selected, "the winning patron is notified that they have won the jackpot[.]" (*Id.*, citing D.I. 237 at JA1799, ¶ 39) Plaintiff does not identify any evidence describing DM33 in any detail.

According to defendants, "DM33 is a notification sent by the host computer to the display on the gaming device that informs the player that they have won Power Winners. It is not a reconfiguration command and does not contain one." (D.I. 192 at 16) In support, defendants cite the expert report of Dr. Kelly, which states that Power Winners "formulates and sends a message to the GMU associated with the gaming device that hosts the winning patron. This message includes the patron's first name and winning amount. The message is displayed to the player at the Player Tracking Display associated with the gaming device." (*Id.*, citing D.I. 237 at JA4412-13, ¶ 93) Additionally, Dr. Kelly stated at his deposition that he had not analyzed whether DM33

25

rearranges the previous configuration of the gaming device, and was not sure that it did. (D.I. 237 at JA3564, 150:17-23) Plaintiff did not refute defendants' arguments in its answering brief, only arguing that defendants themselves agree that DM33 is an "instruction" that would infringe under a broader claim interpretation. (D.I. 213 at 6)

There is no indication of record that DM33 does anything other than inform a player of his bonus winnings. A message that simply informs the Winning Powers player that he has won is not a "command" or "message" as defined by the court, that is, it does not rearrange the previous configuration of the gaming device so that it pays out extra money it would not have paid in its previous configuration. Summary judgment of noninfringement is granted with respect to SDS/CMP Power Winners.

### d. issuing a "command" (claims 10, 46) or "message" (claim 33) "responsive to a predetermined event" (claim 10) or "responsive to a predefined event" (claim 33, 46)

As stated previously, the parties agree that in Power Winners, transaction # 151 is sent to the controller associated with the gaming device with the "Play X" ($0), "Get Y" (jackpot) instruction. (D.I. 192 at 16-17; D.I. 213 at 6, n.6) The dispositive question is whether transaction # 151 is issued responsive to a "predetermined" or "predefined" event. The event, or "trigger," according to plaintiff, is the "'pull from the hat' that has a number less than or equal to the number from the Winning Ticket Table" by the PPE. (D.I. 179 at 32, citing D.I. 237 at JA2227-28 (PPE Installation Guide))

The parties do not dispute that the winning "pull from the hat" causes the issuance of transaction # 151, rather, the parties primarily dispute whether knowing what occurrence will cause the command to be issued (the pull from the hat), without

26

necessarily knowing the time of that occurrence, suffices to make the event "predetermined" or "predefined." As with Power Rewards, plaintiff argues that the fact that an event will occur upon a set of conditions is all that need be known in advance, while defendants argue that more concrete information must be ascertainable. As discussed previously, the court finds plaintiff's interpretation more convincing. An event may be "predetermined" or "predefined" notwithstanding that the precise time of its occurrence is unascertainable.

Defendants also argue that transaction # 151 is not sent "responsive to" the winning ticket pull, it is sent "responsive to" the selection of a winning player. (D.I. 192 at 19-20) That is, "the random winning player selection process is a major intervening step between [when] the PPE picks a random winning "ticket" . . . and when . . . transaction # 151 . . . is sent." (*Id.* at 21) In defendants' logic, "if events A, B, C, D, and E occur in order, E is 'responsive to' D, D is 'responsive to' C, and so on." (*Id.* at 20) Defendants essentially advocate a definition of "responsive to" that includes within its definition a time limit requirement, that is, an immediate result between events. Defendants, however, do not support their reading with any evidence, either in the specification, prosecution history of the patents, or otherwise, and the court declines to effectively limit the claims on this record.

### e. Paying "in accordance with" the "command" or "message" (claims 1, 10, 22, 33 and 46)

Defendant reiterates its arguments with respect to ACSC Power Winners that the act of pressing the "PROMO" button to obtain a bonus award means that the award is not paid "in accordance with" the "command" or "message." For reasons discussed

27

*supra*, the court disagrees.

### f. "Paying via at least said one gaming device during the bonus play period in accordance with the message" (claim 33)

Claim 33 of the '885 patent requires that the gaming device is paid "during the bonus play period in accordance with the message." As noted previously, the court has construed "bonus play period" as "the period during which the bonus promotion is active." According to defendants, the Power Winners jackpot is paid after – not during – the bonus play period insofar as the Power Winners promotion ends when the PPE picks a winner. (D.I. 192 at 24) Dr. Kelly reflects in his expert report that "CMP Power Winners Manager allows up to 10 players to be chosen as winners when the promotion ends [ACSC Power Winners Manager chooses only one winner]." (*Id.*, citing D.I. 237 at JA4407-08, ¶ 85) That is, "if the drawn ticket is one among the winning tickets, the progressive ends. This idea is implemented in the source code, for example, PPE version 1.0[.]" (*Id.*, citing D.I. 237 at JA4415, ¶ 103) A winning patron receives the message and win amount on the display associated with the gaming device; "[i]n response to the message, the player may choose to withdraw the winning amount onto the credit meters of the gaming device." (*Id.*, citing D.I. 237 at JA4415, ¶ 93) According to defendants, there is no indication that the player may make this withdrawal during the bonus play period, because that has ended prior to the award notification. (*Id.*)

Plaintiff points out that Dr. Kelly, during his deposition, stated that the bonus play period is still active while a player is in the process of bring paid. (D.I. 213, citing D.I. 237 at JA3588, 245-46) Plaintiff generally argues that "every Power Winners promotion continues until these two components [the PPE and Power Winners Manager] have

28

performed their respective processing," but the PPE Installation Guide, cited by plaintiff, does not directly support its interpretation. (*Id.*, citing D.I. 237 at JA2222-23)

Clearly, the PPE "only functions . . . to add money to a growing time-based progressive and determine when the award is won." (D.I. 237 at JA2225) The Power Winners Manager ("casino-side software"), after being notified that there is a winner and the value of the pot, is responsible for the selection of the winner (*id.*) and Power Rewards is the mechanism by which the winner is paid (D.I. 192 at 16-17; D.I. 213 at 6, n.6). The dispositive question is not what software is active and when, but at what point the bonus promotion ceases to be "active." In ACSC Power Winners, after the PPE determines that an award is won and after the Power Winners Manager notifies the winner, there is no bonus available to other players.[15] Presumably, to make another bonus available, the casino operator would have to configure another promotion. Plaintiff points to no evidence suggesting that the promotion, a randomized award contest amongst eligible players, continues past the selection and notification of the winner. (D.I. 213 at 20; D.I. 239) On this record, the court declines to find that ACSC Power Winners pays the winning player "during the bonus play period."

### g. Conclusion

For the aforementioned reasons, the court grants summary judgment of infringement of claims 10 and 46 of the '885 patent with respect to ACSC Power Winners, insofar as ACSC Power Winners issues a "command" (claims 10, 46)

---

[15]In the court's view, the Power Winners Manager must select a winner prior to the end of the promotion, insofar as the possibility that an eligible player may win an award is not foreclosed until one winning player is definitely selected by that software.

29

"responsive to a predefined event" (claim 46) or to a "predetermined event" (claim 10), and pays a reward "in accordance with" the command (claims 10, 46). Summary judgment that ACSC Power Winners does not infringe claim 33 of the '885 patent is appropriate insofar as ACSC Power Winners does not pay "during the bonus play period." Summary judgment of noninfringement is granted with respect to SDS/CMP Power Winners (all claims), because DM33 is not a "command" or "message" under the court's construction.

### 3. Power Promotions

#### a. The Power Promotions product[16]

Power Promotions allows two-way transfers of promotional credits awarded to a player account by the casino to the credit meter on the gaming device. With Power Promotions, casino operators can apply a promotional credit to a player's account in a variety of ways, such as directly crediting the account or awarding credits based on an amount of play. For example, a casino may set up a system whereby "Gold" members earn one point per dollar spent, and "Platinum" members earn two points per dollar spent. Power Promotions allows the casino to convert earned points into credits. Credits, which may be designated cashable or non-cashable, may also be awarded by the casino at its discretion, for example, on a player's birthday. Power Promotions points or credits are not automatically transferred onto a gaming device when a player's PTC is inserted. Instead, the player must draw them down onto the gaming device by proceeding through a system-specific withdrawal process. Once withdrawn, a player

---

[16]The parties are in agreement regarding the operation of Power Promotions. (D.I. 179 at 9; D.I. 192 at 13; D.I. 213 at 31-32; D.I. 218 at 1)

can wager the promotional credit to play the gaming device. A player is free to transfer credits back to his player account at any time.

