IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IGT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-282-SLR |
| | ) |
| BALLY GAMING INTERNATIONAL INC., et al., | ) |
| | ) |
| Defendants. | ) |

William J. Wade, Esquire and Anne Shea Gaza, Esquire of Richards, Layton & Finger, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: David P. Enzminger, Esquire and David P. Dalke, Esquire of O'Melveny & Myers LLP, Los Angeles, California.

Jack B. Blumenfeld, Esquire, Karen Jacobs Louden, Esquire, and Jeremy A. Tigan of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Charles K. Verhoeven, Esquire of Quinn Emanuel Urquhart Oliver & Hedges, LLP, San Francisco, California; and Edward J. DeFranco, Esquire of Quinn Enamuel Urquhart Oliver & Hedges, LLP, New York, New York.

**MEMORANDUM OPINION**

Dated: December 22, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

IGT ("plaintiff") brought the present patent infringement action against Bally Gaming International Inc., Bally Technologies, Inc. and Bally Gaming, Inc. d/b/a Bally Technologies (collectively, "Bally" or "defendants") alleging infringement of several of its patents relating to slot machine technologies. Following discovery and an extensive motion practice, the court issued its claim construction and summary judgment decisions.

As discussed in the court's prior opinion (D.I. 281), the parties reduced the number of patents, claims and counterclaims at issue during the course of the litigation. Plaintiff's U.S. Patent Nos. RE 38,812 ("the '812 patent"), RE 37,885 ("the '885 patent"), and 6,431,983 ("the '983 patent") remained at issue prior to summary judgment, as did defendants' counterclaims of invalidity and unenforceability of these patents, and defendants' counterclaims for intentional interference with business relationships and violations of the Sherman Antitrust Act and the Lanham Act.

On April 28, 2009, the court construed the disputed claim terms (D.I. 283), and issued a memorandum opinion addressing seven motions for summary judgment filed by the parties (D.I. 281). The court found the '812 and '885 patents valid. Defendants' motion for summary judgment of invalidity of the '983 patent was denied; there was no cross-motion. Regarding infringement, the court found that: defendants do not infringe the '983 patent; defendants' ACSC[1] "Power Rewards®" product infringes claims 10, 33 and 46 of the '885 patent and claims 21 and 44 of the '812 patent; and defendants'

---

[1] The ACSC designation refers to a particular platform upon which the products may perform.

ACSC "Power Winners®" product infringes claims 10 and 46 of the '885 patent.

The case was set for a jury trial commencing June 1, 2009. At that time, only two issues remained: plaintiff's allegation of willful infringement; and defendants' counterclaim for invalidity of the '983 patent. The court and the parties discussed the propriety of proceeding to trial on these issues and an agreement was reached whereby defendants subsequently dismissed their counterclaim without prejudice. The parties also agreed that willfulness could be tried with plaintiff's claim for damages after appeal, to the extent necessary.[2] Trial was cancelled and, on June 15, 2009, plaintiff filed its motion for permanent injunction, currently pending before the court. (D.I. 296) For the reasons that follow, the court shall deny the motion.

## II. STANDARD

In *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837 (2006) (vacating and remanding *MercExchange, L.L.C. v. eBay Inc.*, 401 F.3d 1323, 1339 (2005)) (hereinafter "*eBay*"), the Supreme Court overruled the Federal Circuit's longstanding "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." Permanent injunctions in patent cases must be based on a case-by-case assessment of the traditional equitable factors governing injunctions. *Id.* at 1839. That is, to be awarded a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

---

[2]The court was informed of both decisions by email; there appears to be no stipulated judgment subsequently filed on the record. The parties may wish to do so for purposes of appeal.

2

that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 1841.

## III. DISCUSSION

### A. Defendants' Re-design

Defendants claim that, in response to the court's memorandum opinion, they "have not put into place a single new Bally casino system that incorporates the two ACSC bonusing products found to infringe"; defendants have redesigned the infringing systems to operate in a manner consistent with the non-infringing (SDS/CMP) versions of the Power Winners® and Power Rewards® products.[3] (D.I. 314 at 1) Plaintiff has not had sufficient opportunity to evaluate the new products. (D.I. 339 at 6, n.4) Plaintiff asserts that defendants do not claim that they are not servicing or replacing existing systems, notwithstanding, self-serving claims of redesign cannot support a denial of its motion. (*Id.* at 7, citing *Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1282 (Fed. Cir. 1988) ("If the defendant be honest in his protestations an injunction will do him no harm; if he be dishonest, the court should place a strong hand against him[.]")) In short,