### b. Infringement analysis

Plaintiff asserts that Power Winners infringes claim 1 of the '983 patent. The limitation at issue in this regard is "transferring promotional credit in the account to the gaming device." By its order of the same date, the court has defined this limitation as "applying the promotional credit in the player account to a credit meter on the gaming device in response to the insertion of a player card alone or with a wager." Plaintiff argued against the inclusion of the "in response to . . ." language, and did not argue in its briefing that credits are applied "in response to" the insertion of a player card. (D.I. 179 at 36-37, D.I. 213 at 32; D.I. 239 at 16-17) Plaintiff only argues that Power Promotions generally applies the credit from the account to the credit meter.

Plaintiff cites defendants' "SDS 9 Slot Data Systems Marketing User Guide," dated March 3, 2006, which provides that Power Promotions allows the withdrawal of player funds as follows: "Once a card is issued, the player inserts the card into any promotional electronic enabled slot machine to download credits. When the card is inserted, the casino's greeting scrolls across the display. Using the keypad, the player selects a transaction type and then follows the instructions that scroll across the display." (D.I. 179 at 35 (claim chart); D.I. 188, ex. 29 at BALLY11835) This selection demonstrates that the transfer of credits is not automatic. The court stops short of specifically equating the "in response to" language of claim 1 with the term "automatic," as defendants suggest, however, plaintiff does not clearly iterate how a multi-step withdrawl process satisfies the "in response to" limitation.

31

Dr. Kelly acknowledged in his report that a "patron may choose to withdraw funds from the player's account" when his PTC is in use. (D.I. 237 at JA04431, ¶ 142) Plaintiff also cites Mr. Crevelt's rebuttal report, stating that "SDS Power Promotions allows two-way transfers of promotional credits awarded to the patron's club account by the casino to the credit meter on the gaming device" and that "Bally's ACSC Power Promotions is similar to that of SDS Power Promotions[.]" (D.I. 188, ex. 8 at ¶¶ 125, 130) Neither statement relates to the "in response to" question at hand.

In short, plaintiff has failed to raise a genuine issue of material fact with respect to whether credits are applied "in response to" the insertion of a player card in Power Promotions, and judgment must be entered for defendants.

### 4. Power Bank

#### a. "Promotional credit"

Power Bank allows patrons to make deposits into their player accounts on the host computer for subsequent access at the gaming device. As with Power Promotions, the parties dispute whether Power Bank allows the transfer of promotional credits, rather than money, between a player's account and a gaming machine. According to defendants, Power Bank does not involve the transfer of non-cashable credits; it is directed to player-deposited money that is always cashable.

Plaintiff states that there are two versions of Power Bank – SDS Power Bank and ACSC Power Bank. (D.I. 179 at 37) Only the latter is accused of infringement. (*Id.* at 9) ACSC Power Bank, plaintiff argues, is marketed as handling both patron-deposited money as well as casino-awarded promotional credits. (*Id.*) According to the "ACSC

10.0 Power Bank User's Guide" (May 1, 2007) cited by plaintiff, Power Bank enables patrons to play "cashless" by depositing funds with the casino cage to be used later via their PTCs. (D.I. 188, ex. 20)  "The SMS allows patrons to redeem these credits (via the cash-out button) or, **if supported by the manufacturer's protocol, play only credits (non-cashable)** which may be played at that specific game." (*Id.*) (emphasis added)

Dr. Kelly testified that he reviewed the source code and has identified functionality allowing Power Bank to download both cashable and non-cashable credits to the gaming device. (D.I. 188, ex. 57 at 264-66)  In contrast, Mr. Crevelt states in his rebuttal declaration that "Power Bank has nothing at all to do with non-cashable credits"; the code for Power Promotions cannot be compiled with code conferring ACSC Power Bank capability. (D.I. 188, ex. 8 at ¶ 140)  Dr. Kelly testified that he has seen documents in which the code for both products was compiled together. (D.I. 237 at JA3595, 273-76)

Defendants cite marketing materials that indicate that Power Bank allows patrons to deposit and later access their money via their PTC.[17]  Defendant also cites plaintiff's interrogatory response, stating the same. (D.I. 218 at 22, citing JA05021-25)  These documents do not contradict the Power Bank manual, which clearly indicates that ACSC Power Bank may also, depending on manufacturer protocol, transfer promotional (non-cashable) credits.

---

[17]The court notes that the citation provided for this document, JA01771, does not correspond to the marketing documents quoted. (D.I. 218 at 22)  Plaintiff does not specifically contest the content of this citation in its reply papers. (D.I. 239 at 18-19)

33

Defendants argue, without support, that the "source code for transferring non-cashable credits actually belongs to Power Promotions, not Power Bank." (*Id.* at 23) Defendants also assert that a casino could not run both Power Promotions and Power Bank together without a "license key," however, they have never sold a "license key" for Power Bank; "ACSC Power Bank is only operational at two casinos," which have not purchased Power Promotions. (D.I. 192 at 23-24)  Defendants do not point to any supporting evidence (or testimony by Mr. Crevelt) on this point.  These bare assertions do not raise a genuine issue of material fact.  *See Hillgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) ("[A]n accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.").

### b. "In response to" the insertion of a PTC

Defendants' alternate non-infringement argument is that Power Bank does not "transfer[ ] promotional credit in the account to the gaming device" because, as with Power Promotions, a player must initiate the withdrawal of credits; withdrawal is not automatic. (D.I. 192 at 37)  Plaintiff relies on the same evidence discussed with respect to Power Promotions, the "SDS 9 Slot Data Systems Marketing User Guide," for its infringement analysis of both Power Promotions and Power Bank. (D.I. 179 at 35 (claim chart))  As an initial matter, the court is not inclined to apply this document – clearly labeled for "Power Promotions" – to Power Bank.  Notwithstanding, as discussed previously, there is no indication from this document that the promotional credit is applied "in response to insertion of a player card."  Plaintiff presents no specific arguments vis-a-vis Power Bank in this regard. (D.I. 179 at 35, 37-38; D.I. 213 at 33-

35; D.I. 239 at 18-19) Because there is no indication of record that the transfer of credits, where it is provided for by manufacturer protocol, occurs "in response to insertion of a player card," judgment must be entered for defendants.

### 5. Conclusion regarding infringement

For the foregoing reasons, Power Rewards infringes claims 10, 33 and 46 of the '885 patent and claims 21 and 44 of the '812 patent, and does not infringe claims 1 and 22 of the '885 patent. ACSC Power Winners infringes claims 10 and 46 of the '885 patent and does not infringe claim 33 of the '885 patent. SDS/CMP Power Winners does not infringe the asserted claims. Power Promotions and Power Bank do not infringe the asserted claims.

### B. Validity

#### 1. Standards

Issued patents are presumed valid, and the "underlying determination of invalidity . . . must be predicated on facts established by clear and convincing evidence." *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998) (citations omitted). The Federal Circuit has stated that "[t]his burden is especially difficult when the [asserted] prior art was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990) (citation omitted). "The presumption of validity under 35 U.S.C. § 282 carries with it a presumption that the examiner did his duty and knew what claims he was allowing." *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989) (citation omitted).

#### a. Anticipation

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *See Key Phar. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. *See id.*

Proving a patent invalid by anticipation "requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir. 1991). The elements of the claimed invention must be arranged or combined in the same manner as in the claim, but the reference need not satisfy an *ipsissimis verbis* test. *In re Gleave*, — F.3d — , Civ. No. 2008-1453, 2009 WL 777398, \*2 (Fed. Cir. Mar. 26, 2009) (citations omitted). "In determining whether a patented invention is [explicitly] anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted "[i]f needed to impart clarity or avoid ambiguity" in ascertaining whether the invention is novel or was previously known in the art. *Id.*

(internal citations omitted).

"A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). Additionally, the reference must "enable one of ordinary skill in the art to make the invention without undue experimentation." *In re Gleave,* 2009 WL 777398 at *2 (citing *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008)). "As long as the reference discloses all of the claim limitations and enables the 'subject matter that falls within the scope of the claims at issue,' the reference anticipates – no 'actual creation or reduction to practice' is required." *In re Gleave,* 2009 WL 777398 at *2 (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380-81 (Fed. Cir. 2003) and *In re Donohue,* 766 F.2d 531, 533 (Fed. Cir. 1985)).

### b. Obviousness

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on several underlying factual inquiries.

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). "Because patents are presumed to be valid, *see* 35 U.S.C. § 282, an alleged infringer seeking to invalidate a patent on obviousness grounds must establish its obviousness by facts supported by clear and convincing evidence." *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006) (citation omitted).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S. Ct. at 1741. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show, by clear and convincing evidence, that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. *Id.* at 1741-42. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. *Id.* at 1742-43. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 1742.