---

[3] In support, defendants provide the declarations of Thomas A. Reilly, Vice President of Sales Systems, and Sean Bybee, Director of ACSC iSeries Engineering. Mr. Bybee explains in great detail that the "Play X, Get Y" functionality of transaction # 151 was removed from the infringing products. (D.I. 321) Both assert that defendants have not sold or offered for sale any infringing product since the court's order. (D.I. 324 at ¶ 39; D.I. 321 at ¶ 11)

3

the issue has not been sufficiently vetted to bear significantly on the court's analysis at this time.[4]

### B. Irreparable Harm and Adequacy of Money Damages

#### 1. The competitive landscape is unclear

As the court has noted in its past opinions, courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor.[5] Plaintiff at bar asserts that it has suffered irreparable harm because: (1) it competes directly with defendants; and (2) plaintiff lost market share to defendants during a critical time in the market's development.

The court notes at this juncture that plaintiff has not provided a clear, summary-level overview of the relevant market for the gaming technology at issue. On the record before the court, it does not appear that plaintiff and defendants are the only market participants. Defendants' documents, cited by plaintiff, identify Konami, MGAM,

---

[4] See W.L. Gore & Assoc's, Inc. v. Garlock, Inc., 842 F.2d 1275, 1281-82 (Fed. Cir. 1988) ("The fact that the defendant has stopped infringing is generally not a reason for denying an injunction against further infringement unless the evidence is very persuasive that further infringement will not take place.").

[5] See, e.g., Muniauction, Inc. v. Thomson Corp., 502 F. Supp. 2d 477, 482 (W.D. Pa. 2007) ("Plaintiff and defendants are direct competitors in a two-supplier market. If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value.") (granting permanent injunction); Johns Hopkins Univ. v. Datascope Corp., 513 F. Supp. 2d 578, 586 (D. Md. 2007) (granting permanent injunction where infringing product was plaintiffs' "only competition" and "thus, its sale reduce[d] the [p]laintiffs' market share"); Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp., No. Civ. A. 03-2910, 2006 WL 3813778, *4 (S.D. Tex. Dec. 27, 2006) (granting permanent injunction requiring structural modifications to infringing deepwater drilling rigs where "the customer base for deep water drill rigs is small, and [defendant] has not only used [its] rigs equipped with the infringing structure to compete for the same customers and contracts as [plaintiff], but also to win contracts over competing bids from [plaintiff]").

Aristocrat and Mikohn as additional "competitive systems threats."[6] (D.I. 297 at 8; D.I. 315, ex. 2; see also id. at ex. 8 (IGT document denoting AC Coin, Aristocrat, Ballys, and Konami as "Western Region" competitors)) Defendants assert that the market consists of several competitive products, including defendants' ACSC (AS/400) system; SDS (Unix) system; Bally One (Windows) system; and MCC (Windows) system. (D.I. 323[7] at ¶ 7) Plaintiff does not specifically dispute this point.[8] (D.I. 339) Even assuming that the parties at bar are the major market players,[9] the court has not been provided with a breakdown illuminating their relative market percentages. The court also does not have before it the market percentages or summary sales data regarding the competitive bonusing products.

Plaintiff cites an undated Bally presentation entitled "Executive Briefing for MEC Magna Entertainment" in which defendants represent that they have "100% market share" in Atlantic City.[10] (D.I. 299, ex. 31 at BALLY215429) It is not clear from this presentation that defendants' relationships with these customers is such that plaintiff has been precluded from making sales – in other words, whether these Atlantic City

---

[6]Plaintiff acknowledges that Mikohn is another market competitor. (D.I. 297 at 9)

[7]The declaration of Derik Mooberry, Bally's Vice President of System Sales.

[8]Plaintiff does not describe its own products in its submissions.

[9]Plaintiff states that defendants acknowledge that plaintiff is their "biggest competitor"; in support, it provides a general citation to a 40-page Acres Gaming document. (D.I. 297 at 15, citing D.I. 298 ex. 3) Defendants do not specifically dispute that plaintiff is the largest of its competitors. (D.I. 314 at 23)

[10]All thirteen of the Atlantic City casinos pre-dating The Borgata are listed on the slide. (D.I. 299, ex. 31 at BALLY215429) No further detail is provided. (Id.)

casinos exclusively purchased defendants' gaming systems to the exclusion of all others. Plaintiff also cites defendants' list of infringing installations (totaling 54 customers). There are 784 casinos in the United States. (D.I. 339 at 5; D.I. 340, ex. 46) Defendants' customers represent, as plaintiff acknowledges, approximately 7% of total bonusing installations in the United States. (D.I. 339 at 5) This is not a clear case of a two-supplier (two-product) market wherein a sale to defendants represents, necessarily, the loss of a sale to plaintiff. Compare *TruePosition, Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400 (D. Del. 2009).