In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, a defendant must also demonstrate, by clear and convincing evidence, that "such a person would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

### 2. Defendants' motion for summary judgment of invalidity of the '983 patent

### a. '983 patent intrinsic record

The '983 patent was filed as United States Patent Application No. 0/832,425

("the '425 application") on April 10, 2001. The '425 application is a continuation of U.S.

Patent Application No. 08/672,217, filed June 25, 1996, now issued as U.S. Patent No.

6,244,958.

The claim ultimately issuing as claim 1 of the '983 patent was submitted by

preliminary amendment on December 17, 2001. (D.I. 237 at JA1539) An office action

was issued by the examiner on January 15, 2002, in which all of the claims were

rejected for obviousness-type double patenting over copending U.S. Application No.

09/134,598. (*Id.* at JA1551-52) The examiner stated the following:

> **Allowable Subject Matter**
> As indicated in copending Application 09/134,598 the features of applying a
> promotional credit to a player's account and not allowing this credit to be cashed
> out are not taught by the prior art of record (see pertinent prior art below.)
>
> **Pertinent Prior Art**
> Yamamoto et al. [U.S. Patent No. 5,135,224], Bittner et al [U.S. Patent No.
> 5,290,033], Boushy ([U.S. Patent No.] 5,761,647), Tillery et al ([U.S. Patent No.]
> 5,197,094) and Dorrough et al ([U.S. Patent No.] 5,287,269) teach gaming
> device crediting/debiting systems.

(*Id.* at JA1553)

The applicant filed a terminal disclaimer (*id.* at JA1558), as well as copies of

foreign references which the examiner had indicated had not been reviewed (*id.* at

JA1561). A Notice of Allowability was issued thereafter. This notice contained an

examiner's amendment to the abstract, shortening its length, but no other substantive

39

information.[18]  (*Id.* at JA1571)

## b. Anticipation by Craine

### i. Disclosure

Defendants assert that claim 1 of the '983 patent is invalid as anticipated by U.S.

Patent No. 5,321,241 to Craine (hereinafter, "Craine").  Craine was issued June 14,

1994.  It discloses a system for tracking casino promotional funds given to a patron over

a network of gaming machines.  In typical casino promotional packages issued to

travelers, coupons are issued to patrons which are redeemable for currency, which

could be taken home, spent on food or spent in another casino.  (Craine col. 1, ll. 11-

29)  Craine provides a method of providing promotional packages to tour patrons that

"ensures that the promotional funds are expended in the casino" issuing them.  (*Id.*, col.

1, ll. 29-40)

The tracking method described in Craine is accomplished by either a key or

player card, which is "encoded so that it can only be used in the casino issuing the key

or card."  (*Id.*, col. 1, ll. 45-54)  In another embodiment, a "touch-memory device" is

used in place of a key.[19]  (*Id.*, col. 1 l. 67-col. 2 l. 2)  The system is described as follows:

---

[18]The court is aware that the '983 patent is currently under reexamination based on the prior art asserted in this litigation.  Non-final opinions and decisions issued by the PTO are not binding on this court.  Additionally, even if the '983 patent is ultimately rejected by the PTO and claim 1 cancelled, that decision is ultimately not a "final" one absent Federal Circuit review.  Insofar as the Federal Circuit has had no occasion to examine the validity of the '983 patent to date, the court is not bound by any authority on the matter and does not substantively address the parties' arguments regarding the propriety and/or impropriety of the PTO's rejections.

[19]"[C]ards can be utilized in place of keys if desired and can be magnetically or optically programmed in a similar manner to provide a currency value in the card which can be utilized in connection with the controller box or device **41** in the same manner as

In general the system for tracking casino promotional funds given to casino patrons is comprised of a plurality of gaming machines in a casino. A bank controller is provided for the plurality of gaming machines. A server is coupled to the bank controller for receiving information from and transmitting information to the bank controller. A plurality of memory devices is provided with each memory device having encoded a serial number which can be assigned to the casino patron. An account balance remote from the memory device is placed in the system for each casino patron. An interface device is provided with each gaming machine and is adapted to receive a memory device to permit operation of the gaming machine and to supply information to the bank controller as the account balance is debited thereby making it possible for the casino to track the promotional funds issued by the casino and to ensure that the promotional funds are only expended in that casino.

(*Id.*, col. 3, l. 58-col. 4, l. 7)

The keys have microprocessors which are programmed with a serial number for identification, and a code which "represents casino identification and permits the system of the present invention to differentiate one casino's keys from another casino's keys." (*Id.*, col. 6, ll. 62-68) Craine discloses a central computer, the "mainframe" (Fig. 1) or "main server" (Fig. 12). "The main server **152** keeps track of the historical data of activity on the casino floor," and "also keeps track of inactive keys that are not currently being utilized on the casino floor." (*Id.*, col. 4, l. 24 & col. 8, ll. 63-66) Information relating to the activities of the patron can be "accumulated in the server and/or in the mainframe computer **21**," alternatively, historical data can be maintained in the "main server **152**." (*Id.*, col. 8, ll. 50-66)

Craine generally provides that, "[u]pon the arrival of tours at the casinos, the casino patrons would be called by name and be given their assigned touch-memory devices." (*Id.*, col. 13, ll. 26-28) The specification provides that "[a]ll of the activities of

the keys." (Craine col. 8, ll. 18-23)

41

the casino patron utilizing the key are recorded in the bank controller **16** which supplies the information to the server **19**. This information can be accumulated in the server and/or in the mainframe computer **21** provided in the computer and at periodic times the information can be printed out on the printer **33** in an appropriate format." (*Id.*, col. 8, ll. 50-56)  A patron may request that more funds be placed "in his or her account associated with his or her touch-memory device" by making such a request (and deposit) at the cashier cage. (*Id.*, col. 14, ll. 12-20)  "[P]ersonal information on the patron is only ascertained if funds are expended that are greater than those which have been given to the casino patron in connection with the promotion." (*Id.*, col. 14, ll. 20-23)  The goal is to keep the amount of information conveyed between the slot machine and the slot bank server "to a minimum thereby increasing the speed of the transaction." (*Id.*, col. 14, ll. 23-25 & 61-65)

If a touch-memory device is lost or stolen, the casino can issue a new device to the patron by "deleting the assignment of the earlier serial number to that patron and assigning a new serial number to that casino patron." (*Id.*, col. 14, ll. 35-49)  The system described in Craine allows the casino to "readily track the expenditure of [ ] promotional funds and at the same time ensure that the promotional funds are expended in the casino[.]" (*Id.*, col. 15, ll. 42-54)

### ii. "Player account"

The parties dispute, for purposes of anticipation, whether Craine discloses a "player account" as claimed in the '983 patent. According to defendants, Craine discloses a "player account" insofar as it provides that "[a]n account balance remote

42

from the memory device is placed in the system for each casino patron." (D.I. 194 at 17, citing Craine col. 3, ll. 64-68) In addition, defendants point out that in claim 16, Craine discloses "opening an account having an account identification at the central data storage for the casino patron assigning a serial number of a memory device to the account of the casino patron." (D.I. 244 at 4, citing Craine col. 17, ll. 17-21)

According to plaintiff, "those of ordinary skill in the art understand that a player account is one in which data is continually associated with one particular player and one particular player's club card." (Id. at 13) In support, plaintiff cites the deposition transcript of defendants' software engineer, who testified that, in his understanding, a "player account" is "an account that is set up by the casino where one or more data elements are continuously associated with one particular player and one particular card so that the card is used to track player play and give comps and possibly other promotional issues." (Id., citing JA4700 at 63) Plaintiff argues that the account described in Craine is not a "player account" because Craine is "unconcerned with the identity of the patrons" unless a patron requests additional funds be added to the external device. (D.I. 214 at 12-13)

Defendants do not specifically dispute that Craine discloses a temporary account used to track promotional credits, which account is later recycled,[20] but argues that claim 1 of the '983 patent does not require a "particular process for setting up the player account or a "permanent association between a particular player and a particular

---

[20](See Craine, col. 2, l. 6 (describing the touch-memory device as "reusable"); col. 7, ll. 28-36 (describing a process of returning keys to the casino); col. 8, ll. 43-49 (same))

43

account" and, therefore, a "player account" is generally disclosed by Craine.

The parties did not seek the court's construction of "player account" (D.I. 167); notwithstanding, because claim construction is a matter of law, the court must ultimately make findings sufficient to facilitate disposition of the issue presented to it.

The '983 patent generally provides that the player "account file" contains "the player's name, the amount of credit issued and other information to be described." ('983 patent, col. 36, ll. 63-65)  It is unclear from the specification what "other information" may be maintained, and plaintiff does not identify a specific portion of the '983 specification shedding light on the matter.  (D.I. 214 at 13)  No other intrinsic (or extrinsic) evidence is provided by plaintiff.  There is, therefore, no indication on this record that the player account described in the '983 patent contains different information, or is otherwise distinguishable, from that disclosed in Craine.  Put another way, the court does not find that the '983 specification supports limiting "player account" in the manner espoused by plaintiff, that is, to an account containing a particular type or quantum of player information and which can not later be recycled or reassigned to another player.