### 2. There is no evidence demonstrating loss of future sales

Plaintiff asserts, and defendants do not dispute, that casinos typically replace their gaming systems about every five to seven years. According to plaintiff, "each lost sale represents a lost opportunity to establish a long-term relationship with a customer." (D.I. 297 at 2) Plaintiff cites no evidence, however, further illuminating these relationships. (*Id.* at 19, citing D.I. 298[11] at ¶ 20 (stating that defendants established a relationship that "will likely" last for several years; a lost sale will "typically lead to a loss of the opportunity to sell numerous [unspecified] other products and services to that customer for several years"; defendant "almost certainly" secured tangential sales; *see also id.* at ¶ 21 ("customers are very likely to make additional future purchases of gaming systems from the same supplier"))

---

[11]Plaintiff relies on the declaration of Richard J. Schneider, its own Executive President of Product Strategy, throughout its papers. (D.I. 298) Defendants have moved to strike Mr. Schneider's declaration on the grounds that it is based on hearsay and is rife with impermissible speculation. (D.I. 313) The court agrees; however, insofar as the court has used the declaration to exemplify the evidentiary problems with plaintiff's case, it will deny as moot defendants' motion to strike. (D.I. 312)

### 3. Plaintiff was not competitive in Atlantic City prior to defendants' infringement

Bonusing became a critical technology between 2000 and 2006. Plaintiff states that Acres Gaming, prior to its acquisition by plaintiff in 2003, saw an increase in revenue from $17 million to $44 million in fiscal year 2001. (D.I. 298 at ¶ 11) Plaintiff also states that it had only three bonusing customers in the United States in 2000, but over 90 customers in 2006. (D.I. 339, citing D.I. 340, ex. 45 at IGTB322600) Defendants began with one installation in 2000 but has over 50 customers to date. (D.I. 314 at 34; D.I. 340, ex. 46) Defendants' Vice President of System Sales acknowledged in 2004 that the industry was in a "pioneer stage" but "moving to the growth stage." (D.I. 299, Ex. 24 at BALLY416399)

The court focuses its analysis, as plaintiff has, on defendants' alleged "toe hold" in the Atlantic City gaming market. (D.I. 297 at 17) Plaintiff asserts that defendants were able to gain a market advantage by making infringing sales to The Borgata, the first new casino to open in Atlantic City (in 2003) in thirteen years. (*Id.* at 17) The Borgata became a "showcase installation" for defendants' promotion of Power Rewards® and Power Winners®. (*Id.* at 11)

By securing its sale to The Borgata, defendants were able to obtain the first New Jersey State approvals for their bonusing products. Plaintiff has not provided the details of the State approval process for the court's benefit. It appears that bonusing products such as those at issue in this litigation must be installed on a "trial basis" in New Jersey pending State approval of that product. (D.I. 298 at 12) Plaintiff's products are not currently approved in New Jersey – meaning that any new customers have to

7

install plaintiff's products on a trial basis pending formal approval. (*Id.*; D.I. 297 at 17)

Defendants have submitted a declaration by Paul Tjoumakaris, who was named Vice President of Slots at The Borgata in 2002 and who, in conjunction with The Borgata's Chief Financial Officer and its head of Information Technology, had the final authority to select the gaming system decision for that casino. (D.I. 317 at ¶ 5) According to Mr. Tjoumakaris, The Borgata considered defendants' SDS and ACSC systems because of familiarity and prior positive experiences with those systems. (*Id.*) He did not recall plaintiff[12] making a proposal to The Borgata; notwithstanding, plaintiff's systems were never considered because none of the decision-makers had experience with its systems. (*Id.* at ¶¶ 6, 8) Mr. Tjoumakaris states that, if they had considered plaintiff's systems (which they did not), concerns would have arisen regarding the regulatory approval process insofar as neither of plaintiff's systems were approved for use in Atlantic City in 2002. (D.I. 317 at ¶ 7)

The court finds Mr. Tjoumakaris's declaration persuasive. Mr. Tjoumakaris is not an interested party. Moreover, plaintiff does not claim that it had a relationship or projected business relationship with The Borgata that was usurped by defendants. If defendants had systems in place at all thirteen additional casinos before The Borgata, it would follow that The Borgata executives would have experience with defendants' products and defendants had goodwill in that market. Plaintiff points to no evidence that, absent ACSC Power Rewards®, The Borgata would have considered (and

---

[12]Or Acres Gaming.