### iii. "Accessible by the host computer"

According to Mr. Crevelt, defendants' expert, the player account disclosed in Craine is accessible by the host computer because a "player's account information is accumulated in a server or mainframe, either of which can serve as 'the host computer' in the '983 patent."  (D.I. 196 at ¶ 50)  Additionally, claim 16 of Craine discloses "transmitting the serial number of the memory device to the central data storage and debiting the account of the casino patron at the central data storage as the gaming

44

machine is utilized by the casino patron." (D.I. 194 at 19; citing Craine col. 17, ll. 27-30) Defendants also point out that, in a response to an Office Action dated June 28, 1993, Craine remarked that "in applicant's method, the player tracking is done in the central computer which only needs to receive the serial number from the memory device." (D.I. 196, ex. 4 at p.5)

Aside from its arguments regarding whether a "player account" is disclosed in the first instance, plaintiff contests the "accessibility" portion of the limitation only on the ground that, in its characterization, "the Craine system tracks when and at which machines the patron is using the promotional credits provided on the external device," and "traces the path this tracking information traverses from the slot machine to the main server." (D.I. 214 at 12, citing Craine col. 13, ll. 58-63) Plaintiff does not explain, nor does it offer any expert testimony regarding: (1) how the mainframe computer (21) or main server (152), disclosed as storing data regarding patron play,[21] do not necessarily have "access" to a player account; or (2) how, in its view, Craine's system can "trace the path" of patron play without "accessing" the player account. (*Id.*) Plaintiff has failed to establish that a genuine issue of material fact exists on this point.

### iv. Location of data

The parties' remaining arguments hinge on whether promotional credits are stored on the memory device or key as disclosed by Craine.

According to defendants and Mr. Crevelt, Craine discloses that the casino applies a promotional credit to the player's account. Under their interpretation, Craine

_____

[21](Craine col. 4, l. 24; col. 8, ll. 50-66)

discloses "applying a promotional credit to the player's account," "permitting the player access to the account," and "transferring promotional credits in the account to the gaming device" as required by claim 1 of the '983 patent, because a player's wagering of promotional credits at the gaming device ("debiting" of his or her player account) requires transfer of credits directly to the gaming machine. (D.I. 194 at 19-20; D.I. 244 at 5-8; D.I. 196 at ¶¶ 53, 55)

Defendants point to several portions of Craine in support of their interpretation, for example: (1) "[a]n interface device . . . permit[s] debiting of the account balance of the casino patron" (abstract); (2) "[a]n account balance **remote from the memory device** is placed **in the system** for each casino patron" (Craine col. 3, ll. 66-68) (emphasis added); (3) "[a]n interface device is provided . . . to supply information to the bank controller as the account balance is debited thereby making it possible for the casino to track the promotional funds by the casino" (*id.*, col. 3, l. 68-col. 4, l. 7); (4) "crediting a currency value representing a promotional fund of the casino **to the account** of the casino patron" (claim 16) (emphasis added); and (4) "debiting the account of the casino patron **at the central data storage** as the gaming machine is utilized by the casino patron" (claim 16) (emphasis added).

Plaintiff presents a different view of Craine. According to plaintiff's expert, Mr. Spencer,[22] Craine discloses that "[c]redits are transferred from the memory device to

---

[22]Notably, plaintiff did not cite Mr. Spencer's report in support of its opposition to defendants' motion on the "applying a promotional credit to the player's account" or "permitting the player to access the account" limitations of the '983 patent; plaintiff first cited Mr. Spencer's report in the context of discussing "transferring promotional credit in the account to the gaming device." (D.I. 214 at 14-17) As the parties' arguments demonstrate, Craine (and the '983 patent) are not so easily understandable such that

the gaming machine – not from the player account to the gaming device[.]" (D.I. 185 at ¶ 296) In support for his opinion that promotional credits are stored on the memory key or card in Craine, and not in a remote player's account, Spencer relies on several portions of the Craine specification, including: (1) the "controller box or device **41** makes the slot machine believe . . . that a physical coin has been dropped into the machine when in fact only a debit has been removed **from the key or card** as hereinafter described" (col. 6, ll. 13-21; see also col. 4, ll. 59-68) (emphasis added); (2) "[t]he microprocessor **121** in each key] also has the capability of being encoded with a specific amount of money which can be varied in accordance with the desires of the casino issuing the key" (col. 7, ll. 3-6); (3) "it should be appreciated that cards can be utilized in place of keys if desired and can be magnetically or optically programmed in a similar manner to provide a currency value **in the card** which can be utilized in connection with the controller box or device **41** in the manner as the keys" (col. 8, ll. 18-24) (emphasis added); and (4) "[w]ithin the control set by the casino, the casino patron can then use the credit amount **on the key or card** to operate the slot machines and to attempt to achieve winnings from those slot machines" (col. 8, ll. 35-39) (emphasis added). (D.I. 185 at ¶ 300)

_____

expert testimony would not be required to demonstrate anticipation. *See Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 n.4 (Fed. Cir. 2004); *see also Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002) ("Typically, testimony concerning anticipation must be testimony from one skilled in the art[.]") On the papers, the court was prepared to find that plaintiff failed to raise a genuine issue of material fact with respect to the former limitations. Because Mr. Spencer's opinion supports plaintiff's position, however, the court will allow the jury to hear argument on all of the limitations.

The court does not substitute itself for the jury and make credibility determinations regarding the experts' conflicting views of the disclosure of Craine. Summary judgment of anticipation is inappropriate with respect to whether Craine discloses "applying a promotional credit to the player's account," "permitting the player access to the account," and "transferring promotional credits in the account to the gaming device."

### v. "Preventing the promotional credit from being cashed out by the player"

Defendants assert that Craine discloses "preventing the promotional credit from being cashed out by the player" in several portions of its specification: (1) an "object of the invention" is to "ensure that the promotional funds are expended in the casino issuing the promotional funds" (col. 1, ll. 36-40); (2) an interface device is provided for this purpose (col. 3, l. 68-col. 4, l. 7); and (3) claim 16 discloses "[a] method for tracking casino promotional funds given to a casino patron to require that such promotional funds given to a casino patron be utilized on gaming machines of the casino" (col. 17, ll. 9-12). Plaintiff does not dispute that Craine seeks to prevent promotional credit from being cashed out by the player, but argues that it discloses no specific mechanism for doing so. (D.I. 214 at 18) A prior art reference must be enabled to be anticipatory. *See, e.g., In re Donohue*, 766 F.2d at 533.

At his deposition, Mr. Crevelt did not identify a particular disclosure in Craine to this effect, but also noted that there is no indication in Craine of a player being able to cash out the promotional credits. (D.I. 237 at JA2937, 342-44) As defendants point out in their reply papers, Craine discloses that it is an object of the invention to provide a

system "in which the key or card is encoded so that it only can be utilized in the casino issuing the key or card" (col. 1, ll. 53-54) and provides that the "interface device" makes it possible to ensure that promotional funds are only expended in the casino issuing the device (col. 3, ll. 68-col. 4, l. 7).  The dispositive issue, therefore, is whether these disclosures are enabling, or sufficient to place the claimed invention in the possession of the public.

Neither party points to expert testimony on this subject, and the briefing provided on the limitation at issue is limited.  As discussed previously, the court does not grant defendants summary judgment that claim 1 of the '983 patent is anticipated because of disputes of fact surrounding several limitations.  With respect to the "preventing the promotional credit from being cashed out by the player" limitation, the court additionally notes that defendants have not responded to plaintiff's enablement argument with any evidence.  Summary judgment is denied on this additional ground.  Because plaintiff has not cross-moved for summary judgment of no anticipation based on Craine, the court need not further evaluate plaintiff's argument in this regard.

### c. Obviousness in view of Craine

Defendants argue that if any elements of claim 1 of the '983 patent are not found to be present in Craine, they nonetheless would have been obvious to one of ordinary skill in the art.  (D.I. 194 at 21-23)

> In appropriate circumstances, a single prior art reference can render a claim obvious.  However, there must be a showing of a suggestion or motivation to modify the teachings of that reference to the claimed invention in order to support the obviousness conclusion.  This suggestion or motivation may be derived from the prior art reference itself, . . ., from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved.

*SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000) (internal citations omitted). In support of their argument, defendants rely on the opinion of Mr. Crevelt. Mr. Crevelt's declaration, however, contains little more than conclusory allegations of obviousness and fails to identify any supporting evidence for his opinions regarding the knowledge of one skilled in the art. (D.I. 196 at ¶¶ 51, 52, 54, 56)

Mr. Crevelt offers only one short paragraph of analysis regarding the scope or content of the art at all, and this concerns the Caesars Request System, a system used at the Caesars Palace Casino in Las Vegas in 2001 or thereabouts. (D.I. 196 at ¶ 59) According to defendants, the Caesars Request System is relevant to the knowledge of ordinary skill in the art as it relates to the '983 patent; specifically, that systems employing non-cashable credits existed and were "spurred by market forces, not scientific or technological innovation."[23] (D.I. 194 at 24-25; see also D.I. 196 at ¶ 59)

Defendants' argument that the Caesars Request System can be used to demonstrate the differences between the prior art and the claims, pursuant to *Graham v. John Deere Co.*, 383 U.S. at 17-18, is fatally flawed insofar as defendants admit the Caesars Request system is not prior art. (D.I. 194 at 13 & 24); see 35 U.S.C. § 103(a) ("A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the **prior art** are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having

_____

[23]To be clear, defendants do not specifically assert that a combination of Craine and the Caesars Request System renders claim 1 of the '983 patent obvious.

50

ordinary skill in the art to which said subject matter pertains.") (emphasis added).[24]

Notwithstanding the defects in defendants' case, the court notes that plaintiff has adduced evidence which demonstrates that genuine issues of fact remain as to obviousness. Mr. Spencer opines that Craine teaches away from the '983 patent insofar as it uses a memory device extraneous to the system as a means to store and debit the promotional credits. (D.I. 185 at ¶¶ 298, 302) Mr. Schwartz, plaintiff's expert, opines that secondary considerations of nonobviousness exist in this case: (1) defendants copied the invention (D.I. 215 at ¶ 98); and (2) the claimed inventions solved a long-felt need to create a bonusing system that could be limited to play on the casino floor, compared to previous methods such as free rolls of quarters (id. at ¶¶ 112- 13). Summary judgment of obviousness is inappropriate.

### d. Conclusion

For the foregoing reasons, defendants have not demonstrated the lack of a genuine issue of material fact with respect to anticipation by Craine. Defendants have also not demonstrated that summary judgment of obviousness based on Craine is appropriate. Defendants' motion, therefore, is denied. There is no cross motion by plaintiff regarding the validity of the '983 patent.

### 3. Cross-motions regarding the validity of the '812 and '885 patents

### a. The asserted prior art references

---

[24]Compare OddzOn Products, Inc. v. Just Toys, Inc., 122 F.3d 1396, 1403-04 (Fed. Cir. 1997) (holding that § 102(f) non-public subject matter can be used to reject a claim of invention by another in possession of the § 102(f) subject matter under a combination of § 102(f) and § 103). Plaintiff claims that defendants copied the "Acres Lucky Coin" (D.I. 179 at 6) and "XTRA Credit" (D.I. 214 at 26) products for which it acquired rights; there is no claim that defendants copied the Caesars Request System.

U.S. Patent No. 5,580,309 to Piechowiak et al. ("Piechowiak"), entitled "Linked gaming machines having a common feature controller," was filed on February 22, 1994 and issued on December 3, 1996.[25]  Piechowiak describes a networked gaming system in which one or more "features," such as a "bonus award," is provided to "all of the gaming machines linked to the system." (Piechowiak col. 1, ll. 47-57)  Alternatively, "only selected ones of the gaming machines are temporarily provided with a certain feature, where the feature is enabled based on the occurrence of some event." (*Id.*, col. 1, ll. 67)  "[A] criterion for enabling the feature may be a specified number of occurrences of a predetermined combination of indicia displayed by the gaming machines" or a "predetermined lapse of time between periods during which the feature has been disabled." (*Id.*, col. 3, ll. 6-10; col. 4, ll. 2-5)  A feature controller periodically polls each of the networked gaming machines, comparing the results of each machine to predetermined criteria stored on the system. (*Id.*, col. 3, ll. 1-5)  If the feature-enabling criteria have been met, "the feature is made available to all linked gaming machines"; a win is thereafter awarded based on the enabled feature "to the first linked gaming machine to generate a game result which matches the feature award criteria." (*Id.*, col. 3, ll. 22-41)

U.S. Patent No. 4,652,998 to Koza et al. ("Koza"), entitled "Video gaming system with pool prize structures," was filed on January 4, 1984 and issued on March 24, 1987. Kona provides an arcade game network that awards prize awards "based upon a random shuffling of a set of prize awards among a predetermined pool of plays for each

---

[25]The parties do not dispute that each of the asserted references predate the inventions at issue and constitute prior art.

52

remote game terminal." (Abstract) "Video amusement game lottery terminals" are connected to a central computer (a "central controller"). (Kona, col. 2, ll. 16-29 & Fig. 1) Multiple network components exist between the central computer and the arcade device. (*Id.*, Fig. 4) Among these components is a "terminal controller processor" which "insure[s] accurate prize payouts guaranteeing a predetermined total prize value within a preselected group of plays, referred to as a 'pool'." (*Id.*, col. 11, ll. 26-30) The pool is divided into a thousand mini-pools of a thousand plays each; this "mini-pool" is used to implement a low-end prize structure. (*Id.*, col. 11, ll. 30-58)

U.S. Patent No. 5,280,909 to Tracy ("Tracy"), entitled "Gaming system with progressive jackpot," was filed February 6, 1992 and issued January 25, 1994. Tracy describes a progressive gaming system. Multiple gaming machines are linked together via a "programmed controller" that "receives from the machines [a] unit bet and machine identification information and supplies to the players . . . information as to the common jackpot." (Tracy, col. 1, ll. 45-58) The current jackpot value, updated by the controller, is compared to a "jackpot-win value"; when the current jackpot reaches this threshold, the controller determines that a jackpot has been won by the winning machine and payment is made to the player. (*Id.*, col. 2, ll. 13-32) A modification is described whereby the controller conveys "payout and control signal information for enabling the gaming machine to make the payout." (*Id.*, col. 6, ll. 62-69) "With this modification each gaming machine is itself adapted to recognize and respond to the payout and control signal information from the controller and to make the required payout." (*Id.*, col. 7, ll. 1-4) "[T]he payout need not be based on a fixed or randomly

generated jackpot-win value. Instead, the payout can be based on other predetermined criteria which the gaming machine can assess and follow in making a payout in response to the control signal in the signaling information. These criteria can include, for example, conditions at the gaming machine itself." (*Id.*, col. 7, ll. 10-17)

Piechowiak, Koza, and Tracy were each before the examiner during prosecution of the '882 and '817 patents, from which the '885 and '812 patents were respectively reissued, and a second time during reissue proceedings. (D.I. 181 at 9; D.I. 220 at 14)

PCT Application No. WO 80/02515 to Krause et al. ("Krause"), entitled "Computerized gaming system," was published on November 27, 1980. (JA5140) Krause describes a plurality of gaming devices connected to a remote central computer. The central computer "continuously communicates" with the gaming devices. (Krause, col. 2, ll. 13-19) The gaming device allows a player to select random indicia, such as a number between 0 and 9, to be matched with a randomly-generated number (or other indicia such as a symbol). If a match is made, a prize is paid out; if the prize amount exceeds a predetermined amount, the prize is awarded by issuing a ticket which must be redeemed at another location. (*Id.*, col. 2, l. 23-col. 3, l. 26) In one embodiment of Krause, "the prize structure of the game may be changed randomly or according to the time of day." (*Id.*, col. 19, ll. 8-11) This change may be controlled by an internal clock in the game machine terminal or by signals received from the central computer. (Col. 19, ll. 18-24) In either case, the central computer keeps track of "which machines are under the control of which prize structure." (*Id.*)

U.S. Patent No. 5,046,736 to Bridgeman, et al. ("Bridgeman"), entitled "Imitative-opponent gambling devices," was filed on October 11, 1988 and issued September 10,

1991. Bridgeman describes an electronically-simulated poker game, or video poker. "Several video screens controlled by a central processor can be hooked together, allowing several lead players to play the same game at the same time." (Bridgeman, col. 2, ll. 15-17; Fig. 1C; col. 8, l. 62-col. 9 l. 2) Several different payoffs are provided, including a "winner bonus, loser bonus, fold bonus, and jackpot bonus." (Id., col. 2, ll. 11-14; Fig. 15) These bonuses generally correspond to provided bonus tables. (Id.; Fig. 15)

## b. Plaintiff's motion of no anticipation by Piechowiak[26]

### i. '885 Patent

Plaintiff moves for summary judgment of no anticipation by Piechowiak. (D.I. 181 at 11) With respect to the '885 patent, the parties dispute whether Piechowiak discloses "preselecting less than all of the gaming devices interconnected by the host computer **responsive to a user-effected action [or host computer action]**" as required by the '885 patent. According to defendants, Piechowiak discloses this limitation by generally stating that, in one embodiment, "only selected ones of the gaming machines are temporarily provided with a certain feature" award. (D.I. 220 at 17, citing Piechowiak, col. 1, ll. 64-67) At his deposition, Crevelt admitted that Piechowiak does not explicitly disclose a user interface which could be used to "preselect" participating devices. (JA2840 at 202:10-17)

### (a) Law of anticipation based upon inherency

A prior art reference may anticipate without explicitly disclosing a feature of the

---

[26]There is no cross-motion by defendants.

claimed invention if that missing characteristic is inherently present in the single anticipating reference. *See Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). The Federal Circuit has explained that an inherent limitation is one that is "necessarily present" and not one that may be established by "probabilities or possibilities." *See id.* at 1268-69. That is, "'[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient.'" *Id.* at 1269 (emphasis in original) (citations omitted).