8

purchased) plaintiff's bonusing products.[13]

Mr. Tjoumakaris's declaration lends some support to plaintiff's argument that customers may be discouraged from purchasing systems that have not been formally approved by the State. In the case of The Borgata, neither parties' product had been approved in 2002, and it is unclear why The Borgata executives did not share the same concern for defendants' (then-unapproved) products. Notwithstanding, plaintiff invites the court to draw an implication that, because defendants now have approval and it does not, customers will be dissuaded from purchasing from plaintiff in the future. Plaintiff does not provide any evidence regarding customers' views on the subject.[14] Plaintiff does not claim that, as a result of defendants' infringement, it is precluded from seeking or obtaining State approval for its products. There is no clear indication, therefore, that plaintiff is at a competitive disadvantage vis a vis defendants' infringing conduct.

In sum, plaintiff's case suffers from several fatal flaws. It is most problematic that plaintiff points to no documentary (or other) evidence regarding the effects of defendants' infringement (on plaintiff).[15] As noted previously, the court has no market data before it. Plaintiff brings its motion against a landscape of several competitors and

---

[13]Mr. Schneider's declaration regarding The Borgata's evaluation of plaintiff's and defendants' products is not convincing in view of Mr. Tjoumakaris's declaration.

[14]It was plaintiff's burden to do so in support of its motion.

[15]Plaintiff relies only on Mr. Schneider's declaration in this respect. (D.I. 297 at 18-21) Plaintiff cannot complain that the court does not find Mr. Schneider's self-serving declaration unpersuasive in view of the fact that it has found Bally's declarations regarding its purported re-design equally unpersuasive.

several competitive products operating on different software platforms. There is no clear indication of a direct link between defendants' infringing sales of ACSC Power Winners® and ACSC Power Rewards® and sales of additional products, loss of goodwill to plaintiff or, more broadly, a change in the market landscape.[16] There is some indication that defendants' sale to The Borgata may benefit defendants in terms of having secured State approval in New Jersey, however, the record is not compelling.[17]

Further, there is no clear indication that money damages cannot be calculated. While it is true that history cannot now be rewritten to remove ACSC Power Rewards® and ACSC Power Winners® from the field of competition during a growth period in the bonusing systems industry, on the record at bar, defendants' sales of ACSC Power Winners® and ACSC Power Rewards® appear to be quantifiable, as are profits on

---

[16]In addition to The Borgata, plaintiff claims that it lost to defendants a systems sale to Spotlight 29 casino in California. (D.I. 294 at 11-12) A Bally document verifies that Spotlight 29 was considering plaintiff's technology prior to purchasing defendants' system. (D.I. 299, ex. 32 at BALLY345423) Plaintiff also asserts that it lost sales to defendants at Mount Airy Casino, Philadelphia Park Casino, Boyd Gaming, and Lincoln Park Casino. In support of its argument that it competed for this business, plaintiff relies only on the declaration of Mr. Schneider. (D.I. 294 at 12-14) The court notes that defendants have provided declarations from executives from Lincoln Park Casino and Mount Airy Casino detailing other reasons why plaintiff did not make the sales at those locations, for example, "stubborn and frustrating negotiating tactics" on the part of plaintiff (D.I. 318) and prior extensive experience with defendants' products (D.I. 319). Notwithstanding, there is no indication that damages resulting from these sales is not quantifiable.

[17]It does not appear as though defendants will require additional approval(s) in view of their redesign. If they do, this will surely moot plaintiff's argument that defendants have obtained a "first approval" benefit.

service and maintenance. (D.I. 340, ex. 46)[18] Because plaintiff has not satisfied its burden to demonstrate irreparable harm and an inadequacy of monetary damages, the court need not address the remaining equitable factors.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion is denied. An appropriate order shall issue.

---

[18]Defendants' (highly confidential) list of ACSC Power Winners® and ACSC Power Rewards® revenue, including maintenance fees, generated in connection with settlement discussions.

11