### (b) Defendants' arguments

Relying on Mr. Crevelt, defendants argue that the user-operated input device is inherent in Piechowiak. (D.I. 220 at 17, 34-35) At his deposition, Mr. Crevelt stated that Piechowiak's disclosure that a feature is provided "only to selected ones of the gaming machines" "implies that there is some [user] input device or method to make such a selection"; "[I]t would be inherent in this patent that you would have some method of making that user interface of some sort to make that selection . . . the input device would be inherent to the system." (JA2840 at 201:17-202:14) Defendants point to no explanation by Mr. Crevelt of how Piechowiak "necessarily" discloses that "user-effected action" or "host computer action" can take place, or other evidence in this regard. In contrast, plaintiff points out that Piechowiak discloses that the feature-enabling criteria of its system are stored in ROM (read-only memory), which Mr. Crevelt himself characterized in his deposition as "unalterable memory." (D.I. 181 at 10; JA2843 at 213:20-25; Piechowiak, col. 2. ll. 40-42 ("The operation of feature controller **110** is controlled by a program stored on ROM **126**," described as hard-wired by

56

communication lines)) According to Mr. Spencer, Piechowiak teaches away from user configurability by disclosing a system where the "feature" criteria are stored in unalterable memory. (D.I. 185 at ¶ 68) Defendants opted not to file a reply brief addressing these arguments.

Even should a jury credit Mr. Crevelt's testimony and discredit Mr. Spencer's interpretation of Piechowiak, defendants point to no evidence that Piechowiak "necessarily" discloses a user input device (or other means) to effectuate a selection of only some of the networked gaming machines. Defendants did not dispute that the Piechowiak "feature" is stored in ROM, an unalterable memory component. Mr. Crevelt has done nothing more than state that Piechowiak inherently anticipates; more than this conclusion is required for a reasonable jury to find in defendants' favor.

### (c) Lack of enabling disclosure

As noted previously, to serve as an anticipating reference, Piechowiak must enable that which it is asserted to anticipate. *See Amgen, Inc.*, 314 F.3d at 1354. Plaintiff asserts that "Piechowiak's lack of disclosure of any method for providing a feature to only certain gaming devices is fatal to [defendants'] assertion of invalidity[.]" (D.I. 240 at 11) Mr. Crevelt admitted at his deposition (in July 2008) that Piechowiak did not specifically list a selection methodology. (JA2841 at 206:15-17) In November 2008, Mr. Crevelt submitted a supplemental declaration in which he stated the following:

Piechowiak '309's system includes "suitable decoders within the gaming machines 101-108 so that the gaming machines 101-108 can be addressed using digital codes." ([Piechowiak] 2:20-22) The central server may include "an address/data bus" for communicating with specific gaming devices via the specific suitable decoders. ([Piechowiak] 2:13-18)

57

(D.I. 223, ex. 6) This is the sole evidence pointed to by defendants in response to plaintiff's enablement argument. (D.I. 220 at 35)

In view of Mr. Crevelt's admission that Piechowiak does not disclose a preselection method and, therefore, does not teach one of ordinary skill in the art how to carry out the "preselecting" limitation, Mr. Crevelt's subsequent statement falls short of demonstrating a genuine issue of material fact with respect to enablement. The cited Piechowiak disclosure is extremely general:

[Multiplexer/de-multiplexer citcuit] **120** may be replaced with an address/data bus and suitable decoders within the gaming machines **101-108** so that the gaming machines **101-108** can be addressed using digital codes.

(Piechowiak, col. 2, ll. 19-22) Mr. Crevelt does not state that (let alone explain how) this disclosure enables one of ordinary skill in the art to "preselect[ ] less than all of the gaming devices interconnected by the host computer responsive to a user-effected action [or host computer action]." Nor does he indicate that this disclosure would sufficiently enable one of ordinary skill in the art to do so without undue experimentation. This is not the case where an expert has conclusorily provided a response to plaintiff's anticipation defense; defendants point to no opinion at all.

## (d) Conclusion

In view of the fact that two separate patent examiners found that Piechowiak did not anticipate the '885 patent, a fact that a jury would be entitled to consider, no reasonable jury could find that defendants meet the "especially difficult" clear and convincing burden to demonstrate that Piechowiak disclosed the "preselecting less than all of the gaming devices interconnected by the host computer responsive to a user-

effected action [or host computer action]" limitation. *See PharmaStem Therapeutics,*

*Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1371 (Fed. Cir. 2007) (citing Hewlett-Packard Co.,

909 F.2d at 467). Summary judgment of no anticipation by Piechowiak is granted in

favor of plaintiff with respect to the '885 patent.[27]

### ii. '812 patent

Piechowiak is also asserted as an anticipatory reference against claims 21 and

44 of the '812 patent, which require "storing the message in a memory connected to a

controller associated with only one of the gaming devices." In support of its argument

that Piechowiak does not disclose this limitation, plaintiff cites the following portion of

Mr. Crevelt's testimony regarding Piechowiak:

> Q. Is the memory of the gaming machine connected to a controller associated with only one gaming device?
> A. That memory in the gaming machine would be in the gaming device, and it's connected to the feature controller.
> Q. And is the feature controller associated with only one gaming device?
> A. Only if you had a network of one machine.
> Q. Does Piechowiak disclose a network of one machine?
> A. It does – it generally discloses a network of multiple machines.
> Q. For purposes of this litigation, are we interested in networks of one gaming machine?
> [Objection]
> A. Generally not.

(JA2931 at 323:24-324:20) Mr. Spencer opines that the memory of the gaming device

itself does not satisfy this limitation because "according to the language of claims 21

and 44, the controller must receive data indicative of gaming device activity from the

gaming device and issue a pay command to the gaming device." (D.I. 185 at ¶ 283)

---

[27]The court need not address the parties' arguments regarding the other contested limitations, for example, "issuing a command or a message."

Therefore, the memory must be independent of the device itself. (*Id.*)

> Defendants point to the following disclosure of Piechowiak in response:
> Gaming Machines **101-108** may operate independently of each other during this
> normal operation mode and award wins based on a normal payout criteria stored
> in either ROM **126** of feature controller **110** or in a memory (i.e., an award table)
> contained within each of the linked gaming machines.

(D.I. 220 at 27 & 47, citing Piechowiak, col. 2, ll. 53-58) The above-referenced passage

indicates that there is a memory contained in each machine that can contain an award

table and be accessed when a win occurs. It does not shed light, however, on whether

the feature controller can store a message in the memory of one machine. In other

words, certain information can clearly flow "out" of this independent memory; it is not

clear from this passage that information can flow "in" to a single machine's memory.

Defendants point to no expert opinion interpreting this passage. (*Id.*)

Defendants also point to U.S. Patent No. 4,837,728 to Barrie et al. ("Barrie"), and

assert that Barrie "discloses a separate controller associated with each individual game

in the linked system and 'coupled for two way communication with' the central

controller." (D.I. 220 at 27) Barrie is generally incorporated by reference by

Piechowiak. The "Background of the Invention" portion of the Piechowiak specification

comprises the following passage:

> Progressive jackpot gaming systems, comprised of one or more interconnected
> gaming machines which award a progressive jackpot award, are well known. . .
> U.S. Pat. No. 4,837,728 to Barrie et al., incorporated herein by reference,
> describes one such progressive gaming system comprised of linked slot
> machines. The circuitry and software used to fabricate and operate these
> conventional linked gaming machines are well known to those skilled in the art.

(Piechowiak, col. 1, ll. 30-43) The subject matter sought to be incorporated into

Piechowiak from Barrie is the disclosure of a central progressive controller, as follows:

> Each game controller is coupled for two-way communication with a rapidly incrementing progressive controller. The progressive controller receives data from each game controller indicating coin receipt and game wins. The progressive controller assigns a portion of each coin to increment progressive bonus meters in accordance with a payout schedule, such as described above. The progressive controller then forwards the meter totals to each game controller to increment the meter amounts displayed by the game controllers.

> When win information is received by the progressive controller, the game controllers are reset . . . . When game play is complete, a win is paid or loss is generated and the meters are thereafter reset by the progressive controller to the current progressive bonus value.

(D.I. 220 at 27, citing Barrie, col. 2, ll. 38-58) According to defendants, "there is no

dispute that controllers in the prior art stored criteria for bonus awards to be paid." (Id.)

Again, no expert opinion is cited in support. Plaintiff does not specifically address

anticipation in its reply papers. (D.I. 240)

It is ultimately defendants' burden to prove anticipation at trial by clear and

convincing evidence. Having reviewed the present record, the court finds that

defendants have not adduced evidence upon which any reasonable jury could find that

Piechowiak anticipates claims 21 or 44 of the '812 patent, more specifically, the "storing

the message in a memory connected to a controller associated with only one of the

gaming devices" limitation.

There is no evidence that Piechowiak discloses to one of ordinary skill in the art

that a command or message including criteria to cause a bonus to be paid via one

gaming device is "stored" in memory connected to a "controller" that is associated with

only one machine. As defined by the court in its order of the same date, a "command"

or "message" results in the reconfiguration of the device such that the device pays out

extra money it would not have paid in its regular configuration. Piechowiak discloses

61

only that an independently-operating machine can award a win based on "normal

payout criteria" stored in its own memory. There is no indication that a reconfiguration

command or message is stored in the machine at all, let alone in a memory "connected

to a controller" associated with only one device; defendants point to no testimony in

support of their assertion to the contrary.

The quoted portion of Barrie, even if incorporated into Piechowiak,[28] does not

provide these details. Barrie provides that two-way communication occurs between the

progressive controller and the gaming controller, but the information received is data

"indicating coin receipt and game wins" and the information forwarded is "meter totals . .

. to increment the meter amounts displayed by the game controllers." Again, there is no

---

[28]Incorporation by reference is a legal issue to be determined by the court. *See Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) Incorporation by reference requires a statement "clearly identifying the subject matter which is incorporated and where it is to be found." *In re Seversky*, 474 F.2d 671, 674 (C.C.P.A. 1973). "[A] mere reference to another application, or patent, or publication is not an incorporation of anything contained therein. . . ." *Id.* Put another way, the host document "must cite the material in a manner that makes clear that it is effectively part of the host document as if it were explicitly contained therein." *Advanced Display Sys.*, 212 F.2d at 1282. It must, therefore, both (1) "identify with detailed particularity what specific material it incorporates"; and (2) "clearly indicate where that material is found in the various documents." *Id.* (citations omitted).

The parties have not focused on this issue and, therefore, have not put forth evidence regarding what one reasonably skilled in the art would find incorporated by reference by the language of Piechowiak. *Id.* On its face, Piechowiak incorporates Barris as a "background" reference describing networked gaming devices. It also imports Barrie's disclosure of the "circuitry and software" used to operate its network. Piechowiak does not specifically mention the progressive controller computer program described in Barrie. Because the progressive controller appears to be "software," there is a colorable argument for incorporation by reference of this feature, generally. However, Piechowiak does not mention two-way communication with such a progressive controller – such communication is neither "circuitry" nor "software." In short, Piechowiak does not "identify with **detailed** particularity" the specific material in Barrie referenced by defendants nor does it "clearly indicate where that material is found in [Barrie]." *Id.* (emphasis added)

indication that a reconfiguration command or message is stored in the machine in a memory "connected to a controller" associated with only one device; defendants proffer only attorney argument to the contrary.

The court concludes that defendants did not meet their burden to demonstrate the existence of a genuine issue of material fact on this issue. As with the '885 patent, the court's conclusion is bolstered by the fact that a jury would be entitled to consider the fact that two separate examiners found that Piechowiak does not anticipate the '812 patent claims. *See PharmaStem Therapeutics, Inc.*, 491 F.3d at 1371 (citation omitted). For the aforementioned reasons, the court grants plaintiff's motion of summary judgment of no anticipation of claims 21 and 44 of the '812 patent by Piechowiak.

### c. Cross-motions on obviousness

### i. Claims 1 and 22 of the '885 patent

### (a) "Preselecting" limitation

Mr. Crevelt opines that claims 1 and 22 of the '885 patent are rendered obvious by Koza, in view of Piechowiak, Bridgeman, Krause and Tracy. (D.I. 223 at ¶ 26) The primary disagreement between the parties is whether the prior art teaches (or suggests) the "preselecting less than all of the gaming devices interconnected by the host computer responsive to a user-effected action [or host computer action]" limitation of the '885 patent.[29] Defendants highlight the following selection of Koza as providing this

_____

[29]In determining obviousness, the inquiry is not whether each limitation existed in the prior art, but whether the prior art made obvious the claimed invention as a whole. *See Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987). The court evaluates, therefore, whether a genuine issue of fact exists with respect to

disclosure:

> The sophisticated centrally controlled lottery system can draw a random
> sampling of players who can be asked to participate in an electronic marketing
> survey. In the electronic marketing survey a free game play is offered on the
> remote terminal if the player will answer a few, simple market survey questions.

(Koza, col. 22, ll. 62-68) Defendants point to no expert testimony (or other evidence) in

support of their interpretation in their papers. (D.I. 220 at 19) On its face, this portion of

Koza does not clearly describe "a central host [computer] that is capable of making

certain features available to a select group of machines." It is unclear whether the

"random sampling" of players for a survey (resulting in a "free play") is comparable to a

"user-effected" or "host computer" action causing the preselection of certain gaming

machines to participate in a promotion. Mr. Crevelt conclusorily states in his declaration

that Koza "discloses a plurality of gaming machines, wherein at least some of the

gaming machines provide for bonusing games/pools that are independent of bonusing

games/pools offered on other gaming machines of the gaming system." (D.I. 223 at ¶¶

30, 40 & ex. 5 at 3, 9) No rationale for his opinion that the "preselecting" limitation is

taught by Koza is provided. (*Id.*)

On this record, and in view of defendants' high burden to show obviousness by

clear and convincing evidence, the court finds that defendants have not demonstrated a

genuine issue of material fact with respect to whether Koza demonstrates the

"preselecting" limitation.

The court finds, however, that an issue of fact exists with respect to whether

---

whether any asserted reference discloses the "preselecting" limitation and, if not,
whether a question of fact exists with respect to whether this limitation was suggested
by the prior art.

Piechowiak suggests the "preselecting" limitation. As discussed previously, Piechowiak does not expressly disclose the "preselecting" limitation. Mr. Crevelt opines that Piechowiak suggests a user input device when it describes the selection of a subset of gaming machines. (D.I. 220 at 18, citing JA2840 at 201:17-202:14) Plaintiff's expert, Mr. Spencer, opines that Piechowiak teaches away from user configurability by disclosing a system where the "feature" criteria are stored in unalterable memory (or ROM). (D.I. 185 at ¶ 68) On this record, there are conflicting expert opinions regarding the disclosure of Piechowiak, evidencing a triable issue.

Finally, defendants argue that, even if no reference discloses the "preselecting" limitation, that limitation was obvious to a person of ordinary skill in the art.[30] Defendants emphasize that John Acres, a named inventor on the '885 patent, testified that the design of the patented system, including the "preselected" element, was driven by the design consideration of eliminating wires from the casino floor. (D.I. 220 at 20-23, citing JA5040-43 at 91:22-94:21) Acres' motivation is not determinative on the issue of obviousness. The test for obviousness is not whether it would have been obvious to try to make the invention. Further, "[t]he decision of obviousness *vel non* is made not from the viewpoint of the inventor, but from the viewpoint of a person of ordinary skill in the field of the invention." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 956 (Fed. Cir. 1997) (citations omitted). In short, defendants point to no expert testimony regarding the viewpoint of one of ordinary skill in the art, and

---

[30]"There is no absolute requirement that each claim limitation be disclosed in a prior art reference," however, "it is the rare invention that is not a combination of prior art elements." *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1377-78 (Fed. Cir. 2008) (citations omitted).

cannot prove obviousness under this "general obvious" theory.

### (b) Motivation to combine

In view of the fact that defendants can potentially demonstrate that the "preselecting" limitation is suggested by Piechowiak, the next inquiry is whether defendants have iterated a motivation to combine Piechowiak with the other asserted prior art references.[31]  Mr. Crevelt summarily opines that, "[i]n light of the teachings of Koza [ ] and Krause [ ],[32] it would have been obvious to one of skill in the art to program the central computer of Piechowiak [ ] to cause a given feature to be enabled, at least temporarily, at a subset of connected gaming machines."  (D.I. 223 at ¶¶ 30, 40, ex. 5 at 3-4)  Mr. Crevelt does not specifically state that there was a motivation for a person of skill in the art to combine Koza with the additional references, with the exception of one statement in the context of the "associating each gaming device with a unique address code" limitation.[33]  Accordingly, there is no rationale provided by Mr.

---

[31]The court notes that defendants very briefly address two other limitations, "using the network" and "issuing a command or message."  (D.I. 220 at 24-25)  The parties have not focused on these arguments, and the court need not issue a finding on this record in view of its ultimate finding that defendants cannot demonstrate a motivation to combine the asserted references.

[32]Defendants do not argue in their papers that the "preselecting" limitation is disclosed in Krause.  (D.I. 220 at 17-19)  Mr. Crevelt provides a citation to Krause in his claim chart, and states that the central computer of Krause "can be programmed to award a bonus win responsive to a predetermined number of game plays."  (D.I. 223, ex. 5 at 3, citing Krause, col. 13, ll. 12-19 and col. 19, ll. 30-34)  Plaintiff's expert, Mr. Spencer, opines in his declaration that the central computer of Krause does not relate to the "preselecting" limitation and, absent any relevant disclosure, "one of ordinary skill in the art would not have been motivated to combine these references in the manner suggested by Mr. Crevelt."  (D.I. 185 at ¶¶ 97-98)

[33]It "would have been obvious to combine [the] address codes [of Piechowiak and Tracy] with the Koza [ ] sytem to achieve the greater efficiency and ease of

Crevelt for why a person of ordinary skill in the art would make the asserted combination of five references, or would have reasonably expected success as a result. On this record and in view of defendants' heightened burden to show obviousness by clear and convincing evidence, the court finds that no reasonable jury could find in favor of defendants.  Summary judgment is granted for plaintiff on claims 1 and 22 of the '885 patent.

### ii. Claims 10, 33 and 46 of the '885 patent

Defendants' assertions regarding the remaining claims of the '885 patent suffer from the same deficiencies.  Again, with the exception of one statement in the context of the "unique address code" limitation, Mr. Crevelt does not specifically state that there was a motivation to combine Piechowiak with Bridgeman, Krause and Tracy.  Mr. Crevelt merely opines that, "[i]n light of the teachings of Krause [ ], it would be obvious to one of ordinary skill in the art to program the central computer of Piechowiak [ ] to cause a given feature to be enabled, at least temporarily, at a subset of connected gaming machines."  (D.I. 223 at ¶¶ 51, 61, 73, ex. 7 at 3, 7-8, 13)  Absent any rationale for why a person of ordinary skill in the art would make the asserted combination of four references, or would have reasonably expected success as a result and, in view of defendants' heightened burden to show obviousness by clear and convincing evidence, the court finds that no reasonable jury could find in favor of defendants and grants summary judgment for plaintiff on claims 10, 33 and 46 of the '885 patent.

### iii. Claims 21 and 44 of the '812 patent

----

monitoring that those codes provide."  (D.I. 223 at ¶¶ 29, 39)

Defendants assert that claims 21 and 44 of the '812 patent are rendered obvious by Piechowiak in view of Tracy.  The primary dispute between the parties is whether the prior art discloses or suggests the "storing the command or message in a memory connected to a controller associated with only one of the gaming devices" limitation of claims 21 and 44.  To this end, defendants argue that Barrie discloses a separate controller associated with individual games in a linked system.  (D.I. 220 at 27)  As discussed *supra*, the parties have not focused on the extent to which Barrie is incorporated by reference into Piechowiak.  Even assuming that Piechowiak's general incorporation of Barrie's "circuitry and software" suffices to incorporate the controller, there is no disclosure in Barrie that a reconfiguration command, as defined by the court, is stored in memory "connected to a controller" associated with only one device.  Defendants point out that Piechowiak discloses storing award criteria in a single machine's memory (D.I. 220 at 27); again, award criteria is distinguishable from a reconfiguration command.

Mr. Crevelt states that "it would be obvious to one of ordinary skill in the art to program the central computer of Piechowiak [ ] to establish criteria, at least temporarily, for a bonus to be paid at one of the connected gaming machines upon the occurrence of a predetermined event.  For example, as described above, bonus conversion tables for groups of gaming machines on a casino floor . . . have long been sent to the machines and are stored in the [standby memory image buffer] in each applicable machine.  This provides a casino operator with additional and more efficient ways to monitor the casino floor and to provide patrons with incentives to play the casino's machines."  (D.I. 223 at ¶¶ 85, 97)  Mr. Crevelt does not specifically explain why a

person of ordinary skill in the art would be motivated to store a reconfiguration command, as compared to a regular payout command, in a memory connected to only one machine.[34]

Notwithstanding the foregoing, Mr. Crevelt does not specifically state that a person of ordinary skill in the art would have been motivated to combine Piechowiak with Tracy. Mr. Crevelt states only that limitations, if not disclosed in Piechowiak, are disclosed in Tracy. (D.I. 223 at ¶¶ 82, 84, 86, 93, 95, 96, 98, 100) Mr. Crevelt does not substantively address Tracy at all, providing only in the context of the "paying the bonus via the gaming device responsive to the receipt of the pay command" limitation that, "[i]n light of the teaching of Tracy [ ], it would therefore be obvious to pay the bonus at the gaming machine in accordance with the command." (*Id.* at ¶¶ 88, 100) No reasonable jury could find in favor of defendants absent a proffer on a motivation to combine (and reasonable expectation of success as a result of the proffered combination). Summary judgment is granted for plaintiff on the validity of claims 21 and 44 of the '812 patent.

---

[34]As explained previously, the court finds Acres' motivation for the development of the patented technology irrelevant to the question of obviousness; defendants can not demonstrate that the "storing the command" limitation is obvious as a matter of law in view of this evidence. (D.I. 220 at 28)

The court notes at this juncture that, in its reply papers, plaintiff introduces arguments that the asserted prior art does not disclose the "transmitting a pay command from the controller to the gaming device upon the occurrence of the predetermined event" limitation of claims 21 and 44 of the '812 patent. (D.I. 240 at 24-25) The filed copy of Mr. Crevelt's supplemental declaration is incomplete. Exhibit 9, that addressing where each limitation of claims 21 and 44 is disclosed in the prior art, contains only one page. (D.I. 223, ex. 9) For this reason, and in view of the fact that defendants did not file a reply brief as per their stipulation, the court is not in a position to evaluate plaintiff's arguments on this limitation.

### 4. Conclusion regarding validity

Based upon the foregoing, the court denies defendants' motion for summary judgment that the '983 patent is invalid as anticipated or being rendered obvious by Craine. Defendants' motion for summary judgment that the asserted claims of the '812 and '885 patents are invalid for obviousness is denied. Plaintiff's motion for summary judgment that the asserted claims of the '812 and '885 patent are not invalid is granted, insofar as defendants cannot prove that: (1) either patent is anticipated by Piechowiak; (2) claims 1 and 22 of the '885 patent are rendered obvious by Koza in view of Piechowiak, Bridgeman, Krause and Tracy; (3) claims 10, 33 and 46 of the '885 patent are rendered obvious by Piechowiak in view of Bridgeman, Krause and Tracy; or that (4) claims 21 and 44 of the '812 patent are rendered obvious by Piechowiak in view of Tracy.

### C. Cross-Motions Regarding Implied License

In their amended answer, defendants asserted as an affirmative defense to infringement the existence of a license between the parties covering the '885, '812, and '983 patents. (D.I. 173) Plaintiff moves for summary judgment that no such license exists, either express or implied. (D.I. 182) In their response, defendants concede that no such express license exists and further concede that no such implied license exists covering the '885 and '812 patents. (D.I. 222 at 1) Defendants contend, however, that an implied license does exist covering the '983 patent and cross-move for summary judgment on that point. (D.I. 221)

In light of defendants' concessions, the court grants plaintiff's motion for

summary judgment that there exists no express or implied license covering the '885 and '812 patents and no express license covering the '983 patent. Furthermore, in light of the court's conclusion that defendants do not infringe the '983 patent, the court denies as moot both parties' motions for summary judgment with respect to whether an implied license covers the '983 patent.

## V. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment of infringement (D.I. 178) is granted in part and denied in part; defendants' motion for summary judgment of noninfringement (D.I. 191) is also granted in part and denied in part. Plaintiff's motion for summary judgment of validity of the '812 and '885 patents (D.I. 180) is granted. Defendants' motions for summary judgment of invalidity of the '812 and '885 patents (D.I. 219) and the '983 patent (D.I. 193) are denied. Plaintiff's motion that defendants have no valid license defense (D.I. 182) is granted in part and denied in part as moot. Defendants' motion that it has a valid license defense (D.I. 221) is denied as moot. An appropriate order shall issue.